IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DWIGHT RODGERS, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO: |
| | ) | 2:06-CV-1067-WKW-SRW |
| CRACKER BARREL OLD | ) | |
| COUNTRY STORE, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

## DEFENDANT CRACKER BARREL OLD COUNTRY STORE, INC.'S EVIDENTIARY  SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant, Cracker Barrel Old Country Store, Inc. ("Cracker Barrel")

and submits its evidentiary submission in support of its Motion for Summary Judgment filed

contemporaneously herewith.

| | |
|---|---|
| Exhibit A | Affidavit of Rich Alexander and Exhibits 1-8 to Affidavit |
| Exhibit B | Deposition of Plaintiff Dwight Rodgers and Exhibits 1-15 to Deposition |
| Exhibit C | RTM Records re: Plaintiff's Employment & Termination |
| Exhibit D | Excerpts of Plaintiff's Interrogatory Responses |
| Exhibit E | Bojangles' Work Incident Reports re: Plaintiff |
| Exhibit F | Ruby Tuesday Records re: Plaintiff |
| Exhibit G | Affidavit of Tommie Patterson and Exhibit 1 to Affidavit |
| Exhibit H | EEOC Statement of Penny Schmidt |

1589571 v1

s/ Jennifer M. Busby
Jennifer M. Busby (BUS009)
Ashley H. Hattaway (HAT007)
Attorneys for Cracker Barrel Old Country
Store, Inc.

**OF COUNSEL**:

BURR & FORMAN LLP
3400 Wachovia Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Byron R. Perkins
The Cochran Law Firm
505 North 20th Street, Suite 825
Birmingham, Alabama 35203

Monica A. York, Esq.
Breedlove & Lassiters, LLP
250 E Ponce de Leon Avenue
Suite 425
Decatur, GA 30030

s/ Jennifer M. Busby
OF COUNSEL

DFT CRACKER BARREL'S

EX. A

TO EVIDENTIARY SUBMISSION

## AFFIDAVIT OF RICH ALEXANDER

STATE OF ALABAMA       )
                                 )
COUNTY OF JEFFERSON   )

The undersigned, Rich Alexander, deposes and states as follows:

1.    My name is Rich Alexander. I am over the age of nineteen and I have personal knowledge of the facts set forth in this affidavit. I give this affidavit voluntarily and without coercion.

2.    I have worked for Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") since 1990, and I have been a District Manager since 1995. I am currently District Manager for District #15, and I oversee eight Cracker Barrel restaurants.

3.    I am aware of and understand Cracker Barrel's Equal Employment Opportunity, Harassment, Discrimination, Retaliation and Open Door policies. True and correct copies of these policies are attached hereto as Exhibit 1. This document was made at or near the time of the occurrence of the matters set forth within, was kept in the course of regularly conducted activity and was made by regularly conducted activity as a regular practice. Cracker Barrel publishes these policies to all employees and enforces these policies.

4.    As a District Manager, I have been well trained in these policies. I was trained in the policies when I began work with Cracker Barrel, and I received

additional training in these policies when I became a District Manager. I attend annual manager meetings where I have refresher training in Cracker Barrel's employment policies. I have attended classes on these policies and in diversity. Cracker Barrel frequently distributes materials reminding us of its policies and emphasizing that it does not tolerate any harassment or discrimination. Cracker Barrel also maintains a Hotline that employees can use to make complaints to the Home Office.

5.    I understand that Cracker Barrel does not tolerate any discrimination, harassment or retaliation and that employees can be disciplined for engaging in any such behavior. The training that I have received at Cracker Barrel has included the prohibitions of these policies. The training has also included information on how to investigate and resolve complaints of discrimination, harassment or retaliation.

6.    I take complaints of discrimination, harassment and retaliation very seriously. If I become aware of employee complaints of discrimination, harassment and retaliation in my district, I investigate and resolve those complaints as appropriate in each circumstance.

7.    According to records of the Company which I have reviewed, Dwight Rodgers was hired by Cracker Barrel in July, 2002 into its Management in Training Program based in part on his resume. I know this because I have had

experience in interviewing and hiring individuals into the management program at Cracker Barrel, and in doing so, I know that we rely on information submitted by employees on their resumes. I also know from my experience in hiring at Cracker Barrel that we would not have hired Mr. Rodgers into our management program if we had known that he had been fired by two other restaurant companies because of his conduct as a manager. We also would not hire anyone that we knew lied about their educational or employment history on documents or other information submitted to Cracker Barrel.

8.     According to records of the Company which I have reviewed, Dwight Rodgers completed his management training and became an Associate Manager at Cracker Barrel in October, 2002.

9.     According to records of the Company which I have reviewed, Dwight Rodgers became a Senior Associate Manager at Cracker Barrel in July, 2004. To be promoted to a SAM position, the employee must complete a Associate Manager Development Guide which must be approved by the General Manager and Districts Managers. Then the individual spends time training on the job for at least a sixty day period. Then the employee attends leadership training at the Home Office. Finally if the Restaurant District Manager and the Regional Vice President approve

of the employee's completion of these tasks, they promote him to the SAM position.

10.    Attached hereto as Exhibit 2 are true and correct copies of plaintiff's Evaluations as an Associate Manager and Senior Associate Manager.    These documents were made at or near the time of the occurrence of the matters set forth within, were kept in the course of regularly conducted activity and were made by regularly conducted activity as a regular practice.  Evaluation 2  of 2004 is the last evaluation performed on plaintiff before he became a General Manager at Cracker Barrel.

11.    I was Dwight Rodgers' immediate supervisor after he became the General Manager at Cracker Barrel.  I selected Mr. Rodgers for the General Manager position in Gardendale, Alabama, with the approval of my supervisor, Ron Phillips, and I promoted him to GM on September 4, 2004.  The usual process for selection of a General Manager is for individuals to apply for a vacancy and then be interviewed by a panel, usually consisting of the District Manager and Regional Vice President over the store and other district managers.  The District Manager over the store selects the individual he wants to be the General Manager, with the approval of the Regional Vice President.  This is the process we used to select Mr. Rodgers for the Gardendale store.

12.    Ron Phillips suggested Mr. Rodgers to me as a candidate for the position, and I invited Mr. Rodgers to apply for the position. I chose Mr. Rodgers for the General Manager position over other Caucasian candidates. I knew at the time that he was African-American.

13.    The other managers who worked at Gardendale when Mr. Rodgers began employment there were Tommie Patterson, Lisa Claburn, Carolyn Freeman and Carol Willis. Ms. Willis later transferred and was replaced by Brian Harbin. Overall, this was a very experienced team of managers. According to the records of the Company which I have reviewed, Tommie Patterson began work for Cracker Barrel in January, 2000, became an Associate Manager in March, 2000 and a Senior Associate Manager in January, 2003. Lisa Claburn began working in the Gardendale store when it opened in 1996 and became a Manager in 1999. Carolyn Freeman also began work for Cracker Barrel in 1996 and became a Manager in 2002. Carol Willis started with Cracker Barrel in 1992 and became a Manager in 1996. Brian Harbin became employed by Cracker Barrel in August, 2004 and became an Associate Manager in October, 2004.

14.    Although Associate Managers are assigned certain duties and assist in the operations of the store, the General Manager is ultimately responsible for making sure that the store meets the standards set for it. These standards include

but are not limited to certain objective standards such as guest complaints, food costs, labor costs, net operating income, restaurant sales growth and retail sales. Under Mr. Rodgers' tenure, the store did not perform well in most of these categories.

15.    Mr. Rodgers also did not demonstrate good leadership skills in the Gardendale store.  After Mr. Rodgers became the General Manager at that store, the other managers reported to me some problems with his leadership.  For example, they told me that he did not communicate to them a clear direction for the store, which caused them uncertainty in how to proceed at times.  They complained that he did not communicate well with them.  They complained that he spent too much time in the office.  They complained that he did not follow through with plans and paperwork and did not hold employees accountable for their actions. They also complained that he did not provide training and role modeling for them and other associates.  One of their primary complaints was that he was not at work enough and sometimes called off at the last minute.  They complained that his absences sometimes caused them to have to work more.

16.    I also personally observed Mr. Rodgers' poor leadership skills when I was in the store.  For example, I observed Mr. Rodgers in the manager office during peak periods at the store when he should have been out in the restaurant.  I

also observed that he did not spend much if any time walking the store to look for food quality and other issues. I also observed that he was not holding the other managers accountable for duties they were assigned.

17.    Because of the employee complaints and my concerns about Mr. Rodgers' ability to lead, I had a meeting with the Associate Managers on March 21, 2005, to discuss their concerns. Following this meeting, I sent Ron Phillips an e-mail in which I outlined the results of that meeting. A true and correct copy of that e-mail is attached hereto as Exhibit 3. This document was made at or near the time of the occurrence of the matters set forth within, was kept in the course of regularly conducted activity and was made by regularly conducted activity as a regular practice. Following the March 21 meeting with the Associate Managers, I met with Mr. Rodgers and discussed his managers' concerns and encouraged him to take steps to improve his leadership of the unit.

18.    This March 21 meeting was not the first time that I met with Mr. Rodgers about his performance. I counseled him about various aspects of his performance from the beginning of his employment in Gardendale. The Gardendale store is near my home so I was able to drop by there frequently, observe operations and talk with Mr. Rodgers about deficiencies I observed. This

coaching and counseling by me was continuous from the start of his employment as a GM until the termination of his employment.

19.    As early as December, 2004, I communicated some of my concerns about Mr. Rodgers' performance as a General Manager to Ron Phillips, including but not limited to his attendance, some accountability concerns and his inability to build credibility with his management team.    Although I was hopeful that Mr. Rodgers could turn his performance around, I had serious concerns that had to be resolved if he was going to succeed as a General Manager.    Mr. Phillips and I met with Mr. Rodgers at that time and discussed our concerns with him.    Attached hereto as Exhibit 4 is a true and correct copy of an e-mail I sent Mr. Phillips and he forwarded to Mike Adkins, Divisional Vice President.    This document was made at or near the time of the occurrence of the matters set forth within, was kept in the course of regularly conducted activity and was made by regularly conducted activity as a regular practice.    In his e-mail, Mr. Phillips noted my concerns in December and our meeting with Mr. Rodgers at that time.

20.    Despite our coaching and counseling of Mr. Rodgers, his performance problems continued, and again on February 22, 2005, I brought some more of them to the attention of Mr. Phillips by e-mail.    Exhibit 4 referenced above contains a copy of that e-mail.    In that e-mail I noted Mr. Rodgers' failure to keep me

informed of schedule changes.  I also noted some instances in which I felt that he was not honest.  I later counseled Mr. Rodgers about these concerns.  When I sent this e-mail, I did not know of the comment that Mr. Patterson made about funerals.

21.    These are just some examples of my interactions with Mr. Rodgers about his performance.  I had many communications with Mr. Rodgers and with Mr. Phillips about Mr. Rodgers' performance during his employment at Gardendale.  Mr. Rodgers' usual response to such counseling was to be defensive and argumentative and to blame others, such as the Associate Managers.

22.    I also evaluated Mr. Rodgers' performance for the time period of September, 2004 through January, 2005.  Although the evaluation period normally began in August, I only judged him on the five months during which he was the General Manager and therefore had control over the operations and financial performance of the store.  Mr. Rodgers received a "2" out of "5" on his Evaluation which was a very poor score.  His poor score was a combination of the store's financial performance under his management and his poor leadership skills.  The financial performance of the store could not be blamed on Mr. Rodgers' predecessor.  Some financial categories, such as food costs, started over every month, and certainly all of the categories could be maintained or improved in the five months covered by the Evaluation.  I reviewed this Evaluation with Mr.

Rodgers, suggested ways he could improve his performance and told him that he had my support.

23.    Unfortunately, Mr. Rodgers' performance did not improve, and I continued to counsel him.  On May 14, 2005, I met with Mr. Rodgers about the fact that he only worked 34 hours in the preceding week even though his store was negative in sales growth and missing food and labor goals.  I also expressed concern that he changed his schedule four times and failed to notify me on most of those occasions.  I e-mailed a detailed account of the meeting to Ron Phillips the next day.  Attached hereto as Exhibit 5 is a true and correct copy of that e-mail. This document was made at or near the time of the occurrence of the matters set forth within, was kept in the course of regularly conducted activity and was made by regularly conducted activity as a regular practice.

24.    In June, 2005, Cracker Barrel was opening a new store in Montgomery, Alabama, which also was in my district.  Before the store opened, I fired the General Manager so the position became vacant.  Mr. Rodgers requested a lateral transfer to that position.  I discussed this request with Mr. Phillips, and we were reluctant to grant the transfer because of his performance issues.  Ultimately, however, we decided to allow the transfer because we hoped that Mr. Rodgers' performance might improve if he had a new store and a new management team

with which to work.   We met with Mr. Rodgers and told him that we were allowing the transfer but that he had to improve his performance.   Mr. Rodgers' request to transfer and some of the concern that we had about allowing him to transfer is documented in Exhibit 5, which is referenced above.

25.    Mr. Rodgers did not perform well in Montgomery either.   From June through August, sales were below expectations and were continually decreasing. There was an unacceptable number of guest complaints, which in my experience contributed to the decreasing sales.   Labor costs and food costs were excessive.   I counseled Mr. Rodgers about these issues.

26.    Again, Mr. Rodgers tried to blame his Associate Managers, but the performance of the store was his responsibility.   Moreover, the Senior Associate Managers and Associate Managers had been trained and had experience at Cracker Barrel.   For example, the Senior Associate Manager had been in management at Cracker Barrel for approximately five years.   They were certainly experienced enough to provide the necessary assistance to Mr. Rodgers.   Moreover, for the first two weeks of operations, there was a Store Opening Supervisor, a Retail Opening Supervisor and their team of people in the store to help Mr. Rodgers.   They were experts in helping new stores open.   Even after they left, Cracker Barrel provided other experienced individuals to help in the store as needed.

27.    On June 17, 2005, I documented some of Mr. Rodgers' performance problems in a memo and discussed those problems with him.    After I gave that memo to Mr. Rodgers, I discussed the concerns I had in detail with Mr. Phillips. Mr. Phillips told me that he approved of the counseling.

28.    Even after June 17, plaintiff's performance did not improve.    On August 6, 2005, I gave Mr. Rodgers a written warning about the unacceptable number of guest complaints in his unit, his lack of urgency in responding to those complaints, and the continually decreasing sales in the unit.    In the warning, I outlined some steps he could take to address the problems.

29.    On August 12, I was in the Montgomery store, and plaintiff and two other managers were on duty.    While there, I found food items that were not labeled or had expired.    The items should have been thrown away.    The managers on duty should have done a walk through to make sure they had been discarded, but clearly they had not.    This was a very serious matter as food quality and safety is of the utmost importance, and the managers, including Mr. Rodgers are trained in the importance of labeling and discarding product.    When I approached Mr. Rodgers about this matter, he immediately blamed his Associate Managers and did not take personal responsibility for the food quality in his store.    On that same day, I gave him a final written warning for this incident and many other operational

failings, all of which I discussed with him. I told him that he had to improve immediately or he could be terminated.

30. Even after all of the counseling, Mr. Rodgers continued to have performance problems. I outlined some of these problems on a Documentation of Performance which I attached to his termination form.

31. One of the problems included in that Documentation of Performance was Mr. Rodgers' failure to participate in conference calls or to otherwise give me personal notification of certain operational issues. For example, in August, he was supposed to personally call me and provide an explanation if the store did not meet the "R" goal for the day, which means the labor dollars spent compared to sales for the day. He did not do this. When I asked him about this failure, he said he thought his performance was based on "E", which relates to productivity of employees. I explained that "R" was the relative goal and that he must call me when he missed that goal. He still failed to do that.

32. On August 18, he had an Associate Manager leave me a voice mail about why labor costs were over the expectation when I expected a personal call. This was one example of Mr. Rodgers failing to address operational issues personally, and instead putting the obligation on his associates.

33.    Likewise, on July 20, plaintiff failed to participate in a conference call in which I expected him to participate personally. Instead, he had an Associate Manager participate. When I asked him about not participating in the call, he acted like it was no big deal, indicating again that he did not understand the importance of taking personal responsibility for the store's success.

34.    To my knowledge, Mr. Rodgers did not move on July 20, 2005. The U-Haul receipt that he submitted to the Company shows that he moved on July 22, 2005. Attached hereto as Exhibit 6 is a true and correct copy of that receipt. This document was made at or near the time of the occurrence of the matters set forth within, was kept in the course of regularly conducted activity and was made by regularly conducted activity as a regular practice.

35.    I terminated Mr. Rodgers' employment on September 3, 2005 in the presence of Monique Frank, Retail District Manager for the store. I read the above-referenced Documentation of Performance to Mr. Rodgers and asked him if he had any questions. He said that he did not. I then told him that he was being terminated. He made no comments, but handed me his keys. I asked him if he had any personal items he needed from the store, and he said no. I then asked him for his employee discount card and he said it was in his car and that he would bring it in. Ms. Frank and I then shook hands with him, and he walked out. Attached

hereto as Exhibit 7 is a true and correct copy of a statement written by Monique Frank on the day of the termination, which she gave to me at that time. This document was made at or near the time of the occurrence of the matters set forth within, was kept in the course of regularly conducted activity and was made by regularly conducted activity as a regular practice.

36.    Cracker Barrel's policy is that all employees must use clear plastic bags to carry their belongings. Any bags that are not clear must be checked before they leave the building. For this reason, General Managers did not carry briefcases. I do not recall Mr. Rodgers using a briefcase. I know that Mr. Rodgers did not take a briefcase from the store on the day that I terminated him.

37.    I made the decision to terminate Mr. Rodgers, and Mr. Phillips approved it. I was very disappointed that I had to terminate Mr. Rodgers. His failure to succeed in the General Manager position reflected poorly on me because I promoted him to the position and supervised him. Retention of managers is important to my success as a District Manager.

38.    As is Cracker Barrel's general practice, I temporarily filled the General Manager position after Mr. Rodgers' termination until we could complete the formal process for filling the position. I chose another African-American General Manager named Jerome Kelly to fill that temporary position. I hoped that

he would apply to become the permanent General Manager.  However, Mr. Kelly

decided not to apply for the permanent position.

39.    In March, 2005, I was informed about a comment that Tommie

Patterson made to Penny Schmidt after Mr. Rodgers had called to let Mr. Patterson

know that his aunt had died.  The comment was "don't they have their funerals on

the weekends?  I investigated this complaint.

40.    I interviewed Ms. Schmidt and she confirmed the comment and that

the comment was made in response to her inquiry about scheduling.

41.    I then spoke to Mr. Patterson about the comment.  He admitted it but

said that he did not mean the comment to be derogatory.  He said he thought it was

a true statement and that he thought it was responsive to Ms. Schmidt's question

about when Mr. Rodgers would return to work.  Mr. Patterson seemed sincere and

sorry if he had offended Ms. Schmidt.  I verbally counseled Mr. Patterson about

the comment and told him that it was inappropriate and that he should not make

any other such comments in the future.  I also told him to apologize to Ms.

Schmidt, and I told Ms. Schmidt that Mr. Patterson would be apologizing to her.

Mr. Patterson did indeed apologize.  I was not told of any other alleged

discriminatory comments by Mr. Patterson.

42.    I did not interview Mr. Rodgers in detail about the comment.  I did not see any need to do so for several reasons.  First, it was my understanding that he was not present when the comment was made.  Second, Mr. Patterson admitted to making the comment.    Third, I interviewed the witness, Ms. Schmidt.    My investigation into the matter was sufficient to allow me to resolve the matter, and I verbally counseled Mr. Patterson about the comment, which was a confidential personnel matter.  I did not talk about the confidential details of this matter any further, but I let Mr. Rodgers know that I handled it.

43.    I do not recall who reported Mr. Patterson's comment to Home Office. If Mr. Rodgers made that report, as a General Manager, I would expect him to report such employee issues to the Home Office and to me if he believed they involved discrimination.  My assessment of Mr. Rodgers' performance had nothing to do with the Patterson comment.

44.    I have reviewed the records of Hotline calls made by Dwight Rodgers during his employment which are kept by Cracker Barrel in the regular course of business.  There are records of calls by him to the Hotline on only two topics. One, he called about the comment by Patterson.    Two, he called about his termination.  Attached hereto as Exhibit 8 are true and correct copies of the records of those Hotline calls.  These documents were made at or near the time of the

occurrence of the matters set forth within, were kept in the course of regularly conducted activity and were made by regularly conducted activity as a regular practice.

45.    None of my actions towards Mr. Rodgers were based on his race or any retaliatory animus.  I have supervised many other African-Americans who have been very successful with Cracker Barrel.

46.    The foregoing is true and complete to the best of my knowledge and sworn to under penalty of perjury.


DATED:    _7/31/2007_

_Rich Alexander_ (signature)
Rich Alexander


**VERIFICATION**

STATE OF ALABAMA            )
                           )
COUNTY OF JEFFERSON         )

Before me, _Rich Alexander_ a notary public in and for said county in said State, personally appeared, Rich Alexander, who is known to me and who being first duly sworn, deposes and says that he has personal knowledge of the facts set forth in the foregoing affidavit and that all such matters are true and correct to the best of his knowledge.

Subscribed and sworn before me this _31_ day of July, 2007.

NOTARY PUBLIC

My Commission Expires:

2/17/08

EXHIBIT 1

TO ALEXANDER AFFIDAVIT

# Employment Policies

## Equal Opportunity Statement

Employment opportunities at Cracker Barrel Old Country Store are open to all qualified applicants solely on the basis of their job-related experience, knowledge, skills, and abilities. Qualified applicants are considered for all open positions for which they apply and for advance-ment without regard to race, color, religion, sex, sexual orientation, national origin, age, marital status, or the presence of a medical condition or disability. Cracker Barrel complies with all applicable federal, state and local laws with regard to equal employment opportunity. Advancement is based entirely on an individual's demonstrated performance, job-related ability, skills, and knowledge and the resulting potential for promotion to the job openings applied for.

Cracker Barrel will not tolerate any form of discrimination, harassment or retaliation affecting its employees or applicants due to race, color, religion, sex, sexual orientation, national origin, age, marital status, medical condition, or disability.

Employees who believe they have been subjected to unlawful discrimination, harassment, or retaliation must immediately advise their Supervisor, Manager, or District Manager. In addition, you can always call the Employee Relations Department toll-free at 1-800-333-9566 to report issues or concerns about your employment at Cracker Barrel. You are also strongly encouraged to report inappropriate conduct that you observe, whether or not it affects you directly.

The company's anti-discrimination and anti-harassment policies are intended to result in effective responses to problems. They require you to provide the company an immediate opportunity to investigate and resolve your workplace concerns. You must notify your Supervisor, Store Managers, District Manager, or the Employee Relations Department at the above number regarding issues of harassment, discrimination or retaliation. Employees are encouraged to use the chain of command, but you are not required to notify or speak to store management prior to contacting the Employee Relations Department.

## Employment at Will

This Employee Handbook is to give you information about Cracker Barrel's general employment policies, procedures, and benefits. Please read this handbook carefully and be sure you understand it all.

This handbook is not intended to be contractual in nature or to form the basis of an expressed or implied contract and should not be relied upon as a contract or an agreement promising employment to any person at any time. The policies, procedures, and benefits discussed in this handbook are specified in detail in other documents and they may be unilaterally amended, modified, or deleted by Cracker Barrel at any time, with or without prior notice. This handbook and the policies, procedures, and benefits contained in it do not in any way constitute, and should not in any way be construed as a contract of employment, a promise of employment, a promise of continuing employment or a guarantee of any term or condition of employment.

It is the express policy and intent of Cracker Barrel Old Country Store that the employment relationship is an employment-at-will relationship, for no definite duration and is terminable at will by either party with or without cause, with or without notice, for any reason or for no reason.

## Rules of Conduct

Cracker Barrel Old Country Store expects the highest standards of behavior from you. All employees must comply with all Cracker Barrel work rules at all times. If you have a question regarding any of these policies, please ask your manager for an explanation because you can be disciplined immediately or terminated if you do not follow these rules.

Be sure you read the "Employment at Will" section of this handbook.

Be aware that these Rules of Conduct list many of the most important rules but they are not intended to cover all conduct or work performance issues which may be grounds for disciplinary action or immediate dismissal, and Cracker Barrel can unilaterally change or add to them at any time, without prior notice.

These Rules of Conduct are based on the company's Statement of Company Standards of Conduct and they sound very formal because Cracker Barrel takes this matter very seriously. How each one of us behaves reflects on all of us!

C 10

Rodgers v. Cracker Barrel
Def. Initial Disc. 0160

# *You MUST...*

1. be courteous, friendly, and helpful to our guests and other employees at all times.

2. pay full attention to your work.

3. follow specific instructions of management.

4. not use profane, indecent, or abusive language or act in a rude or boisterous manner.

5. perform your job in a safe manner.

6. have proper cause, give prior notification to management, and receive authorization to be absent from work.

7. not engage in conduct which may constitute any form of discrimination or harassment.

8. not make threats to other employees or guests. Cracker Barrel Old Country Store has a zero tolerance for threats or acts of violence.

9. exit the building after you have completed your shift and not remain in the building for reasons other than company related business.

10. conduct yourself at all times in a manner which is consistent with all applicable laws. Conviction of any felony crime or serious misdemeanor, regardless of the place or circumstances, is cause for immediate termination unless otherwise prohibited by law. Employees must inform their supervisor if they are/have been convicted of a felony. Employees who are incarcerated (regardless of the reason) and miss a scheduled shift will be terminated for an unexcused absence.

11. not possess, store, or use alcoholic beverages or illegal drugs on company property or while in the performance of company business. Abuse of prescription drugs and reporting to work under the influence of alcohol or illegal drugs are also prohibited.

12. comply with the Drug-Free Workplace Policy. Post-accident drug testing will be required and a positive drug test or a failure to cooperate in drug testing (where permitted) could result in denial of worker's compensation benefits and termination from employment, as permitted by law.

13. not possess, store, or use weapons on company property or while in the performance of company business, regardless of whether such possession is lawful.

14. not cause or participate in an assault, fight, argument, or other disturbance.

15. not engage in conduct that is unbecoming to Cracker Barrel's image.

16. wear clean, proper clothing or other prescribed attire while working.

17. follow the Employee Meal Policy.

18. not remove, take away or use company property without proper authority from a company representative.

19. protect the confidentiality of all company information and not disclose any company information without written, prior authorization.

20. immediately report all racial discrimination, all sexual harassment, all other offensive actions, all accidents, suspected dishonesty, or other unusual circumstances to your store management.

21. not make unauthorized long distance telephone calls on a company telephone or using a company phone card.

22. not allow friends or relatives in "employee only" areas.

23. follow package checking regulations and use designated employee entrances and exits.

24. not engage in solicitation or distribution of written materials or other items during working time in work areas.

25. not post written materials or other items on company bulletin boards or company property without prior approval from management.

26. not work overtime without prior authorization of management.

27. use tobacco products only in designated areas.

28. be honest in handling money, merchandise, or other property which belongs to the company, other employees, or guests.

29. maintain truth and accuracy in all company records and documents including your employ-ment application, time records and tip reporting.

30. not offer or receive money or other things of value to influence the decisions made by any employee of the company.

31. not make false or incomplete statements or mis-statements to any auditors or investigators employed or retained by the company or to any company official regarding company business.

32. comply with Cracker Barrel's Asset Protection Policy.



C 11

Rodgers v. Cracker Barrel
Def. Initial Disc. 0161

Employee Handbook

*Employment Policies*

## Open Door Policy



Employee Relations Department
Cracker Barrel Old Country Store
P.O. Box 787, Hartmann Drive
Lebanon, TN 37088 - 0787
Toll-free Telephone: 1-800-333-9566

As an employee of Cracker Barrel Old Country Store you belong to an important group of people. Cracker Barrel pleases its employees by supporting them as they strive for success and by listening to their concerns and ideas. Cracker Barrel relies on store managers to do this as part of their jobs.

Your manager is responsible for your training. He or she wants you to do well, and is interested in your welfare, your work, your working conditions, and your satisfaction as an employee of Cracker Barrel. We encourage you to go to your manager with any questions or suggestions, or to review any problems or decisions affecting your job.

Your manager is your first link to the rest of the company.

If you then believe the situation has not been resolved or if you just can't talk about it with your manager, write or call your District Manager. If you believe your problem or concern has still not been resolved, write or call the Employee Relations department toll-free at 1-800-333-9566. It is required that you provide the company an opportunity to investigate and resolve your workplace concerns. Therefore, you must notify your store managers, district manager, or the Employee Relations department at the above number regarding issues of harassment or discrimination. Employees are encouraged to use the chain of command but are not required to speak to store management prior to contacting the home

office. You will need to provide your name and store number to ensure a proper investigation is conducted.

Cracker Barrel always tries to have a good working atmosphere for all employees. Of course, there will be occasions when problems need to be discussed so that solutions can be reached. It is everyone's responsibility to help maintain good working relationships and to continue to communicate until the problem is finally resolved.

Please know that you are not required to complain to your immediate supervisor first and you won't be retaliated against by using this policy in good faith.

## Harassment and Discrimination

Cracker Barrel Old Country Store does not tolerate unlawful harassment or discrimination based on an individual's protected status. We value and respect all of our employees and all employees are responsible for ensuring that the store is free from harassment or discrimination. Inappropriate or offensive behavior, actions, words, jokes or comments based on an individual's race, color, religion, sex, sexual orientation, national origin, age, marital status, medical condition, or disability will not be tolerated and may constitute harassment or discrimination. Be aware that Cracker Barrel will take affirmative steps to end any such conduct, up to and including termination.

You must avoid any action or conduct which could be viewed as unlawful harassment or discrimination, including but not limited to:

- Sexual touching, advances or propositions
- Verbal abuse of a sexual or racial nature or regarding a person's disability or national origin
- Graphic or sexual comments about an individual's dress or body
- Sexually or racially degrading words to describe an individual or group
- Display in the workplace of sexually suggestive or racially offensive objects or pictures
- Sexually or racially offensive jokes
- Any derogatory or negative language which could cause hostility in the workplace
- Inappropriate touching such as rubbing shoulders or other body parts
- Comments about a person's sexual practices or preferences

If you have a complaint of harassment or discrimination at work by anyone, including managers, co-workers, guests or vendors, you must report the complaint. It is the obligation of all employees to report any and all known or perceived harassment or discrimination to their manager or to the Employee Relations department toll-free at 1-800-333-9566. It is required that you provide the company an opportunity to investigate and resolve your workplace concerns. Therefore, you must notify your store managers, district manager, or the Employee Relations department at the above number regarding issues of harassment or discrimination. Employees are encouraged to use the chain of command but are not required to speak to store management prior to contacting the home office. If you voice a workplace concern, you must ensure your

manager completes an Employee Relations Open Door Report and submits it to the Employee Relations department at the home office. All complaints will be investigated in a timely manner, and as far as a complete investigation allows, kept confidential. Confirmed cases of harassment or discrimination will be regarded as gross misconduct and appropriate disciplinary action, which may include termination, will be taken. Employees will not be retaliated against by using this policy in good faith.

If you have questions or concerns that need to be addressed, please contact the Employee Relations department at the above number.

C 12

EXHIBIT 2

TO ALEXANDER AFFIDAVIT

Evaluation View

IMAGED

## Associate Performance Evaluation

Employee Name:        RODGERS DWIGHT N

Employee ID:          364639

Employee Position:    GM0237

Evaluator:            SPEZIALE, THOMAS K

Evaluator ID:         846425

Evaluator Position:   GM0505

Evaluation:           Eval 2 of 2004

Review dates

Evaluation End Dates for Fiscal: 2004

Eval 1 - 01/30/2004

Eval 2 - 07/30/2004

1) All employees who are evaluated will receive a signed paper copy of their own evaluation.

2)Evaluators will send evaluations to the home office HRIS department.

Rodgers v. Cracker Barrel
Def. Initial Disc. 0123

**Objective 1: Achieve and maintain fully staffed stores with high quality management and hourly employees.** Process Date 10-15-2004 10:0:18

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| Eval_1> | 5: Role Model: (0.2% or less) | 1) Meet overtime % related to total labor cost | |
| Eval_2> | 4: Exceeds Standards: (0.21% to 0.3%) | 5: Role Model: (0.2% or less) 4: Exceeds Standards: (0.21% to 0.3%) 3: Meets Standards: (0.31% to 0.4%) 2: Needs Improvement: (0.41% to 0.6%) 1: Unacceptable: (0.61% or greater) | N/A |
| Eval_1> | 5: Role Model: (98. or less) | 2) Achieve hourly employee turnover goal (Goal = 115% annualized) | |
| Eval_2> | 1: Unacceptable: (146 or greater) | 5: Role Model: (98. or less) 4: Exceeds Standards: (99 to 109.) 3: Meets Standards: (110 to 120.) 2: Needs Improvement: (121 to 145.) 1: Unacceptable: (146 or greater) | N/A |
| Eval_1> | 3: Meets Standards | 3) Staffing and Retention | |
| Eval_2> | 3: Meets Standards | | |
| | 3.1 Develops and implements appropriate staffing and succession plans. | | N/A |
| | 3.2 Hires appropriately qualified candidates through effective interviewing and selection processes. | | N/A |
| | 3.3 Follows procedures outlined in the Staffing and Retention guide. Follows Best Practices guidelines for staffing and retention. | | N/A |
| | 3.4 Creates a work atmosphere where employees feel appreciated and motivated to perform and remain with Cracker Barrel. | | N/A |
| | 3.5 Confronts and resolves employee conflicts and morale issues. | | N/A |
| | 3.6 Supports and promotes quality of life initiatives. | | N/A |
| | 3.7 Evaluations are performed on a timely basis per the review | | N/A |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0124

Evaluation View

| | | |
|---|---|---|
| | cycle. | |
| | 3.8 Interviews all applicants and has a good application system in place. | N/A |
| | 3.9 Uses designated skill trainers for all positions and meets regularly to improve training. | N/A |

| | | |
|---|---|---|
| Eval_1> | 3: Meets Standards | 4) Leading, Developing, and Communicating with Others |
| Eval_2> | 3: Meets Standards | |
| | 4.1 Communicates Cracker Barrel mission, vision, values, and goals to employees. Motivates and gains commitment from others. Schedules and holds weekly operational management meetings. | Strength |
| | 4.2 Holds managers and staff accountable to Cracker Barrel Standards. | N/A |
| | 4.3 Trains managers and employees effectively, using a hands-on approach when necessary. | N/A |
| | 4.4 Provides specific, constructive and well-balanced feedback to retail counterpart, subordinates, peers, and supervisors on an ongoing basis. | Strength |
| | 4.5 Effectively manages PAR program to develop employees. | N/A |
| | 4.6 Listens actively; promotes and practices open door policy and manager is approachable. | N/A |
| | 4.7 Communicates clearly, candidly and honestly; avoids ambiguity and mixed messages. | N/A |
| | 4.8 Effectively uses situational leadership skills to communicate with others. | Strength |
| | 4.9 Participates in MIT and Associate Manager development as outlined in the Associate Manager Development Guide. | N/A |

| | | |
|---|---|---|
| Eval_1> | 3: Meets Standards | 5) Administering Policies and Procedures |
| Eval_2> | 3: Meets Standards | |
| | 5.1 Executes Cracker Barrel's orientation and skills training programs for new employees. | Strength |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0125

| | | |
|---|---|---|
| | 5.2 Documents and manages discipline and/or performance problems in accordance with Cracker Barrel's policies and procedures. | Strength |
| | 5.3 Demonstrates a working knowledge of fair employment policies and guidelines (EEO guidelines, hiring minors, OSHA, etc.). | N/A |
| | 5.4 Supports and executes responsibilities associated with the performance management process. | N/A |
| | 5.5 Leads and supports all Best Practices initiatives. | N/A |
| Eval_1> | Objective 1 Comment | 3-1 Has submitted staffing plans and staffing needs in a timely manor.3-2 Some poor selections in staffing. Need to better qualify applicants.3-4 Well respected be employees.3-5 Performs documentation in a fair and consistant manor. 3-5 Is approachable and resolves issues.4-2 Instructs managers on proper procedures. 4-5 Clear concise evals along with hospitality appraisals. 5-1 Participates in orientations and PAR 0. 5-5 Quotes from BP manuals to guide daily decisions. |
| Eval_2> | Objective 1 Comment | Dwight has very good administrative skills in staffing and retention. He fully understands the process to staff a store. He can clearly articulate what development is needed for an individual. He uses the appropriate tools |
| **Objective 1: Point Subtotal** | | |
| Eval_1 | Performance Measurements: | 19.00 |
| | Performance Behaviors: | 30.00 |
| Eval_2 | Performance Measurements: | 6.80 |
| | Performance Behaviors: | 30.00 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0126

10/15/2004

Evaluation View

**Objective 2: Improve guest perceptions.  Process Date 10-15-2004 10:0:21**

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| Eval_1> | 1: Unacceptable: (8 or more guest complaints) | 6) Number of guest complaints<br><br>5: Role Model: (0 to 1. guest complaints)<br>4: Exceeds Standards: (2 to 3. guest complaints)<br>3: Meets Standards: (4 to 5. guest complaints)<br>2: Needs Improvement: (6 to 7. guest complaints)<br>1: Unacceptable: (8 or more guest complaints) | N/A |
| Eval_2> | 1: Unacceptable: (8 or more guest complaints) | | |
| Eval_1> | 2: Needs Improvement: (75 to 84.) | 7) Store Visit Report (average of two scores)<br><br>1: Unacceptable: (74. or below)<br>2: Needs Improvement: (75 to 84.)<br>3: Meets Standards: (85 to 88.)<br>4: Exceeds Standards: (89 to 93.)<br>5: Role Model: (94 or above) | N/A |
| Eval_2> | 1: Unacceptable: (74. or below) | | |
| Eval_1> | 4: Exceeds Standards | 8) Building and Maintaining Guest Relations | |
| Eval_2> | 3: Meets Standards | | |
| | 8.1 Educates and empowers employees to please guests. | | Strength |
| | 8.2 Interacts frequently with guests in dining room (e.g. table visits) and retail store in a friendly, courteous manner. | | Strength |
| | 8.3 Follows through on commitments made to internal and external guests (e.g. follow through with complaints). | | N/A |
| | 8.4 Resolves guest problems or needs using S.T.A.R.S. Sets an example for employees. | | N/A |
| | 8.5 Provides service to guests that exceeds their needs and expectations. | | N/A |
| | 8.6 Staff is friendly, smiles, and demonstrates pleasing people practices. | | N/A |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0127

10/15/2004

| Eval_1> | 4: Exceeds Standards | 9) Planning and Supervising Operations | |
|---|---|---|---|
| Eval_2> | 4: Exceeds Standards | | |
| | 9.1 Does accurate sales and labor forecasts. Anticipates and responds to volume fluctuations / bottlenecks and takes appropriate action. | | N/A |
| | 9.2 Manages multiple tasks and responsibilities simultaneously. Organized and uses day planner effectively. Meets all company and district deadlines. | | Strength |
| | 9.3 Considers employee training, breaks, and special requests when preparing schedules. | | N/A |
| | 9.4 Uses organizational skills. Prioritizes, delegates, and follows-up to maintain a smooth operation. | | Strength |
| | 9.5 Plans shifts using appropriate tools (e.g. PEP Talk, shift cards, production charts, Ally Rally, Red Book) to ensure store readiness. | | N/A |
| | 9.6 Determines Behaviors that need improvement; develops and implements goals and plans which successfully address these Behaviors. | | Strength |
| Eval_1> | 3: Meets Standards | 10) Safety, Security and Sanitation | |
| Eval_2> | 3: Meets Standards | | |
| | 10.1 Follows all HACCP guidelines. | | Strength |
| | 10.2 Meets all Cracker Barrel asset protection policy, cash management, safety, security, and sanitation standards. | | Strength |
| | 10.3 Maintains property, building, and equipment function at all times. | | N/A |
| | 10.4 Performs regular walk-thrus and holds all employees accountable for safety, security, and sanitation. | | N/A |
| | 10.5 Performs all required safety and sanitation inspections and makes adjustments as necessary. | | N/A |
| | 10.6 Ensures regular inspection of restrooms. | | N/A |
| | 10.7 Monitors dating and rotating shelf-life on boxes and food packages. | | N/A |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0128

| 10.8 Makes regular supervised trash runs throughout shift. | | N/A |
|---|---|---|
| 10.9 Educates and trains hourly staff and other managers on proper safety and security procedures. | | N/A |
| 10.10 Promotes the "clean as you go" policy. | | N/A |
| Eval_1> | Objective 2 Comment | 8-1 The guest comes first! 8-2 Very good guest service skills overall. Very good retail awareness. 9-2 & 9-4 Highly organized to compelete a large task list. 10-1 HACCP needs improvement. 10-4 Very good awareness to all safety and security process. Aware of Loss Prevention issues. |
| Eval_2> | Objective 2 Comment | Understands guest service needs and traines to that level. Excellent rapport with guests. Motivates staff to please the guest. |
| Objective 2: Point Subtotal | | |
| Eval_1 | Performance Measurements: | 5.00 |
| | Performance Behaviors: | 34.40 |
| Eval_2 | Performance Measurements: | 3.40 |
| | Performance Behaviors: | 30.00 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0129

10/15/2004

## Objective 3: Improve store margins.   Process Date 10-15-2004 10:0:24

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| Eval_1> | 1: Unacceptable: (greater than or equal to +0.2) | 11) Achieve restaurant labor goal<br><br>5: Role Model: (less than or equal to -0.3)<br>4: Exceeds Standards: (-0.29 to -0.1)<br>3: Meets Standards: (-0.09 to 0.00)<br>2: Needs Improvement: (+0.01 to +0.19)<br>1: Unacceptable: (greater than or equal to +0.2) | N/A |
| Eval_2> | 1: Unacceptable: (greater than or equal to +0.2) | | |
| Eval_1> | 4: Exceeds Standards: (-0.29 to -0.1) | 12) Achieve food cost goal<br><br>5: Role Model: (less than or equal to -0.3)<br>4: Exceeds Standards: (-0.29 to -0.1)<br>3: Meets Standards: (-0.09 to +0.09)<br>2: Needs Improvement: (+0.1 to +0.39)<br>1: Unacceptable: (greater than or equal to +0.4) | N/A |
| Eval_2> | 2: Needs Improvement: (+0.1 to +0.39) | | |
| Eval_1> | 1: Unacceptable: (+3.07% or greater) | 13) Reduce retail inventory shrinkage to hit targeted goal (Goal = 2.3%)<br><br>5: Role Model: (+1.54% or less)<br>4: Exceeds Standards: (+1.55% to +2.04%)<br>3: Meets Standards: (+2.05% to +2.55%)<br>2: Needs Improvement: (+2.56% to +3.06%)<br>1: Unacceptable: (+3.07% or greater) | N/A |
| Eval_2> | 5: Role Model: (+1.54% or less) | | |
| Eval_1> | 3: Meets Standards | 14) Maintaining Sales and Quality of Operation | |
| Eval_2> | 3: Meets Standards | | |
| | 14.1 Manages production, labor, and other costs using Cracker Barrel tools to achieve planned targets. | | N/A |
| | 14.2 Follows company mandatory food cost requirements. | | N/A |
| | 14.3 Increases sales and profitability through shift execution and appropriate sales-building strategies (using a seating index and appropriate staffing). | | N/A |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0130

| | | |
|---|---|---|
| | 14.4 Maximizes productivity of self and others. | N/A |
| | 14.5 Takes initiative to solve operational problems that arise. | N/A |
| | 14.6 Labor - schedules properly for the volume to hit the targeted goals. | N/A |
| | 14.7 Demonstrates an understanding of the impact of all decisions on Cracker Barrel profits. | N/A |
| | 14.8 Uses data to make appropriate decisions to maximize sales. | N/A |
| | 14.9 Adheres to Cracker Barrel product and guest service standards. | N/A |
| | 14.10 Adheres to Cracker Barrel food quality and recipe standards. | N/A |
| | 14.11 Trains and maintains proper procedures on guest check, exception reporting, service comps, manager unknowns, voids, and meal policies. | N/A |
| | 14.12 Has proper (minimum standards) levels of small wares in service to assure a smooth operation. | N/A |
| | 14.13 Partners with management team to reduce shrinkage. | N/A |
| | 14.14 Reduces shrinkage through the use of the "Effective Shrinkage Management" tool. | N/A |
| | 14.15 Ensures compliance to Retail Audit Procedures. | N/A |
| | 14.16 Follows Asset Protection Policy. | N/A |
| Eval_1> | Objective 3 Comment | 14-2 Has performed Targeted food review with appropriate action plans. 14-3 Leads employees to do their best, motivates well. 14-6 Some issues with scheduling, schedule holes. 14-11 Excellent with administrative responsibilities. 14-14 Audits all retail procedures. |
| Eval_2> | Objective 3 Comment | Quality driven individual. Has worked to overcome operational obsticles. |
| Objective 3: Point Subtotal | | |
| Eval_1 | Performance Measurements: | 8.60 |
| | Performance Behaviors: | 14.40 |
| Eval_2 | Performance Measurements: | 7.80 |
| | Performance | 14.40 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0131

Behaviors:

Rodgers v. Cracker Barrel
Def. Initial Disc. 0132

10/15/2004

Evaluation View

**Objective 4: Exceed the Financial Plan**  Process Date 10-15-2004 10:0:26

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|------|--------|--------------------------------------|------------|
| Eval_1> | 5: Role Model: NOI v/s LY: (+20.01% or greater) | 15) Net Operating Income (NOI) v/s Last Year NOI<br><br>1: Unacceptable: NOI v/s LY: (0%)<br>2: Needs Improvement: NOI v/s LY: (+0.01% to +7.5%)<br>3: Meets Standards: NOI v/s LY: (+7.51% to +15.09%)<br>4: Exceeds Standards: NOI v/s LY: (+15.1% to +20%)<br>5: Role Model: NOI v/s LY: (+20.01% or greater) | N/A |
| Eval_2> | 2: Needs Improvement: NOI v/s LY: (+0.01% to +7.5%) | | |
| Eval_1> | 5: Role Model Rsales: (+6.1% or greater) | 16) Real Net Restaurant Sales Growth<br><br>1: Unacceptable Rsales: (-3.6% or below)<br>2: Needs Improvement Rsales: (-3.59% to +3.39%)<br>3: Meets Standards Rsales: (+3.4% to +5.49%)<br>4: Exceeds Standards: (+5.5% to +6.09%)<br>5: Role Model Rsales: (+6.1% or greater) | N/A |
| Eval_2> | 1: Unacceptable Rsales: (-3.6% or below) | | |
| Eval_1> | 3: Meets Standards: (-0.09% to +3.9%) | 17) Achieve Retail Sales v/s Last Year<br><br>1: Unacceptable: (-3.6% or below)<br>2: Needs Improvement: (-3.59% to -0.1%)<br>3: Meets Standards: (-0.09% to +3.9%)<br>4: Exceeds Standards: (+3.91% to +5.99%)<br>5: Role Model: (+6% or greater) | N/A |
| Eval_2> | 1: Unacceptable: (-3.6% or below) | | |
| Eval_1> | Objective 4 Comment | | |
| Eval_2> | Objective 4 Comment | | |
| **Objective 4: Point Subtotal** | | | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0133

Evaluation View

| | | | |
|---|---|---|---|
| Eval_1 | Performance Measurements: | 23.80 | |
| | Performance Behaviors: | Subtotal N/A | |
| Eval_2 | Performance Measurements: | 7.20 | |
| | Performance Behaviors: | Subtotal N/A | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0134

10/15/2004

## 2004: Performance Summary

| Process Date 10-15-2004 10:0:28 | | | |
|---|---|---|---|
| Objective No | Performance Areas | Eval 1 | Eval 2 |
| Objective 1 | Performance Measurements: | 19 | 6.8 |
| | Performance Behaviors: | 30 | 30 |
| Objective 2 | Performance Measurements: | 5 | 3.4 |
| | Performance Behaviors: | 34.4 | 30 |
| Objective 3 | Performance Measurements: | 8.6 | 7.8 |
| | Performance Behaviors: | 14.4 | 14.4 |
| Objective 4 | Performance Measurements: | 23.8 | 7.2 |
| | Performance Behaviors: | — | — |
| Current Evaluation Performance Measurements Score: | | 56.4 | 25.2 |
| Current Evaluation Performance Behaviors Score: | | 78.8 | 74.4 |
| Current Evaluation Overall Performance Rating: | | 3 | 3 |
| | Overall Annual Performance Measurements Score: | 40.8 | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0135

10/15/2004

| | | |
|---|---|---|
| | Overall Annual Performance Behaviors Score: | 76.6 |
| | | |
| | 2004 Overall Annual Rating: | 3 |
| | 2004 Rating Scale: | 1 = 19.0000 - 29.4999<br>2 = 29.5000 - 49.4999<br>3 = 49.5000 - 69.4999<br>4 = 69.5000 - 89.4999<br>5 = 89.5000 - 100.0000 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0136

10/15/2004

## Individual Development Program

Process Date 10-15-2004 10:0:28

| Developmental Plan | Resources needed | Method to Measure | Follow-up Date |
|---|---|---|---|
| **Eval 1** | | | |
| Improven ability to develop Associate Manager in Supply Management, Labor Management and Food Management | AMDG, BP manuals and Read " Developing Leaders Around You" | Sucessful completion of the AMDG with positive results | 7/30/04 |
| | | | |
| **Eval 2** | | | |
| Understanding the Associate manager development process | 1 on 1 with associate, read--In search of excellance | store indicators, management promotion | monthly |
| | | | |

| | Current Recommendations | (Check) | Comments |
|---|---|---|---|
| **Career Development:** | Remain in current position for continued development | -X- | Learn and understand the General Manager position |
| | Developmental Projects | -- | |
| | Promote | -- | |
| | Willing to relocate | -- | |
| | Special interests | -- | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0137

Evaluation View

### Eval - 2004 Performance Comments and Signatures

Supervisor's Comments:

Strengths:        Excellent communicator and motivator. Should do well as GM.

Improvement(s) from last evaluation:I have not worked a great deal wuith Dwight over the past 6 months. I have however had several discussions and meetings with Dwight. He has grown. I have acertained this by the content and questions fielded.

Developmental Needs:

Employee's Comments:

Rodgers v. Cracker Barrel
Def. Initial Disc. 0138

Employee's
Signature: _____

Supervisor's
Signature: _____

Second Level Review
Signature: _____

---

**Definition for Second Level Review and Signature**

1. Associate Manager and Senior Associate Manager evaluations performed by General Manager, the Second Level Review is the District Manager.

~OR~

2. General Manager and Retail Manager evaluations performed by District Manager, the Second Level Review is the Regional Vice President.

---

"I accept and understand Cracker Barrel's Equal Employment Opportunity policy, Anti-harassment policy, and Open Door policy, and that employees may utilize the company's toll free number (1-888-648-DOOR) to report complaints or violations of these policies. I understand that the company may be held responsible for acts of harassment that I commit, condone, tolerate, or fail to investigate. I further understand that if I violate any aspect of these policies that I will be subject to immediate discipline, up to and including termination, and that I can be sued and may be held personally liable for my acts or omissions. Therefore, I acknowledge and confirm that I am not aware of any observed, alleged, experienced, or reported harassment, including discrimination or sexual harassment. I commit that I will report any such knowledge or awareness of possible violations of these policies to my immediate supervisor or the Employee Relations Department."

Employee signature: _____

Process Date 10-15-2004 10:0:29

Rodgers v. Cracker Barrel
Def. Initial Disc. 0139

Employee's
Signature:

Supervisor's
Signature:

Second Level Review
Signature:

---

**Definition for Second Level Review and Signature**

1. Associate Manager and Senior Associate Manager evaluations performed by General Manager, the Second Level Review is the District Manager.

--OR--

2. General Manager and Retail Manager evaluations performed by District Manager, the Second Level Review is the Regional Vice President.

---

"I accept and understand Cracker Barrel's Equal Employment Opportunity policy, Anti-harassment policy, and Open Door policy, and that employees may utilize the company's toll free number (1-888-648-DOOR) to report complaints or violations of these policies. I understand that the company may be held responsible for acts of harassment that I commit, condone, tolerate, or fail to investigate. I further understand that if I violate any aspect of these policies that I will be subject to immediate discipline, up to and including termination, and that I can be sued and may be held personally liable for my acts or omissions. Therefore, I acknowledge and confirm that I am not aware of any observed, alleged, experienced, or reported harassment, including discrimination or sexual harassment. I commit that I will report any such knowledge or awareness of possible violations of these policies to my immediate supervisor or the Employee Relations Department."

Employee signature:

Process Date 10-15-2004 10:0:29

Rodgers v. Cracker Barrel
Def. Initial Disc. 0140

## Associate Performance Evaluation

Employee Name:          RODGERS DWIGHT N

Employee ID:            364639

Employee Position:      AM0505

Evaluator:              SPEZIALE, THOMAS K

Evaluator ID:           846425

Evaluator Position:     GM0505

Evaluation:             Eval 1 of 2004

Review dates

Evaluation End Dates for Fiscal: 2004

Eval 1 - 01/30/2004

I. All employees who are evaluated will receive a signed paper copy of their own evaluation.

II. Evaluators will send evaluations to the home office HRIS department.

Rodgers v. Cracker Barrel
Def. Initial Disc. 0105

4/23/2004

Evalua. .view

Ot ect .I: Achieve and maintain fully staffed stores with high quality management and hourly employees.   Process Date 4-22-2004 11:50:6

| ...va.. | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| E .tl. | 5: Role Model: 0.2% or less) | 1) Meet overtime % related to total labor cost<br><br>5: Role Model: (0.2% or less)<br>4: Exceeds Standards: (0.21% to 0.3%)<br>3: Meets Standards: (0.31% to 0.4%)<br>2: Needs Improvement: (0.41% to 0.6%)<br>1: Unacceptable: (0.61% or greater) | N/A |
| E .tl. | 5: Role Model: 98. or less) | 2) Achieve hourly employee turnover goal (Goal = 115% annualized)<br><br>5: Role Model: (98. or less)<br>4: Exceeds Standards: (99 to 109.)<br>3: Meets Standards: (110 to 120.)<br>2: Needs Improvement: (121 to 145.)<br>1: Unacceptable: (146 or greater) | N/A |
| E .tl. | 3: Meets Standards | 3) Staffing and Retention | |
| | | 3.1 Develops and implements appropriate staffing and succession plans. | Strength |
| | | 3.2 Hires appropriately qualified candidates through effective interviewing and selection processes. | Developmental |
| | | 3.3 Follows procedures outlined in the Staffing and Retention guide. Follows Best Practices guidelines for staffing and retention. | N/A |
| | | 3.4 Creates a work atmosphere where employees feel appreciated and motivated to perform and remain with Cracker Barrel. | Strength |
| | | 3.5 Confronts and resolves employee conflicts and morale issues. | Strength |
| | | 3.6 Supports and promotes quality of life initiatives. | N/A |

IMAGED

Rodgers v. Cracker Barrel
Def. Initial Disc. 0106

Evaluation View

| | | |
|---|---|---|
| | 3.7 Evaluations are performed on a timely basis per the review cycle. | N/A |
| | 3.8 Interviews all applicants and has a good application system in place. | N/A |
| | 3.9 Uses designated skill trainers for all positions and meets regularly to improve training. | N/A |

| E d | 3: Meets Standards | 4) Leading, Developing, and Communicating with Others | |
|---|---|---|---|
| | 4.1 Communicates Cracker Barrel mission, vision, values, and goals to employees. Motivates and gains commitment from others. Schedules and holds weekly operational management meetings. | N/A | |
| | 4.2 Holds managers and staff accountable to Cracker Barrel Standards. | Strength | |
| | 4.3 Trains managers and employees effectively, using a hands-on approach when necessary. | N/A | |
| | 4.4 Provides specific, constructive and well-balanced feedback to retail counterpart, subordinates, peers, and supervisors on an ongoing basis. | N/A | |
| | 4.5 Effectively manages PAR program to develop employees. | Strength | |
| | 4.6 Listens actively; promotes and practices open door policy and manager is approachable. | N/A | |
| | 4.7 Communicates clearly, candidly and honestly; avoids ambiguity and mixed messages. | N/A | |
| | 4.8 Effectively uses situational leadership skills to communicate with others. | N/A | |
| | 4.9 Participates in MIT and Associate Manager development as outlined in the Associate Manager Development Guide. | N/A | |

| E d | 3: Meets Standards | 5) Administering Policies and Procedures | |
|---|---|---|---|
| | 5.1 Executes Cracker Barrel's orientation and skills training programs for new employees. | Strength | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0107

Evaluation View

| | | |
|---|---|---|
| | 5.2 Documents and manages discipline and/or performance problems in accordance with Cracker Barrel's policies and procedures. | N/A |
| | 5.3 Demonstrates a working knowledge of fair employment policies and guidelines (EEO guidelines, hiring minors, OSHA, etc.). | N/A |
| | 5.4 Supports and executes responsibilities associated with the performance management process. | N/A |
| | 5.5 Leads and supports all Best Practices initiatives. | Strength |
| Eval | Objective Comment | 3-1 Has submitted staffing plans and staffing needs in a timely manor.3-2 Some poor selections in staffing. Need to better qualify applicants.3-4 Well respected be employees.3-5 Performs documentation in a fair and consistant manor. 3-5 Is approachable and resolves issues.4-2 Instructs managers on proper procedures. 4-5 Clear concise evals along with hospitality appraisals. 5-1 Participates in orientations and PAR 0. 5-5 Quotes from BP manuals to guide daily decisions. |
| Objective 1: Point Subtotal | | |
| Eval | Performance Measurements: | 19.00 |
| | Performance Behaviors: | 30.00 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0108

Evalu:  Vi:w

Objective 2: Improve guest perceptions.   Process Date 4-22-2004 11:50:8

| Xai | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| E al | 1: Unacceptable: (8 or more guest complaints) | 6) Number of guest complaints<br><br>5: Role Model: (0 to 1, guest complaints)<br>4: Exceeds Standards: (2 to 3, guest complaints)<br>3: Meets Standards: (4 to 5, guest complaints)<br>2: Needs Improvement: (6 to 7, guest complaints)<br>1: Unacceptable: (8 or more guest complaints) | N/A |
| E d | 2: Needs Improvement: (75 to 84.) | 7) Store Visit Report (average of two scores)<br><br>1: Unacceptable: (74, or below)<br>2: Needs Improvement: (75 to 84.)<br>3: Meets Standards: (85 to 88.)<br>4: Exceeds Standards: (89 to 93.)<br>5: Role Model: (94 or above) | N/A |
| E il | 4: Exceeds Standards | 8) Building and Maintaining Guest Relations | |
| | | 8.1 Educates and empowers employees to please guests. | Strength |
| | | 8.2 Interacts frequently with guests in dining room (e.g. table visits) and retail store in a friendly, courteous manner. | Strength |
| | | 8.3 Follows through on commitments made to internal and external guests (e.g. follow through with complaints). | N/A |
| | | 8.4 Resolves guest problems or needs using S.T.A.R.S. Sets an example for employees. | N/A |
| | | 8.5 Provides service to guests that exceeds their needs and expectations. | N/A |

ht       elp1/EvalS/Eval_Process//index.cin

Evaluation View

| | |
|---|---|
| 8.6 Staff is friendly, smiles, and demonstrates pleasing people practices. | N/A |

| 4: Exceeds Standards | 9) Planning and Supervising Operations | |
|---|---|---|
| 9.1 Does accurate sales and labor forecasts. Anticipates and responds to volume fluctuations / bottlenecks and takes appropriate action. | | N/A |
| 9.2 Manages multiple tasks and responsibilities simultaneously. Organized and uses day planner effectively. Meets all company and district deadlines. | | Strength |
| 9.3 Considers employee training, breaks, and special requests when preparing schedules. | | N/A |
| 9.4 Uses organizational skills. Prioritizes, delegates, and follows-up to maintain a smooth operation. | | Strength |
| 9.5 Plans shifts using appropriate tools (e.g. PEP Talk, shift cards, production charts, Ally Rally, Red Book) to ensure store readiness. | | N/A |
| 9.6 Determines Behaviors that need improvement; develops and implements goals and plans which successfully address these Behaviors. | | N/A |

| 3: Meets Standards | 10) Safety, Security and Sanitation | |
|---|---|---|
| 10.1 Follows all HACCP guidelines. | | Developmental |
| 10.2 Meets all Cracker Barrel asset protection policy, cash management, safety, security, and sanitation standards. | | N/A |
| 10.3 Maintains property, building, and equipment function at all times. | | N/A |
| 10.4 Performs regular walk-thrus and holds all employees accountable for safety, security, and sanitation. | | Strength |
| 10.5 Performs all required safety and sanitation inspections and makes adjustments as necessary. | | N/A |
| 10.6 Ensures regular inspection of restrooms. | | N/A |
| 10.7 Monitors dating and rotating shelf-life on boxes and food packages. | | N/A |
| 10.8 Makes regular supervised trash runs throughout shift. | | N/A |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0110

Evalua...  View                                                    Page 7 of 18

| | 10.9 Educates and trains hourly staff and other managers on proper safety and security procedures. | Strength |
|---|---|---|
| | 10.10 Promotes the "clean as you go" policy. | N/A |
| E...l | Objective 2 Comment | 8-1 The guest comes first! 8-2 Very good guest service skills overall. Very good retail awareness. 9-2 & 9-4 Highly organized to complete a large task list.10-1 HACCP needs improvement. 10-4 Very good awareness to all safety and security process. Aware of Loss Prevention issues. |
| Objec...e 2: Point Subtotal | | |
| E...l | Performance Measurements: | 5.00 |
| | Performance Behaviors: | 34.40 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0111

E  au   View                                                    **Page 8 of 18**

O  ject   3: Improve store margins.   Process Date 4-22-2004 11:50:10

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| E  al | 1: Unacceptable: (greater than or equal to +0.2) | 11) Achieve restaurant labor goal<br><br>5: Role Model: (less than or equal to -0.3)<br>4: Exceeds Standards: (-0.29 to -0.1)<br>3: Meets Standards: (-0.09 to 0.00)<br>2: Needs Improvement: (+0.01 to +0.19)<br>1: Unacceptable: (greater than or equal to +0.2) | N/A |
| E  al | 4: Exceeds Standards: (-0.29 to -0.1) | 12) Achieve food cost goal<br><br>5: Role Model: (less than or equal to -0.3)<br>4: Exceeds Standards: (-0.29 to -0.1)<br>3: Meets Standards: (-0.09 to +0.09)<br>2: Needs Improvement: (+0.1 to +0.39)<br>1: Unacceptable: (greater than or equal to +0.4) | N/A |
| E  al | 1: Unacceptable: (+3.07% or greater) | 13) Reduce retail inventory shrinkage to hit targeted goal (Goal = 2.3%)<br><br>5: Role Model: (+1.54% or less)<br>4: Exceeds Standards: (+1.55% to +2.04%)<br>3: Meets Standards: (+2.05% to +2.55%)<br>2: Needs Improvement: (+2.56% to +3.06%)<br>1: Unacceptable: (+3.07% or greater) | N/A |
| E  al | 3: Meets Standards | 14) Maintaining Sales and Quality of Operation | |
| | | 14.1 Manages production, labor, and other costs using Cracker Barrel tools to achieve planned targets. | N/A |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0112

E  lu   : View

| | |
|---|---|
| 14.2 Follows company mandatory food cost requirements. | Strength |
| 14.3 Increases sales and profitability through shift execution and appropriate sales-building strategies (using a seating index and appropriate staffing). | Strength |
| 14.4 Maximizes productivity of self and others. | N/A |
| 14.5 Takes initiative to solve operational problems that arise. | N/A |
| 14.6 Labor - schedules properly for the volume to hit the targeted goals. | Developmental |
| 14.7 Demonstrates an understanding of the impact of all decisions on Cracker Barrel profits. | N/A |
| 14.8 Uses data to make appropriate decisions to maximize sales. | N/A |
| 14.9 Adheres to Cracker Barrel product and guest service standards. | N/A |
| 14.10 Adheres to Cracker Barrel food quality and recipe standards. | N/A |
| 14.11 Trains and maintains proper procedures on guest check, exception reporting, service comps, manager unknowns, voids, and meal policies. | Strength |
| 14.12 Has proper (minimum standards) levels of small wares in service to assure a smooth operation. | N/A |
| 14.13 Partners with management team to reduce shrinkage. | N/A |
| 14.14 Reduces shrinkage through the use of the "Effective Shrinkage Management" tool. | N/A |
| 14.15 Ensures compliance to Retail Audit Procedures. | Strength |
| 14.16 Follows Asset Protection Policy. | N/A |
| Objective 3 Comment | 14-2 Has performed Targeted food review with appropriate action plans. 14-3 Leads employees to do their best, motivates well. 14-6 Some issues with scheduling, schedule holes. 14-11 Excellent with administrative responsibilities. 14-14 Audits all retail procedures. |
| Object   3: Point Subtotal | |

ht  //  relpt/EvalS/Eval_Process//index.cfm

Rodgers v. Cracker Barrel
Def. Initial Disc. 0113



Evaluation View

| Performance Measurements: | 8.60 |
| Performance Behaviors: | 14.40 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0114

Evaluator View

Objective 4: Exceed the Financial Plan   Process Date 4-22-2004 11:50:11

| | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| E d | 5: Role Model: NOI v/s LY: (+20.01% or greater) | 15) Net Operating Income (NOI) v/s Last Year NOI<br><br>1: Unacceptable: NOI v/s LY: (0%)<br>2: Needs Improvement: NOI v/s LY: (+0.01% to +7.5%)<br>3: Meets Standards: NOI v/s LY: (+7.51% to +15.09%)<br>4: Exceeds Standards: NOI v/s LY: (+15.1% to +20%)<br>5: Role Model: NOI v/s LY: (+20.01% or greater) | N/A |
| E d | 5: Role Model Rsales: (+6.1% or greater) | 16) Real Net Restaurant Sales Growth<br><br>1: Unacceptable Rsales: (-3.6% or below)<br>2: Needs Improvement Rsales: (-3.59% to +3.39%)<br>3: Meets Standards Rsales: (+3.4% to +5.49%)<br>4: Exceeds Standards Rsales: (+5.5% to +6.09%)<br>5: Role Model Rsales: (+6.1% or greater) | N/A |
| E d | 3: Meets Standards: (-0.09% to +3.9%) | 17) Achieve Retail Sales v/s Last Year<br><br>1: Unacceptable: (-3.6% or below)<br>2: Needs Improvement: (-3.59% to -0.1%)<br>3: Meets Standards: (-0.09% to +3.9%)<br>4: Exceeds Standards: (+3.91% to +5.99%)<br>5: Role Model: (+6% or greater) | N/A |
| E d | Objective 4 Comment | | |
| Objective 4: Point Subtotal | | | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0115

ht .://. .relp1 'EvalS/Eval_Process//index.c___                    4/22/2004



Evalu... View

| Performance Measurements: | 23.80 | |
|---|---|---|
| Performance Behaviors: | Subtotal N/A | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0116

Eval View

## 2004: Performance Summary

| Process Date 4-22-2004 11:50:12 | | |
|---|---|---|
| Objective X | Performance Areas | Eval 1 |
| Obje c | Performance Measurements: | 19 |
| | Performance Behaviors: | 30 |
| Obje c | Performance Measurements: | 5 |
| | Performance Behaviors: | 34.4 |
| Obje c | Performance Measurements: | 8.6 |
| | Performance Behaviors: | 14.4 |
| Obje c | Performance Measurements: | 23.8 |
| | Performance Behaviors: | |
| Current Evaluation Performance Measurements Score: | | 56.4 |
| Current Evaluation Performance Behaviors Score: | | 78.8 |
| Current Evaluation Overall Performance Rating: | | 3 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0117

http://help/EvalS/Eval_Process//index.cfm

Enter View

| | |
|---|---|
| Overall Annual Performance Measurements Score: | 56.4 |
| Overall Annual Performance Behaviors Score: | 78.8 |
| 2004 Overall Annual Rating: | 3 |
| 2004 Rating Scale: | 1 = 19.0000 - 29.4999<br>2 = 29.5000 - 49.4999<br>3 = 49.5000 - 69.4999<br>4 = 69.5000 - 89.4999<br>5 = 89.5000 - 100.0000 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0118

ht    ...    el::t EvalS/Eval_Process//index.cfm

Employee Review

## Individual Development Program

Date 4-22-2004 11:50:12

| Developmental Plan | Resources needed | Method to Measure | Follow-up Date |
|---|---|---|---|
| ability to develop Manager in Supply chain, Labor Management, Management | AMDG, BP manuals and Read " Developing Leaders Around You" | Sucessful completion of the AMDG with positive results | 7/30/04 |
| | | | |

| Current Recommendations | (Check) | Comments |
|---|---|---|
| Remain in current position for continued development | -X- | |
| Developmental Projects | -X- | running the unit |
| Promote | - - | |
| Willing to relocate | - - | |
| Special interests | - - | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0119

http:// ... relpl EvalS/Eval_Process//index.cfm

4/22/2004

E- lu   Y    w

al - 2004 Performance Comments and Signatures

S  e   's Comments:

S  en      Dwight has excellent skills in administration and
  p    evelopment. He has learned Food management, PAR,
      d  s an excellent mulit tasker. He is now currently
  rk   towards mastering running the unit. This will be the
      er in his development. He is doing a very good job.

Improvement(s) from last evaluation:
  n improvement in labor management however has
  s au   re to go.

Developmental Needs: dwight
  d   round out his career and put the whole concept
  v   He will do this via running the unit.

  hi   's Comments:

Rodgers v. Cracker Barrel
Def. Initial Disc. 0120

Evaluation View

Employee's
Signature:

Supervisor's
Signature:                    TIM SPEZIALE

Second Level Review
Signature:

**Definition for Second Level Review and Signature**

1. Associate Manager and Senior Associate Manager evaluations performed by General Manager, the Second Level Review is the District Manager.

~OR~

2. General Manager and Retail Manager evaluations performed by District Manager, the Second Level Review is the Regional Vice President.

"I accept and understand Cracker Barrel's Equal Employment Opportunity policy, Anti-harassment policy, and Open Door policy; and that employees may utilize the company's toll free number (1-888-648-DOOR) to report complaints or violations of these policies. I understand that the company may be held responsible for acts of harassment that I commit, condone, tolerate, or fail to investigate. I further understand that if I violate any aspect of these policies that I will be subject to immediate discipline, up to and including termination, and that I can be sued and may be held personally liable for my acts or omissions. Therefore, I acknowledge and confirm that I am not aware of any observed, alleged, experienced, or reported harassment, including discrimination or sexual harassment. I commit that I will report any such knowledge or awareness of possibl

Rodgers v. Cracker Barrel
Def. Initial Disc. 0121

Evaluation View

violations of these policies to my immediate supervisor or the Employe
Relations Department. "

Employee signature:

Process Date 4-18-2004 21:7:28

IMAGED

IMAGED

IMAGED

IMAGED

Rodgers v. Cracker Barrel
Def. Initial Disc. 0122

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi-Annual Evaluation

## FY 2003 Associate Manager Performance Evaluation

**THIS PAGE MUST BE COMPLETED TO CONTINUE.**

Associate Manager's Name: Dwight Rodgers

Associate Mgr. Employee Number: 364639

General Manager Name: Thomas K. Speziale

General Mgr. Employee Number: 846425

Store Number: 505

DM Name: George Katsoudas

District Number: 47

Evaluation Cycle: FY 2003 1st Semi-Annual Evaluation

Evaluation Date: 3/21/2003

**THIS PAGE MUST BE PRINTED WHEN EVALUATION IS SUBMITTED TO HR**

1. All Associate Managers will receive a printed page copy of their evaluation.
2. District Managers will receive and process all Store Management evaluations through Home Office.

Rodgers v. Cracker Barrel
Def. Initial Disc. 0093

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

## FY 2003 Associate Manager Standards, Weights, and Rating Scales

**Company Goal: "To Become the Best Restaurant Company in America"**

Performance Measures = 80 points
Performance Behaviors = 120 points

| Objective 1: Achieve and maintain fully staffed stores with high quality management and hourly employees. | |
|---|---|
| **Performance Measurements** | **Weight** |
| 1) Meet overtime % related to total labor cost | 5 |
| 1: Unacceptable: (.61% or greater)  2: Needs Improvement: (.41% to .60%)  3: Meets Standards: (.31% to .40%)  4: Exceeds Standards: (.21% to .30%)  5: Role Model: (.20% or less) | |
| 2) Achieve hourly turnover goal (Goal = 125% annualized) | 14 |
| 1: Unacceptable: (146 or greater)  2: Needs Improvement: (126 to 145)  3: Meets Standards: (113 to 125)  4: Exceeds Standards: (101 to 116)  5: Role Model: (100 or less) | |
| **Performance Behaviors** | |
| 3) Staffing and Retention | 24 |
| 4) Leading, Developing, and Communicating with Others | 14 |
| 5) Administering Policies and Procedures | 12 |

| Objective 2: Improve guest perceptions. | |
|---|---|
| **Performance Measurements** | **Weight** |
| 6) Number of guest complaints | 5 |
| 1: Unacceptable: (8 or more guest complaints)  2: Needs Improvement: (6 - 7 guest complaints)  3: Meets Standards: (4 - 5 guest complaints)  4: Exceeds Standards: (2 - 3 guest complaints)  5: Role Model: (0 - 1 guest complaints) | |
| 7) Store Visit Report (average of two scores) | 5 |
| 1: Unacceptable: (74 or below)  2: Needs Improvement: (75 to 84)  3: Meets Standards: (85 to 89)  4: Exceeds Standards: (90 to 93)  5: Role Model: (94 or better) | |
| **Performance Behaviors** | |
| 8) Building and Maintaining Guest Relations | 22 |
| 9) Planning and Supervising Operations | 12 |
| 10) Safety, Security, and Sanitation | 13 |

| Objective 3: Improve store margins. | |
|---|---|
| **Performance Measurements** | **Weight** |
| 11) Achieve restaurant labor goal | 5 |
| 1: Unacceptable: (greater than or equal to +.20)  2: Needs Improvement: (+.01 to +.19)  3: Meets Standards: (-.09 to 0)  4: Exceeds Standards: (-.29 to -.10)  5: Role Model: (less than or equal to -.30) | |
| 12) Achieve food cost goal | 5 |
| 1: Unacceptable: (greater than or equal to +.40)  2: Needs Improvement: (+.10 to +.39)  3: Meets Standards: (-.09 to +.09)  4: Exceeds Standards: (-.29 to -.10)  5: Role Model: (less than or equal to -.30) | |
| 13) Reduce inventory shrinkage to hit targeted goal | 5 |
| 1: Unacceptable: (+3.76% or greater)  2: Needs Improvement: (+3.26% to +3.75%)  3: Meets Standards: (+2.75% to +3.25%)  4: Exceeds Standards: (+2.25% to +2.74%)  5: Role Model: (+2.24% or less) | |
| **Performance Behaviors** | |
| 14) Maintaining Sales and Quality of Operation | 24 |

| Objective 4: Exceed the financial plan. | |
|---|---|
| **Performance Measurements** | **Weight** |
| 15) Net Operating Income (OI vis Last Year OI | 12 |
| 1: Unacceptable OI vis LY: (-5.00%)  2: Needs Improvement OI vis LY: (-1.01% to +7.50%)  3: Meets Standards OI vis LY: (+7.51% to +15.00%)  4: Exceeds Standards OI vis LY: (+15.10% to +20.00%)  5: Role Model OI vis LY: (+20.01% or greater) | |
| 16) Achieve Net Restaurant Sales Growth | 11 |
| 1: Unacceptable Rates: (-3.50% or below)  2: Needs Improvement Rates: (-3.50% to -3.59%)  3: Meets Standards Rates: (+2.40% to +5.49%)  4: Exceeds Standards Rates: (+5.50% to +6.09%)  5: Role Model Rates: (+6.10% or greater) | |
| 17) Achieve Retail Sales vis Last Year | 5 |
| 1: Unacceptable: (-3.50% or below)  2: Needs Improvement: (-3.59% to -0.10%)  3: Meets Standards: (-0.09% to +3.00%)  4: Exceeds Standards: (+3.91% to +5.99%)  5: Role Model: (+6.00% or greater) | |

| General Rating Scale | |
|---|---|
| 1: Unacceptable | Performance fails to meet job requirements and requires immediate improvement. |
| 2: Needs Improvement | Performance is somewhat below job requirements and requires attention. |
| 3: Meets Standards | Performance is acceptable and meets job requirements. |
| 4: Exceeds Standards | Performance is excellent and usually exceeds job requirements. |
| 5: Role Model | Performance is outstanding and consistently exceeds job requirements. |

| Performance Ratings (Overall Performance rating averages both performance measures and behaviors) |
|---|
| **Overall Rating Scale**  1 = 19 - 29.49 points  2 = 29.50 - 49.49 points  3 = 49.50 - 69.49 points  4 = 69.50 - 89.49 points  5 = 89.50 - 100 points |

Confidential Document

FY03 Associate Manager 1
Document Revised 1/??

Rodgers v. Cracker Barrel
Def. Initial Disc. 0094

Page 2 of 10




Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi-Annual Evaluation

Assoc. Manager Name: Dwight Rodgers
Employee Number: 951638
GM Name: Thomas K. Speziale
General Mgr. Employee Number: 846425
Store Number: 505

**Objective 1: Achieve and maintain fully staffed stores with high quality management and hourly employees.**

Performance Measurements:

Focus Areas:

| | Performance Measurements | | |
|---|---|---|---|
| 1st Semi / 2nd Semi | 3. Needs Improvement (41% to 60%) | 1) Meet overtime % related to total labor cost | |
| 1st Semi / 2nd Semi | 4. Exceeds Standards (101 to 115) | 2) Achieve hourly employee turnover goal (Goal = 120% annualized) | |

Performance Behaviors:

Actions:

Focus Areas:

| | | | |
|---|---|---|---|
| 1) Staffing & Retention | 3.1 Develops and implements appropriate staffing and succession plans. | |
| 3. Meets Standards | 3.2 Hires appropriately qualified candidates through effective interviewing and selection processes. | Strength |
| | 3.3 Follows procedures outlined in the Staffing & Retention guide. Follows Best Practices guidelines for staffing and retention. | Developmental |
| | 3.4 Creates a work atmosphere where employees feel appreciated and motivated to perform and remain with Cracker Barrel. | |
| | 3.5 Confronts and resolves employee conflicts and morale issues. | |
| | 3.6 Supports and promotes quality of life initiatives. | Strength |
| | 3.7 Evaluations are performed on a timely basis per the review cycle. | |
| | 3.8 Interviews all applicants and has a good application system in place. | Strength |
| | 3.9 Uses designated skill trainers for all positions and meets regularly to improve training. | |

| | | | |
|---|---|---|---|
| 4) Leading, Developing and Communicating with Others | 4.1 Communicates Cracker Barrel mission, vision, values and goals to employees. Motivates and gains commitment from others. Schedules and leads weekly management meetings. | Strength |
| 4. Exceeds Standards | 4.2 Holds managers and staff accountable to Cracker Barrel Standards. | Strength |
| | 4.3 Trains employees effectively, using a hands-on approach when necessary. | |
| | 4.4 Provides specific, meaningful and well-balanced feedback to retail counterparts, subordinates, peers, and supervisors on an ongoing basis. | |
| | 4.5 Effectively manages performance to develop employees. | Strength |
| | 4.6 Listens actively; makes sure all positions open their policy and manager is approachable. | |
| | 4.7 Communicates clearly, candidly, and honestly; avoids ambiguity and mixed messages. | Strength |
| | 4.8 Effectively uses situational leadership skills to communicate with others. | |
| | 4.9 Participates in self and Associate Manager development as outlined in the Associate Manager Development Guide. | |

| | | | |
|---|---|---|---|
| 5) Administering Policies & Procedures | 5.1 Executes Cracker Barrel's orientation and skills training programs for new employees. | Strength |
| 3. Meets Standards | 5.2 Documents and manages discipline and/or performance problems in accordance with Cracker Barrel's policies and procedures. | |
| | 5.3 Demonstrates a working knowledge of fair employment policies and guidelines (EEO guidelines, hiring reports, OSHA, etc.). | Strength |
| | 5.4 Supports and activates responsibilities associated with the performance management process. | |
| | 5.5 Follows all Best Practices initiatives. | Developmental |

Each Performance Measure and Behavior MUST have a rating to calculate the Objective Subtotal.
If not, "NOT COMPLETE" will be displayed. Go back and review results.

**Objective 1 Point Subtotals:**

| | | |
|---|---|---|
| 1st Semi | Performance Measurements: | 13.20 |
| 2nd Semi | Performance Behaviors: | 22.80 |
| | Performance Measurements: | NOT COMPLETE |
| | Performance Behaviors: | NOT COMPLETE |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0095

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi Annual Evaluation

Assoc. Manager Name: Dwight Rodgers
Employee Number: 364633
GM Name: Thomas K. Speziale
General Mgr. Employee Number: 640425
Store Number: 605

### Objective 2: Improve guest perceptions.

**Performance Measurements:**

| | | | Focus Areas: |
|---|---|---|---|
| 1st Semi / 2nd Semi | 1: Unacceptable: (9 or more guest comforts) | 4] Number of guest complaints | |
| 1st Semi / 2nd Semi | 3: Meets Standards: (35 to 86) | Store Visit Report (average of bus scores) | |

**Performance Behaviors:**

| | Actions: | Focus Areas: |
|---|---|---|
| 8] Building and Maintaining Guest Relations | 8.1 Educates and empowers employees to please guests. | Strength |
| 1st Semi / 2nd Semi — 3: Meets Standards | 8.2 Interacts frequently with guests in dining room (e.g., table visits) and retail store in a friendly, courteous manner. | Strength |
| | 8.3 Follows through on commitments made to internal and external guests (i.e. follow through with complaints) | Strength |
| | 8.4 Resolves guest problems or needs using S.T.A.R.S. Sets an example for employees. | Strength |
| | 8.5 Provides service to guests that exceeds their needs and expectations. | |
| | 8.6 Uses a friendly, sales, and demonstrable pleasing people practices. | |
| 9] Planning and Supervising Operations | 9.1 Does accurate sales and labor forecasts. Anticipates and responds to volume fluctuations / bottlenecks and takes appropriate action. | Developmental |
| 1st Semi / 2nd Semi — 3: Meets Standards | 9.2 Utilizes multiple tasks and non-committed resources. Organized and uses day planner effectively. Meets all company and district deadlines. | |
| | 9.3 Considers employee training, breaks, and special events in preparing schedules. | |
| | 9.4 Uses organization of GMA Priorities, delegation and follow-up to maintain a smooth operation. | Strength |
| | 9.5 Plans shifts using appropriate tools (e.g. PEP, labor cards, production charts, Ally Rally, Red Book) to ensure store readiness. | Strength |
| | 9.6 Determines behaviors that need improvement, develops and implements goals and plans which successfully address these behaviors. | |
| 10] Safety, Security, and Sanitation | 10.1 Follows all HACCP guidelines. | Strength |
| 1st Semi / 2nd Semi — 3: Meets Standards | 10.2 Meets all Cracker Barrel asset protection policy, cash management, safety, security, and sanitation standards. | Strength |
| | 10.3 Maintains property, building, and equipment function at all times. | Developmental |
| | 10.4 Performs regular walk-thrus and holds all employees accountable for safety, security, and sanitation. | |
| | 10.5 Performs all required safety and sanitation inspections and makes adjustments as necessary. | Strength |
| | 10.6 Ensures regular inspection of restrooms. | Strength |
| | 10.7 Monitors dating and rotating shelf life on foods and food packages. | |
| | 10.8 Makes regular guaranteed trash runs throughout shift. | |
| | 10.9 Educates and trains hourly staff and other managers on proper safety and security procedures. | |
| | 10.10 Promotes the "clean as you go" policy. | Strength |

Each Performance Measure and Behavior MUST have a rating to calculate the Objective Subtotal. If not, "NOT COMPLETE" will be displayed. Go back and review results.

**Objective 2 Point Subtotal:**

| | |
|---|---|
| 1st Semi — Performance Measurements: 6.80 | |
| Performance Behaviors: 30.00 | |
| 2nd Semi — Performance Measurements: NOT COMPLETE | |
| Performance Behaviors: NOT COMPLETE | |

FY03 Associate Manager Evaluation
Document Revised 11/01/2002

Rodgers v. Cracker Barrel
Def. Initial Disc. 0096

IMAGED

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi Annual Evaluation

Assoc. Manager Name: Dwight Rodgers
Employee Number: 354939
GM Name: Thomas K. Speziale
General Mgr. Employee Number: 345425
Store Number: 505

**Objective 3: Improve store margins.**

Performance Measurements:

| 1st Semi / 2nd Semi | 5: Role Model: (less than or equal to -.30) | | 11) Achieve restaurant labor goal | | Focus Areas: |
|---|---|---|---|---|---|

| 1st Semi / 2nd Semi | 1: Unacceptable (greater than or equal to +.40) | | 12) Achieve food cost goal | | |
|---|---|---|---|---|---|

| 1st Semi / 2nd Semi | 1: Unacceptable (+0.30% or greater) | | 13) Reduce inventory shrinkage to his targeted goal | | |
|---|---|---|---|---|---|

Performance Behaviors:

| | | Actions: | Focus Areas: |
|---|---|---|---|
| | 14) Maintaining Sales and Quality of Operation | 14.1 Manages production, labor, and other costs using Cracker Barrel tools to achieve planned targets. | Strength |
| 1st Semi / 2nd Semi | 3: Meet Standards | 14.2 Follows company mandatory food cost requirements. | Developmental |
| | | 14.3 Increases sales and profitability through shift execution and appropriate sales-building strategies (using a seating index and appropriate staffing) | |
| | | 14.4 Maximizes productivity of self and others. | Strength |
| | | 14.5 Takes initiative to solve operational problems that arise. | Strength |
| | | 14.6 Labor - schedules properly for the volume to hit the targeted goal. | |
| | | 14.7 Demonstrates an understanding of the impact of all decisions on Cracker Barrel profits. | |
| | | 14.8 Uses data to make appropriate decisions to maximize sales. | |
| | | 14.9 Adheres to Cracker Barrel product and guest service standards. | |
| | | 14.10 Adheres to Cracker Barrel food quality and standards. | |
| | | 14.11 Takes and maintains proper procedures for cash, credit, check, collection, reporting, service comps, manager unknowns, voids, and meal discounts. | |
| | | 14.12 Has proper (minimum standards) level of total teams in service to assure a smooth operation. | |
| | | 14.13 Partners with management to reduce shrinkage. | |
| | | 14.14 Reduces shrinkage through the use of the "Effective Shrinkage Management" tool. | Developmental |
| | | 14.15 Ensures compliance to Retail Audit Procedure. | Developmental |
| | | 14.16 Follows Asset Protection Policy | Strength |

Each Performance Measure and Behavior MUST have a rating to calculate the Objective Subtotal.
If not, "NOT COMPLETE" will be displayed. Go back and review results.

| 1st Semi / 2nd Semi | Objective 3 Point Rationale: |
|---|---|
| | Performance Measurements: 10.30 |
| | Performance Behaviors: 14.40 |
| | Performance Measurements: NOT COMPLETE |
| | Performance Behaviors: NOT COMPLETE |

IMAGED

Rodgers v. Cracker Barrel
Def. Initial Disc. 0097



Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi-Annual Evaluation

Assoc. Manager Name: Dwight Rodgers
Employee Number: 384639
GM Name: Thomas K. Speziale
General Mgr. Employee Number: 646425
Store Number: 505

**Objective 4: Exceed the Financial Plan**

Performance Measurements:

| | | | | | | Focus Areas: |
|---|---|---|---|---|---|---|
| 1st Semi / 2nd Semi | 3: Role Model CS vs LY: (+30.01% or greater) | ▼ | 11) Net Operating Income (OI) vs Last Year OI | | | ▼ |
| 1st Semi / 2nd Semi | 1: Role Model Review (+4.10% or greater) | ▼ | Net Restaurant Sales Growth | | | ▼ |
| 1st Semi / 2nd Semi | 2: Needs Improvement: (-3.99% to -0.10%) | ▼ | 17) Achieve Retail Sales vs Last Year | | | ▼ |

Each Performance Measure and Behavior MUST have a rating to calculate the Objective Subtotal.
If not, "NOT COMPLETE" will be displayed. Go back and review results.

| | Objective 4 Point Subtotal: | |
|---|---|---|
| 1st Semi | Performance Measurements 21.25 | |
| | Performance Behaviors --- | |
| 2nd Semi | Performance Measurements NOT COMPLETE | |
| | Performance Behaviors --- | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0098

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi-Annual Evaluation
Assoc. Manager Name: Dwight Rodgers
Employee Number: 384639
GM Name: Thomas K. Speziale
GM Employee Number: 846425
Store Number: 505
Evaluation Date: 3/21/2003

**Company Goal: "To Become the Best Restaurant Company in America"**

## FY 2003 Performance Summary

Note: Evaluations are completed semi-annually. It is important for all managers to receive "two" evaluations per year. The first column represents the "1st Semi Annual Evaluation" (fiscal periods 1-6) and the second column represents the "2nd Semi Annual Evaluation" (fiscal periods 7-12). Both scores are used to calculate the "Overall Performance Rating".

Each Objective Performance Measures and Behaviors MUST have a rating to calculate an Overall Performance Rating. If not, "NOT COMPLETE" will be displayed.

| | | 1st Semi-Annual Evaluation | 2nd Semi-Annual Evaluation | Annual |
|---|---|---|---|---|
| Objective 1: Achieve & maintain fully staffed stores. | Performance Measurements | 13.20 | NOT COMPLETE | 13.20 |
| | Performance Behaviors | 32.80 | NOT COMPLETE | 32.80 |
| Objective 2: Improve guest perceptions. | Performance Measurements | 8.80 | NOT COMPLETE | 8.80 |
| | Performance Behaviors | 30.00 | NOT COMPLETE | 30.00 |
| Objective 3: Improve store margins. | Performance Measurements | 10.20 | NOT COMPLETE | 10.20 |
| | Performance Behaviors | 14.40 | NOT COMPLETE | 14.40 |
| Objective 4: Exceed the financial plan. | Performance Measurements | 21.20 | NOT COMPLETE | 21.20 |
| | Performance Behaviors | -- | -- | -- |
| Total Score Performance Measurements | | 53.20 | #VALUE! | 53.20 |
| Total Score Performance Behaviors | | 77.20 | #VALUE! | 77.20 |
| Overall Performance Rating | | 3 | #VALUE! | 3 |
| Performance Improvement Form (PIF) Required: | | NO | #VALUE! | |

**Rating Scale:**
1 = 19.00 – 29.49
2 = 29.50 – 49.49
3 = 49.50 – 69.49
4 = 69.50 – 89.49
5 = 89.50 – 100

| 2003 Overall Performance Rating | 3 |
|---|---|

Career Management and Tracking: Please complete the career development information.

| | Current Recommendations (Check) | | Comments |
|---|---|---|---|
| Career Development | Retain in current position for continued development | ☑ | (Add comments here) |
| | Developmental projects | ☐ | (Note position here) |
| | Promote | ☐ | (Note position here) |
| | Willing to relocate | ☐ | (Note any ideal areas here) |
| | Special Interests | ☐ | (Note any special interests here) |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0099

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi-Annual Evaluation
Assoc Manager Name: Dwight Rodgers
Employee Number: 364639
GM Name: Thomas K. Speziale
GM Employee Number: 546425
Store Number: 505
Evaluation Date: 3/21/2003

**FY 2003 Performance Comments and Signatures**                    **1st Semi-Annual Evaluation**

Identify which quarter the comments are referencing.
Should comments exceed what is displayed in the textbox on the screen, attach additional sheet.

THE TEXTBOXES DO NOT EXPAND.

Highlight Text To:
Cut: CTRL-X
Copy: CTRL-C
Paste: CTRL-V
Enter: CRTL-Enter

1st Semi-Annual Evaluation (Insert Comments here)



Employee Comments
Employee Comments may be written in this space.

Employee Signature: _____  Date 3/28/03

Manager's Signature: _____  Date _____

DMs Signature (if required) _____  Date _____

Restaurant RVP Signature: _____  Date _____

By signing this evaluation,

"I accept and understand Cracker Barrel's Equal Employment Opportunity policy, Anti-harassment policy, and Open Door policy; and that employee's may utilize the company's toll free number (1-888-446-DOOR) to report complaints or violations of these policies. I understand that the company may be held responsible for acts of harassment that I commit, condone, tolerate, or fail to investigate. I further understand that if I violate any aspect of these policies that I will be subject to immediate discipline, up to and including termination, and that I can be sued and may be held personally liable for my acts or omissions. Therefore, I acknowledge and confirm that I am not aware of any observed, alleged, experienced, or reported harassment, including discrimination or sexual harassment. I commit that I will report any such knowledge or awareness of possible violations of these policies to my immediate supervisor or the Employee Relations Department."

Employee Signature _____  Date 3/28/03

FY03 Associate Manager Evalua
Document Revised 11/01/200:

Rodgers v. Cracker Barrel
Def. Initial Disc. 0100

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi-Annual Evaluation
Assoc. Manager Name: Dwight Rodgers
Employee Number: 364839
GM Name: Thomas K. Speziale
GM Employee Number: 846425
Store Number: 505
Evaluation Date: 3/21/2003

FY 2003 Performance Comments and Signatures
*Identify which quarter the comments are referencing.*

2nd Semi-Annual Evaluation

THE TEXTBOXES DO NOT EXPAND.
Should comments exceed what is displayed in the textbox on the screen, attach additional sheet.

Highlight Text To:
Cut:    CTRL-X
Copy:   CTRL-C
Paste:  CTRL-V
Enter:  CTRL-Enter

2nd Semi-Annual Evaluation: (Insert comments here)

Employee Comments
Employee comments may be written in this space.

Employee Signature: _____ Date _____

Manager's Signature: _____ Date _____

DMA Signature: _____ Date _____

Restaurant RVP Signature: _____ Date _____
By signing this evaluation.

"I accept and understand Cracker Barrel's Equal Employment Opportunity policy, Anti-harassment policy, and Open Door policy, and that employee's may utilize the company's toll free number (1-888-648-DOOR) to report complaints or violations of these policies. I understand that the company may be held responsible for acts of harassment that I commit, condone, tolerate, or fail to investigate. I further understand that if I violate any aspect of these policies that I will be subject to immediate discipline, up to and including termination, and that I can be sued and may be held personally liable for my acts or omissions. Therefore, I acknowledge and confirm that I am not aware of any observed, alleged, experienced, or reported harassment, including discrimination or sexual harassment. I commit that I will report any such knowledge or awareness of possible violations of these policies to my immediate supervisor or the Employee Relations Department. "

Employee Signature _____ Date _____

Rodgers v. Cracker Barrel
Def. Initial Disc. 0101

Cracker Barrel Old Country Store, Inc.
FY 2003 Associate Manager Performance Evaluation

FY03 1st Semi-Annual Evaluation
Assoc. Manager Name: Dwight Rodgers
Employee Number: 384839
GM Name: Thomas K. Speziale
GM Employee Number: 845425
Store Number: 505
Evaluation Date: 3/21/2003

## FY 2003 Individual Development Plan

|  | Assignment | Resources Needed | Achievement | Follow-Up Date |
|---|---|---|---|---|
| 1st Semi-Annual Evaluation: | Learn targeted food management system | Targeted food book, D47 bp seminar | achieve food cost | End of fiscal 03 |
|  | Organization | Day Timer | Complete quality of assignment as well as on time | End of fiscal 03 |
|  | Implement Focus Fifty | FF program | reduced shrink | End of fiscal 03 |
|  | Reduction in guest complaints | Guest service, staffing, table visits | 1 per month goal | End of fiscal 03 |
|  | (Insert assignment here) |  |  |  |
|  | (Insert assignment here) |  |  |  |

|  | Assignment | Resources Needed | Achievement | Follow-Up Date |
|---|---|---|---|---|
| 2nd Semi-Annual Evaluation: | (Insert assignment here) |  |  |  |
|  | (Insert assignment here) |  |  |  |
|  | (Insert assignment here) |  |  |  |
|  | (Insert assignment here) |  |  |  |
|  | (Insert assignment here) |  |  |  |
|  | (Insert assignment here) |  |  |  |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0102

Dwight has worked diligently in the opening of unit #505 Athens. He has leaned the Cracker Barrel standards quickly and competently. The store opened fully staffed. The store also had very good financial results during the first months of operation. The opportunities for the store and for Dwight and the unit are as follows:

- Overtime needs to be reduced to .35%
- Guest Complaints need to be at no more than one per month. Continue to maintain presence on the floor.
- Learn the standards included in the Targeted Food Management Book (i.e. recipes, ideal knowledge, FCCC, etc.)
- Implementation of focus fifty program.
- Retail percent to total needs to improve.
- We as a management team need to be more cohesive. We need to share opinions with each other. We need to assess overall performance of our actions and the staff. As a group we must have unified goals.
- Insure that courses are nearing completion on the E-Learning computer.
- Develop your own organization system (Day Timer)
- Accurately enforce and all cash handling and audit procedures. Implement the Focus Fifty program
- Assist retail counterpart to drive sales and reduce shrink.

Keep up the hard work



Rodgers v. Cracker Barrel
Def. Initial Disc. 0103



Rodgers v. Cracker Barrel
Def. Initial Disc. 0104

# EXHIBIT 3
# TO ALEXANDER AFFIDAVIT

-----Original Message-----
**From:**  **Alexander Rich 8015**
**Sent:**  Tuesday, March 22, 2005 8:00 PM
**To:**    Phillips Ron 9802
**Subject:**      03-23-05 RE: Dwight Rodgers Concerns

Ron, once again, I come to you for advice in regards to my efforts to understand, support and correct behaviors of my general manager Dwight Rodgers.  I had a mandatory meeting with the associate managers of #237 Gardendale this past Monday which I had pre-planned with Dwight as we both agreed that their was a lot of dissention among the management team and this dissention was obvious to the employees and was a distraction to our business needs.  Following is a recap of this meeting with Tommie Patterson, Carolyn Freeman and Brain Harbin.  Lisa Claburn did not attend as she is out on medical leave of absence.

I opened the meeting with asking for feedback as to what are the current issues at our Gardendale location.  At this time I listened and took the following notes:

1.  Lack of communication.  Communication in passing.  Manager meetings are not being held weekly and when held are not planned out well.  No clear vision.

2.  Managers are not on the same page.  Lots of confusion.
3.  Dwight not here a lot.  A lot of issues of health and personal distractions.
4.  Tommie asked to meet with Dwight and told Dwight that he questioned his commitment.  Dwight immediately turned this to questioning Tommie's commitment and never asked Tommie any probing questions in regards to Tommie's initial request.

5.  Dwight came out with a new checklist that he uses to evaluate managers.  Never rolled out to managers in a meeting format and does not himself complete the checklist on shifts he is responsible for.  Double standard.

6.  Lack of courtesy for others.  Carolyn was sick with the flu when she opened one day.  Asked Dwight if she could leave instead of attending the managers meeting.  Dwight required her to stay after her opening shift.  Yet he has missed three shifts when he was sick.

7.  Associates feel they are working more hours and putting in more effort than Dwight.
8.  Brian, a fairly new associate, said he questions Dwight's passion for the job.
9.  Two weeks ago, Dwight was off of Wednesday which is SBD.  He came into the restaurant and was on the 1 hour conference call with Rich & Debbie and then stayed and did admin work for another 3 hours.  The next day, Thursday, he called a shift leader in to cover his mid shift because he worked on his day off.

10.  Many of occasions of asking other managers to cover his shifts and never offers to make up for their days off.
11.  Never seeks opinions of his management team.  His way only.
12.  Very knowledgeable about CB policies and procedures.  Great ideas and talks a good game.  No follow up.

Ron, since this turned into a leadership issue, I asked the managers to independently rate Dwight on a scale of 1-10 with ten being high in the following categories:

**_Category_**      **_Brian_**  **_Tommie_**  **_Carolyn_**

| | | | |
|---|---|---|---|
| **Respect** | 5 | 3 | 1 |
| **Work Ethic** | 2 | 2 | 3 |
| **Credibility** | 3 | 2 | 1 |
| **Integrity** | 2 | 1 | 1 |
| **Role Model** | 2 | 2 | 1 |
| **Sets Vision** | 4 | 1 | 1 |
| **Compassion** | 4 | 4 | 2 |
| **Passion** | 4 | 2 | 3 |

Ron, another concern I have is that the managers are on a 6 day work week with Lisa out and Dwight at the home office for phase 2 of his new ETC training.  He took Sunday off and his schedule shows him at the home office Monday through Thursday and returning to open on Friday.  My understanding which I will confirm tomorrow is that the GMs are at the home office until Tuesday and the ETC stays through Thursday.  Dwight called me twice yesterday to question how the meeting went and I twice confirmed that his next day back in the unit would be Friday and I would have a meeting with him then to discuss my findings.  I am going to be very disappointed if in fact he is not at home office on Wednesday and Thursday and takes these days off when his managers are working 6 days.  This of course would give him 3 days off this week.

George asked me to stay on the line today after the conference call as Dwight has been seeking George's advice.  Dwight tells George that I take Tommie's side because I thought Tommie should have been chosen for the GM position.  Ron, we never even considered Tommie for this position and I feel I have always been very objective when it comes to treating managers fairly and equally.

My concern is how to present these issues to Dwight as in the past he becomes very defensive and always tries to justify his position without taking any ownership for mistakes he might have made.  If it is at all possible, I would like to have a third party at my meeting with Dwight this Friday when I discuss these issues.  I know it is short notice, but any help is appreciated.

Thanks.
Rich Alexander

EXHIBIT 4

TO ALEXANDER AFFIDAVIT

-----Original Message-----
**From:  Phillips Ron 9802**
**Sent:**  Monday, February 28, 2005 4:06 PM
**To:**    Adkins Mike 394
**Subject:**      02-28-05 FW: Dwight Rogers

So you're in the loop... Rich had some concerns about two months ago regarding Dwight.
Rich and I sat down together with Dwight and worked through some attendance issues, accountability concerns, and his inability to build credibility.

I'll be talking with Rich to get more information... FYI

Ron

-----Original Message-----
**From:  Alexander Rich 8015**
**Sent:**  Tuesday, February 22, 2005 8:05 PM
**To:**    Phillips Ron 9802
**Subject:**      Dwight Rogers

Ron, I need to share with you some additional concerns that have surfaced with Dwight at Gardendale.  I am definitely going to address these concerns with Dwight when he returns to work.  However, I would appreciate any advise you could give me.

Dwight continues to not keep me informed of his schedule changes and is not always totally honest in my opinion when questioned even over minor items.  Here are some of my recent concerns.

At the meeting you held for the new GMs & RMs, I gave Dwight a signed check for Jim 'N Nick"s.  As I was leaving on vacation, I asked Dwight to give me a voice mail as to the amount of the check.  Never heard from Dwight for 7 days. Left him a voice mail reminding me that he was to leave me a message.  He responded that he did leave me a voice mail and the amount was $$430.90.  Ron, I am a voice mail addict and especially if anyone is leaving me a message in regards to my personal finances, I would not delete that message.  I am concerned why he just can't say "Sorry, Rich here is the amount".  Again an example that he is incapable of just admitting a mistake.  This is something that to me would have been a very minor mistake.

I found out today that this past Sunday, Dwight was scheduled to close.  He came in at 4pm and stayed until 4:45pm and said he was sick and left.  The shift leader that had been there since 8am had to stay until 9pm.  Dwight did not call me to inform me that he was sick and would miss his shift.  He knows that GMs must leave me any schedule changes just as I do to you.

I did not know of this when I called Dwight Monday morning at 11am to check on the set up for the meeting you had today.  He did not tell me while we were on the phone that he was sick the night before and didn't work his shift.  While I was talking to him about the meeting set up, he stated that he had just heard that his aunt in South Carolina had died.  I expressed my condolences and questioned whether he needed additional time off. I also asked him about the funeral arrangements and he replied that he didn't know.  He responded that he would attend the funeral but it would not change

his schedule.  I told him to call me Monday afternoon and we would continue to discuss the needs for your meeting on Tuesday.

Dwight didn't call me back.  At 4pm I called the store and asked to speak to Dwight who was supposed to be closing.  I was told that Tommie Patterson was the closing manager.  I knew that Tommie had come in at 8am to work on schedules.  Tommie said that Dwight asked him to close for him as his aunt had died.  This is after Dwight had told me that his schedule would not be affected.

Ron, it is now 8pm Tuesday night.  Dwight did not dial in on a conference call I had with the GMs at 10am this morning, has not once again informed me of his schedule changes and has not responded to other misc. voice mails.

Ron, I feel Dwight is very talented and capable of being the leader we need him to be, but I feel his is loosing credibility among the managers and staff due to his off-beam behaviors.  I plan to meet with him on Sunday morning to discuss my concerns and would appreciate your advice.

Thanks.
Rich A.

EXHIBIT 5

TO ALEXANDER AFFIDAVIT

**Barnes Kelly 419**

| | |
|---|---|
| **From:** | Tramel Kim 419 |
| **Sent:** | Friday, June 03, 2005 10:58 AM |
| **To:** | Barnes Kelly 419 |
| **Subject:** | FW: 05-15-05 FW: Mtg. with Dwight Rodgers |
| **Importance:** | High |

Please keep this with any other information pertaining to Dwight Rodgers and his performance issues. Ron and I spoke at length on Tuesday, May 31, 2005 concerning Dwight's desire to transfer to the new Montgomery unit as GM. I advised Ron that I was reluctant with this situation because Dwight currently is on a "2" for performance and has continued to have attendance and interpersonal issues within his unit. I had already shared these same concerns earlier in the day with Mike Adkins. He was planning to talk to Dwight about the ongoing issues with his performance and explore the potential for moving him from unit #237 to unit #574. I asked Ron to follow back up with me after they had their discussion but have heard nothing further from him on this matter.

-----Original Message-----
| | |
|---|---|
| **From:** | Phillips Ron 9802 |
| **Sent:** | Sunday, May 15, 2005 5:13 PM |
| **To:** | Adkins Mike 394; Tramel Kim 419 |
| **Cc:** | Alexander Rich 8015 |
| **Subject:** | 05-15-05 FW: Mtg. with Dwight Rodgers |

Kim and Mike,
Rich sent this to me Sunday PM; Rich and I talked early Sunday AM. This has been an ongoing problem with Dwight and has reduced his effectiveness in the unit - both in his in-store presence and his ability to command respect and support from his management staff (Note the voice mail I forwarded from Rich/Brian.)

I am very concerned of the direction Dwight is taking (not leading, but taking) the Gardendale unit. At the very least, my opinion is this MUST be a final written warning... but that will probably not solve Dwight's problems. He continues to refuse to accept any responsibility for his actions and how they impact the team. His failure to change can (and will) result in termination - not demotion... you can't teach work ethic....

As you can tell, I'm frustrated by Dwight's inability to connect the dots. I have sat down with Rich and Dwight months ago and he was "given the message" to LEAD the store.... Kim, what are your thoughts???

Ron

-----Original Message-----
| | |
|---|---|
| **From:** | **Alexander Rich 8015** |
| **Sent:** | Sunday, May 15, 2005 5:06 PM |
| **To:** | Phillips Ron 9802 |
| **Cc:** | Alexander Rich 8015 |
| **Subject:** | Mtg. with Dwight Rodgers |

Ron, I met with Dwight Rodgers on Saturday morning May 14th at 6:00 am to discuss my concerns with two issues:
      Hours worked for the week of May 7th through May 13th
      His continuous lack of notifying me of changes in his schedule even after many conversations

The amount of time that he was out of his unit for the above mentioned week was brought to my attention via a voice mail from Brian Harbin one of his associate managers. I forwarded that message to you and you gave me advice as to how to address these issues with Dwight. As you are aware, this is not the first conversation I have had with Dwight as to either his work ethic and/or his leadership impact when he is in the unit.

Reviewing the Red Book and having statements from all the associate managers, here is a recap of Dwight's work week for the week ending May 13th in which he worked 34.25 hours. Again, this is in a unit that is negative in sales growth and missing food and labor goals.

**Saturday**: Scheduled to work 11a - 9p. He switched with Lisa Claburn (without notifying me) and then would be working 4p - close. Dwight was called by Carolyn Freeman

around 11am to stop by the Pelham Cracker Barrel to pick up some food items. He did not arrive at the unit as scheduled at 4pm. He arrived at 5pm and at 6:45pm he informed Lisa and Tommie Patterson that he didn't realize that there were going to be three managers on duty and that he was leaving and would work the upcoming Thursday on his scheduled day off to eliminate 10 hours that were scheduled for a shift leader. Dwight did leave me a voice mail on Saturday that he was changing his schedule on Sunday (Mother's Day) and instead of working 4p - close he would be working 11a -9pm.

**Sunday**: Dwight did not arrive at the unit until 12:45pm not as scheduled at 11am. Again, no call to me that he was going to be late. Dwight worked on Mother's Day from 12:45pm until 8pm. Tommie Patterson (SAM) was scheduled 1:30p to close and came in at 11am as he was both concerned about having only one associate and a shift leader on Mother's Day and he also expressed to me that he was not confident that his General Manager, Dwight, would be in at 11am. On Mother's Day, Tommie worked 11a - close (a 13 1/2 hr. day) and Dwight worked 7 1/4 hours.

**Monday**: Dwight was scheduled 11a -9p and changed his schedule to 1:30 - close. Again, I received no message on this schedule change. He did complete this shift.

**Tuesday**: Tuesday was Employee Appreciation Day. Dwight worked 10a - 4pm.

**Wednesday**: This is the only day that Dwight actually worked what he was scheduled (1:30pm to close).

**Thursday**: This is the day that Dwight was supposed to work to make up for only working one hour and 45 minutes on Saturday. He notified the unit (not me) that he was sick and to go ahead and use shift leader Kevin for the 11a - 9pm shift.

**Friday**: This was also an original scheduled day off and Dwight made the decision to go ahead and take this day off even though he had Thursday off and only worked Saturday for one hour and 45 minutes.

On Saturday the 14th of May at 6:00am I met with Dwight and told him that I had two concerns that needed to be discussed. His hours worked at the unit for the week ending May 13th and his continuous failure to notify me of General Manager schedule changes which we had discussed on many prior conversations.

Dwight immediately spoke of working 60 hours the prior week. I told Dwight thanks for working 60 hours for the week ending May 6th, but I was here to address the issues that had promoted the need for this meeting. I spoke of Dwight changing his schedule 4 times in one week and that I was not informed except for the Sunday change in which he didn't work what he told me he would be (11a - 9pm). I also went through his work week and the fact that he only worked approximately 34.25 hours at a time that his unit is struggling in restaurant and retail sales growth and cost control management.

I asked Dwight if he felt I was holding him to a different standard than other GMs in the district and he replied "No, I know other GMs call in schedule changes". I then questioned him as to why he fails to call in necessary schedule changes. He replied "I informed the managers and just failed to call you". I spoke to the fact that as a District Manager it is my obligation to call Ron Phillips if I need to make a change to my schedule. I also asked him if his ETC for example was scheduled 9a - 5p on a Monday and did not come in due to a schedule change, would he address this with her an hourly employee. His answer was "yes". I then explained the importance of the GM position in our company and how as we all advance in leadership roles, our direct reports expect a very high standard in our delivery of role modeling the behaviors that expect from our subordinates.

I also told Dwight that I had the opportunity to meet with Laura Murchison our retail RVP when I was at the new unit opening for #574 Montgomery in Lebanon. Laura mentioned that she was going to stop by Gardendale on the way home. I asked Laura that if Dwight was there to question Dwight if there were any issues with my leadership that was of any concern to gain feedback in order to improve our working relationship. I informed Dwight that I met with Laura this past Friday (May 13th) at the new unit in Montgomery and questioned her as to any feedback she had to the conversation the both of you had at your unit. Laura responded that the only concern you had was you felt that I did not have trust in you at your current position. I then told Dwight that I appreciated his concern and his failure to inform me of schedule changes is an example of why I might not exhibit the level of trust that he is looking for.

Dwight then stated that he felt I micro managed his unit. I asked for examples and he stated that his managers call me with concerns/frustrations. I tried to explain to Dwight that he needs to ask himself why his direct reports are more comfortable calling me/leaving voice mail versus talking with him. I told him that his associates should feel more comfortable talking with him as they work together and are in contact with Dwight much more than they are with me. I expressed that I would question the openness of my relationship with my General Managers if they were calling Ron Phillips with concerns about myself as the leader in District 15.

Ron, at this time, I feel it is necessary to document Dwight on his failure to inform me of his schedule changes as this is a requirement of even District Managers.  I have statements from all the associate managers as to Dwight's participation in the unit's operation this past week and their frustrations with his leadership at this unit.

Your advise as to how to proceed from this point is greatly appreciated.

Thanks.

Rich A. Alexander

EXHIBIT 6

TO ALEXANDER AFFIDAVIT

**REMIT TO:**
U-Haul
PO BOX 52128
Phoenix    AZ    85072-2128
PH:800-345-5876 OR 602-263-6611
HOURS: MON-FRI 8AM - 4PM MST
e-mail:Credit_Administration@fc.uhaul.com

**BILL TO:**
ATTN: SHERRIE ARTHUR
CRACKER BARREL-OLD CNTRY
121 MOVING CENTER COURT
MADISON TN 37115

**U-HAUL**

**INVOICE**
INV_ 2236124
DESC _Dwight Rogers_
DATE _7-25_
AMT _219.82_
CODE _1.574.54110.6.2_
BX MN3

Please include customer and invoice
numbers with your payment.  Your
business is appreciated.

| PAGE# | 1 OF | 1 |
|---|---|---|

| INVOICE NUMBER |
|---|
| 2236124 |

| INVOICE DATE |
|---|
| 25-JUL-05 |

| PURCHASE ORDER |
|---|
| DWIGHT ROGERS |

| SALES ORDER |
|---|
| 775068 09142819 |

| CUSTOMER NO |
|---|
| 99067041 |

_70140_

| TERMS | DUE DATE | SALESPERSON | RENTED DATE | MILES ALLOWED |
|---|---|---|---|---|
| DUE UPON RECEIPT | 14-AUG-05 | Keith Richardson | 22-JUL-05 | 128-1 |

| LINE# | ONEWAY OUT | QTY | UNIT PRICE | EXTD AMOUNT |
|---|---|---|---|---|
| 1 | Easy Loading Mover 17' (EL2763G) Odom Out: 157331 Due: 23-JUL-05 | 1 | 106.240 | $ 106.24 |
| 2 | Auto Transport | 1 | 59.000 | $ 59.00 |
| 3 | Utility Dolly | 1 | 10.000 | $ 10.00 |
| 4 | Furniture Pads, Regular | 36 | 0.280 | $ 10.00 |
| 5 | Rental Protection | 1 | 28.000 | $ 28.00 |
| 6 | Tax | 1 | 6.580 | $ 6.58 |

_OK to pay_
_Scu -_
_9/14/05_
_Chg # 574_
_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_

Location: VESTAVIA HILLS, AL

| Name: ROGERS DWIGHT - *1SHERRY ARTHUR | TOTAL: | $219.82 |
|---|---|---|

_Dwight Rogers_
_Pickup - Vestavia Hills, AL_
_Dropoff - Montgomery, AL_

**AP**

SEP 15 '05

**ENTERED**
SEP 16 2005

Rodgers v. Cracker Barrel
Def. Initial Disc. 0178

EXHIBIT 7

TO ALEXANDER AFFIDAVIT

On 9-3-05 at 9 am I was witness to the termination of Dwight Reyser at CB unit 574. Rich Alexander read the Counseling statement and Reasons for Termination to Dwight and then asked Dwight if he had any questions. Dwight stated that he did not. Rich then went on to let Dwight know he was being terminated. Dwight made no comments. He remained very calm and handed his Keys to Rich. Rich asked if there were any personal items that Dwight needed to get - He stated "no". Rich asked Dwight for his discount Card and Dwight said it was in his car. Rich and I both shook hands with Dwight and walked him out. Dwight came back to the front door a couple minutes later and handed me his discount card. I thanked him and he left.

Janice J. Frank
9-3-05

EXHIBIT 8

TO ALEXANDER AFFIDAVIT

Print Ticket

Store #: 237        **Guest Relations Ticket # 410980Closed**        Store #: 237

**Mr Dwight Rodgers**
**Store No: 237**
**Job Class: GM**

Phone:
Evening:

|  |  |
|---|---|
| Status: **Closed** | |
| Category: **Mgr Advisement – Discipline** | Assigned to: **Kelly Barnes** |
| Store #: **237 - Gardendale, Al (Gardendale, Al 35071)** | |

| | |
|---|---|
| Incident Date: | |
| Manager Reported Date: | |
| Disposition: | Origin: **1** |
| Resolution: **Counseling** | Party Size: **0** |
| Employee Name: | Refund Amt: **0.00** |
| Penalty Status: **No** | Total Sale Amt: **0.00** |

## Questions and Answers

1.  **Please describe the general nature of your call.**
    see action log

## Involved Parties

| **Alexander, Rich (Store# 237)** | **Jenkins, Debby (Store# 237)** |
|---|---|
| Involved Type: Restaurant DM | Involved Type: Retail DM |
| Job Code:   RSTDM | Job Code:   GSDM |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |
| **Murchison, Laura (Store# 237)** | **Patterson, Tommie (Store# 237)** |
| Involved Type: Retail RVP | Involved Type: Accused |
| Job Code:   VP | Job Code:   RTSAM |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |
| **Phillips, Ron (Store# 237)** | **Popee, Kay (Store# 237)** |
| Involved Type: Restaurant RVP | Involved Type: Retail Mgr |
| Job Code:   VP | Job Code:   GSMGR |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |
| **Rodgers, Dwight (Store# 237)** | **Schmid, Penny (Store# 237)** |
| Involved Type: Affected Party | Involved Type: Witness (Employee) |
| Job Code:   RSTGM | Job Code:   WAIT4 |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |

## Action Log Records

*10/07/2005 11:55AM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*06/29/2005 04:55PM - ktramel*

Rodgers v. Cracker Barrel
Def. Initial Disc. 0163

**Ticket Viewed:** This Ticket was reviewed.

*06/01/2005 09:22AM - kbarnes*
  **Ticket Printed:** This Ticket Was Printed.

*06/01/2005 09:21AM - kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*06/01/2005 09:21AM - kbarnes*
  **Ticket Emailed:** This Ticket Was Emailed To : ER_Archive_Ticket@CrackerBarrel.com .

*06/01/2005 09:21AM - kbarnes*
  **Ticket Updated:** This Ticket Has Been Updated.

*06/01/2005 09:21AM - kbarnes*
  **Call Received:** Friom Action Log of a duplicate ticket: 04/27/2005 04:36PM - kbarnes Call Received: While Dwight was at Home Office for Training, Rich Alexander held a manager's meeting with Dwight's team. Dwight is aware if this meeting. Rich had shared with me that Dwight has not worked the type of schedule expected of a General Manager and that he may have lost some important credibility with his management team early-on when he started at the store. (by working shorter shifts, not early, not late, etc.) Dwight has also had two or three deaths in the family since joining the unit, which on it's own would not be a problem, but he has taken extended time off for each of the incidents.... and has not been as flexible with his team of assciate managers. Rich wants to see Dwight as a leader work with Tommie and earn his trust. Rich interviewed the Shift Leader while at the store...she overheard Tommie comment. His commenet was insensitive and she did beleive that he did not trust Dwight's notification of another funeral but it was not perceved as offensively as Dwight had presented. Rich decided to coach Tommie on his approach.

*06/01/2005 09:21AM - kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*06/01/2005 09:15AM - kbarnes*
  **Ticket Printed:** This Ticket Was Printed.

*06/01/2005 09:15AM - kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*06/01/2005 09:14AM - kbarnes*
  **Ticket Emailed:** This Ticket Was Emailed To : ER_Archive_Ticket@CrackerBarrel.com .

*06/01/2005 09:14AM - kbarnes*
  **Ticket Status Changed:** The Status Of This Ticket Was Changed To Closed.

*06/01/2005 09:11AM - kbarnes*
  **Reply Requested:** SUMMARY: Rich conducted a manager's meeting while Dwight was at Home Office. Dwight knows this meeting occured. Expectations, positives and team concerns were discussed at the meeting then communicated with Dwight by Rich. Tommie's comment was said out of frustration that Dwight has been out of the unit so much and not reporting to the store as scheduled. Rich spoke with tommie and advised him that such comments could be misinterpreted. Rich spoke with Dwight and explained that the comment was addressed but that it was not considered a racial slur.

*06/01/2005 09:10AM - kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*05/26/2005 09:39AM - kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

Rodgers v. Cracker Barrel
Def. Initial Disc. 0164

*05/25/2005 05:14PM – kbarnes*
  **Ticket Printed:** This Ticket Was Printed.

*05/25/2005 05:14PM – kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*05/16/2005 03:54PM – afsmith*
  **Ticket Viewed:** This Ticket was reviewed.

*04/28/2005 02:09PM – kbarnes*
  **Ticket Updated:** This Ticket Has Been Updated.

*04/28/2005 02:08PM – kbarnes*
  **Call Attempt:** Called Dwight at the store. he is not in today

*04/28/2005 02:08PM – kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*04/27/2005 04:28PM – kbarnes*
  **Ticket Updated:** This Ticket Has Been Updated.

*04/27/2005 04:27PM – kbarnes*
  **Internal Correspondence:** CROSS REFERENCE TO TICKET # 409609

*04/27/2005 04:26PM – kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*04/25/2005 01:45PM – kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*03/28/2005 07:00AM – kbarnes*
  **Ticket Printed:** This Ticket Was Printed.

*03/28/2005 07:00AM – kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*03/14/2005 04:09PM – kbarnes*
  **Ticket Viewed:** This Ticket was reviewed.

*03/14/2005 11:35AM – kbarnes*
  **Ticket Updated:** This Ticket Has Been Updated.

*03/14/2005 11:35AM – kbarnes*
  **Call Attempt:** 678-595-5174 I called Dwayne on his cell phone Had to leave a message

*03/14/2005 11:34AM – kbarnes*
  **Call Received:** Call from Dwayne cell phone 678-595-5174 please call

Rodgers v. Cracker Barrel
Def. Initial Disc. 0165

*03/14/2005 11:34AM – kbarnes*
  **Call Made:** I called debbie and gave her fax number to home Office Employee relations

*03/14/2005 11:33AM – kbarnes*
  **Call Received:** Debbie Jenkins called and requested my fax number Rick Aleander wants her to send the

statemenst to em for our meeting this afternoon

***03/14/2005 11:13AM - kbarnes***
**Ticket Updated:** This Ticket Has Been Updated.

***03/14/2005 11:11AM - kbarnes***
**Call Received:** Rich, DM called Meet him at room 101 at 4 pm please to review stateme

***03/14/2005 09:35AM - kbarnes***
**Ticket Updated:** This Ticket Has Been Updated.

***03/14/2005 09:34AM - kbarnes***
**Call Attempt:** Sent voice mail to rich reminding him we need to meet to review statements

***03/14/2005 09:34AM - kbarnes***
**Ticket Viewed:** This Ticket was reviewed.

***03/14/2005 09:33AM - kbarnes***
**Ticket Status Changed:** The Status Of This Ticket Was Changed To Conclusion.

***03/14/2005 09:32AM - kbarnes***
**EMail Sent:** I sent an email to Rich, DM as follows: Wed 3/9/2005 3:36 PM Hey Rich, I understand you're traveling and may be at Home Office next week. Dwight is faxing me statements and I believe you have interviewed Penny (or at least gotten her statement). Let's discuss together next week while you're here. Thanks! Kelly Barnes Employee Relations Ext. 4166

***03/14/2005 09:31AM - kbarnes***
**Ticket Viewed:** This Ticket was reviewed.

***03/09/2005 04:22PM - bmcgee***
**Ticket Viewed:** This Ticket was reviewed.

***03/09/2005 03:38PM - kbarnes***
**Ticket Viewed:** This Ticket was reviewed.

***03/09/2005 03:38PM - kbarnes***
**Ticket Status Changed:** The Status Of This Ticket Was Changed To Pending.

***03/09/2005 03:33PM - kbarnes***
**Call Made:** 678-595-5174 cell ph if needed On 21st incident occured. Dwight called a couple of days ago and the initial part of this actin log was from that original call. Dwight called his store and spoke with Asst Manager, Tommie Patterson and informed him of death in the family. He wouldn't be in due to funeral. Tommie hung up adn stated something like "I thought black people only had funerals on weekends." Offensive to shift leader;and to GM who is African American. I advised GM to get statement from Penny and to make sure DM is in the loop to investigate. Dwight used to work for EEOC a good partner to have. Likes Cracker Barrel. He mentioned that Tommie, Sr Asst Mgr had wanted GM position when Dwight was hired and may have resentment but Dwight noted that he has watched/observed to see if Tommie is racist or just resentful that he didn't get the job. Penny Schmidt, Shift Leader statement with Penny Schmidt Rich, DM has copies of the statement. Rich spoke with Penny on March 8, 2005. Will interview Tommy. Rich is traveling til Monday March 14th. Meeting for all. may be delayed due to travel to Home Office. Rich Alexander, DM

***03/09/2005 02:32PM - kbarnes***
**Ticket Status Changed:** The Status Of This Ticket Was Changed To Open.

Rodgers v. Cracker Barrel
Def. Initial Disc. 0166

Created 03/09/2005 03:38PM by Kelly Barnes                    Source: CSR

Updated 06/01/2005 09:21AM by Kelly Barnes

No Letters have been created for this contact.

# CONFIDENTIAL CONCLUDING REPORT

**Reported Date:**
**Today's Date.:**                   10/07/2005 11:55:59 AM
**Store # .....:**                    237
**District #...:**                    015
**Region #.....:**                    02
**Investigator.:**                    kbarnes
**Complaint type(s):**                Mgr Advisement - Discipline
**GRS Ticket#..:**                    410980

**I. General Summary of Complaint.**

**II. Outline of the Investigative Process.**

**III. Summary of the Evidence or Explanation of Absence of Evidence.**

**IV. Review of the History of all Involved Parties/Store.**

**V. Determination.**

**VI. Explanation of Basis for Determination.**

**VII. Action(s) Taken with Regard to All Involved Parties.**

**Patterson, Tommie (Store# 237)**
Involved Type: Accused
Job Code:     RTSAM
Hire Date:
Gender:
Ethnicity:

*Rodgers v. Cracker Barrel
Def. Initial Disc. 0167*

**Schmid, Penny (Store# 237)**
Involved Type: Witness (Employee)
Job Code:        WAIT4
Hire Date:
Gender:
Ethnicity:

* * * * * E N D O F R E P O R T * * * * *

Rodgers v. Cracker Barrel
Def. Initial Disc. 0168

Store #: 237 | Guest Relations Ticket # 409609 | Store #: 237

**Manager Report 237**
**Dept No:**
**Job Class: NA**

,

Phone:
Evening:

Status: **Closed**                                                    Assigned to: **Kelly Barnes**
Category: **Manager Report of Incident - Employee**

Store #: **237 - Gardendale, Al (Gardendale, Al 35071)**

Incident Date:
Manager Reported Date:                                                 Origin: **Phone**
Disposition: **Policy Violation Not Found**                            Party Size: **0**
Consent Order:
Resolution: **Counseling**                                             Refund Amt: **0.00**
Employee Name:                                                         Total Sale Amt: **0.00**
Penalty Status: **No**

---

Questions and Answers

**1. Manager's account of the incident.**
Received telephone call from Dwight Rodgers (GM) regarding a potential employee incident seeking advise as to how he should proceed. Rodgers stated that Penny Schmid (Shift Leader) came to him to let him know about a comment that Tommie Patterson (SAM)took a call from an hourly employee stating that the employee would not be in to work due to a funeral. When hanging up the telephone, Patterson made an inappropriate comment stating that -"he thought black people were only buried during the week, not on the weekend". This comment offended Schmid as she is married to an African American man.

Involved Parties

| | |
|---|---|
| **Alexander, Rich (Store# 237)** | **Jenkins, Debby (Store# 237)** |
| Involved Type: Restaurant DM | Involved Type: Retail DM |
| Job Code: RSTDM | Job Code: GSDM |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |
| **Murchison, Laura (Store# 237)** | **Patterson, Tommie (Store# 237)** |
| Involved Type: Retail RVP | Involved Type: Accused |
| Job Code: VP | Job Code: RTSAM |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |
| **Phillips, Ron (Store# 237)** | **Popee, Kay (Store# 237)** |
| Involved Type: Restaurant RVP | Involved Type: Retail Mgr |
| Job Code: VP | Job Code: GSMGR |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |
| **Rodgers, Dwight (Store# 237)** | **Schmid, Penny (Store# 237)** |
| Involved Type: Restaurant GM | Involved Type: Witness (Employee) |
| Job Code: RSTGM | Job Code: WAIT4 |
| Hire Date: | Hire Date: |
| Gender: | Gender: |
| Ethnicity: | Ethnicity: |

Action Log Records

*06/27/2006 03:02PM - kbarnes*
   **Ticket Viewed:** Ticket Viewed

*06/27/2006 03:02PM - kbarnes*

**Ticket Viewed:** This Ticket was reviewed.

*06/27/2006 02:48PM - ltthomps*
**Ticket Viewed:** This Ticket was reviewed.

*06/19/2006 12:43PM - kbarnes*
**Ticket Viewed:** Ticket Viewed

*06/19/2006 12:43PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*12/12/2005 02:55PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*12/12/2005 02:53PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*11/10/2005 02:59PM - mmcbrien*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 03:39PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 03:39PM - vbarr*
**Ticket Updated:** This Ticket Has Been Updated.

*09/07/2005 03:37PM - vbarr*
**Call Received:** Rodgers also stated that he felt that he was terminated for trying to do his job, but was told not to do his job when it pertained to a manager caught smoking in the unit. Rodgers also stated that Alexander advised that same manager with hints on how to keep his job even though he was smoking in the unit. Rodgers was advised that any additional correspondence regarding this matter needed to be discussed with Barnes and he again indicated that he would speak with her.

*09/07/2005 03:37PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 03:35PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 03:35PM - vbarr*
**Ticket Updated:** This Ticket Has Been Updated.

*09/07/2005 03:26PM - vbarr*
**Call Received:** 3:15 p.m. from Dwight Rodgers. Rodgers asked what the time frame was to submit statements regarding investigations and was told that it could vary definitely with 10 days is the goal, but a majority of the time statements are received next day and some during the same week. Rodgers advised that he had been terminated and thought it was ironic that this ticket was closed on 6/17/2005 and the documentation he had received reflected dates from 6/17/2005. Rodgers stated that he had contacted the EEOC to ask questions, as he had a previous EEOC background. Rodgers stated that he strongly felt that he had been terminated for this incident because he inquired about the incident. Rodgers further stated that the only reason he inquired about the incident was because he had not received any notification stating that this case had been closed and he wanted to know about it because it involved him. Rodgers stated that he did not want to seem as though he was contacting Barr in order to obtain information regarding his case because he had been terminated. Barr advised Rodgers that he would need to speak with Barnes regarding this incident if he had further questions and advised that he could reach her at the 800 number at ext. 4166 if he needed to speak with her and he stated that he would contact her later.

*09/07/2005 03:26PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 02:39PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 02:39PM - vbarr*
**Ticket Updated:** This Ticket Has Been Updated.

*09/07/2005 02:38PM - vbarr*
**Internal Correspondence:** emailed ticket to Kelly Barnes so that she could see the most recent activity on this ticket and so she could follow-up with Rodgers if needed.

*09/07/2005 02:38PM - vbarr*
**Ticket Emailed:** This Ticket Was Emailed To kbarnes@crackerbarrel.com.

*09/07/2005 02:36PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 02:36PM - vbarr*
**Ticket Updated:** This Ticket Has Been Updated.

*09/07/2005 02:31PM - vbarr*
**Call Received:** Call received Dwight Rodgers regarding the outcome of this case. The Guest Resource Team asked Rodgers if he could be called right back because each ticket would need to be viewed individually and he indicated that he could be reached at 678.595.5174. Reviewed the GRS database for tickets for #237 and found ticket number 409609 was the ticket Rodgers was calling about. Once contacted, Rodgers indicated that he had spoken with Rich Alexander, but had received no feedback from anyone regarding the outcome of this case. Rodgers was advised by Barr that the case was closed by Barnes on 6/17/05 and that no policy violation was found. Rodgers was advised that if he needed any additional information regarding this case, he would need to speak with Barnes directly. Rodgers was asked if he would like Barnes to call him back regarding this issue and he stated that he did not; however, he thought it was strange that he had not heard back from anyone regarding this matter.

*09/07/2005 02:28PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*09/07/2005 02:21PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*06/17/2005 11:23AM - kbarnes*
**Ticket Emailed:** This Ticket Was Emailed To : ER_Archive_Ticket@CrackerBarrel.com .

*06/17/2005 11:23AM - kbarnes*
**Ticket Status Changed:** The Status Of This Ticket Was Changed To Closed.

*06/17/2005 11:23AM - kbarnes*
**Reply Requested:** SUMMARY: While Dwight was at Home Office for Training, Rich Alexander held a manager's meeting with Dwight's team. Dwight is aware if this meeting. Rich had shared with me that Dwight has not worked the type of schedule expected of a General Manager and that he may have lost some important credibility with his management team early-on when he started at the store. (by working shorter shifts, not early, not late, etc.) Dwight has also had two or three deaths in the family since joining the unit, which on it's own would not be a problem, but he has taken extended time off for each of the incidents.... and has not been as flexible with his team of assciate managers. Rich wants to see Dwight as a leader work with Tommie and earn his trust. Rich interviewed the Shift Leader while at the store...she overheard Tommie comment. His commenet was insensitive and she did beleive that he did not trust Dwight's notification of another funeral but it was not perceived as offensively as Dwight had presented. Rich decided to coach Tommie on his approach.

*06/17/2005 11:22AM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*06/17/2005 11:15AM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*06/09/2005 12:38PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*06/01/2005 09:19AM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*05/25/2005 05:15PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*04/27/2005 04:42PM - kbarnes*

**Ticket Updated:** This Ticket Has Been Updated.

*04/27/2005 04:41PM - kbarnes*
**Internal Correspondence:** I will contact Dwight tomorrow and Advise that he and Rich make a connection on this issue.

*04/27/2005 04:36PM - kbarnes*
**Call Received:** While Dwight was at Home Office for Training, Rich Alexander held a manager's meeting with Dwight's team. Dwight is aware if this meeting. Rich had shared with me that Dwight has not worked the type of schedule expected of a General Manager and that he may have lost some important credibility with his management team early-on when he started at the store. (by working shorter shifts, not early, not late, etc.) Dwight has also had two or three deaths in the family since joining the unit, which on it's own would not be a problem, but he has taken extended time off for each of the incidents.... and has not been as flexible with his team of assciate managers. Rich wants to see Dwight as a leader work with Tommie and earn his trust. Rich interviewed the Shift Leader while at the store...she overheard Tommie comment. His commenet was insensitive and she did beleive that he did not trust Dwight's notification of another funeral but it was not perceved as offensively as Dwight had presented. Rich decided to coach Tommie on his approach.

*04/27/2005 04:36PM - kbarnes*
**Call Made:** Called Von Barr to thank her for passing on Dwight's message requesting a call back.

*04/27/2005 04:31PM - kbarnes*
**Call Attempt:** Called Store and Dwight was gone for the day. I have now cross-referenced the two tickets related to this matter and will add the notes from Rich Alexander's store visit.

*04/27/2005 04:29PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*04/27/2005 04:13PM - vbarr*
**Ticket Emailed:** This Ticket Was Emailed To kbarnes@crackerbarrel.com.

*04/27/2005 04:12PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*04/27/2005 04:12PM - vbarr*
**Ticket Updated:** This Ticket Has Been Updated.

*04/27/2005 04:11PM - vbarr*
**Reply Requested:** Kelly - Please call Dwight Rodgers at #237 regarding this incident. He stated that he should be at the store until 5:00 or later this evening. Thanks Von

*04/27/2005 04:10PM - vbarr*
**Call Received:** Call received from Rodgers stating that he had not had a return call about this incident. Rodgers asked if I could let Kelly know that he called so that she can call him back to advise as to how to proceed.

*04/27/2005 04:09PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*04/25/2005 01:45PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*04/06/2005 03:57PM - kbarnes*
**Ticket Updated:** This Ticket Has Been Updated.

*04/06/2005 03:56PM - kbarnes*
**Call Received:** From Rich Alexander received today.. He will provide furtehr clairification.

*04/06/2005 03:56PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*03/30/2005 12:30PM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*03/18/2005 09:39AM - kbarnes*
**Ticket Updated:** This Ticket Has Been Updated.

*03/18/2005 09:37AM - kbarnes*
**Internal Correspondence:** DM, Rich Alexander and I reviewed statements sent by GM. Rich has been in training here at home office all week. Rich will meet with tommie early next week to discuss ane will provide me with an update.

*03/18/2005 09:37AM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*03/08/2005 09:02AM - kbarnes*
**Ticket Updated:** This Ticket Has Been Updated.

*03/08/2005 09:01AM - kbarnes*
**Call Attempt:** Left a voice mail for Dwight, GM asking if he has obtained statements and gave him my fax # again.

*03/08/2005 09:00AM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*03/07/2005 11:59AM - kbarnes*
**Ticket Status Changed:** The Status Of This Ticket Was Changed To Conclusion.

*03/07/2005 11:58AM - kbarnes*
**Call Received:** I spoke with the manager who will obtain statements and fax them to Employee Relations. (we spoke on Friday, March 4, 2005).

*03/07/2005 11:57AM - kbarnes*
**Ticket Viewed:** This Ticket was reviewed.

*03/04/2005 04:02PM - vbarr*
**Ticket Emailed:** This Ticket Was Emailed To kbarnes@crackerbarrel.com.

*03/04/2005 04:00PM - vbarr*
**Ticket Viewed:** This Ticket was reviewed.

*03/04/2005 03:58PM - vbarr*
**Internal Correspondence:** This ticket is being reassigned to Kelly Barnes. Rodgers has been advised to begin and ODR investigation and instructed to speak with Barnes for further direction as to how he should proceed. Rodgers called back and asked if he could speak with Barnes and was transferred to Barnes. Barr also let Barnes know that the ticket was also forthcoming.

*03/04/2005 03:43PM - vbarr*
**Ticket Status Changed:** The Status Of This Ticket Was Changed To Open.

Created&NBSP;03/04/2005 04:00 PM by Von Barr
Updated 09/07/2005 03:39 PM by Von Barr

Source: CSR

| No Letters have been created for this contact. |
| --- |

# CONFIDENTIAL CONCLUDING REPORT

**Reported Date:**
**Incident Date.:**
**Today's Date.:**                                06/04/2007 09:27:59 AM
**Store # .....:**                                237
**District #...:**                                015
**Region #.....:**                                10
**Investigator.:**                                kbarnes
**Complaint type(s):**                            Manager Report of Incident - Employee

**Nature(s) of Complaint:**

**Consent Order Violation(s):**

**GRS Ticket#..:**                                      409609

## I. General Summary of Complaint.

## II. Outline of the Investigative Process.

## III. Summary of the Evidence or Explanation of Absence of Evidence.

## IV. Review of the Accused's Employment/Training History

## V. Review of the Store History

## VI. Determination.

    Policy Violation Not Found

## VII. Explanation of Basis for Determination.

## VIII. Other Issues Arising from Investigation.

## IX. Action(s) Taken with Regard to All Involved Parties.

**Patterson, Tommie (Store# 237)**
Involved Type:  Accused
Job Code:       RTSAM
Hire Date:
Gender:
Ethnicity:

**Schmid, Penny (Store# 237)**
Involved Type:  Witness (Employee)
Job Code:       WAIT4
Hire Date:
Gender:
Ethnicity:

*****E N D O F R E P O R T*****

DFT CRACKER BARREL'S

EX. B

TO EVIDENTIARY SUBMISSION

# FREEDOM COURT REPORTING

Page 1

1 IN THE UNITED STATES DISTRICT COURT
2 MIDDLE DISTRICT OF ALABAMA
3 NORTHERN DIVISION
4
5 CASE NUMBER:
6 DWIGHT N. RODGERS,
7 Plaintiff,
8 vs.
9 CRACKER BARREL OLD
10 COUNTRY STORE, INC.,
11 Defendants.
12
13 S T I P U L A T I O N
14 IT IS STIPULATED AND AGREED by
15 and between the parties through their
16 respective counsel that the deposition of
17 DWIGHT N. RODGERS may be taken before
18 Tanya D. Cornelius, Certified Shorthand
19 Reporter and Notary Public, at the law
20 offices of Burr & Forman, LLP, Suite 3100
21 Wachovia Tower, 420 20th Street North,
22 Birmingham, Alabama, on the 13th day of
23 June 2007.

Page 3

1 I N D E X
2 EXAMINATION BY:        PAGE NUMBER:
3 Ms. Busby              8
4 Ms. York               419
5 Ms. Busby              424
6
7 E X H I B I T S
8 DEFENDANT'S EXHIBIT NO.:    PAGE NUMBER:
9 1 - Resume                  52
10 2 - 1/28/05 Evaluation      136
11 3 - Action Plan             161
12 4 - 3/30/05 Letter to       161
13 Rich Alexander
14 5 - EEOC Charge of Discrimination 223
15 6 - Employee Counseling Report   281
16 7 - 7/24/05 E-mail          285
17 Guest Relations Issue
18 8 - Employee Counseling Report   295
19 9 - Handwritten notes       326
20 10 - Charge Questionnaire    329
21 11 - Dismissal and Notice of  339
22 Rights
23

Page 2

1 IT IS FURTHER STIPULATED AND
2 AGREED that the signature to and the
3 reading of the deposition by the witness
4 is waived, the deposition to have the
5 same force and effect as if full
6 compliance had been had with all laws and
7 rules of Court relating to the taking of
8 depositions.
9 IT IS FURTHER STIPULATED AND
10 AGREED that it shall not be necessary for
11 any objections to be made by counsel to
12 any questions, except as to form or
13 leading questions, and that counsel for
14 the parties may make objections and
15 assign grounds at the time of the trial,
16 or at the time said deposition is offered
17 in evidence, or prior thereto.
18 IT IS FURTHER STIPULATED AND
19 AGREED that notice of filing of the
20 deposition by the Commissioner is waived.
21
22
23

Page 4

1 EXHIBITS CONTINUED:        PAGE NUMBER:
2 12 - Plaintiff's Initial    345
3 Disclosures
4 13 - 6/17/05 Rich Letter to   361
5 Rodgers
6 14 - Rodgers Letter to Phillips  363
7 15 - 8/6/05 Rich Memo to Rodgers  366
8

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

```
1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        BREEDLOVE & LASSITER
5        BY: Monica A. York, Esquire
6            Lee Breedlove, Esquire
7        250 East Ponce de Leon Avenue
8        Suite 425
9        Decatur, Georgia  30030
10
11   FOR THE DEFENDANT:
12       BURR & FORMAN, LLP
13       BY: Jennifer Busby, Esquire
14           Ashley Hattaway, Esquire
15       Suite 3100 Wachovia Tower
16       420 20th Street North
17       Birmingham, Alabama  35203
18
19
20
21
22
23
```

Page 6

```
1         I, Tanya D. Cornelius,
2    Certified Shorthand Reporter and Notary
3    Public, acting as Commissioner, certify
4    that on this date, as provided by the
5    Federal Rules of Civil Procedure, and the
6    foregoing stipulation of counsel, there
7    came before me at the law offices of Burr
8    & Forman, LLP, Suite 3100 Wachovia Tower,
9    420 20th Street North, Birmingham,
10   Alabama, beginning at 9:30 a.m., DWIGHT
11   N. RODGERS, witness in the above cause,
12   for oral examination, whereupon the
13   following proceedings were had:
14
15
16
17
18
19
20
21
22
23
```

Page 7

```
1         MS. BUSBY:  Mr. Breedlove is
2    here.  He is lawyer for Mr. Rodgers.
3    He's not admitted in this case for
4    Alabama, but we have verified through
5    Byron Perkins that he has given his
6    permission because he believes he is
7    allowed under the Alabama Rules to sit in
8    on the deposition.  I don't know if he's
9    allowed or not.  I don't think he's
10   supposed to practice law in Alabama
11   without being admitted, but as long as
12   his admitting attorney believes he's
13   allowed to sit in, we're going to
14   proceed.  Fair enough?
15        MS. YORK:  Uh-huh (positive
16   response).
17        MS. BUSBY:  Okay.
18
19        DWIGHT RODGERS,
20   being first duly sworn, was examined
21        and testified as follows:
22
23        THE REPORTER:  Will this be
```

Page 8

```
1    usual stipulations?
2         MS. BUSBY:  Yes.
3         MS. YORK:  Yes.
4
5         EXAMINATION
6    BY MS. BUSBY:
7         Q.  Mr. Rodgers, I'm Ginger
8    Busby.  I represent the Cracker Barrel,
9    and we're here to take your deposition
10   today.  Have you ever had a deposition
11   taken?
12        A.  No.
13        Q.  If you need a break or don't
14   understand the question, just let me
15   know.  That's the first two rules.  The
16   third rule is the most important.  You
17   have to answer out loud.  You and I will
18   start to talking and I probably will
19   shake my head at you which might make you
20   shake your head back.  Try to remember to
21   say yes.  And if I point at you or nod my
22   head, that means you have to answer
23   verbally, and that's why I'm doing it,
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1 because I have understood that you have
2 responded to me, but I have to make sure
3 for the record that the court reporter
4 gets to take down a verbal answer. So if
5 that occurs, that's why that would
6 occur. So just try to remember that.
7     A.   Okay.
8     Q.   Tell me your full name.
9     A.   Dwight Norman Rodgers, Sr.
10     Q.   And what is your current
11 address?
12     A.   _____, and that's
13 Stone Mountain, Georgia 30088.
14     Q.   What's your birth date?
15     A.   ___/66.
16     Q.   What's your Social Security
17 number?
18     A.   _____
19     Q.   Where did you grow up?
20     A.   Norfolk, Virginia.
21     Q.   I know you went to high
22 school in Virginia; is that right?
23     A.   Yes.

Page 10

1     Q.   What year did you graduate?
2     A.   '85.
3     Q.   And then what did you do
4 after high school?
5     A.   I attended Commonwealth
6 College, and I left Commonwealth College
7 and joined the military.
8     Q.   Commonwealth College is
9 located where?
10     A.   Virginia, Norfolk, Virginia.
11     Q.   How long did you go there?
12     A.   Right at a year.
13     Q.   Okay. And you joined the
14 military in what regard?
15     A.   I don't understand the
16 question.
17     Q.   I mean, did you just join as
18 an enlisted?
19     A.   Yes, as an enlisted.
20     Q.   Sometimes people leave from a
21 college, and I didn't know which one you
22 did. You just enlisted, correct?
23     A.   Yes.

Page 11

1     Q.   All right. Where did you
2 go? Where did they assign you?
3     A.   I was assigned to Europe, and
4 as well as Maryland. And for like basic
5 training and my international training, I
6 went to Kentucky and Indiana.
7     Q.   Okay. So what year was this?
8 '86 about, '87?
9     A.   No, I went in '85.
10     Q.   So how long were you -- are
11 you still in the military?
12     A.   No. I got out in '91.
13     Q.   All right. So from '85 to
14 '91, you're in the military?
15     A.   Yes.
16     Q.   All right. During that time
17 where all are you stationed?
18     A.   The vast majority I was
19 stationed in Mannheim, Germany, and after
20 Mannheim I went to Hagerstown, Maryland,
21 Fort Ritchie.
22     Q.   And why did you get out?
23     A.   At the time I had a son, and

Page 12

1 it was just being out of the country, my
2 wife at that time and I were just having
3 a lot of marital problems, and it just
4 was more feasible for me to get out.
5     Q.   And I'll ask you about that
6 in a minute. Let me ask a better
7 question. I mean, was your time up? I
8 mean, did you have to ask to be
9 discharged or, you know, sometimes when
10 people enlist, they enlist just for a
11 certain number of years. I mean, how did
12 you go about getting out of the Army?
13     A.   Yes. It was upon request.
14     Q.   Upon request. And to the
15 best of your recollection that was in
16 1991?
17     A.   To the best of my
18 recollection, yes.
19     Q.   Okay. You said military. I
20 said Army. Which armed forces?
21     A.   Army.
22     Q.   Okay. All right. You said
23 your wife at the time. So you have been

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  married before?
2    A.  Yes.
3    Q.  Okay.  What is her name?
4    A.  Katherine.
5    Q.  With a C or a K?
6    A.  K.
7    Q.  Katherine.  What's her maiden
8  name?
9    A.  Longshore, L-o-n-g-s-h-o-r-e.
10    Q.  And how long were you married
11  to Ms. Longshore?
12    A.  Five years.
13    Q.  Okay.  Where does she live?
14    A.  I know she resides in
15  Virginia.
16    Q.  Okay.  Now, you had children
17  with her?
18    A.  Yes.
19    Q.  And what are their names?
20    A.  Just one.
21    Q.  Okay.
22    A.  His name is Dwight.
23    Q.  And how old is Dwight?

Page 14

1    A.  He's eighteen now.
2    Q.  Does he live outside the
3  state of Alabama?
4    A.  Yes.
5    Q.  Okay.  Now, have you been in
6  any other marriages?
7    A.  Yes.
8    Q.  All right.  Are you currently
9  married?
10    A.  No.
11    Q.  All right.  Who did you marry
12  after Ms. Longshore?
13    A.  Lizzie, L-i-z-z-i-e, Barnes,
14  B-a-r-n-e-s.
15    Q.  And when did you marry Ms.
16  Barnes?
17    A.  August of '91.
18    Q.  How long were you married to
19  Ms. Barnes?
20    A.  Twelve years.
21    Q.  Okay.  So sometime in '03 you
22  were divorced?
23    A.  Yes.

Page 15

1    Q.  Okay.  Where does she live?
2    A.  She's in Korea.  I don't know
3  exactly where.
4    Q.  Well, has she --
5    A.  She's currently in the
6  military.
7    Q.  Okay.  I was going to say,
8  now that is an interesting way of being
9  married.  She's an American and you met
10  her here and were married to her here?
11    A.  Yes.
12    Q.  Did you meet her in the
13  military?
14    A.  Yes.
15    Q.  And did she live with you in
16  Alabama, as an example?
17    A.  No.
18    Q.  Did she live with you in
19  Georgia?
20    A.  In Georgia, yes.
21    Q.  Okay.  So when you moved to
22  Alabama, she never moved here with you?
23    A.  That's correct.

Page 16

1    Q.  Okay.  Did you have any
2  children with her?
3    A.  Yes.
4    Q.  Okay.  How many?
5    A.  One.
6    Q.  All right.  What's the -- is
7  it a girl or a boy?
8    A.  Boy.
9    Q.  What's his name?
10    A.  Arlando.
11    Q.  A-r-l-a-n-d-o?
12    A.  Yes.
13    Q.  And how old is he?
14    A.  Twenty-one.
15    Q.  And where does he live?
16    A.  He's in the military as well
17  and he's in Germany.
18    Q.  Okay.  Any other marriages?
19    A.  No.
20    Q.  Any other children?
21    A.  Yes.
22    Q.  Okay.  Who are they?
23    A.  His name is Dwight as well.

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    Q.    Okay.
2    A.    He resides in North Carolina.
3    Q.    How old is he?
4    A.    Dwight will be twenty-six.
5    Q.    All right.  Do you have any
6    relatives in the state of Alabama?
7    A.    No.
8    Q.    All right.  You grew up in
9    Virginia.  You went in the military.  You
10   came out of the military in approximately
11   '91, and then what did you do?
12   A.    I moved from Europe to
13   Arizona, and I worked as a civilian.
14   Q.    What was your first job as a
15   civilian after coming out of the
16   military?
17   A.    I was customer service
18   manager.
19   Q.    For what company?
20   A.    It's called Maxx Club,
21   M-a-x-x Club.
22   Q.    What type of --
23   A.    It's a version of Sam's Club.

Page 18

1    Q.    Okay.  So as the customer
2    service manager, tell me what that
3    involved.
4    A.    I managed the -- what they
5    call front line which is the cashier's
6    line as well as electronics department,
7    as well as scheduling and maintaining the
8    records and finances for the front end of
9    the business.
10   Q.    So when you say front end,
11   you mean the cashiers and the electronics
12   department?
13   A.    Yes, as well as the customer
14   service counter.
15   Q.    Okay.  And the same thing for
16   scheduling?  It will be customer service,
17   counter, cashiers, and the electronics
18   department?
19   A.    Correct.
20   Q.    And how long were you with
21   Maxx Club?
22   A.    I don't recall the time.
23   Q.    Just approximately?  I mean,

Page 19

1    a year, two years?
2    A.    Approximately right about two
3    years.
4    Q.    And why did you leave?
5    A.    Relocated with military
6    spouse.
7    Q.    That would be Ms. Barnes?
8    A.    Yes.
9    Q.    Okay.  All right.  Where did
10   you relocate to?
11   A.    We moved to Athens, Georgia.
12   Q.    All right.  Now, before I get
13   to that, let me make sure I'm clear on
14   this.  You get out of the military.  At
15   the time you get out, you're married to
16   Ms. Longshore who has stayed in Virginia
17   the whole time, I take it?
18   A.    Yes.  When I initially got
19   out of the military.
20   Q.    Right.  She didn't travel
21   with you to Europe and all those places?
22   A.    She did travel to Europe for
23   six months.

Page 20

1    Q.    Okay.
2    A.    She was in Europe for six
3    months, yes.
4    Q.    But then came home to
5    Virginia?
6    A.    Yes.
7    Q.    And she is the one that you
8    had Dwight who is eighteen with?
9    A.    That's correct.
10   Q.    Okay.  Shortly after you got
11   back, I take it you got divorced and
12   married Ms. Barnes?
13   A.    That's correct.
14   Q.    All right.  Ms. Barnes -- did
15   y'all go to Arizona because that's where
16   she was stationed or how did you make it
17   to Arizona?
18   A.    That's correct.
19   Q.    Okay.  So then she gets
20   transferred to Georgia?
21   A.    Yes.
22   Q.    And you moved to -- and
23   that's how you show up in Athens,

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1 Georgia?
2    A.    That's correct.
3    Q.    And we are approximately in
4 1993 as best you can recall?
5    A.    Around about '93, yes.
6    Q.    We'll figure it out
7 eventually later.  Sometimes dates come
8 back to you when you kind of follow your
9 timeline.  But approximately '93.  So you
10 leave Maxx Club, transfer to Athens, and
11 where did you go to work?
12    A.    I was with the Athens
13 Banner-Herald, the local newspaper.
14    Q.    Is that a newspaper?
15    A.    Uh-huh (positive response).
16    Q.    And what did you do for them?
17    A.    District manager.
18    Q.    Tell me what a district
19 manager for the newspaper does.  And the
20 reason I ask that, you know, the district
21 would be -- I mean, wouldn't it just be
22 Athens, or I mean, I don't know.
23    A.    No, it's not.  It's actually,

Page 22

1 it was the three surrounding cities.
2    Q.    Okay.
3    A.    And the district manager was
4 just responsible for ensuring that the
5 circulation department new subscribers
6 and regular subscribers were not only
7 receiving their paper but collections
8 were being done properly, that routes
9 were done properly, just for the
10 distribution of the paper.
11    Q.    And how long did you do that?
12    A.    I'm not one hundred percent
13 sure how long I stayed there.
14    Q.    Well, again, just --
15    A.    About a year maybe.
16    Q.    Okay.  Why did you leave
17 them?
18    A.    I accepted a position with a
19 company called PIA.
20    Q.    PIA?
21    A.    Yes.
22    Q.    What does that stand for?
23    A.    That's just their name, and

Page 23

1 it's a merchandising company.
2    Q.    Where are they located?
3    A.    At the time they were out of
4 Sarasota, Florida.
5    Q.    Well, wait a minute.  Did you
6 move to Florida?
7    A.    No.
8    Q.    You were working in Athens?
9    A.    That's just where the home
10 office was.
11    Q.    Okay.  Well, tell me what you
12 did for them.
13    A.    I was -- they called it the
14 coastal director.  It was where I did
15 quality assurance inspections on work
16 that the company itself was contracted to
17 do.
18    Q.    All right.  Well, let me back
19 up.  What kind of merchandise did they
20 represent?
21    A.    To -- when CVS purchased
22 Revco, they would hire PIA to come in,
23 gut it, and make it look like CVS.  So it

Page 24

1 was like floor planning and remodeling,
2 per se.
3    Q.    So they didn't really have
4 like shampoo as their merchandise.  What
5 they did is they --
6    A.    No, what they did is they
7 physically set it.
8    Q.    -- rearranged the merchandise
9 of other vendors?
10    A.    That's correct.
11    Q.    And you would do what, go to
12 the store and make sure it was set up
13 like it was supposed to be?
14    A.    That's correct.
15    Q.    How often did you have to do
16 that?
17    A.    Well, from the size of the
18 project, it was whenever completion,
19 whenever a store was completed, one of
20 the field managers would call me, and I
21 would go out to that location just to
22 make sure that the planograms were done
23 correctly, the contracts and everything

6 (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1  was signed and complete. And it can be
2  daily. Sometimes I'm in one location
3  three and four days just depending on
4  what's happening.
5      Q.   Well, I guess what I'm trying
6  to figure out is this is kind of like a
7  contract position? I mean, like you
8  wouldn't go like every day 8:00 to 5:00?
9      A.   No. We never stayed in one
10 location. It depended on how long it
11 took. If you went into a location, it
12 just depended on how much work it took to
13 pull all the shelving out, have other
14 contractors come in and put shelving in,
15 and then reset the shelves.
16     Q.   So y'all would actually put
17 the merchandise on the shelves and
18 organize it in the manner it was supposed
19 to be organized?
20     A.   Planogram, yes.
21     Q.   So was it a full-time job?
22     A.   Yes.
23     Q.   All right. How long did you

Page 26

1  work for them, PIA?
2      A.   About two and a half, three
3  years.
4      Q.   Okay. And was it all in the
5  Athens, Georgia, area?
6      A.   No. I did extensive travel
7  for them.
8      Q.   Okay. Who was the
9  supervisor?
10     A.   Floyd Baker.
11     Q.   And where was Mr. Baker
12 located?
13     A.   He was in Pennsylvania,
14 Philadelphia.
15     Q.   Okay. So basically they
16 would assign you to a certain location
17 depending on where you needed to organize
18 the merchandise in a particular --
19     A.   Right. It was what they call
20 a merchandising upgrade which means we
21 would start -- because it was going
22 nationwide. So we would start in a
23 particular city and state and do several

Page 27

1  cities within that state, and then that
2  would be the state that I would be
3  assigned to until it's complete. And
4  then we would pick up and move to the
5  following state. And it was done state
6  by state by state.
7      Q.   Did you have like the same
8  group of people that y'all went together
9  or --
10     A.   I had five field managers,
11 and each of them had two supervisors that
12 worked for them.
13     Q.   All right. Why did you leave
14 PIA?
15     A.   My wife was relocating, and
16 my son was back in Athens, Georgia, so I
17 went back to Athens.
18     Q.   All right. See, where did
19 you go? I messed up where you went.
20 When you say you went back to Athens,
21 you left Athens and went where?
22     A.   With the traveling, if we're
23 doing North Carolina, it could take a

Page 28

1  month or so. If we're doing South
2  Carolina, it could take an additional
3  month. When I went back to Athens,
4  at the time I was in New York, but it was
5  still with PIA doing the same things.
6  It's just that at the time that the job
7  ended with PIA, I went back to Georgia.
8  I had been in New York for about three
9  months.
10     Q.   Okay. So when you say your
11 wife was relocating, she was leaving
12 Athens?
13     A.   Yes.
14     Q.   Where was she going?
15     A.   Just to Augusta, Georgia.
16     Q.   To Augusta?
17     A.   Uh-huh (positive response).
18     Q.   Is she still in the military
19 at this point?
20     A.   Yes.
21     Q.   But your son was staying in
22 Athens?
23     A.   Correct. That's where her

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1 mother lives.
2    Q.   Arlando was staying in
3 Athens?
4    A.   Correct.
5    Q.   With Ms. Barnes' mother?
6    A.   That's correct.
7    Q.   Okay.  And so she moves to
8 Augusta, but you come back to Athens to
9 stay there with your son?
10    A.   Yes.
11    Q.   Okay.  Where did you go to
12 work then?
13    A.   I started my own company.
14    Q.   Okay.  What was it called?
15    A.   Prestige Merchandising.
16    Q.   All right.  Tell me about
17 that company.
18    A.   It's the same as PIA.  I just
19 did it individually.
20    Q.   All right.  So basically you
21 offered your services to companies that
22 needed merchandise arranged in their
23 stores?

Page 30

1    A.   Correct.
2    Q.   Okay.  Was it like
3 incorporated, LLC?  What did you --
4    A.   No.  It was a proprietorship.
5    Q.   Okay.  And how long did you
6 do Prestige Merchandising?
7    A.   Approximately about two
8 years.
9    Q.   Give me an example of who --
10 name two clients.
11    A.   I had Johnson & Johnson and
12 McClain Distributors.
13    Q.   All right.  Now Johnson &
14 Johnson, I know baby shampoo and all the
15 way up to --
16    A.   Much larger.
17    Q.   I was going to say all the
18 way up to detergent?
19    A.   Yes.
20    Q.   I don't know who McClain
21 Merchandising is.
22    A.   They are more so like candy
23 vendors.  They do a lot of candy

Page 31

1 transportation.
2    Q.   All right.  So you did that
3 for about two years.  Why did you stop
4 doing that?
5    A.   I relocated.
6    Q.   So you do Prestige
7 Merchandising all in and around the
8 Athens area?
9    A.   That's correct.
10    Q.   Okay.  So why did you
11 relocate?
12    A.   I was thinking that was a
13 time frame where Lizzie and I separated.
14    Q.   Okay.  Well, where did you
15 relocate to?
16    A.   North Augusta, South
17 Carolina.
18    Q.   Well, didn't you tell me she
19 moved to Augusta?
20    A.   Yes.
21    Q.   All right.  So did you
22 relocate to get closer to her?
23    A.   No.  It was for work.

Page 32

1    Q.   All right.  Well, let's back
2 up.
3    A.   Okay.
4    Q.   She is in Augusta.  You are
5 in Athens.  Y'all decide, you think, to
6 get separated during this time?
7    A.   Yes.
8    Q.   All right.  So you closed
9 down your business?  Do you sell it?
10 What do you do with it?
11    A.   I completed the contract and
12 closed it.
13    Q.   Complete the contract and
14 closed it.  And when you say completed
15 the contract, with these clients that you
16 mentioned?
17    A.   Yes.
18    Q.   And you complete the
19 contract, close it.  During this time are
20 you applying for jobs in other locations?
21    A.   Yes.
22    Q.   What type of jobs are you
23 looking for?

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1    A.    Anything in merchandising or
2  quality assurance and also food.
3    Q.    Why food?
4    A.    Training.
5    Q.    What do you mean training?
6    A.    Anything in the food training
7  industry.  They have people who train
8  health inspection.  They have people who
9  train surveys and things like that.
10    Q.    So you were actually looking
11  for a training position or a quality
12  assurance position?
13    A.    Yes.
14    Q.    Okay.  When you say North
15  Augusta -- you said South Carolina --
16    A.    That's correct.
17    Q.    -- but did you say a city?
18    A.    North Augusta is a city in
19  South Carolina.
20    Q.    Thank you.  That's what I
21  wanted to know.  North Augusta in South
22  Carolina?
23    A.    Yes.

Page 34

1    Q.    Okay.  What did you go there
2  for?
3    A.    Work.
4    Q.    I know, but I mean what job?
5    A.    I'm sorry.  Training director
6  for Bojangles Restaurant.
7    Q.    Now, when you say training
8  director, what type of training?
9    A.    I trained the managers who
10  were going to be going into the
11  restaurants.  I trained the health and
12  sanitation, and I inspected the
13  restaurants for safety and sanitation as
14  well.
15    Q.    But what did you train the
16  managers?  I mean, when you say you're
17  training the managers, you don't mean --
18    A.    Restaurant operations.
19    Q.    You mean restaurant
20  operations?
21    A.    Yes.
22    Q.    Just the health and
23  sanitation part or more than that?

Page 35

1    A.    No, more than that.  I
2  physically went into the restaurant and
3  learned the operations.
4    Q.    You mean as part of your
5  training when you started?
6    A.    That's correct.
7    Q.    Okay.  So you learned the
8  operations, and then you would do
9  training?
10    A.    That's correct.
11    Q.    Okay.  How long were you
12  employed with Bojangles?
13    A.    That was so long ago.  Around
14  about three years, I think.
15    Q.    I think you must have started
16  there around '99 just adding up how long
17  you think that you worked at these other
18  places; is that right?
19    A.    Around about '99, yes.
20    Q.    All right.  So were you
21  always the training director or did you
22  have other titles at Bojangles?
23    A.    I was the training unit

Page 36

1  director as well.
2    Q.    What's the difference in
3  training director and training unit
4  director?
5    A.    Training unit director, I
6  physically worked in the restaurant.  It
7  was the certification restaurant for all
8  the restaurants in the region.
9    Q.    Okay.  So you worked in the
10  certification restaurant.  Which one was
11  that?
12    A.    Martinez, Georgia.
13    Q.    All right.  So let's back up
14  here.  You first go to North Augusta,
15  South Carolina.  Is that their
16  headquarters or something?
17    A.    No.  That's where I resided,
18  in North Augusta, South Carolina.
19    Q.    You lived there?
20    A.    That's correct.
21    Q.    But you worked at the
22  Bojangles in Martinez, Georgia?
23    A.    Correct.  It's fifteen

9  (Pages 33 to 36)

## FREEDOM COURT REPORTING

Page 37

1  minutes this way you're in South
2  Carolina, fifteen-minute drive you're in
3  Georgia.
4      Q.   Okay.
5      A.   So it's just within the
6  region where I would have to travel to.
7      Q.   Why did you pick North
8  Augusta, South Carolina?  Did you have
9  relatives there or something?
10     A.   No.  Just the housing.
11     Q.   So you moved to North Augusta
12 for the job that -- was the restaurant
13 located in Martinez, Georgia?
14     A.   I didn't know exactly where
15 it was.  I knew I would be in that
16 market.  So I chose --
17     Q.   That's what I was trying to
18 get to.
19     A.   Yes.
20     Q.   When you first took the job,
21 where did you physically go to work?
22 Maybe that's a better question.
23     A.   I physically started at that

Page 38

1  training restaurant.
2      Q.   Okay.  So you started at this
3  restaurant, and you start as the training
4  director for that area or was it for the
5  whole country?  I don't know how big this
6  place is.  I mean, you know, Bojangles,
7  I don't know, is it all over the country?
8      A.   Right.  No.  It's for that
9  market, and it's nine -- ten units in
10 that market.
11     Q.   Okay.  So you're the training
12 director for Bojangles in -- did they
13 have a name of that market?
14     A.   Martinez is what we called
15 it.
16     Q.   All right.  We'll call it
17 Martinez.  So you were the training
18 director for ten to twelve restaurants in
19 the Martinez market?
20     A.   Correct.
21     Q.   All right.  And then you
22 became the unit -- training unit
23 director?

Page 39

1      A.   And the training unit
2  director means I was physically in
3  Martinez restaurant.  I physically worked
4  out of the restaurant.
5      Q.   Okay.
6      A.   As the training director, I
7  traveled all restaurants.  I didn't
8  physically go into the same restaurant
9  every day.
10     Q.   Yeah.  I mean, I may have it
11 backwards.  That's why I'm asking.  You
12 said you were a training director, but
13 did you actually start as a training unit
14 director for just the Martinez market?
15     A.   That was my first title, yes.
16     Q.   And then you became the
17 training director for that region?
18     A.   That's correct.
19     Q.   Okay.  Any other titles while
20 you were there?
21     A.   Just I did -- when I started,
22 it's manager, and then that -- that's how
23 you hired in.  You hired in as a manager,

Page 40

1  and then once you graduate from the
2  management course, then it was the
3  training unit director, and then the next
4  promotion was the --
5      Q.   Let's see.  That's why we're
6  confused.  When I asked you what you did,
7  you started with your last title.
8      A.   Okay.
9      Q.   What you actually did is you
10 were hired as a manager of a restaurant?
11     A.   No.  I was hired as a
12 training manager, but I had to start out
13 as a manager to learn operations.  In the
14 business, when you go in, it's just like
15 as a MIT.  You're hired as a general
16 manager, but you're MIT, and then you
17 complete the MIT course, and that makes
18 you a manager now.
19     Q.   MIT meaning manager in
20 training?
21     A.   Manager in training.
22     Q.   I understand.  When you used
23 the term training manager, I took you to

10 (Pages 37 to 40)

## FREEDOM COURT REPORTING

Page 41

1  mean that you were hired to train
2  managers. But what you're trying to say
3  is that you were hired as a manager in
4  training?
5      A.   No.  I was hired to train
6  managers, but when you said to list the
7  jobs, the way they did my titles, I was
8  hired to train managers.
9      Q.   Okay.
10     A.   But as a MIT -- I went
11 through the course as a MIT, and once you
12 complete the MIT course, your title
13 changes to manager.
14     Q.   Right.  I understand that.
15 I'm just trying to figure out how you
16 could be hired to train managers when
17 you've never had any experience at
18 training managers in the restaurant
19 business, if I understand your history
20 correctly.
21     A.   Okay.  The training aspect of
22 it wasn't about being able to train
23 people.  I went through the restaurant in

Page 42

1  order to know operations.  So in order to
2  learn how the company, hands-on how it
3  works, that's the way you do it.  I mean,
4  I can't train you how to make a biscuit
5  if I don't know how to make a biscuit
6  myself.  So it was to physically go
7  through hands-on and then to take it from
8  there to the next level.
9      Q.   Okay.  So when you applied
10 for the job, you are applying for a job
11 to work in the training department for
12 this area to train people?
13     A.   In the field, yes.
14     Q.   In the field?
15     A.   Yes.
16     Q.   How to be a manager?
17     A.   Yes.
18     Q.   Okay.  But you have to be
19 trained to be a manager first?
20     A.   No.  I have to be trained in
21 operations first.
22     Q.   All right.  So you go through
23 operations training first?

Page 43

1      A.   Right.  Restaurant training.
2      Q.   Restaurant training?
3      A.   Yes.
4      Q.   And how long did that last?
5      A.   Eleven weeks, approximately
6  eleven weeks.
7      Q.   After you do the restaurant
8  training, then do you act as a manager in
9  the restaurant for a period of time?
10     A.   Yes.  You go through
11 restaurant operations, yes.
12     Q.   So how long then did you act
13 as a manager in the restaurant after the
14 first eleven weeks?
15     A.   About six weeks to get my own
16 certification.
17     Q.   So then you worked there for
18 six weeks as the restaurant manager?
19     A.   Correct.
20     Q.   Is this at Martinez?
21     A.   Correct.
22     Q.   Okay.  After that six weeks,
23 what do you do?

Page 44

1      A.   I get my certification and
2  become into the position of the training
3  manager.
4      Q.   Okay.  Now, as the training
5  manager, you are now training people who
6  were, like yourself, nineteen weeks prior
7  to this or seventeen weeks prior to this,
8  coming into the training program?
9      A.   That's correct.
10     Q.   Okay.
11     A.   That's correct.
12     Q.   How long did you do that?
13     A.   For about nine months to a
14 year.
15     Q.   Okay.  After that what did
16 you do?
17     A.   And then that's when I went
18 to the field.
19     Q.   That's when you became the
20 district training manager?
21     A.   Correct.
22     Q.   Training director you said is
23 what the title was?

11  (Pages 41 to 44)

**FREEDOM COURT REPORTING**

Page 45

1    A.   Yes.
2    Q.   Training director.  Okay.
3  And it was training director for that
4  Martinez market which was ten to twelve
5  stores?
6    A.   Correct.
7    Q.   How long did you do that?
8    A.   Approximately three and a
9  half, four years.
10    Q.   Okay.  So basically you were
11  with Bojangles about five years?
12    A.   Pretty much, yes.
13    Q.   Okay.  What was your title
14  after that?
15    A.   I went to Cracker Barrel.
16    Q.   Oh, you came straight from
17  Bojangles to apply to Cracker Barrel?
18    A.   Yes.
19    Q.   Okay.  Then let me make sure
20  I have this right.  You're in the
21  training unit director for about a year
22  after your first seventeen weeks of the
23  training we've talked about.  Then for

Page 46

1  three and a half to four years you're the
2  training director for that region,
3  correct?
4    A.   Approximately, yes.
5    Q.   All right.  So if my timing
6  is right, that's about five years.  So
7  we're up to 2004 about?
8    A.   2002.  From '99 to 2002.
9  That's about four years.
10    Q.   Okay.  No.  That's only three
11  years at best.  I mean, we may have the
12  years wrong.  I'm just trying to really
13  get a feel for how long were you with
14  this company, Bojangles.
15    A.   Okay.  I understand.  I
16  traveled so much.
17    Q.   Do you think it was about
18  four years, five years?  We added up
19  about five years based on the time for
20  you to do those tasks you described, but
21  --
22    A.   I think it was for about four
23  years, closer to four years.

Page 47

1    Q.   Okay.  Why did you leave
2  Bojangles?
3    A.   I was recruited by Cracker
4  Barrel.  I apologize.  That's incorrect.
5  I left Bojangles because they switched
6  from corporate to franchise.
7    Q.   Okay.  What do you mean by
8  that?
9    A.   They sold -- Bojangles
10  corporate sold off that portion of the
11  market, and it became the franchise
12  market.
13    Q.   Okay.  So Bojangles sold the
14  Martinez area?
15    A.   Correct.
16    Q.   And it became a franchise?
17    A.   Correct.
18    Q.   Who bought it?
19    A.   I don't know.
20    Q.   Okay.  But it happened before
21  you left there?
22    A.   That's correct.
23    Q.   All right.  So you worked

Page 48

1  with them for a time while it was
2  franchise?
3    A.   Just a couple of months.
4    Q.   Was it still called
5  Bojangles?
6    A.   Yes.
7    Q.   Okay.  So what did you do,
8  turn in your notice, or what happened?
9    A.   Yes, I turned in my notice.
10    Q.   All right.  So then where did
11  you go?
12    A.   I met with Ted Moore, liaison
13  to the Atlanta market.
14    Q.   Say that again?
15    A.   The recruiter for Cracker
16  Barrel, Ted Moore.
17    Q.   So did you know him before
18  this?
19    A.   No.
20    Q.   I mean --
21    A.   He contacted me versus my
22  resume online.
23    Q.   You had your resume posted

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 49 |
|---|

1  online?
2      A.  Yes.
3      Q.  Like how did you post it?
4      A.  Monster.com.
5      Q.  And is he employed by Cracker
6  Barrel?
7      A.  Yes.
8      Q.  All right.  So you had your
9  resume posted on Monster.com, and Ted
10 Moore contacted you?
11     A.  Correct.
12     Q.  Do you remember when that
13 was?
14     A.  No.
15     Q.  All right.  Well, what did he
16 say when he called you?
17     A.   He asked if I would meet
18 him.  He was in the Atlanta market, and I
19 drove down on my day off and met with
20 him.
21     Q.  So you were still working
22 when you met him?
23     A.   That's correct.

| Page 50 |
|---|

1      Q.  Okay.  Do you have any memory
2  of when that was?
3      A.  No, I don't.
4      Q.  Do you keep any kind of like
5  calendar or anything from year to year
6  with your appointments on it?
7      A.  I've relocated so much.  I've
8  moved so much with Cracker Barrel, with
9  other companies.
10     Q.  You don't keep that kind of
11 stuff?
12     A.  No, I don't have that.
13     Q.  Okay.  Well, anyway, you
14 drive down and met with him in Atlanta?
15     A.  Yes.
16     Q.  All right.  And then what
17 happens after that?
18     A.   I interviewed with them and
19 they asked me to do a test and to do
20 paperwork for like previous work history
21 and background check, I guess you can
22 call it, type information.
23     Q.  All right.  Now, what kind of

| Page 51 |
|---|

1  test did you do?
2      A.   It was -- I'm just thinking.
3  I've taken so many.  With Cracker Barrel
4  it was one -- if I'm not mistaken, about
5  P&Ls, profit and losses, and how to do
6  calculations on food and things of that
7  nature.
8      Q.  All right.  Did you meet him
9  like at a --
10     A.  At a restaurant.
11     Q.  That's what I was going to
12 ask you, at a Cracker Barrel restaurant?
13     A.  Yes.
14     Q.  Which one was it?  Do you
15 remember?
16     A.  No, I do not.
17     Q.  All right.  I at least might
18 have your application.  That would help
19 us get the exact date on this.
20         MS. BUSBY:  Go off the record
21 for a minute.
22         (Whereupon, a discussion off
23 the record was held.)

| Page 52 |
|---|

1      Q.  I'm going to show you what
2  I'm marking as Exhibit 1 to your
3  deposition and give you a second to look
4  at it.
5          (Whereupon, Defendant's
6  Exhibit No. 1 was marked for
7  identification and copy of same is
8  attached hereto.)
9      Q.  All right.  Exhibit 1, I
10 believe, is your resume, if you look --
11 is this what you were referring to when
12 you said you posted it on Monster.com?
13     A.  Yes.
14     Q.  It really looks like it
15 starts at the bottom of page one; is that
16 right?  Objective?
17     A.  Yes.
18     Q.  What it looks like to me is
19 that somebody has e-mailed this to
20 somebody.  I guess Monster sent it.  At
21 the beginning of page one it says Monster
22 resume, and it has a number.  Do you see
23 that right there in the middle?

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

| Page 53 |
| --- |

1    A.    Yes.
2    Q.    And your e-mail is
3    DNRODG@YAHOO.COM?
4    A.    Yes.
5    Q.    And on Friday, June the 21st,
6    you sent it to Burt Medoff, M-e-d-o-f-f,
7    correct?
8    A.    Yes.
9    Q.    Who is that?
10    A.    I don't know.  It could be
11    another person that they hired to recruit
12    for them or -- I don't know.
13    Q.    You don't remember ever
14    talking or meeting with that person?
15    A.    No.
16    Q.    Okay.  Ted Moore is at the
17    top of the page.  That's who --
18    A.    Contacted me, yes.
19    Q.    Contacted you?  All right.
20    Now, it has on here a Stone Mountain,
21    Georgia address.  Whose address was that?
22    A.    That was mine.
23    Q.    Well, had you already moved

| Page 54 |
| --- |

1    then from North Augusta?
2    A.    Yes, I was already moving to
3    the Atlanta market.
4    Q.    Okay.  So apparently,
5    according to your previous testimony, in
6    June of '02 you're still employed at
7    Bojangles, but you have posted this
8    resume on Monster.com because they are
9    going to a franchise system, correct?
10    A.    I'm sorry.  Could you ask
11    that again?
12    Q.    Yeah.  I'm just trying to get
13    us back into our timeline so that we know
14    where we are.  You had already testified
15    that you were working at Bojangles and
16    you were -- they had switched to a
17    franchise market.  So you posted your
18    resume on Monster.com.  And all I'm
19    saying is it looks like you did that
20    sometime prior to June 21st, 2002 based
21    on this being a Monster resume posting?
22    A.    That was posted prior to June
23    21st?

| Page 55 |
| --- |

1    Q.    Yeah, sometime prior to June
2    21st.
3    A.    Yeah.
4    Q.    And so at the time you posted
5    it, you were still working for Bojangles
6    based on what you told me a few minutes
7    ago.  So I'm just trying to establish we
8    know you were working at Bojangles until
9    at least June of 2002?
10    A.    Actually, the posting that's
11    on here is -- it was posted prior to
12    that, but as you update it, it changes
13    dates.
14    Q.    Okay.
15    A.    So even today if I make any
16    changes on it and save it, it will render
17    today's date.
18    Q.    Okay.  Let me just ask a
19    better question.  All I'm trying to get
20    to is try to help us get to a timeline of
21    when you worked at Bojangles.
22    A.    Okay.
23    Q.    So you think it would -- do

| Page 56 |
| --- |

1    you think you were still working there in
2    June of '02?
3    A.    No.  It couldn't have been
4    '02.
5    Q.    All right.  Well, let's look
6    at this thing and then maybe we can
7    figure this thing out.  According to this
8    you were working at RTM Southeast,
9    Incorporated?
10    A.    That's correct.
11    Q.    All right.  Didn't we talk
12    about RTM already?  Didn't we have them
13    reversed?
14    A.    No, we haven't.
15    Q.    We haven't talked about RTM?
16    A.    That's correct.
17    Q.    So you work at Bojangles and
18    you go from Bojangles to RTM?
19    A.    That's correct.  And then
20    from RTM to Cracker Barrel.
21    Q.    All right.  Let's get
22    ourselves up to speed here.
23    A.    Okay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1　　Q.　So according to your resume,
2　you go from the Athens Daily News to the
3　Bojangles?
4　　A.　Yes.
5　　Q.　But you didn't have listed on
6　here your own company.  So that must have
7　been in between Athens and --
8　　A.　If you go down one, you'll
9　see Prestige Staffing Merchandising
10　Services, and it says operating partner/
11　owner.
12　　Q.　So that's you?
13　　A.　Yes.
14　　Q.　So which one is right, your
15　resume or your testimony?
16　　A.　I don't understand.
17　　Q.　Well, I mean, we're out of
18　order.  I just want to know which one is
19　-- you testified in a different order
20　than your resume.  Is the resume the
21　correct order versus the --
22　　A.　The resume is the correct
23　order.

Page 58

1　　Q.　That's fine.  I just want to
2　get us in the correct order.
3　　A.　Okay.
4　　Q.　All right.  So let's look at
5　the resume.  According to this, you are
6　with PIA.
7　　A.　Correct.
8　　Q.　All right.  Then from PIA you
9　go to?
10　　A.　Prestige.
11　　Q.　Prestige, which is your own
12　company?
13　　A.　Yes.
14　　Q.　And then to the Athens Daily?
15　　A.　Yes.
16　　Q.　Then to Bojangles?
17　　A.　Yes.
18　　Q.　Because before you said
19　Arizona, Athens, PIA, Prestige.
20　　A.　Well, you won't see Arizona
21　on here because it didn't list.
22　　Q.　Well, I'm not even trying to
23　get to that.  I'm just trying to get to

Page 59

1　the order of these other three.
2　　A.　Arizona before --
3　　Q.　So apparently you came from
4　Arizona to PIA, not the Athens newspaper?
5　　A.　Correct.
6　　Q.　Okay.  Do you see why I'm
7　trying to straighten that out?
8　　A.　Yes, I understand.
9　　Q.　Before you told me you
10　started at the Athens newspaper.
11　According to your resume you went PIA,
12　Prestige, Athens, and then Bojangles?
13　　A.　Correct.
14　　Q.　Okay.  Then according to your
15　resume, you were with Bojangles until
16　August of '01, and then you went to RTM?
17　　A.　Yes.
18　　Q.　All right.  What is that?
19　　A.　It's a franchise of Arby's,
20　Mrs. Winner's.
21　　Q.　I thought you said you left
22　Bojangles because it became a franchise?
23　　A.　I did.

Page 60

1　　Q.　Why would you go from one
2　franchise to another franchise?
3　　A.　The opportunity and the
4　salary.  They also offered other
5　incentives.
6　　Q.　Okay.  Let me get back on my
7　notes and get this straight.  Okay.  So
8　you did not leave Bojangles because you
9　were recruited by Cracker Barrel.  We
10　know that is not correct.
11　　A.　That's why I left RTM.
12　　Q.　So you left Bojangles because
13　it went to a franchise.  Then you went to
14　RTM, which is a franchise of Arby's and
15　Mrs. Winner's, right?
16　　A.　That's correct.
17　　Q.　In, according to this resume,
18　Atlanta, Georgia?
19　　A.　That's correct.  I came down
20　to Atlanta.
21　　Q.　So that's why you moved back
22　to Atlanta?
23　　A.　Yes.  I was already moving to

15  (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1 Atlanta.
2    Q.    You were moving from
3 Bojangles because you were quitting there
4 because they were going to a franchise?
5    A.    Correct.
6    Q.    All right.  Then you went to
7 Atlanta to work for RTM?
8    A.    Correct.
9    Q.    Now, did you work in either
10 an Arby's or a Mrs. Winner's?
11    A.    Yes.
12    Q.    Okay.  Which one?
13    A.    Indian Creek in -- I think
14 that's Norcross, Georgia.
15    Q.    Okay.  But Indian Creek,
16 like, what, the Arby's or which one?
17    A.    It's a dual concept.  It's
18 two restaurants in one.  So it's Arby's
19 and Mrs. Winner's.
20    Q.    Mrs. Winner's is chicken,
21 right?
22    A.    Yes.
23    Q.    It's a dual concept.  Is this

Page 62

1 the only one you're at?
2    A.    No.
3    Q.    Okay.  Which other one did
4 you go to?
5    A.    Stone Mountain, Georgia.
6    Q.    And was that a dual concept
7 or a singular?
8    A.    That's a dual concept as
9 well.
10    Q.    Okay.  Now, according to
11 this, this was 8/2/01.  So August of '01,
12 and you were working there when you
13 talked to --
14    A.    Ted Moore.
15    Q.    -- Ted Moore.  Okay.  So
16 basically were you not happy or what was
17 the problem?  Because you had a job, but
18 you had your resume posted on Monster?
19    A.    My resume was always posted.
20 I never -- once I put it on, it never
21 goes away.  Right now today it's still.
22    Q.    But you update it?
23    A.    That's correct.

Page 63

1    Q.    All right.  So were you hired
2 as the general manager for RTM?
3    A.    RTM?  They call it fast
4 track.
5    Q.    All right.  Well, let's go
6 back to Bojangles then.
7    A.    Okay.
8    Q.    Bojangles, you get wind or
9 they tell you or they do sell off to
10 become a franchise.  You worked there for
11 a little while, and you're looking for
12 another job, and you find it at RTM?
13    A.    Yes.
14    Q.    I mean, how did you find out
15 about that job?
16    A.    The same.
17    Q.    Posted -- because of the
18 posting?
19    A.    Yes.
20    Q.    Somebody called you?
21    A.    Yes.
22    Q.    Do you remember who called
23 you from them?

Page 64

1    A.    No.
2    Q.    So somebody calls you, and
3 you interview with them at RTM?
4    A.    Yes.
5    Q.    And you start in Norcross?
6    A.    Yes.
7    Q.    What is the position that
8 you're actually hired as?
9    A.    It's, again, as a general
10 manager, but they call it fast track.
11 They bring you in at that salary because
12 they expect you to achieve that rather
13 quickly.
14    Q.    Do they have a manager
15 training program as well?
16    A.    Yes.
17    Q.    All right.  So you were hired
18 at the title general manager, but you're
19 actually training until you, I guess,
20 pass the training and then get there?
21    A.    That's correct, because you
22 have to learn their operations.
23    Q.    How long does that process

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  last?
2      A.    A couple of months, four
3  months maybe.
4      Q.    Okay.  When did you start at
5  Cracker Barrel?
6      A.    July 2002.
7      Q.    Okay.  So let's go back to
8  this then.  You have started August 2001
9  at RTM, and you worked for a period in
10  Norcross, and then you go to Stone
11  Mountain?
12      A.    That's correct.
13      Q.    And then because your resume
14  is posted on Monster, best you can
15  recollect this person named Ted Moore
16  contacted you?
17      A.    Yes.
18      Q.    And asked you to interview
19  with him?
20      A.    Yes.
21      Q.    Okay.  In some Cracker Barrel
22  in the Atlanta market?
23      A.    Yes.

Page 66

1      Q.    All right.  So why did you
2  decide to take the job at Cracker Barrel
3  and leave RTM?
4      A.    Just the stability of the
5  company.  I reviewed their numbers and
6  their bonus program and pretty much the
7  stability.
8      Q.    So did you work out a notice
9  at RTM?
10      A.    Yes.
11      Q.    How long a notice was it?
12      A.    Two weeks.
13      Q.    Who was your immediate
14  supervisor at RTM?
15      A.    Rundell.
16      Q.    Spell that for me.
17      A.    R-u-n-d-e-l-l.
18      Q.    Okay.  Was he like, what, the
19  district manager?
20      A.    Yes.
21      Q.    Okay.  When you worked in --
22  this says here on your resume that you
23  managed two assistant managers while you

Page 67

1  were with RTM?
2      A.    Yes.
3      Q.    Who were those two assistant
4  managers?
5      A.    Their names I don't recall.
6      Q.    And then from there, RTM, you
7  went to Cracker Barrel?
8      A.    Yes.
9      Q.    All right.  July of '02?
10      A.    Yes.
11      Q.    Have we covered all your
12  employment history up to Cracker Barrel?
13      A.    Yes.
14      Q.    All right.  Have you ever
15  been written up at any of these previous
16  employers?
17      A.    I don't recall any
18  documentation from any previous employers
19  up to that point.
20      Q.    What do you mean
21  documentation?
22      A.    Written.
23      Q.    You might have got a verbal

Page 68

1  warning about something?
2      A.    No disciplinary, nothing
3  disciplinary.
4      Q.    Okay.  Have you ever been
5  talked to about, you know, you need to
6  improve your management skills or do this
7  better or that better?
8      A.    That would always be done in
9  evaluations, if they needed to say that.
10      Q.    All right.  So no
11  disciplines?
12      A.    Correct.
13      Q.    All right.  Have you ever
14  been terminated from a job?
15      A.    No.  They were done with
16  notice.
17      Q.    You were hesitating.  What
18  were you thinking about?
19      A.    Because when you say from a
20  job ever, I'm thinking, you know from
21  teenager and all that.
22      Q.    No.  I'm sorry.  I was not
23  referring to that.  I mean of these

17  (Pages 65 to 68)

## FREEDOM COURT REPORTING

Page 69

1 companies we've referred to in your adult
2 life, you've not been terminated from any
3 of them?
4    A.   No.
5    Q.   And then on the back page of
6 this it talks about three colleges, and
7 you only talked about the Commonwealth
8 College.
9    A.   University of Maryland is
10 when I was in the military.
11    Q.   Where is that located?
12    A.   I was in Europe.  It's just a
13 branch.
14    Q.   It's like a correspondence
15 course or something?
16    A.   Right.
17    Q.   Is it affiliated with the
18 military?
19    A.   It's on the military
20 installation, but it's the university
21 that's on the --
22    Q.   You do it on a computer?
23    A.   No, it's a class.

Page 70

1    Q.   You physically sit in a
2 class?
3    A.   Yes.
4    Q.   What is that next one?
5    A.   Cochise College.
6    Q.   Where is that?
7    A.   That's in Arizona, Sierra
8 Vista, Arizona.
9    Q.   So that was a physical
10 location?
11    A.   Yes.
12    Q.   Where you physically went to
13 class?
14    A.   Yes.
15    Q.   So this middle one is they
16 have some branch at the University of
17 Maryland on one of these bases?
18    A.   That's correct.
19    Q.   Which base was it?
20    A.   I went in several bases.  The
21 last one I attended was Camp Darby in
22 Livorno, Italy.
23    Q.   Well, it looks like you're

Page 71

1 only a half a year away from getting a
2 degree?
3    A.   Yes.
4    Q.   Am I reading that right?
5    A.   Yes.
6    Q.   In what?
7    A.   Business --
8    Q.   You say bachelor's, but I --
9    A.   Business management.
10    Q.   So at Commonwealth you did a
11 year.  At University of Maryland you did
12 about one and a half years and at Cochise
13 you did about a year?
14    A.   Cochise.
15    Q.   Cochise?
16    A.   Yes.
17    Q.   Have you been to any other
18 schools?
19    A.   You mean physical schools
20 like the facility or have I had to take
21 additional classes?
22    Q.   Well, either way.  What have
23 your classes been in?  Have you taken

Page 72

1 additional classes?  Is that what you're
2 trying to tell me?
3    A.   Well, like Serve Safe, and
4 I've also taken employee rights classes
5 and different things.  Are you asking
6 those questions?
7    Q.   So you have taken different
8 classes related to your employment work?
9    A.   Correct.
10    Q.   No.  I'm talking about have
11 you taken any other -- been to any other
12 schools, classes, whether it's computer,
13 whether it's a correspondence, whether
14 it's physical location, other than these
15 three that you've listed that would
16 contribute towards your degree that you
17 said you were seeking?
18    A.   No.
19    Q.   Okay.  Serve Safe is a
20 program that -- that is the Cracker
21 Barrel -- the program that Cracker Barrel
22 utilizes, I believe, but what it is is
23 it's from the health departments where

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  they talk about how do you serve safe
2  food? Is that what you're referring to?
3      A.   Yes.
4      Q.   And I know it's called by
5  different names. And Cracker Barrel may
6  call it a different name than Bojangles
7  than RTM, but basically it's the health
8  department's food safety recommendations?
9      A.   Yes.
10     Q.   Okay. Let's take a break.
11 That does get us through all of your work
12 history until Cracker Barrel, right?
13     A.   Yes.
14         MS. BUSBY: All right. We'll
15 take a break and we'll start back up
16 there.
17         (Whereupon, a brief recess
18 was taken.)
19     Q.   Okay. Right before we took
20 our break, I asked you if you had ever
21 been terminated and you said no. Have
22 you ever been asked to resign in lieu of
23 termination?

Page 74

1      A.   No.
2      Q.   Have you ever gotten in
3  trouble at any of your employers for
4  falsifying any type of food costs?
5      A.   No.
6      Q.   Falsifying any kind of
7  scheduling?
8      A.   No.
9      Q.   Saying that you were
10 somewhere that you weren't?
11     A.   No.
12     Q.   Do your parents live in
13 Virginia?
14     A.   My parents are deceased.
15     Q.   Do you have any brothers or
16 sisters?
17     A.   Yes.
18     Q.   Where do they live?
19     A.   Virginia.
20     Q.   As part of preparation for
21 your deposition, what did you review?
22     A.   A tape.
23     Q.   What kind of tape?

Page 75

1      A.   I think it's titled
2  Deposition Tape.
3      Q.   A video?
4      A.   Yes.
5      Q.   Okay. How to give a
6  deposition video?
7      A.   No. To -- just wanting to
8  say you must be honest, make sure you
9  answer all the questions to the best of
10 your ability. That's pretty much it.
11     Q.   Well, how long did the tape
12 last?
13     A.   A few minutes, four minutes
14 maybe.
15     Q.   Where did you watch it?
16     A.   At the attorneys' office.
17     Q.   Which attorney?
18     A.   Breedlove.
19     Q.   In Georgia?
20     A.   Yes.
21     Q.   You met with your attorneys,
22 I take it?
23     A.   Yes.

Page 76

1      Q.   Did you review any documents?
2      A.   No.
3      Q.   You gathered up documents to
4  give to your attorneys to produce to us
5  in this case; is that right?
6      A.   Yes.
7      Q.   All right. Do you have any
8  documents that have not been produced?
9      A.   No.
10     Q.   In the pile of documents that
11 you produced to us, there was a lot of
12 employment records of other people.
13 Where did you get those?
14     A.   I don't understand the
15 question.
16     Q.   Well, in the documents that
17 you gave to your attorneys that your
18 attorneys gave to us, you had some
19 disciplinary forms that you had filled
20 out on people who had worked for you
21 while you were at Cracker Barrel; is that
22 right?
23     A.   I don't recall all the

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  documents that I submitted.
2      Q.   All right.  There's a pile of
3  documents this thick (indicating) that
4  your attorneys gave to us that I take it
5  that you gave to them to produce to us;
6  is that right?
7      A.   I'm not sure what all the
8  documents are that you all received.
9      Q.   All right.  Well, I have two
10 hundred and sixty-nine pages of documents
11 that were produced, and included in those
12 documents were evaluations and
13 disciplinary counseling reports that were
14 for people other than you.
15         Brian Thompson.  Do you
16 recognize his name?
17     A.   Yes.
18     Q.   All right.  Who is he?
19     A.   Brian Thompson was an
20 associate manager for Cracker Barrel.
21     Q.   And it appears that you have
22 given him a written counseling that you
23 signed on -- somewhere between June 25th

Page 78

1  of '05 and 7/12 of '05.
2      A.   I'm not sure of the dates.
3      Q.   Well, my question really is:
4  What was this document doing in your
5  possession?
6      A.   If there was a document that
7  was issued while employed there, it was
8  probably the copy for my files.
9      Q.   When you say your files, what
10 kind of files did you have?
11     A.   Any files, awards,
12 incentives, anything that we used for
13 employees.
14     Q.   Okay.  Well, when you do a
15 counseling report on somebody, is it --
16 you're supposed to go over it with them,
17 right?
18     A.   That's correct.
19     Q.   Then it goes to their
20 personnel file; is that right?
21     A.   A copy goes to the personnel
22 file.
23     Q.   And this is a confidential

Page 79

1  piece of information about that person,
2  whoever it is; is that right?
3      A.   That's correct.
4      Q.   And you're telling me it was
5  your practice to keep a personal copy of
6  them yourself?
7      A.   No, ma'am.  It was one that
8  was issued, and when I left from there, I
9  surrendered all the papers that I had.
10 So anything that I had that pertained to
11 Cracker Barrel I was asked to make sure I
12 surrendered, which I did.
13     Q.   When you say surrendered, you
14 mean gave it back to Cracker Barrel?
15     A.   Yes.
16     Q.   All right.  Well, then that
17 gets me back to my question.  These
18 documents were produced by you to us.  So
19 apparently you still had them in your
20 possession?
21     A.   When I was asked to return
22 the documents to Cracker Barrel, my
23 attorneys asked me to give them any and

Page 80

1  everything that I had that belonged to
2  Cracker Barrel.  And I went home and went
3  through everything that I thought may
4  have anything that pertained to Cracker
5  Barrel and made sure I surrendered it.
6      Q.   When you say you surrendered
7  it, you surrendered it to your lawyers?
8      A.   Yes.
9      Q.   My question was a little bit
10 different than that.  Before your lawyers
11 asked them to give -- before your lawyers
12 asked you to give them a copy of all your
13 documentation related to Cracker Barrel,
14 what were you doing with it in your
15 possession?
16     A.   It was to Rich Alexander, who
17 was a direct manager, who was not local
18 in our market.  So any documentation that
19 we had, we would always pass on to Rich.
20 And apparently by the time my termination
21 came, he had not come to get the
22 documentation, because anything like that
23 was always given to Rich.

20 (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1    Q.   What do you mean hadn't come
2  to get it, come where?
3    A.   To Montgomery.
4    Q.   To the store?
5    A.   Yes.
6    Q.   Well, I understand that.  So
7  my question is:  When you were
8  terminated, it should have been at the
9  store, right, not in your possession?
10    A.   When I was terminated, Rich
11  was not at the store.
12    Q.   So you took all of the
13  company records at the store that day
14  with you?
15    A.   No.
16    Q.   Well, it's a violation of the
17  company policy for you to take other
18  people's employee records, correct?
19    A.   I never took the employees'
20  records.
21    Q.   Well, you have them because
22  you produced them to us, correct?
23    A.   No.  Those records were to be

Page 82

1  surrendered, and I was terminated before
2  he took those out of my possession.  So I
3  surrendered them.
4    Q.   Well, you didn't surrender
5  them until your lawyers asked for them,
6  right?
7    A.   I wasn't aware that it was in
8  my possession until I searched for them.
9  So I searched for anything.
10    Q.   Why would you take some
11  employee's counseling record that had
12  already been signed by that employee
13  months before your termination to your
14  house?
15    A.   Again, upon my termination, I
16  walked through and Rich was not -- he was
17  not there to collect anything, and
18  anything that we have, we surrender to
19  him.
20    Q.   Well, I understand that while
21  you're in the store, if the district
22  manager comes, you give him
23  documentation, correct?

Page 83

1    A.   That's correct.
2    Q.   Okay.  My question to you is:
3  You have copies of people's personal
4  employee records at your house?
5    A.   They were not at my house.
6    Q.   Where were they?
7    A.   They were in a briefcase,
8  which Rich normally has me to meet him
9  off site sometimes.  We never always met
10  at the restaurant.
11    Q.   Okay.  So you had a briefcase
12  full of stuff in your car or at home or
13  somewhere?
14    A.   No, ma'am, I didn't have a
15  briefcase full of stuff.  It would be
16  anything that needed to be -- that Rich
17  requested that he get a copy of.
18    Q.   Well, why would you have a
19  copy of Ashley Moore's employee
20  counseling report that you did not
21  participate in?
22    A.   Again, if he asked --
23  anything that he asked for, if we meet, I

Page 84

1  just give the documentation for his
2  files.
3    Q.   Seems to me, if Rich did the
4  employee counseling report of Ashley
5  Moore, he would have it, wouldn't you
6  think?
7    A.   I'm not sure.
8    Q.   All right.  So just so we're
9  clear about this, under oath you're
10  telling me that the reason that you had
11  the documents in your possession that you
12  have given to your lawyers to surrender
13  to Cracker Barrel is because you had them
14  in a briefcase that you were meant to
15  give to Rich Alexander?
16    A.   No.  The documents were
17  documents that he requested copies of and
18  he never got.
19    Q.   All right.  So your testimony
20  is that Rich has requested copies of the
21  documents that you had in your possession
22  that you were able to then produce?
23    A.   I'm sorry?

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  Q.   Your testimony is the
2  reason that you have these personnel
3  records is because Rich requested a copy
4  of them and you kept them in a briefcase
5  but the two of you never got around to
6  meeting for you to give them to him?
7      MS. YORK:  I'm going to
8  object because it's been asked and he's
9  answered it six to seven times.
10     MS. BUSBY:  Well,
11 inconsistently.
12     MS. YORK:  He's answered the
13 question.
14     MS. BUSBY:  Are you
15 instructing him not to answer?
16     MS. YORK:  I'm objecting
17 because he's asked and answered.  You
18 said it's inconsistent, but you've asked
19 it five different ways.
20     MS. BUSBY:  I'll continue to
21 ask until I'm satisfied with the answer.
22  Q.   (By Ms. Busby)  The reason
23 you have other people's personnel records

Page 86

1  in your possession that you gave to your
2  lawyer is because you made copies of
3  them?
4      A.   No.
5      Q.   Okay.  Then we'll start
6  over.  Why do you have other people's
7  personnel records in your possession?
8      MS. YORK:  Asked and
9  answered.
10     Q.   Go ahead.
11     A.   I've already testified to why
12 I have them, upon his request.
13     Q.   Well, who made the copies?
14     A.   I don't know.
15     Q.   All right.  So some unknown
16 person made copies and gave them to you
17 for you to give to Rich?  That's your
18 testimony?
19     A.   No, ma'am.  At the time, as
20 you stated, that I didn't even
21 participate in one of them, I don't know
22 how that copy was produced.  I just know
23 that when he requested that he needs a

Page 87

1  copy of something, I look for it.  And if
2  it's there, I make sure I get it to him.
3      Q.   All right.  So you look for
4  it.  You get it, and apparently you put
5  it in a briefcase that you had in your
6  possession when you were terminated?
7      A.   Yes.
8      Q.   All right.  And where was
9  this briefcase located?
10     A.   The briefcase was a locked
11 case that stayed in the main office under
12 shelving.
13     Q.   Well, how did the briefcase
14 come to be in your possession after you
15 were terminated?
16     A.   The briefcase was one of the
17 things that actually was handed to me
18 that was something that I carried that
19 was given to me upon termination.
20     Q.   It was your personal
21 briefcase?
22     A.   The briefcase itself was one
23 that I purchased, but I purchased with my

Page 88

1  own funds, but it was one that I kept
2  there because it had a lock on it.
3      Q.   All right.  So who handed you
4  the briefcase upon your termination?
5      A.   Rich Alexander.
6      Q.   I thought you told me just a
7  minute ago he wasn't there, which is why
8  you didn't give him the documents?
9      A.   No, ma'am.  He never came
10 before the time that I was terminated to
11 retrieve them.
12     Q.   All right.  So you were
13 terminated, and Rich Alexander was there?
14     A.   That's correct.
15     Q.   Yet you took the briefcase
16 with these documents with you?
17     A.   When I was terminated, I was
18 handed the briefcase and told my services
19 were no longer needed, and I left
20 immediately.
21     Q.   All right.  When did you look
22 in the briefcase?
23     A.   When I was asked if I had any

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  documentation or anything belonging to
2  Cracker Barrel, to go through everything,
3  and anything and everything that I had to
4  make sure I turned it in.
5      Q.  All right.  So you never
6  looked in the briefcase from the day you
7  were terminated until --
8      A.  That's correct.
9      Q.  When?
10      A.  I'm not sure exactly when.
11      Q.  Well, when did you hire a
12  lawyer?
13      A.  I'm not sure of the exact
14  date.
15      Q.  Within a week of your
16  termination?
17      A.  No.
18      Q.  Within a month?
19      A.  No.
20      Q.  Within two months?
21      A.  I'm not sure exactly when.
22      Q.  All right.  Was Mr. Breedlove
23  the first lawyer you hired?

Page 90

1      A.  Yes.
2      Q.  Okay.  Did you know him prior
3  to this for any other legal reason?
4      A.  No.
5      Q.  How did you come to know Mr.
6  Breedlove?
7      A.  I searched through phone
8  books, and I just called around and asked
9  people if there was anyone who does
10  employee rights.
11      Q.  What do you mean you called
12  -- you called around lawyers or you
13  called around friends or what are you
14  talking about?
15      A.  I called everybody.  Through
16  the phone book.  I called other
17  attorneys.  I asked friends.  I asked the
18  EEOC.  I asked numerous of people.
19      Q.  Did the EEOC recommend Mr.
20  Breedlove?
21      A.  No, they did not.
22      Q.  Did a friend recommend Mr.
23  Breedlove?

Page 91

1      A.  Honestly, with all the
2  contacts I made, I'm not sure how I came
3  across Mr. Breedlove.
4      Q.  You may have just come across
5  him in the phone book?
6      A.  Yes.  I'm not sure, again,
7  how I came across Mr. Breedlove.
8      Q.  So once you get an attorney,
9  Mr. Breedlove's office, sometime
10  thereafter they asked you to give them
11  any documents you have related to Cracker
12  Barrel?
13      A.  Yes.
14      Q.  And it is at that time that
15  you look in the briefcase?
16      A.  I looked through numerous of
17  things, but yes.
18      Q.  All right.  What other things
19  did you look through?
20      A.  Any old gym bag I had.  He
21  said do a one hundred percent search of
22  anything and anything that was belonging
23  to Cracker Barrel --

Page 92

1      Q.  All right.  So my question
2  was:  Where did you look in and you've
3  now said a briefcase and a gym bag?
4      A.  I looked through everything.
5  I went back to my vehicle just to make
6  sure that there was nothing that
7  pertained to Cracker Barrel, and I
8  searched throughout my own personal
9  belongings just to make sure I had
10  nothing that belonged to Cracker Barrel.
11      Q.  Did you keep file folders?
12      A.  No.  They just told me to do
13  an extensive search, which I did.
14      Q.  All right.  Let's do it this
15  way.  This might be the easiest way to do
16  it then.  The first document I have in
17  what you produced is the employee open
18  door report.  Tell me what that is.
19      A.  It's the policies and
20  procedures that Cracker Barrel has
21  established for if any complaint of
22  discrimination, harassment, or anything
23  of that nature is brought before the

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

| Page 93 |
|---|

1 general manager and/or a member of
2 management, that's the report that we
3 complete.
4 **Q.    So this is the company's**
5 **policy that if there is a complaint of**
6 **some nature, you fill out a report, send**
7 **it to employee relations, collect**
8 **statements, and determine if any**
9 **disciplinary counselings need to be**
10 **completed?**
11     A.    Also a copy of that report
12 goes to the district manager, and I don't
13 know what they do with it.
14     **Q.    All right.  The next thing**
15 **you have is the pleasing people**
16 **statement, which is what?**
17     A.    I'm not one hundred percent
18 sure, because they have numerous of
19 documents with pleasing people on it.
20     **Q.    Well, take a look at that.**
21 **That's document two in the production.**
22     A.    This is a form explaining the
23 equal employment opportunity policy, the

| Page 94 |
|---|

1 harassment discrimination policy, and the
2 open door policy.
3     **Q.    Those are the policies that**
4 **in your management and training you would**
5 **have been trained on, correct?**
6     A.    Yes.
7     **Q.    And agreed to abide by,**
8 **correct?**
9     A.    Yes.
10     **Q.    And that apparently is a copy**
11 **you kept for yourself, but you would**
12 **execute a copy as part of your**
13 **employment; is that right?**
14     A.    Yes.
15     **Q.    Okay.  The next several**
16 **documents from your production appear to**
17 **me to be an example of your earnings; is**
18 **that correct?**
19     A.    I'm not sure.
20     **Q.    You've produced three sheets**
21 **that show your current earnings and a**
22 **bonus, if any, that was paid, I believe,**
23 **is what the purpose of these three**

| Page 95 |
|---|

1 **documents are; is that correct?**
2     A.    These are earning statements,
3 yes.
4     **Q.    Okay.  And then you have**
5 **produced some U-Haul records.  What's the**
6 **purpose of producing the U-Haul receipt**
7 **for ninety-three dollars and seventy-four**
8 **cents?**
9     A.    It was a documentation that
10 was in my possession that pertained to
11 Cracker Barrel.
12     **Q.    And how does it pertain to**
13 **Cracker Barrel?**
14     A.    I'm not sure without seeing
15 if it was involved in a relocation or if
16 it was involving transporting something
17 or --
18     **Q.    These are documents number**
19 **six and seven.**
20     A.    This is documentation for a
21 U-Haul truck.
22     **Q.    Well, is it something that**
23 **you were doing for yourself or doing for**

| Page 96 |
|---|

1 **Cracker Barrel?**
2     A.    If it's Cracker Barrel's
3 authorization, it's Cracker Barrel.
4         Can you be more specific when
5 you ask for myself or Cracker Barrel?
6     **Q.    Well, I'm just asking.  You**
7 **produced it, and you say it pertains to**
8 **this case in some manner.  I just want to**
9 **know how?**
10     A.    When you ask for myself, it
11 was for relocating for Cracker Barrel.
12     **Q.    That's what I'm asking.**
13     A.    Okay.
14     **Q.    So you showed it because this**
15 **is the company paid for the price of some**
16 **boxes and tape and the truck for you to**
17 **move?**
18     A.    Yes.
19     **Q.    Okay.  And it looks -- do you**
20 **recollect when that was?**
21     A.    No.  And I noticed that's not
22 dated, so I can't tell you specifically
23 for which move or at which time.

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1    Q.   Well, at the bottom it says
2  7/19/05. I don't know if that's just the
3  print date or what that is.
4    A.   I'm not sure either.
5    Q.   Okay. All right. Then the
6  next thing I have is Cracker Barrel --
7  that you produced to Cracker Barrel,
8  excuse me, was document number eight.
9  Tell me what that is.
10    A.   It's a gift card I received
11  from three of the employees with Cracker
12  Barrel from a death that I had in the
13  family. They all got together and bought
14  flowers for the grave.
15    Q.   Okay. When was this?
16    A.   I'm not sure because I've had
17  three deaths during that time frame, and
18  I'm not sure which one it was from. But
19  I know that's what it was for.
20    Q.   When you say three deaths,
21  during that time frame?
22    A.   During my tenancy with
23  Cracker Barrel.

Page 98

1    Q.   During the time you were
2  employed with Cracker Barrel?
3    A.   Yes.
4    Q.   Who were the deaths?
5    A.   The death was my aunt.
6    Q.   What's her name?
7    A.   Viola, V-i-o-l-a, Dunbar.
8    Q.   D-u-n-b-a-r?
9    A.   Yes.
10    Q.   How did you say her first
11  name?
12    A.   Viola.
13    Q.   Where did she live?
14    A.   South Carolina.
15    Q.   When did she die?
16    A.   I don't know the exact date.
17    Q.   Well, approximately. I mean,
18  which year?
19    A.   It's been a couple of years.
20  I'm not sure.
21    Q.   Okay. Who are the other
22  deaths?
23    A.   It was another aunt, Sherry

Page 99

1  Thompson.
2    Q.   Where did she live?
3    A.   In Athens, Georgia.
4    Q.   Okay. Do you remember when
5  she died?
6    A.   Not the time frame, no.
7    Q.   All right. And who else?
8    A.   And -- no, my mother was
9  prior to Cracker Barrel. It was just
10  two. My mother was prior to Cracker
11  Barrel.
12    Q.   So when you said three, you
13  were talking about your mother, but she
14  was before that?
15    A.   It was prior to Cracker
16  Barrel, yes.
17    Q.   All right. So you produced
18  this because this is a condolence flowers
19  for either your Aunt Viola or your Aunt
20  Sherry?
21    A.   Correct.
22    Q.   Now, did you attend both of
23  the funerals while you were employed?

Page 100

1    A.   Yes.
2    Q.   And one of them you attended
3  was in South Carolina, and one of them
4  was in Athens, Georgia?
5    A.   Yes.
6    Q.   All right. This came from a
7  Gardendale florist.
8    A.   I was at the Gardendale
9  location.
10    Q.   Okay. When both of these
11  women passed or --
12    A.   I'm not sure.
13    Q.   Okay. So you don't know
14  which one this relates to?
15    A.   No.
16    Q.   All right. Then you appear
17  to have some other Cracker Barrel
18  policies, public accommodation statements
19  and other information that you've
20  produced. And then there's a paper,
21  number thirteen, that says evaluations
22  before Gardendale. Is that your
23  handwriting?

25 (Pages 97 to 100)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 101

1      A.    No.
2      Q.    And so do you have copies of
3   your performance evaluations, I take it?
4      A.    Yes.
5      Q.    Okay.  And so then you
6   produced some evaluations.  And then the
7   next thing you have is your EEOC charge;
8   is that right?
9      A.    Yes.
10     Q.    Okay.  We're going to talk
11  about that.  So this is a good place to
12  start.
13         All right.  You started at
14  Cracker Barrel in '02, right?
15     A.    Yes.
16     Q.    And you went in the
17  management-in-training program; is that
18  right?
19     A.    Yes.
20     Q.    And you were assigned the
21  position of associate manager?
22     A.    Yes.
23     Q.    All right.  Where was that?

Page 102

1      A.    Athens, Georgia.
2      Q.    All right.  And who was your
3   manager?
4      A.    Tom Speziale.
5      Q.    Spell that last name.
6      A.    S-p-e-z-i-a-l-e.
7      Q.    All right.  Was he your
8   general manager the whole time you were
9   in the Athens location?
10     A.    Yes.
11     Q.    Is he still with Cracker
12  Barrel?
13     A.    Yes.
14     Q.    Where is he located?
15     A.    I'm not sure.  I know he's
16  still with the company, but he's not in
17  Athens anymore.
18     Q.    When is the last time you've
19  talked to him?
20     A.    It's been almost a year, year
21  and a half.
22     Q.    Where was he at that time?
23     A.    La Grange, Georgia.

Page 103

1      Q.    So do you think he's still in
2   La Grange?
3      A.    I don't know.
4      Q.    Okay.  Who was the district
5   manager?
6      A.    George Katsoudas.
7      Q.    While you were in La Grange
8   he was the district manager?
9      A.    No, I wasn't in La Grange.  I
10  was in Athens.
11     Q.    While you were in Athens he
12  was the district manager?
13     A.    Yes.
14     Q.    Was he the district manager
15  the entire time you were at the Athens
16  location?
17     A.    Yes.
18     Q.    Is he still with Cracker
19  Barrel?
20     A.    I don't know.
21     Q.    When is the last time you
22  talked to him?
23     A.    It's been years.

Page 104

1      Q.    So you just don't have any
2   idea about him?
3      A.    No.
4      Q.    All right.  How long were you
5   in the Athens location?
6      A.    It's difficult to answer
7   that because they had me travel to other
8   stores even though Athens was my parent
9   restaurant.
10     Q.    So you would go assist if
11  there were openings in other stores or if
12  a store was missing management?
13     A.    No.  I went to assist if
14  there was food cost issues with other
15  stores or training issues.
16     Q.    And tell me what you mean by
17  that.
18     A.    They had an issue with food
19  cost and training in Cordele, Georgia.
20  Though I was assigned to Athens, they
21  sent me to Cordele to evaluate the
22  training program, evaluate the food cost
23  program, and then render a written report

26  (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  to their district manager.
2      Q.   And who was that district
3  manager?
4      A.   I don't recall his name.  His
5  first name is Matt.  I don't recall his
6  last name.
7      Q.   Did you do a written report?
8      A.   Yes.
9      Q.   Did you do -- did you keep a
10  copy of it?
11      A.   No.  It was given to Matt.
12      Q.   Any other stores that you
13  went to while you were assigned to
14  Athens?
15      A.   Yes.
16      Q.   All right.  Which ones?
17      A.   Conyers, Georgia; Kennesaw,
18  Georgia; Canton, Georgia; Commerce,
19  Georgia.  And that's all that I can
20  recall.
21      Q.   And what would you do while
22  you were going to visit those stores?
23      A.   The same, just review their

Page 106

1  exception reports, review their food
2  costs, and just help out wherever needed
3  once that was done until I went to the
4  next restaurant.
5      Q.   So were you acting in the
6  role of a visiting associate manager?
7      A.   Well, I was there -- my
8  instructions there were to review the
9  reports, and then afterwards until I
10  received new instructions, yes, I would
11  fill in where needed.
12      Q.   Who would give you these
13  instructions?
14      A.   Ron Phillips.  He's a
15  regional vice-president.
16      Q.   Okay.  Was Ron Phillips the
17  regional vice-president the entire time
18  you were employed with Cracker Barrel?
19      A.   Yes.
20      Q.   Okay.  Is he still employed
21  with Cracker Barrel?
22      A.   I don't know.
23      Q.   When is the last time you've

Page 107

1  talked to him?
2      A.   It's been years.
3      Q.   Okay.  Was he in Georgia?
4  Where was his office, Georgia?
5      A.   We had the entire region.
6  His office was in Tennessee, but his
7  field was the southern region.
8      Q.   Okay.  So Ron Phillips would
9  give you temporary assignments at other
10  locations?
11      A.   Yes.
12      Q.   All right.  So during the
13  time you were assigned to Athens, is it
14  your testimony that you were in Athens in
15  other stores more than you were actually
16  in the Athens store?
17      A.   No.  I was physically in the
18  Athens store the majority of my associate
19  management time being assigned to Athens,
20  but towards the end when I was getting
21  promoted to senior associate manager, I
22  started going to the field.  It was Ron's
23  assignments just to go to other fields

Page 108

1  and review and give feedback and things
2  of that nature towards me being promoted
3  from associate to senior associate.
4      Q.   Okay.  So you started in the
5  training.  You became an associate
6  manager assigned to Athens, and you were
7  promoted to senior associate by whom and
8  at what store?
9      A.   By Ron Phillips and Lithia
10  Springs, Georgia.
11      Q.   Ron Phillips did the
12  promotion in Lithia Springs, Georgia?
13      A.   Yes.
14      Q.   That promotion has to be
15  recommended by somebody and approved by
16  Ron Phillips; is that right?
17      A.   I don't know how it worked.
18  It was a regional vice-president, so I
19  don't know how it worked.
20      Q.   Your district manager would
21  have had to have recommended you; is that
22  right?
23      A.   There should have been

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1 feedback, yes. I mean, just natural,
2 yes.
3    Q.  All right. Now, you have
4 produced some of these evaluations, and
5 the first one is done by the gentleman
6 you mentioned, Tom Speziale; is that
7 right?
8    A.  Yes.
9    Q.  And this was an evaluation
10 when you were -- it's dated Evaluation 1
11 of 2004. So would you have been a senior
12 associate manager at this point?
13    A.  In 2004? No.
14    Q.  What would you have been
15 then, associate?
16    A.  I'm not sure, but the form
17 that you have should have the title on
18 it.
19    Q.  It just says Associate
20 Performance Evaluation?
21    A.  Okay. In 2004 I wasn't an
22 associate.
23    Q.  Well, that's what I'm asking.

Page 110

1 What were you?
2    A.  In -- what's the date on it?
3    Q.  It's Evaluation 1 of 2004.
4 I mean, that's how you produced it to
5 me. That's why I'm asking what that
6 means.
7    A.  During this evaluation
8 period, there was no other GM that I was
9 under where I had enough time to evaluate
10 me other than Tom. I was physically
11 under Rich Alexander, but I did not have
12 enough time under Rich for him to
13 evaluate me. So they went back to Tom to
14 do the evaluation.
15    Q.  Okay. But what was your
16 position in January of 2004?
17    A.  Associate, yes.
18    Q.  All right. And then -- what
19 are the job duties of an associate
20 manager?
21    A.  Numerous daily operations,
22 food costs, scheduling. Each associate
23 is given areas of responsibility. They

Page 111

1 can cross or they can be individualized.
2 You can be the food course manager as
3 well as the labor manager. You're also
4 responsible for training and developing
5 the hourly employees.
6    Q.  So does the general manager
7 determine what each individual associate
8 manager is going to be primarily
9 responsible for?
10    A.  Yes, yes.
11    Q.  Okay. And then the general
12 manager is ultimately responsible to make
13 sure all of those things are handled
14 accordingly; is that right?
15    A.  Yes.
16    Q.  Okay. So during your role as
17 an associate manager or a senior
18 associate manager, you may have been
19 responsible for specific tasks assigned
20 to you by whoever the general manager was
21 where you were located?
22    A.  Yes.
23    Q.  Okay. And then whoever that

Page 112

1 general manager was is ultimately
2 responsible for, I guess, the -- how the
3 store does and how the employees perform
4 and the associates perform?
5    A.  Yes.
6    Q.  Okay. Then on 4/17/04,
7 you've produced to me document number --
8 that you've marked as 28, your individual
9 development program plan was to -- your
10 career development project was to work on
11 running the unit?
12    A.  Yes.
13    Q.  Okay. And I guess what they
14 are saying is that -- that must be
15 related to where it's the developmental
16 needs? You've improved from your last
17 evaluation in labor management but you
18 have some more to go and you're going to
19 do this by putting the whole concept
20 together and working on running the
21 unit? Is that what it means by
22 developmental plan?
23    A.  It's just the -- prior to you

28 (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1  running the unit, any feedback that the
2  general manager may have for areas that
3  he may want you to concentrate on.
4  Though you're running the unit actively,
5  and not to be there physically there with
6  you, and they give you projects to work
7  on, and then they coach and teach you
8  through any area that they think you need
9  to work on just to improve, yes.
10      Q.  And what they do for a while,
11  and I've seen this word as best I can
12  recall from reviewing the documents
13  you've produced --
14      MS. YORK:  Is this a question
15  or are you just making a comment?
16      MS. BUSBY:  Well, if you
17  won't be so rude as to interrupt me, I
18  bet you can figure it out.
19      MS. YORK:  You said what they
20  do, you didn't say I'm asking you what
21  they do.
22      Q.  (By Ms. Busby)  What they do
23  from looking at the documents that I have

Page 114

1  seen that you have produced is they --
2  using your term, they coach you in
3  improvement areas before you would get to
4  any kind of what would be considered any
5  type of disciplinary action; is that
6  correct?
7      A.  I don't understand.
8      Q.  You said that as you learn
9  and need areas of improvement, they coach
10  you and train you?
11      A.  The general managers?
12      Q.  Yes.
13      A.  Yes.  And district managers.
14      Q.  If you are a general manager,
15  then the district manager does that,
16  correct?
17      A.  That's the process, yes.
18      Q.  Okay.  And the coaching and
19  teaching and developmental training
20  occurs prior to them getting to a point
21  where they think you've had an
22  opportunity to learn and therefore you
23  wouldn't want to discipline somebody in

Page 115

1  the area?
2      A.  Well, the coaching is
3  continuance, and before you apply
4  discipline, it's still based on
5  knowledge.  So I don't understand.
6      Q.  Well, as an -- I'm just
7  reading here from the document that you
8  and I were looking at, Page 30.  It says
9  that associate managers and senior
10  associate manager evaluations are
11  performed by the general manager and then
12  second level review is by the district
13  manager.
14      A.  That's the process, yes.
15      Q.  Okay.  So when you were an
16  associate manager and senior associate
17  manager, as you were during this time of
18  these evaluations that you've produced to
19  me, you would receive coaching, told
20  areas of improvement that you needed to
21  concentrate on on your evaluation, given
22  a development plan like we went over, and
23  during the time between that and the next

Page 116

1  review, you would receive the coaching
2  and training?
3      A.  That's the process, yes.
4      Q.  Okay.  Well, did that occur
5  in your case?
6      A.  I can't say yes to that
7  because there can be an area where they
8  tell you that this is what you need to
9  improve on, and you're just given a
10  source to go and read and learn about and
11  things of that nature.  As a trainer, to
12  me that's not a part of coaching, because
13  there's no feedback process.  So that's
14  the process that is supposed to happen.
15      Q.  Let me just ask this
16  question:  As it relates to you, are you
17  referring to any specific incident?
18      A.  No, just the system itself.
19      Q.  Okay.  All right.  So the
20  next document that -- that's the last
21  document that you produced was this
22  4/17/2004 where your developmental plan
23  is working on running the unit?

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1    A.   I don't know if that's the
2  last document.  Again, that was too many
3  documents.  So I don't know if that's the
4  last document.
5    Q.   That was going to be my next
6  question.  This is the last one you had.
7  That's not the last review you received,
8  correct?
9    A.   One more time?
10    Q.   I mean, you received regular
11  evaluations while you worked for the
12  company, did you not?
13    A.   Yes.
14    Q.   Okay.  The last one that you
15  have given me is dated -- well, it just
16  says process date, April 17th, 2004.  You
17  would have had --
18    A.   Again, I don't know if that's
19  the last one that I've turned in, because
20  I turned in so many documents.  I don't
21  know if that was the last review or
22  evaluation that I turned in.
23    Q.   When you say turned in, you

Page 118

1  mean to your lawyers?
2    A.   That would have come from me.
3    Q.   Right.  To your lawyers?
4    A.   Yes.
5    Q.   I'm not asking you about what
6  you gave your lawyers.  I'm just saying
7  you received regular reviews,
8  evaluations, coachings, and trainings
9  while you were at Cracker Barrel,
10  correct?
11    A.   Yes.
12    Q.   Okay.  We can agree that you
13  have received evaluations past April of
14  2004, right?
15    A.   Yes.
16    Q.   This just happened to be the
17  last one you had in your file, as far as
18  we know based on what was produced to us?
19    A.   As far as I know.
20    Q.   Okay.  All right.  Where were
21  you working in 2004?
22    A.   I was out of Athens, Georgia,
23  but that was the time frame that I was

Page 119

1  going to different locations.
2    Q.   Okay.  But you've said this
3  evaluation was done by Tommy because you
4  had been assigned to Rich, but you had
5  not been with him long enough?
6    A.   Right.  When you said 2004, I
7  was also promoted in 2004.  So when you
8  said that you didn't see anything on it
9  and it said associate, I know I was
10  promoted.  So I thought that that was the
11  evaluation from Tom that was given to
12  Rich which I thought was that evaluation.
13    Q.   It may be.
14    A.   No.  That evaluation is from
15  Tom during my tenure with Tom.
16    Q.   Do you recollect when you
17  were promoted in 2004?
18    A.   Yes.
19    Q.   Okay.  When was that?
20    A.   Senior associate in July and
21  general manager September.
22    Q.   Okay.  Who promoted you to
23  senior associate?

Page 120

1    A.   Ron Phillips.
2    Q.   Okay.  Who was your district
3  manager who would have recommended it?
4    A.   I was assigned to George
5  Katsoudas, but, again, I don't know if he
6  requested feedback from the other
7  district managers who I went to assist in
8  the restaurants.
9    Q.   Okay.  So George may have
10  made the recommendation to Ron, and Ron
11  may have asked other district managers
12  their opinion as well?
13    A.   Yes.
14    Q.   Okay.  You just don't know
15  one way or the other?
16    A.   Correct.
17    Q.   All right.  So which store
18  were you located at when you became
19  senior associate?
20    A.   Lithia Springs, Georgia.
21    Q.   And that is -- then Rich
22  Alexander has now become your district
23  manager; is that right?

30 (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1    A.   No.
2    Q.   **When did that occur?**
3    A.   When I became general
4    manager.
5    Q.   **All right.  So you're --**
6    A.   In September.
7    Q.   **Okay.  September of '04 which**
8    **store are you in?**
9    A.   I relocated to Gardendale,
10   Alabama.
11   Q.   **All right.  Did you apply for**
12   **a general manager position?**
13   A.   Yes.
14   Q.   **Okay.  How did you go about**
15   **doing that?**
16   A.   They list positions that's
17   available.  Actually, I applied to Warner
18   Robbins, Georgia, and I was requested for
19   -- to interview for Gardendale.
20   Q.   **Okay.  So there was an**
21   **opening for general manager in Warner**
22   **Robbins, Georgia.  Did you interview with**
23   **somebody?**

Page 122

1    A.   Yes.
2    Q.   **Who did you interview with?**
3    A.   It was a panel of four --
4    five.  And I don't know all their names,
5    but Ron Phillips was a member.  The
6    regional vice-president sits in on those
7    interviews.
8    Q.   **Do you remember anybody else?**
9    A.   Matt, his last name Dunnaway,
10   Matt Dunnaway.  And James Smith was
11   another district -- restaurant district
12   manager.  And then there were two retail
13   district managers there as well.  I don't
14   know their names.
15   Q.   **Okay.  All right.  Apparently**
16   **you did not get that position at Warner**
17   **Robbins; is that correct?**
18   A.   That's correct.
19   Q.   **But the next call you get is**
20   **will you come interview for the general**
21   **manager at Gardendale?**
22   A.   Yes.  But they explained
23   Warner Robbins to me.

Page 123

1    Q.   **Right.  They explained that**
2    somebody else got it but that do you want
3    to go interview at Gardendale?
4    A.   Yes.
5    Q.   **All right.  Who did you**
6    interview with at Gardendale?
7    A.   Rich Alexander was there,
8    James Smith.
9    Q.   **You're going to have to tell**
10   me who some of these people are.  Who is
11   James Smith?
12   A.   These are restaurant district
13   managers.  Richard Alexander, James Smith
14   are the only ones I can remember their
15   names.  The retail district manager that
16   was there -- I'm sorry.  I remember his
17   face.  I just don't remember the name.
18   Q.   That's fine.
19   A.   And Ron Phillips is a name
20   that I remember who was physically there.
21   Q.   Where was the interview?
22   A.   Gardendale, Alabama.
23   Q.   **And this is Mr. Alexander's**

Page 124

1    district now?
2    A.   That is now, yes.
3    Q.   **Okay.  And you were**
4    **recommended to be given the opportunity**
5    **to be general manager at Gardendale?**
6    A.   What do you mean
7    recommended?
8    Q.   **Well, the people who**
9    **interviewed you recommended that you be**
10   **given the offer and it's approved, I take**
11   **it; is that right?**
12   A.   Yes.
13   Q.   **Okay.  Do you know how that**
14   **works internally?**
15   A.   No.
16   Q.   **Okay.  So if I tell you that**
17   **the district manager of the area makes a**
18   **recommendation for the hiring of general**
19   **manager to the next level and that they**
20   **approve it, you don't know one way or the**
21   **other how that works?**
22   A.   That's correct.
23   Q.   **So who gives you -- who**

31 (Pages 121 to 124)

## FREEDOM COURT REPORTING

Page 125

1  actually gives you the offer?  Do you
2  remember who called you?
3      A.   The first phone call came
4  from Ron Phillips, and the second phone
5  call came from Rich Alexander.
6      Q.   Okay.  And what do they say?
7      A.   Ron just called and asked if
8  I had heard from Rich yet, and I said
9  no.  And he said congratulations, and we
10 termed the call.
11     Q.   And you waited to hear from
12 Rich?
13     A.   Yes.
14     Q.   And then Rich called you and
15 said we're offering you the general
16 manager for Gardendale and gave you the
17 details, I guess?
18     A.   Yes.
19     Q.   All right.  When were you to
20 start in Gardendale?
21     A.   September '04.
22     Q.   Okay.  So you came from --
23 you were living I guess in Georgia at the

Page 126

1  time?
2      A.   At that time, yes.
3      Q.   All right.  Where did you
4  move to?
5      A.   Birmingham, Alabama.
6      Q.   Okay.  And you started in
7  September as the general manager?
8      A.   Yes.
9      Q.   Were there any associate
10 managers who were already in Gardendale
11 at the time?
12     A.   Yes.
13     Q.   Who were they?
14     A.   Lisa Clayburn.  Her last name
15 is Willis.  I just don't remember her
16 first name.  And there was one other
17 young lady.  I don't recall her name.
18     Q.   Okay.
19     A.   And then Tommy Patterson.
20     Q.   Okay.  And so Tommy Patterson
21 is an associate manager?
22     A.   Senior associate manager.
23     Q.   Senior associate manager?

Page 127

1      A.   Yes.
2      Q.   Lisa is an associate manager?
3      A.   Associate manager.
4      Q.   Somebody named Willis is an
5  associate manager?
6      A.   Yes.
7      Q.   And then there was a fourth
8  associate manager?
9      A.   Yes.
10     Q.   Okay.  So you had four
11 associate managers?
12     A.   Three associate, one senior
13 associate, yes.
14     Q.   Three associate and one
15 senior.  Okay.  All right.  You began as
16 the general manager in Gardendale, and
17 how did that go?
18     A.   I don't understand.
19     Q.   Well, I mean, you know, you
20 come in.  I guess you assign the
21 associate managers to specific duties,
22 and you take on specific duties yourself?
23     A.   No.  The duties were already

Page 128

1  assigned when I got there because Tommy
2  Patterson was the acting general manager
3  because they were without a general
4  manager for some time before I got there.
5      Q.   Okay.
6      A.   So I did not change the areas
7  of responsibilities because I didn't know
8  their performance in those
9  responsibilities.
10     Q.   Okay.  Well, did you have any
11 problems or issues with managing those
12 associate managers?
13     A.   I don't understand what you
14 mean by problems or issues.
15     Q.   Well, you're their boss,
16 right?
17     A.   Yes.
18     Q.   All right.  You eventually
19 judged their performance and what their
20 strengths and weaknesses were, I take it?
21     A.   Yes.
22     Q.   Did you have any trouble
23 managing them?

32  (Pages 125 to 128)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 129

1    A.   There was no trouble managing
2   them. I mean, I had no problems with the
3   duties that they were assigned with and
4   their performance of their duties.
5    Q.   Okay. Were there any other
6   — you're hesitating as if there's some
7   other issue. Is there some other issue?
8    A.   No. It was more so just
9   trying to express my answer so that, you
10  know, it's understood.
11   Q.   All right. So as far as you
12  were concerned, they all performed well
13  in their assigned duties?
14   A.   Not well, no.
15   Q.   Okay. Well, how did they
16  perform?
17   A.   Their performance wasn't to
18  standard, but it also required coaching.
19  So it was not knowing their knowledge of
20  their positions, not knowing them or
21  their characters or how they work in
22  those positions could dictate their
23  performance. So they didn't perform

Page 130

1   well, but they weren't totally
2   inadequate.
3    Q.   How long did it take you to
4   come to this conclusion?
5    A.   I had a meeting with them on
6   responsibilities in November of 2004.
7    Q.   Okay. And did you make any
8   notes or write anybody up or anything
9   like that in November of 2004?
10   A.   No one was documented, just
11  areas of responsibilities were changed,
12  but no one was given disciplinary action
13  based on performance.
14   Q.   So you just held a management
15  meeting?
16   A.   Yes.
17   Q.   And said I'm going to change
18  your duties?
19   A.   Yes.
20   Q.   Whose duties did you change?
21   A.   The younger associates, the
22  duties that they had were pretty much
23  duties you have to be trained and

Page 131

1   developed, and they had not learned the
2   lesser duties prior to going to that
3   duty. So I just took them into the
4   easier duties so they would learn the
5   basics for the following duties.
6    Q.   All right. Did you take over
7   then any of their specific duties?
8    A.   Physically take over, no.
9    Q.   Okay. Who did you assign
10  those to?
11   A.   Tommy Patterson, the senior
12  associate. He was responsible for the
13  initial follow-up once the system was put
14  into place. But to physically take over
15  their duties, no.
16   Q.   Well, who was in charge of
17  scheduling?
18   A.   I don't know who had that
19  specific duty at that time.
20   Q.   Who was in charge of food
21  cost?
22   A.   Again, I don't know who had
23  what particular duty at what time.

Page 132

1    Q.   Well, how does it work? They
2   schedule or they do food cost and then
3   they give it to you for check off or
4   approval as a general manager? I mean,
5   how does that work?
6    A.   Well, scheduling is done by
7   the labor manager. Then it's passed to
8   the general manager and then passed to
9   the district manager. And then it's a
10  conference call and it's reviewed.
11   Q.   Okay.
12   A.   Food cost is pretty much done
13  the same way except for one is done
14  without the general manager, and one is
15  done with the general manager. It's done
16  twice a month. So the mid-month one may
17  not involve the general manager, but the
18  end of the month one would.
19   Q.   At the end of the month you
20  look back and see what's happened
21  throughout the month to check the food
22  cost?
23   A.   Correct.

33 (Pages 129 to 132)

## FREEDOM COURT REPORTING

Page 133

1    Q.   And then you have to report
2  it to your district manager?
3    A.   Correct.
4    Q.   Okay.  And there's certain
5  standards that you're supposed to meet
6  with food cost and labor cost that you're
7  looking at, I guess, on a monthly basis?
8    A.   Yes.
9    Q.   Okay.  When you say there's a
10  conference call, is that like a regularly
11  standing conference call?
12    A.   Yes.
13    Q.   When is that scheduled?
14    A.   Weekly.
15    Q.   I mean, is it at the same
16  time or just it varies?
17    A.   Usually at the same time
18  unless something else is going on where
19  we may have to call and say one is out of
20  town or one call was extended from
21  another restaurant, because of the
22  individual restaurant and the DM.  So if
23  Restaurant A's call lasted longer, then

Page 134

1  Restaurant B's call may be later.
2    Q.   The scheduling of managers,
3  when managers worked, who does that?
4    A.   That's the general manager or
5  the senior associate.
6    Q.   Okay.  Who did your first
7  evaluation in Gardendale?
8    A.   My first one in Gardendale,
9  that's the one I believe that Tom
10  Speziale did because I didn't have enough
11  time under Rich.
12    Q.   Well, no.  That one we looked
13  at was in early '04.  You said you didn't
14  start in Gardendale until September of --
15    A.   Of '04.
16    Q.   Yes.
17    A.   That's why I said if this one
18  has me as associate manager with Tom
19  Speziale, that's the one when I was
20  physically under Tom Speziale.
21    Q.   This was Evaluation 1 of
22  2004?
23    A.   Correct.

Page 135

1    Q.   How many evaluations do you
2  get per year?
3    A.   There are two a year,
4  semi-annual.
5    Q.   Okay.  So your second one
6  would have been done by Rich Alexander?
7    A.   No.  Because the second one
8  would have been due in October.  I didn't
9  get promoted until September, which means
10  I would have only had thirty days under
11  Rich, which would not have given him
12  enough time to evaluate me.
13    Q.   Okay.  Well, this one that
14  you've produced to me is from April of
15  '04?
16    A.   Yes.
17    Q.   So what you're saying is
18  there's a second one for '04, your second
19  semi-annual review?
20    A.   That's correct.
21    Q.   And it's your recollection
22  that that would have been also done by
23  Tom?

Page 136

1    A.   Yes.
2    Q.   So the first evaluation of
3  '05 would have been the one that was done
4  by Rich Alexander; is that correct?
5    A.   Again, you would have to give
6  me dates, because for us, the fiscal
7  years and the calendar years are
8  different.  So I have to know dates
9  before I can answer that.
10    Q.   April of '05 would have been
11  done by Rich Alexander?
12    A.   Yes.
13    Q.   And that would have been done
14  for the period of October through March?
15    A.   On the front it will give you
16  period and fiscal year.
17    MS. BUSBY:  I'll let you look
18  at it.  Let me mark this as Exhibit 2.
19    (Whereupon, Defendant's
20  Exhibit No. 2 was marked for
21  identification and copy of same is
22  attached hereto.)
23    Q.   This is the same front as the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 137

1  one you previously showed me, and it's in
2  April. So it appears to me that they do
3  your first semi-annual review -- they
4  give them to you in April. That's
5  consistent with the one you produced for
6  2004. Is that your recollection?
7      A.   This is for January. This is
8  through January.
9      Q.   Okay. So this review is for
10 the period of time, for your purposes
11 then, from when you started in September
12 to January, September '04 to January of
13 '05?
14     A.   Yes.
15     Q.   Okay. And then -- you keep
16 that copy. Okay. And this review is
17 gone over with you by the district
18 manager who at the time for you was Rich
19 Alexander?
20     A.   Yes.
21     Q.   Okay. If you'll flip to the
22 last page, it appears to me that your
23 signature is on here. It's the one that

Page 138

1  looks like a big gigantic D; is that
2  right?
3      A.   Yes.
4      Q.   That's your signature?
5      A.   Yes.
6      Q.   So you and Rich reviewed this
7  review; is that correct?
8      A.   Yes.
9      Q.   All right. And your
10 supervisor's comments would be Rich
11 Alexander's comments to you?
12     A.   Yes.
13     Q.   And he is going over y'all
14 have had -- it appears that you've had
15 some not so good numbers as it relates to
16 financial targets; is that correct?
17     A.   Yes.
18     Q.   Okay. And the profit and
19 loss, that's what P&L stands for; is that
20 right?
21     A.   Yes.
22     Q.   The profit and loss is being
23 affected by food cost and labor cost and

Page 139

1  net operating income, and he's saying
2  that that needs to be worked on; is that
3  right?
4      A.   Yes. These numbers are under
5  dual management.
6      Q.   Tell me what you mean by
7  that.
8      A.   For the time frame, again, I
9  didn't get there until September.
10     Q.   Right.
11     A.   So the numbers continue on
12 for the entire quarter.
13     Q.   Right.
14     A.   And regardless of the numbers
15 prior to my getting there, they still
16 belong to the restaurant itself.
17     Q.   Right. So what he's saying
18 is -- the way I read this is that in the
19 first half he's saying you've got some
20 disappointing numbers that you need to
21 work on, and they are concerning. But
22 what I'm really concerned about is the
23 lack of cohesive committed management

Page 140

1  team at your unit?
2      A.   Okay.
3      Q.   Is that not correct? That's
4  what's in the second paragraph.
5      A.   Yes, that's in the second
6  paragraph.
7      Q.   Okay. And he says that y'all
8  have had many conversations about
9  subordinate managers' frustrations with
10 your leadership. And then he says in the
11 following areas, which we'll go through.
12 But before we get to that, what was that
13 about? You and Dwight were -- he was
14 coaching you? I mean, what happens here?
15     A.   No, this was him expressing
16 his concerns with, again, the numbers,
17 what the numbers -- the numbers, they
18 can't be changed.
19     Q.   Right. I'm not talking about
20 the numbers. I want to know the -- he
21 says that his biggest concern is the lack
22 of cohesive committed management team at
23 your unit. And then he says that you and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1  he have had many conversations about your
2  subordinate managers' frustrations with
3  your leadership in the following areas,
4  mutual respect, credibility, work ethic,
5  passion for position you're in, your
6  vision statement, and other key
7  leadership traits. And it says that
8  you're not going to be able to fix the
9  top line in the middle of the P&L until
10 you get your team behind you and set a
11 clear direction for your unit. That's
12 what the second paragraph says; is that
13 right?
14      A.  Yes.
15      Q.  Okay. Well, what I want to
16 go through with you is, first, he says
17 that y'all have had many conversations
18 about this.
19      A.  Yes.
20      Q.  Okay. So I take it that you
21 and he, from sometime after you began in
22 September until this review was done in
23 January, for the period of January, you

Page 142

1  and he have met over issues with
2  management of the unit and issues between
3  you and the other associate managers; is
4  that right?
5       A.  We met over behaviors, yes.
6       Q.  All right. When you say met
7  over behaviors, what are you referring
8  to? I just want to make sure you and I
9  are communicating.
10      A.  Okay. What I mean by met
11 over behaviors, where, as a general
12 manager, instructions were given as far
13 as even when the areas of
14 responsibilities were changed, there was
15 push back on those areas of
16 responsibility. They were very
17 comfortable, the management team who was
18 there prior. They were very comfortable
19 with the acting general manager that they
20 had, and there was push back. Again, as
21 I testified earlier, there was -- as far
22 as their performance, they weren't
23 performing well, but they also weren't

Page 143

1  inadequate. It was the behaviors where
2  there were issues.
3       Q.  What were they complaining
4  about you? I mean, the words he uses --
5  so I'm just trying to get what your
6  response to this is -- is he said that
7  they say that they are frustrated with
8  your leadership in the following areas,
9  mutual respect. That sounds to me like
10 you didn't respect them and they didn't
11 respect you. Is that what that means to
12 you?
13      A.  No, ma'am. Mutual respect is
14 when a decision has to be made and you
15 have to stand firm with your decision,
16 the same way if Rich tells me this has to
17 be done, that's that. You know, the
18 debate is over. Then that was an area
19 when changes were made that were
20 necessary and that had to have been made,
21 whether they liked them or not, they were
22 necessary. They were company policy.
23 They were standards. And I did not

Page 144

1  accept the feedback that they apparently
2  were accustomed to being able to give.
3       Q.  Okay. And then credibility,
4  work ethic, passion for the position you
5  are in?
6       A.  I think that all ties back
7  again to the behaviors. The passion has
8  always been there, and --
9       Q.  Well, you're aware, are you
10 not, that your work ethic was questioned
11 because there were those in the unit who
12 felt like you were not at work enough.
13      A.  No.
14      Q.  You've never heard that
15 before?
16      A.  That I was not at work
17 enough?
18      Q.  Right.
19      A.  No.
20      Q.  I'm not saying it's true or
21 not true. I'm saying that is a complaint
22 that was made against you?
23      A.  Yes, yes.

36 (Pages 141 to 144)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 145

1    Q.   All right.  I mean, that's
2  what I'm trying to get to.
3    A.   Yes.
4    Q.   I'm not here to debate what
5  went on at the time.  But from Rich
6  Alexander, district manager's position,
7  what he is having to deal with is you are
8  frustrated because you've made a
9  decision, and they are used to being able
10  to argue back, and you're not going to
11  have that because you've made the
12  decision.  They are frustrated because
13  they feel like they ought to be able to
14  argue back because they allege they know
15  more than you because you're not in the
16  unit as much as you should be?
17    A.   No.
18    Q.   Okay.  What's incorrect about
19  what I said?
20    A.   The push back has nothing to
21  do with the allege of me not being in the
22  unit.  The push back was when they felt
23  that they should be able to do certain

Page 146

1  things or act certain ways and it was in
2  violation of company policy or if it's
3  not within our standards and the answer
4  is no, then they were not happy with
5  that.
6    Q.   Give me an example.
7    A.   A prime example that what
8  frustrated -- I had one of the managers
9  wanting to terminate an employee, but as
10  a management team, the employee was not
11  set up for success, and I would not sign
12  off on the termination, because they were
13  not disciplined, the behavior.  They were
14  disciplining based on emotions.
15    Q.   Who was that?  Do you
16  recollect?
17    A.   No, I can't -- it's a male
18  employee, but I can't recall his name.
19    Q.   All right.  Why were they
20  complaining that you weren't in the store
21  enough?
22    A.   I can't answer that one, why
23  they were complaining I wasn't.

Page 147

1    Q.   I mean --
2    A.   Because during that time
3  frame, you know, manager schedules are
4  done and submitted.  We submit schedules,
5  and we have our schedules.  So any time
6  that you're not in the restaurant,
7  there's no coverage.  So that's
8  impossible.
9    Q.   All right.  Did you try to
10  address their complaint that you weren't
11  there enough?
12    A.   Rich and I had that
13  discussion, yes, several discussions.
14    Q.   Okay.  Well, apparently you
15  gave him a plan of action that included
16  reaching out to others for suggestions
17  that would improve your leadership
18  skills.  What was that?
19    A.   I don't recall the plan of
20  action itself unless you have something I
21  can read.
22    Q.   Well, I might.  What -- do
23  you recollect what it would look like?

Page 148

1    A.   No.
2    Q.   I mean, is it -- do you
3  remember doing one?
4    A.   All evaluations follows --
5  plan of action is followed by anything
6  that's commented on.
7    Q.   Well, when it said you're
8  going to reach out to others in your
9  organization, I take it that means
10  Cracker Barrel?
11    A.   Yes.
12    Q.   Did you ever reach out to
13  anybody?  Did you call or talk to anybody
14  about help with leadership skills?
15    A.   I called out to Tom Speziale,
16  not for help with leadership skills, but
17  as an avenue of having someone to bounce
18  ideas off of that knows company policies
19  and procedures and things of that nature.
20    Q.   Do you recollect did he help
21  you put together a plan of action?
22    A.   No, he didn't.  It was just
23  conversation.

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1    Q.   All right.  Did you ever --
2  is there another -- isn't there another
3  Tom?
4    A.   With Cracker Barrel?
5    Q.   Yeah.
6    A.   Yes.
7    Q.   What was his last name?
8    A.   I'm not sure.
9    Q.   Pate, Tom Pate?
10   A.   Thomas Pate.  He's with home
11 office.
12   Q.   Did you ever reach out to him
13 for assistance in a leadership plan?
14   A.   Human resources, yes.
15   Q.   He's with human resources?
16   A.   I think he's human resources.
17   Q.   All right.  Well, tell me
18 about that.
19   A.   I had further dealings --
20 earlier dealings with Tom when I was
21 going through the senior associate
22 management program, and he always just
23 said if we need to run ideas by him or to

Page 150

1  talk to him, that we were allowed to call
2  him, and he gave us his number.  And by
3  virtue of the position, I just thought he
4  would be someone that would be good to
5  talk to.
6    Q.   Is that who you worked with
7  on your --
8    A.   No.  It was just
9  conversation.
10   Q.   -- plan of action?
11   A.   Just conversation with Tom.
12       MS. BUSBY:  Off the record a
13 minute.
14       (Whereupon, a discussion off
15 the record was held.)
16       MS. YORK:  I need to take a
17 break.
18       (Whereupon, a luncheon recess
19 was taken.)
20   Q.   (By Ms. Busby)  Mr. Rodgers,
21 when we left for the lunch break, we were
22 talking about your evaluation, and you
23 were telling me that one of the issues on

Page 151

1  this evaluation is that you were dealing
2  with profit and loss issues from a former
3  manager; is that right?
4    A.   Yes.
5    Q.   All right.  Well, I'm going
6  to -- do you recollect when the fiscal
7  year is for Cracker Barrel, when it
8  starts?
9    A.   July or August.
10   Q.   Okay.  So if I tell you the
11 fiscal year starts in August, you would
12 agree with me then that you had been
13 running the Gardendale store for five of
14 the six months that this evaluation
15 covered, correct?
16   A.   Yes.
17   Q.   So in all actuality, the
18 performance comments that are made here
19 relate to not former management but five
20 months of your management?  Wouldn't that
21 be right?
22   A.   No.  It also constitutes the
23 time that I was also removed from the

Page 152

1  facility for Cracker Barrel where another
2  manager was still left.
3    Q.   I don't understand what you
4  mean by that.
5    A.   From that quarter when you
6  discussed profit and loss, guest
7  complaints is a part of profit and loss,
8  and if we -- that quarter I think we
9  received six, but three of them was prior
10 to my getting there.  So the numbers from
11 August and from the time that I came in
12 in September, as I physically -- I
13 relocated there in September, but by the
14 13th or 14th is when I physically went
15 into position and started assuming
16 responsibility for the restaurant.
17   Q.   All right.  So you take
18 responsibility for half of September,
19 October, November, December, and January
20 during this period?
21   A.   Yes.
22   Q.   Okay.  And the food cost
23 starts over every month, right?

38  (Pages 149 to 152)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1    A.   Yes.
2    Q.   And that's something that is
3  completely within the management control?
4    A.   Not completely.
5    Q.   How is it not completely?
6    A.   Food costs done month to
7  month is also partially with systems that
8  were in place though it's done -- the
9  numbers are done month to month, the
10  systems are or the training is ongoing
11  and continuous.
12    Q.   I did not understand that.
13  I'm sorry.  Okay.
14    A.   Okay.  With food cost, there
15  was an issue with food cost prior to my
16  coming in.  So the issue with food cost
17  prior to my coming in, we have to
18  evaluate what's the issue with food cost,
19  how come that's happening, look at the
20  training of the personnel that's dealing
21  with it, which is everyone in the
22  building, and then change those habits in
23  order to improve on food cost.

Page 154

1    Q.   All right.  Let's talk about
2  your associate managers that you came in
3  on.  How long had they been with the
4  company?
5    A.   Tommy Patterson, the senior
6  associate manager, I think at that time
7  he had been with the company almost eight
8  years, maybe nine years.
9    Q.   All right.  How long at
10  Gardendale?
11    A.   Four or five.  I'm not sure
12  how many years he had been there.
13    Q.   Okay.
14    A.   Ms. Willis and the other
15  three associates, I'm not sure their
16  tenancy was with the company, how long.
17  And I do know that one -- just to clear
18  up on the other young lady, she had been
19  at Gardendale maybe eight months to a
20  year.
21    Q.   What about Ms. Willis, how
22  long had she been there?
23    A.   I don't know.

Page 155

1    Q.   And you said Lisa somebody?
2    A.   Clayburn I think is her last
3  name.
4    Q.   Has she been there over ten
5  years?
6    A.   No.  She's been with the
7  company for some time, but I don't know
8  how long she was at Gardendale.
9    Q.   But she had been at Cracker
10  Barrel for over ten years?
11    A.   I don't know her tenancy at
12  Cracker Barrel.
13    Q.   You do know that the
14  associate managers that you were working
15  for had been with the company for the
16  most part for long periods of time,
17  correct?
18    A.   No.  I wasn't sure how long
19  they had been with the company.
20    Q.   All right.  Let me make sure
21  that I'm very clear on what your
22  testimony is.  Your testimony is you
23  agree that food cost is something that is

Page 156

1  looked at monthly, yes or no?
2    A.   I agree that food cost is
3  evaluated monthly, but there's issues
4  that affected those monthly numbers.
5    Q.   And those issues are things
6  that the general manager is supposed to
7  control?
8    A.   Those are things that all
9  managers are actually supposed to
10  control.
11    Q.   Do you take personal
12  responsibility for anything?
13    A.   Yes.
14    Q.   All right.  What?
15    A.   The numbers of the restaurant
16  when I took over.
17    Q.   Okay.  So did you take -- do
18  you take personal responsibility for what
19  the food cost numbers were for the month
20  of October?
21    A.   Yes.
22    Q.   And then November?
23    A.   Yes.

39 (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1   Q.   December?
2   A.   Yes.
3   Q.   January?
4   A.   Yes.
5   Q.   Until you left in September
6   of '05?
7   A.   No. I left there in May of
8   '05.
9   Q.   Where did you go?
10  A.   Montgomery, Alabama.
11  Q.   All right. So you take
12  responsibility for Gardendale until May
13  of '05?
14  A.   Yes.
15  Q.   Then you take responsibility
16  for Montgomery June, July, August, and
17  part of September of '05?
18  A.   June, July, and August.
19  Q.   You take responsibility for
20  June, July, and August for the numbers?
21  A.   Yes.
22  Q.   All right. So back to this
23  evaluation, it says that they've had --

Page 158

1   Mr. Alexander has had many conversations
2   with you about complaints from your
3   subordinate managers. And we've talked
4   about those for the most part, correct?
5   A.   No. We've had
6   conversations. The numbers of
7   conversations that we've had was about
8   behaviors. It wasn't the fact that he
9   came to me and said we have a complaint
10  about this. Most of those conversations
11  that we had was initiated by myself
12  because of the behaviors of the associate
13  managers.
14  Q.   All right. Well, his
15  sentence is: We have had many
16  conversations about your subordinate
17  managers' frustrations with your
18  leadership in the following areas, mutual
19  respect, credibility, work ethic, passion
20  for the position you are in, your vision
21  statement, and other key leadership
22  traits.
23       So are you saying that you

Page 159

1   did not have many conversations with Mr.
2   Alexander about those topics?
3   A.   Again, we've had numerous of
4   conversations, but the conversations that
5   we had in reference to frustrations were
6   conversations initiated because of --
7   again, of behaviors that were portrayed.
8   Mutual respect conversations, again, are
9   conversations where they were not happy
10  with decisions that had to be made. And
11  the reason we had numerous of
12  conversations is because I've had to
13  contact Mr. Alexander in reference to it
14  versus Mr. Alexander contacting me.
15  Q.   All right. So your testimony
16  is he did not talk to you about problems
17  that the associate managers had with you?
18  A.   No. We discussed it, but it
19  wasn't always initiated by Mr. Alexander.
20  Q.   I didn't say that. I'm just
21  trying to get you to admit that the two
22  of you talked about your frustration with
23  your associate managers and your

Page 160

1   associate managers' frustration with you?
2   A.   And I've already testified
3   that, yes, we've had that conversation
4   initiated on both ends.
5   Q.   And I promise this will go
6   faster. I'm just trying to get us to the
7   next paragraph. I mean, literally, I'm
8   just trying to get us to the next
9   paragraph.
10       You don't dispute that you
11  told Mr. Alexander you were frustrated
12  with your people, and you don't dispute
13  that Mr. Alexander told you that your
14  people were frustrated with you?
15  A.   No.
16  Q.   So y'all had numerous
17  conversations about that topic regardless
18  of who brought it up?
19  A.   Yes.
20  Q.   Okay. Now then, based on
21  that, what he says is: You have given me
22  a plan of action that includes reaching
23  out to others. That's where we were when

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1  we left off, right?
2      A.   Yes.
3      Q.   Okay.  I found it, I think.
4  And you're going to have to help me with
5  exactly how this -- I'm going to give you
6  all three of these things so that we can
7  basically get to what all this is from a
8  timeline perspective.  It looks like
9  -- I'm going to show you what I'm marking
10 as Exhibits 3 and 4.  I apologize for
11 this, but I'm going to go in reverse.
12     (Whereupon, Defendant's
13 Exhibit Nos. 3 and 4 were marked for
14 identification and copy of same is
15 attached hereto.)
16     Q.   It looks like you are sending
17 an e-mail to Mr. Alexander that says, as
18 per our conversation, I have voicemail
19 out to others who are giving me some
20 feedback on measures I could take to
21 resolve the perception matter here, and
22 I'm going to forward you that as well.
23 If this is not to your satisfaction, let

Page 162

1  me know.
2      And that is on April the 2nd,
3  2005.  You send an attached March 30th,
4  2005 letter, I guess.  And then on
5  Exhibit 3, I'm not exactly sure what this
6  is, but apparently it looks like you've
7  talked to somebody and they've sent you
8  some sort of information about what they
9  think you could do or review or read to
10 assist you.
11     So I'm going to let you read
12 them, but before we even go there, let's
13 start with Exhibit No. 3.  Is that what
14 that is, somebody has sent that to you?
15     A.   No.  I don't remember ever
16 seeing this.
17     Q.   All right.  Well, then look
18 at No. 4.  No. 4 is an e-mail that you
19 send to Rich attaching a letter that you
20 write to him on March 30th, 2005, is it
21 not?
22     A.   This letter is not in
23 response to this (indicating).

Page 163

1      Q.   No, no.  I know it's not.
2  The evaluation says that he already has
3  that.  He says you have given me a plan
4  of action that includes reaching out to
5  others in our organization for
6  suggestions that will improve your
7  leadership skills.  That's what you say
8  in that letter.  Here's my plan of
9  action.  That's dated March the 30th,
10 2005.  Your evaluation you signed on --
11 the beginning of April of 2005.  I think
12 that's what y'all are referring to, but,
13 I mean, you may think differently.
14 That's why I'm asking.
15     A.   Yes.
16     Q.   Okay.  So that is the plan of
17 action that you had submitted to Rich
18 that he's referring to in your evaluation
19 where he says you gave me a plan of
20 action, and that's a good step, but this
21 is a serious problem, and we've got to do
22 some more stuff.  And that's what we're
23 going to talk about in a minute.  But I

Page 164

1  just want to get us to that -- how do we
2  get to March 30th?  I guess y'all had had
3  a conversation.  He had told you about
4  these issues again and said you need to
5  have a plan of action?  I'm saying that
6  based on reading your letter.  Is that to
7  your recollection or do you recollect
8  something different?
9      A.   No.  This isn't -- this was
10 based on a manager meeting, and the
11 results of this manager meeting was later brought
12 to my attention.
13     Q.   Okay.  What manager meeting?
14     A.   It was a manager meeting held
15 at Gardendale that I was not a part of.
16     Q.   Okay.
17     A.   They -- I won't say they.
18 Rich held an unusual meeting where he had
19 a meeting where the associates were asked
20 to rate their general manager, myself, on
21 ethics and performances and things of
22 that nature.  And as the result of this
23 meeting that they had, Rich conversed to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 165

1  me that the associate managers had
2  frustrations.  But this was a meeting
3  that was very unusually held.  That
4  wasn't common practice to ask associates
5  to eval their general manager that way
6  and not have him present.
7      Q.   Okay.  Well, did you know
8  about the meeting when it occurred?
9      A.   No.
10      Q.   All right.  When did the
11  meeting occur?
12      A.   It happened in March while I
13  was in Lebanon, Tennessee.
14      Q.   All right.  When were you in
15  Lebanon, Tennessee, and what were you
16  doing there?
17      A.   I don't recall the dates, but
18  I was there with the training
19  coordinator.  She was brand new to her
20  position, and it required both her and
21  the general manager to attend.
22      Q.   Somebody who was going to
23  work in the Gardendale store, you went

Page 166

1  with her?
2      A.   That's right.
3      Q.   So y'all go to the training,
4  and I guess the associate manager is left
5  in charge of the store?
6      A.   The senior associate, Tommy
7  Patterson.
8      Q.   And sometime during that
9  time, there's a meeting that occurs?
10      A.   That's correct.
11      Q.   Who told you about the
12  meeting?
13      A.   Rich did.
14      Q.   When did he tell you?
15      A.   When I returned from
16  Tennessee.
17      Q.   Okay.  Did he talk to you on
18  the phone or face to face?
19      A.   Face to face.
20      Q.   All right.  What did he say?
21      A.   He held a meeting with the
22  associate managers, and he wanted to
23  convey their frustrations.

Page 167

1      Q.   Okay.  The district manager
2  goes to the stores in his district, what,
3  once a week?
4      A.   It just depends on his
5  schedule.
6      Q.   On some regular basis which
7  is not a specific day, I gather?
8      A.   Correct.
9      Q.   All right.  So did this
10  meeting occur on a day that he arrived on
11  his regularly scheduled visit?
12      A.   I don't know his schedule.
13      Q.   You don't know?
14      A.   Right.
15      Q.   Do you have any idea whether
16  or not he came for his normal visit and
17  somebody complained to him or how did
18  this go about occurring?  I mean, do you
19  have any idea?
20      A.   I don't have any idea, but at
21  no point would all the associates be
22  scheduled to be there at the same time on
23  the same day.

Page 168

1      Q.   Okay.
2      A.   Someone had to be -- with me
3  out of the building, somebody had to be
4  scheduled.  There was too many bodies in
5  at the same time.
6      Q.   So they have a meeting, and
7  they talk about -- or you think it's a
8  meeting where at least he's talked to
9  them about what they say are their
10  frustrations?
11      A.   Correct.
12      Q.   And you get back, and he
13  conveys they are frustrated about these
14  topics?
15      A.   Right.
16      Q.   What were the topics?
17      A.   Their frustrations were about
18  their areas of assignment.
19          MS. YORK:  I don't mean to
20  interrupt again, but can I please have a
21  copy of the exhibit?
22          MS. BUSBY:  There's one right
23  there.  This is my copy.  You can look at

42 (Pages 165 to 168)

# FREEDOM COURT REPORTING

Page 169

1 that one.
2    A.    How their duties were changed
3 around.  They were also frustrated -- it
4 was actually physically said that they
5 didn't understand how I -- how come I was
6 there versus Tommy who had been there for
7 a number of years and was acting GM, how
8 come I was promoted over -- well, I
9 wasn't promoted over him.  I was just
10 promoted into the restaurant.  And it was
11 pretty much, again, more about personal
12 than professional.
13    Q.    This says, Per your request,
14 I'm responding to the letter of concern
15 that you and I discussed on March 26th.
16 When it says letter of concern, was there
17 an actual letter?
18    A.    I don't remember.  I don't
19 recall.  Again, when he met with me, we
20 just had a brief conversation.  So I
21 don't know.  I don't recall.
22    Q.    Okay.  But from the meeting
23 that you two had, you went back, and you

Page 170

1 said that you've enlisted some people to
2 help you with these -- to use your term,
3 interpersonal relations, I guess?
4    A.    Yes.
5    Q.    And you said you're going to
6 conduct a survey of the hourly employees?
7    A.    That's correct.
8    Q.    Did you do that?
9    A.    Yes, I did.
10    Q.    Where is the survey?
11    A.    They were sent to Cracker
12 Barrel home office.
13    Q.    Okay.  And it was hourly
14 employees who did this?
15    A.    Yes.
16    Q.    Who drafted the survey?
17    A.    Dan McChurch, the director of
18 training at the time.
19    Q.    Did you keep a copy of it?
20    A.    No.  I forwarded them to home
21 office as they requested once the survey
22 was completed.
23    Q.    Okay.  And then it says on

Page 171

1 April the 5th instead of your standard
2 managers meeting you had an off-site
3 managers meeting, that you planned to do
4 it.  I don't know.  Did you do that?
5    A.    Yes.
6    Q.    What occurred at that
7 off-site meeting?
8    A.    We discussed the surveys.
9    Q.    And what was the feedback?
10    A.    In the surveys the main
11 question that was asked and answered
12 consistently was that the hourly
13 employees felt that the management team
14 was doing what they had to do to sabotage
15 things and that they wanted to see things
16 turn around.
17    Q.    I must have misunderstood
18 you.  They said the management team was
19 sabotaging?
20    A.    Yes.  They were specifically
21 -- they were not asked to place their
22 names on the survey.  They were just
23 asked to complete it, and it was turned

Page 172

1 into the training coordinator and
2 forwarded to home office.  We discussed
3 the most consistently asked question was
4 about what did they think about their
5 management team, which consists of
6 myself, Tommy, and the other three
7 associates.  And the consistent answer
8 was more of the associates not willing to
9 uphold to standards, not willing to
10 change, even comments that were made
11 about I want to see them fail, I'm not
12 going to help them, it is what it is.
13    Q.    So basically it sounds like
14 to me that the hourly people are saying
15 the home management team cannot work
16 together.  Is that what you're saying?
17    A.    No.  What I'm saying is that
18 they recognized that there were acts
19 taking place that should not have taken
20 place with myself being the general
21 manager and my associate managers going
22 against policies that I have, commenting
23 against those policies, which they

43 (Pages 169 to 172)

# FREEDOM COURT REPORTING

Page 173

1  shouldn't do, instead of enforcing them.
2      Q.   All right.  So what did you
3  say to them on April the 5th if that's
4  what the surveys showed?
5      A.   We just discussed the issues
6  and we discussed the fact of the
7  structure of the restaurant, and I had to
8  go into a little depth with the fact that
9  I did not know any members of the
10  management team prior to my coming
11  there.  So I did nothing to hinder anyone
12  else's career and that I needed for them
13  to get on board.
14          (Whereupon, a discussion off
15  the record was held.)
16      Q.   Did you evaluate any of your
17  associate managers while you were in
18  Gardendale?
19      A.   Yes.
20      Q.   Do you recall what kind of
21  evaluations you gave her?
22      A.   Not completely, no.
23      Q.   If an associate manager has a

Page 174

1  problem with their manager, they are
2  supposed to go to their district manager,
3  right?
4      A.   No.
5      Q.   Who are they supposed to go
6  to?
7      A.   The management they have the
8  problem with to try and resolve it, and
9  if they can't, then the next one in
10  charge.
11      Q.   And if you have a problem
12  with your district manager who you can't
13  resolve it, you're supposed to go?
14      A.   To the regional
15  vice-president.
16      Q.   So if the associate managers
17  felt they had a problem with you that
18  they couldn't resolve, the appropriate
19  person for them to go to in this instance
20  would have been Rich?
21      A.   That's correct.
22      Q.   And your appropriate person,
23  if you felt you had an issue, would have

Page 175

1  been to go to Mr. Phillips?
2      A.   If I couldn't resolve it with
3  Rich?
4      Q.   Right.
5      A.   Then yes, Mr. Phillips.
6      Q.   All right.  So back to the
7  evaluation, what we are referring to in
8  Exhibit -- tell me what number that is?
9      A.   This one?
10      Q.   Yes.
11      A.   4.
12      Q.   Exhibit 4 is referring to --
13  I mean, excuse me.  Exhibit 2, your
14  evaluation, is referring to Exhibit 4,
15  correct?
16      A.   No, ma'am.
17      Q.   Okay.  Then what was the plan
18  of action?
19      A.   Uhm.
20      Q.   Okay.  Let me just stop and
21  ask a better question.  You gave him
22  Exhibit 4 on March -- what's the date of
23  that e-mail?  The letter is dated March

Page 176

1  30th, but you e-mailed it to him on what
2  date?
3      A.   April 2nd.
4      Q.   April 2nd.  All right.  The
5  e-mail says it's an action plan.  My
6  question is:  You said that is not what
7  is being referred to in the evaluation.
8  Is there something else you sent him
9  between April the 2nd and the date of
10  your evaluation which looks like it might
11  be April the 5th?
12      A.   The action plan of the
13  restaurant that this is referring to is a
14  collected plan.  It's what each
15  individual associate promises to agree to
16  in writing, and then I would also do my
17  commitment to them, and that's what that
18  plan is.  It's not this.  It's every
19  associate turned in a plan of action, and
20  then my commitment to them would be the
21  top portion of it.  That's what the
22  action plan was.  But this is not the
23  action plan.

44  (Pages 173 to 176)

## FREEDOM COURT REPORTING

Page 177

1    Q.   All right.  Let's read this
2  sentence.  It says, You have given me a
3  plan of action that includes reaching out
4  to others in your organization for
5  suggestions that will improve your
6  leadership skills.  In this letter,
7  that's Exhibit 4, you tell him I have
8  solicited the assistance of Mr. Kevin
9  Dilley and Dan McChurch from Home Office
10  Management Development Department on
11  different exercises that I may be able to
12  use to break the communication barrier
13  between myself and the management team of
14  this unit.
15    A.   That's communication, but
16  this isn't the action plan.  This is just
17  the communication between Rich and I.
18  This is not the action plan itself.
19    Q.   Well, what were you planning
20  to do to improve your leadership skills?
21    A.   The action plan was more to
22  speak with the training department just
23  to get a better understanding because

Page 178

1  there was so many issues with behaviors
2  and there were blatant issues of behavior
3  to try and communicate better to try and
4  resolve those issues.
5    Q.   Did you have any blatant
6  issues of behavior?
7    A.   I don't understand the
8  question.
9    Q.   Did you have any blatant
10  issues of behavior?
11    A.   I need you to be more
12  specific for me.
13    Q.   You just said you're going to
14  resolve the blatant issues of behavior?
15    A.   Yes.
16    Q.   Okay.  I'm asking you: Did
17  you personally have any blatant issues of
18  behavior?
19    A.   Behaviors that I needed
20  addressed or behaviors that I addressed?
21    Q.   That you needed to address
22  yourself?
23    A.   No.  That wasn't my reason

Page 179

1  for contacting them.
2    Q.   Well, then here's my next
3  point:  The next sentence says, Your
4  action plan is a good step, but you first
5  must realize there is a serious problem
6  and may be very self-analytical in how
7  you're going to change some behaviors to
8  regain the trust, respect, and
9  credibility with your managers.
10    So what behaviors were you,
11  yourself, going to have to change to
12  regain the trust, respect, and
13  credibility with your managers?
14    A.   It wasn't behaviors as far as
15  personal behaviors.  It was other methods
16  of getting the work done through your
17  management staff versus having to be in
18  constant frustration with them.
19    Q.   Well, it says next, you must
20  be more approachable, listen to
21  understand, and give clear direction, and
22  your planning skills need improving?
23    A.   And, again, that came based

Page 180

1  off of feedback that I was not physically
2  there, which, again, I proved that I
3  was.  And those were his comments to me.
4    Q.   But he's your district
5  manager.  If he's told you you need to be
6  more approachable, listen to understand,
7  give clear direction, and planning skills
8  -- your planning skills need improving,
9  then you're supposed to try to address
10  his evaluation of you, are you not?
11    A.   And that's my reason for
12  reaching out to others just to find out
13  if there was other methods or anything
14  other than what I was implementing that
15  may assist in that.
16    Q.   Why did he tell you to quit
17  being so defensive and argumentative?
18    A.   That was his opinion.
19    Q.   Well, he is your district
20  manager, and that was -- his opinion was
21  you were too defensive and argumentative?
22    A.   Not that I was aware of.
23    Q.   Well, you're aware of it as

45 (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 181

1  of this date, right?
2      A.   That's as he documented here,
3  but my demeanor is not defensive or
4  argumentative.
5      Q.   **You don't perceive yourself**
6  **as defensive or argumentative?**
7      A.   No. I think that I do think
8  things out, though, and I don't just say
9  yes because you say it should be yes.
10     Q.   **Well, if your district**
11 **manager has told you you needed to listen**
12 **better, be more approachable, and improve**
13 **your planning skills and give clear**
14 **directions, if you disagreed with him, I**
15 **guess your response would be you're not**
16 **going to do it?**
17     A.   No, ma'am. If we can work
18 that out, as I have done -- and what this
19 doesn't show is that the conversation
20 after this with Ron Phillips and Rich and
21 myself followed this evaluation.
22     Q.   **All right. You had a meeting**
23 **with Ron and Rich after this evaluation?**

Page 182

1      A.   That's correct.
2      Q.   **Okay. And did you say I**
3  **disagree with everything Rich has said**
4  **about me in my evaluation?**
5      A.   No. I explained my
6  disagreeing with the meeting that took
7  place is not common practice and has
8  never happened because I asked the
9  question of the other general managers,
10 and I asked Ron Phillips the same
11 question. And I also did not agree with
12 the fact that if there was an issue, they
13 were allowed to go to Rich and say, I
14 have an issue, and then Rich not ask the
15 first question, have you discussed this
16 issue with Dwight. I think that gave
17 them too much leeway to not have to be in
18 compliance, because if they just did not
19 like it, it was easier to call him and
20 get him involved versus communicating
21 with me.
22     Q.   **You don't know whether or not**
23 **he asked them that question, though, do**

Page 183

1  you?
2      A.   Which question?
3      Q.   **Have you discussed this issue**
4  **with Dwight?**
5      A.   Yes, I do.
6      Q.   **And how do you know that?**
7      A.   Because I asked him.
8      Q.   **You asked who?**
9      A.   I asked Rich Alexander.
10     Q.   **You asked Rich Alexander, Did**
11 **you ask them if they discussed this with**
12 **me?**
13     A.   Yes.
14     Q.   **And he said no, I didn't ask**
15 **that question?**
16     A.   Yes. And I expressed that I
17 didn't think that that was the correct
18 way to do it because he wasn't allowing
19 the team to form because it was too easy
20 for them to come outside of the team than
21 come inside.
22     Q.   **You were never successful for**
23 **working out your differences with the**

Page 184

1  team at Gardendale, were you?
2      A.   I was very successful with
3  those that were not trying to be
4  manipulative.
5      Q.   **Which management member were**
6  **you successful with?**
7      A.   Well, the management team
8  itself was a team. I had issues with the
9  behaviors, but, again, their performances
10 were improved. So if you're basing this
11 assessment on the performances, then,
12 yes, we've had good performances, because
13 they were improved. And towards the end,
14 their behaviors actually was not as vile
15 but still needed addressing.
16     Q.   **All right. So I want to make**
17 **sure I get this straight. You think that**
18 **some of the managers' behavior was vile,**
19 **but you don't think that you had any**
20 **issues with your behavior in return?**
21     A.   As a general manager, it was
22 my responsibility to run the operation
23 and to be analytical and to make

46 (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

1  decisions.
2      Q.   And to be there?
3      A.   As I was.
4      Q.   And to tell the truth?
5      A.   As I do.
6      Q.   And to manage food cost?
7      A.   As I did.
8      Q.   And to manage labor?
9      A.   As I did.
10      Q.   And most of those things are
11  objective things that can be looked at to
12  determine if you did or not, correct?
13      A.   They can be looked at, but
14  you also -- those things are looked at
15  not just singly.  They are looked at
16  collectively.
17      Q.   Well, and the district
18  manager's job and the regional
19  vice-president's job is to make sure if,
20  for whatever excuse is given, those
21  objective criteria are not being met, to
22  make sure that they get a management team
23  in place that can meet them.  You

Page 186

1  understand that, don't you?
2      A.   No, ma'am.  It is their
3  responsibility to make sure that if
4  something was out of place or out of
5  order or standards were not being met, to
6  evaluate and to coach and to work toward
7  making sure that that happens.
8      Q.   And if the evaluation and the
9  coaching did not work, then there are
10  mechanisms in place to deal with those
11  situations?
12      A.   What are you asking?
13      Q.   Well, I'm asking -- at
14  Cracker Barrel they have a procedure
15  where you are written up and given a
16  final warning and then terminated.  Other
17  places you've worked have different ways
18  of doing it, I guess?
19      A.   Well, no, that's not just
20  their procedure to document and to
21  terminate.  Again, if there is an issue
22  or if there's a situation, you try and
23  get to the root of the situation.

Page 187

1      Q.   And you may have a
2  disagreement on the root of the
3  situation, but you respect the fact that
4  in their role as district manager or
5  regional vice-president or general
6  manager or whatever the person's title
7  is, in their position, whatever they
8  determine is the root of the problem,
9  then they need to address it?
10      A.   To address, yes.
11      Q.   Now, you spoke to Ron
12  Phillips after this evaluation about the
13  meeting, and it was a meeting between you
14  and Dwight and Ron according to your
15  recollection; is that right?
16      A.   It was myself, Rich, and
17  Ron.  You said Dwight, but Rich.
18      Q.   Sorry.  Yourself -- you are
19  Dwight, though, right?
20      A.   Yes.
21      Q.   Dwight, Rich, and Ron?
22      A.   Yes.
23      Q.   The three of you met?

Page 188

1      A.   Yes.
2      Q.   After your evaluation in the
3  beginning of April?
4      A.   Yes.
5      Q.   Did you take notes at that
6  meeting?
7      A.   No.
8      Q.   Was there any e-mails about
9  it?
10      A.   Yes.
11      Q.   Okay.  Who sent an e-mail?
12      A.   I requested it in the
13  meeting.
14      Q.   I didn't understand that.
15  Say that again?
16      A.   I requested the meeting with
17  Rod and Rich.
18      Q.   You sent an e-mail requesting
19  the meeting?
20      A.   Yes.
21      Q.   Do you have a copy of the
22  e-mail where you did that?
23      A.   No.

47  (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 189

1    Q.   What was your e-mail account
2  at the time?
3        A.   It's the exact same for GM.
4  Unit 237 is the same for any e-mails that
5  comes in and out.
6        Q.   So you sent an e-mail
7  requesting a meeting to your
8  recollection, and the meeting occurred?
9        A.   Yes.
10       Q.   Where was the meeting?
11       A.   Gardendale restaurant.
12       Q.   Who was in attendance?
13       A.   Rich Alexander, Ron Phillips,
14  and myself.
15       Q.   What was the result of the
16  meeting?
17       A.   Ron's words were for Rich to
18  remember that I was the operations and to
19  back up and let me operate.
20       Q.   All right.  And this happened
21  in approximately what month?
22       A.   It was a couple of days after
23  this evaluation.  I don't exactly

Page 190

1  remember.  It was just a couple of days
2  after this evaluation.
3        Q.   So that would have been in
4  April?
5        A.   Possibly, or the end of
6  March.  I don't know the dates.
7        Q.   If you're looking at that
8  evaluation, it looks like it happened
9  sometime before the 5th of April is what
10  I'm looking at?
11       A.   Yes.
12       Q.   And your letter to Rich was
13  dated March 30th.  So sometime between
14  March the 30th and April the 5th you have
15  your evaluation, and thereafter you send
16  an e-mail?
17       A.   Yes.
18       Q.   And shortly thereafter you
19  had the meeting to which you referred?
20       A.   Yes.
21       Q.   All right.  After the
22  meeting, were you able to implement
23  successfully your action plan at

Page 191

1  Gardendale?
2        A.   No.  The issues continued to
3  grow with the policy violations and my
4  contact to Rich.
5        Q.   All right.  What do you mean
6  policy violations?
7        A.   Security policies being
8  violated.
9        Q.   What would those be?
10       A.   The front door being open
11  after we're closed.  Tommy at the time
12  was married, and he was allowing another
13  young lady inside the facility after it
14  was secured that was not an employee.
15  And one day I came up to the restaurant,
16  and she was not an employee in the
17  restaurant, way after closing, and when I
18  questioned it, I did find out that she
19  was a former employee, but she was not
20  allowed to be in the facility.
21       Q.   Who was it?
22       A.   I don't recall her name.
23       Q.   When did this occur?

Page 192

1        A.   It was shortly after.  I'm
2  not sure exactly, but that was one of the
3  incidences.
4        Q.   Did you write it up?
5        A.   No.  I was told by Rich that
6  he would handle it, which I didn't
7  understand, because I was going to
8  document the violation.
9        Q.   Did you call Ron Phillips
10  about this?
11       A.   No.  Earlier comments by
12  Rich, don't forget who you work for, and
13  things of that nature, just led me to
14  think that when he said he would take
15  care of it, that he would take care of
16  it.  And I later found out that he did
17  not.
18       Q.   What do you mean?
19       A.   The documentation wasn't
20  presented.
21       Q.   Well, do you know if he
22  talked to the young lady or Tommy?
23       A.   I know he talked to other

48  (Pages 189 to 192)

# FREEDOM COURT REPORTING

Page 193

1  hourly employees about it, but I don't
2  know if he spoke -- when he said he'll
3  take care of it, then the only way that I
4  know he talked to Ms. Linda, another
5  hourly employee, was because she
6  physically relayed the conversation back
7  to me.
8      Q.  So, in other words, he did
9  some sort of investigation into it by
10 talking to others, but you don't know who
11 all?
12     A.  Correct.
13     Q.  Okay.  All right.  Anything
14 else other than that example?
15     A.  Too numerous.  Can you be
16 more specific?
17     Q.  Well, if you're complaining
18 about any of them here today, you know,
19 just tell me.  I mean, if you're not, you
20 don't have to tell me.  But I'm just
21 trying to figure out -- my question to
22 you was:  After the meeting, were you
23 able to operate the store to your

Page 194

1  satisfaction and manage your management,
2  and you said, no, there continued to be
3  policy and security breaches.
4      A.  Well, prior to April, a
5  discriminative remark was made by Tommy
6  Patterson where I contacted human
7  resources, and I lodged an open door
8  review which I was not allowed to conduct
9  because it involved me.
10     Q.  Wait.  Let's just stop.
11     A.  Okay.
12     Q.  So prior to the April -- a
13 remark had been made?
14     A.  Yes.
15     Q.  By Tommy?
16     A.  Correct.
17     Q.  To you?
18     A.  I was on the phone, but he
19 was talking to the shift leader, Penny
20 Schmidt at the time.
21     Q.  Was it something you heard or
22 was it something that happened after he
23 hung up the phone with you?

Page 195

1      A.  No.  He placed the phone down
2  but the phone was not hung up.
3      Q.  So you heard the remark?
4      A.  Portions of it, only portions
5  of it.
6      Q.  I don't understand what
7  you're saying.  Tell me exactly what
8  occurred.  You are on the telephone?
9      A.  Yes.
10     Q.  Tommy has answered the
11 telephone?
12     A.  That's correct.
13     Q.  And Tommy is located at the
14 store?
15     A.  Cashier's stand, correct.
16     Q.  Where are you located?
17     A.  I was at home.
18     Q.  In Birmingham?
19     A.  Yes.
20     Q.  Okay.  All right.  You called
21 to say what?
22     A.  I had left the day prior ill,
23 and when I got home, I found out that

Page 196

1  there was a death in my family.
2      Q.  One of those you told me
3  about?
4      A.  Yes.  I just don't know -- I
5  can't remember exactly which one.
6      Q.  You've told me -- I thought
7  you said Viola had died in March of '05,
8  but I can't now tell my note.  You said
9  it was either Viola Dunbar or Sherry
10 Thompson.  Those are your aunts?
11     A.  Yes.
12     Q.  First you had said your
13 mother, but you said she died before you
14 went to Cracker Barrel?
15     A.  Correct.  But I did not know
16 when exactly, what month they passed in.
17     Q.  Well, I'm just trying to
18 figure out.  Okay.  You had gotten notice
19 that either Viola Dunbar has passed away
20 or Sherry Thompson has passed away?
21     A.  That's correct.
22     Q.  Viola Dunbar is in South
23 Carolina?

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1    A.   That's correct.
2    Q.   Which city did she live in,
3    Florence, did you say?
4    A.   No.
5    Q.   Why did I write that down?
6    A.   I don't know.  She was in a
7    nursing home for a long period of time,
8    so I don't know exactly where she
9    resided.
10    Q.   Did you go to the funeral?
11    A.   Yes.
12    Q.   Where was the funeral?
13    A.   In South Carolina.
14    Q.   Okay.  Was the funeral in
15    Florence, South Carolina?
16    A.   No.
17    Q.   Why did I write down
18    Florence, South Carolina?
19    A.   I don't know.
20    Q.   Did you say Sherry Thompson
21    was in Athens, Georgia?
22    A.   Yes.
23    Q.   Okay.  Do you know anybody

Page 198

1    that lives in Florence, South Carolina?
2    A.   No.
3    Q.   Okay.  Where in South
4    Carolina does Ms. Dunbar live?  That must
5    be who died if you went to -- unless Ms.
6    Thompson was buried in South Carolina?
7    A.   She was residing in the
8    nursing home in Aikens, South Carolina
9    when she passed.  But the exact city
10    where she resided, I'm not sure.
11    Q.   Well, that's irrelevant.  I'm
12    really just trying to get to --
13    A.   It was in Aikens, South
14    Carolina.
15    Q.   Where did you go to the
16    funeral?
17    A.   In Aikens.
18    Q.   Was Ms. Thompson buried in
19    Aikens, South Carolina?
20    A.   No.  She was buried in
21    Athens, Georgia.
22    Q.   So then the funeral -- your
23    aunt that passed away must have been Ms.

Page 199

1    Dunbar?
2    A.   Again, I don't know which
3    one.
4    Q.   Well, if you went to South
5    Carolina for the funeral, I'm just trying
6    to get you there.
7    A.   I'm trying to remember.  Yes.
8    Q.   I mean, I don't know, but I
9    asked you where did you go to the funeral
10    when you were on the phone?
11    A.   That's correct.
12    Q.   You said you went to South
13    Carolina?
14    A.   That's correct.
15    Q.   And if the only one of these
16    two women that lived in South Carolina
17    was Viola, it must have been her?
18    A.   That's correct.
19    Q.   We'll just -- Viola Dunbar we
20    think is whose funeral you went to?
21    A.   Correct.
22    Q.   And she's your aunt?
23    A.   Correct.

Page 200

1    Q.   So you call in to say I've
2    had word that my aunt has passed?
3    A.   Correct.
4    Q.   Okay.  Now, that's where you
5    were.
6    A.   I was on the phone.  Tommy
7    was also scheduled to work that day.  And
8    I just called to make sure that he was
9    there and to give him word of what was
10    happening.  I was already scheduled off
11    the following two days, which was my days
12    off, and I was going to try and go up and
13    find out what was going on and things of
14    that nature, if he was going to be at the
15    restaurant.
16    Q.   All right.  Let me get this
17    straight.  You've gone home the day
18    before sick.  You're supposed to work the
19    next day, but you're sick and your aunt
20    has died.  So you call in to make sure
21    Tommy is there because he was scheduled
22    to work that day, too.  The next two days
23    you were already scheduled off?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1    A.    Correct.
2    Q.    Okay. And so you were
3  calling in to say, I might not be back
4  after those next two days, depending on
5  what's going on?
6    A.    No. I was calling just to
7  make them aware of the death so that once
8  I got -- since I had just gotten news, I
9  wanted to give them news so that we can
10  plan accordingly for the funeral.
11    Q.    Okay.
12    A.    While on the phone with him I
13  heard Penny Schmidt asking him if I was
14  okay, and the reason -- because I left
15  from work with the flu. I was at work
16  sick, and she wasn't sure if I was -- she
17  didn't know that there was a death. She
18  thought I was still sick, and she just
19  wanted to make sure that we had
20  coverage. And I heard Penny ask if I was
21  okay, and then that's when Tommy said to
22  her that he has a death in his family.
23  And she asked if I knew when the -- if he

Page 202

1  knew when the funeral was and what -- if
2  we needed to do anything to make any
3  adjustments to the schedule. And before
4  the phone disconnected itself, the only
5  portion of the conversation I heard was
6  don't blacks. I didn't hear the rest of
7  the conversation.
8    Q.    All right. So he's hanging
9  the phone up the whole time she's asking
10  what was that about?
11    A.    Correct.
12    Q.    Okay.
13    A.    I got to work.
14    Q.    Wait a minute. So you go to
15  work this same day?
16    A.    Not that day, no, my next
17  scheduled day. I went back to work.
18    Q.    Did you go to the funeral in
19  South Carolina?
20    A.    It wasn't two days after the
21  death, ma'am. Yes, but it wasn't that
22  same week. It was the following week.
23  This was like a Tuesday or a Wednesday.

Page 203

1    Q.    Okay. So you call. You take
2  off your two days. You come back, and
3  then you leave and go to the funeral?
4    A.    Yes.
5    Q.    Okay. All right.
6    A.    I returned to work, and Penny
7  was very frustrated and asked if she
8  could speak with me.
9    Q.    This is two and a half days
10  later, I'm guessing?
11    A.    Correct.
12    Q.    Okay.
13    A.    And asked if she could speak
14  with me, and I said, yes, you know, it's
15  okay. She was really angry and wasn't
16  sure how to, you know, to hold the
17  conversation with me. But I informed
18  her, you know, as a supervisory member,
19  you know, anything that you hear or know
20  or have knowledge of, you have to talk to
21  me about it, which she did. Then she
22  completed the portion that I heard on the
23  phone. She told me what was said.

Page 204

1    Q.    All right. Hang on. Let me
2  get to that in a minute. All right. So
3  you hear, Don't blacks. But I guess you
4  don't think anything else about it until
5  you get to work and she wants to talk to
6  you about something, but you don't know
7  what it is she wants to talk to you about
8  until she tells you?
9    A.    No, I didn't know what the
10  rest of the conversation was. Because
11  when I called back, Tommy didn't come
12  back to the phone.
13    Q.    That's what I mean. All
14  right. So you hear two words. You go on
15  about finishing getting well or being off
16  or whatever happened in those two and a
17  half days?
18    A.    Well, after the phone
19  disconnected and when I heard that, I
20  called back and asked to speak with
21  Tommy. They said that Tommy and Penny
22  was in the midst of a conversation. And
23  then I asked them to have him call me.

51 (Pages 201 to 204)

# FREEDOM COURT REPORTING

Page 205

1    Q.    Okay.
2         A.    He did not call that evening
3    and then I didn't hear or talk to him for
4    several days, because when I got back, he
5    was off.
6         Q.    That's what I'm saying. You
7    don't know anything about what the
8    conversation is about at all. You don't
9    talk to anybody?
10        A.    Correct.
11        Q.    Until you come back to work
12   two and a half days later and Penny
13   approaches you and says she's frustrated
14   about something and wants to talk to you
15   about it?
16        A.    Yes.
17        Q.    But when she says that, you
18   don't know what it is going to be at that
19   point; is that right?
20        A.    That's correct.
21        Q.    So then you tell her, you
22   need to tell me, and then what does she
23   say?

Page 206

1         A.    She told me that she was
2    angry at a comment that was made, and I
3    asked who made the comment and what was
4    the comment. She said it was a racial
5    comment. She still had not said who said
6    what. So before we continued on, I told
7    her that I was going to have to start the
8    open door because of the nature of her
9    conversation.
10        She stated that while Tommy
11   was on phone with me and she was asking
12   about me being sick, she found out that,
13   you know, I had a death in the family,
14   and she was trying to find out if we
15   needed any additional coverage to change
16   the schedule a week or two down the road
17   to try to meet any funeral
18   accommodations. And that's when she told
19   me that he made the comment when she
20   asked if he knew when the funeral would
21   be, that don't blacks bury their kind on
22   the weekends, that way they can party. I
23   asked her to stop right there, and

Page 207

1    because I had already heard a portion of
2    it, I called home office to get advice on
3    how to handle it because it also
4    frustrated me. There were personal --
5    again, there were behaviors before that
6    were, I felt, against the person, the
7    color, and not against the person, the
8    position.
9         Q.    I mean, specific events, or
10   you just felt that way?
11        A.    No, specific events. So I
12   called home office and informed them what
13   was going on, and they said I had to
14   immediately remove myself from the open
15   door policy because the comment towards
16   me also offended myself as well as Ms.
17   Schmidt.
18        Q.    So, in other words, what you
19   were saying is you called to say Ms.
20   Schmidt has said this, She is frustrated
21   and offended, and I'm offended as well.
22   And they said, If you're saying you're
23   offended as well, then somebody else

Page 208

1    needs to look into this?
2         A.    Correct.
3         Q.    Keep going. I just wanted to
4    make sure I understood what you were
5    saying.
6         A.    Okay. Well, they told me
7    that -- for me to notify Rich Alexander,
8    which I did, and that was on March the
9    5th. So I called home office on 4/3 --
10   I'm sorry, on 3/4. So I talked to him
11   the following day because he was out of
12   town. He came back in town.
13        Q.    How can you remember
14   specifically that's the day you talked to
15   him? Do you have a note of it or
16   something?
17        A.    Well, when I filed the EEOC
18   complaint, they asked for that date
19   specifically.
20        Q.    How did you tell them that?
21   Did you have a note of it or something?
22        A.    No. I knew when I filed --
23   when I called, because they initiated a

52  (Pages 205 to 208)

# FREEDOM COURT REPORTING

Page 209

1  open check, and you just have to call and
2  ask about the open check, the date and
3  time.
4      **Q.   Okay.  So you call Rich?**
5      A.   And I informed him.
6      **Q.   About what Penny said Tommy**
7  **said?**
8      A.   Yes, and also from what I
9  heard, the portion that I heard on the
10  telephone myself.
11     **Q.   Okay.**
12     A.   And I expressed my
13  frustrations with him, again, because
14  there were other racial comments made
15  prior to this.
16     **Q.   Okay.  Now, this is the first**
17  **I've heard of any of that, so we're going**
18  **to have to slow down and go through that**
19  **here in a minute.**
20     A.   Okay.
21     **Q.   What are the other racial**
22  **comments that you claim were made prior**
23  **to this and by whom?**

Page 210

1      A.   There was a guest.  His name
2  is -- I'm sorry.  He's a vendor.  He
3  works for Alabama Power, and I just know
4  his first name.  His name is Bill.  He
5  was in a conversation with Tommy, and as
6  I was walking past, his comment to Tommy
7  was no black man should be in charge of
8  this many whites.
9      **Q.   And you heard this?**
10     A.   Yes.
11     **Q.   Did you do an open door**
12  **investigation on this?**
13     A.   By that being a vendor, I did
14  call home office to let them know about
15  the comment and Bill's behaviors.
16     **Q.   Who did you talk to?**
17     A.   The intake specialist.  Her
18  name is Vonn Barr.
19     **Q.   B-a-r-r?**
20     A.   Yes.
21     **Q.   And what did she say?**
22     A.   She asked me if I addressed
23  it, and I explained yes, that I addressed

Page 211

1  it.
2      **Q.   How did you address it?**
3      A.   I asked Bill to please
4  refrain from those type of comments.  And
5  at that time I also told Tommy that those
6  were not the kind of conversations that
7  he should be having because that can
8  cause other problems.
9      **Q.   Well, I mean, did Tommy say**
10  **anything or was he just standing there**
11  **when the man said it?**
12     A.   I didn't hear what Tommy
13  said.  I started to walk off, but I
14  turned around and I addressed it with
15  Bill.
16     **Q.   So this man, who is a third**
17  **party, said it in your presence and in**
18  **Tommy's presence?**
19     A.   Yes.
20     **Q.   And you didn't hear Tommy say**
21  **anything, but you started to walk off,**
22  **and you turned around and you decided to**
23  **tell the man immediately, right?**

Page 212

1      A.   Yes.
2      **Q.   And what did he say?**
3      A.   He explained how he had been
4  a vendor there for years and he can come
5  and go as he please.  Tommy had no issues
6  with him when he was a general manager.
7  And I relayed that information on to home
8  office when I spoke with them.
9      **Q.   Okay.  Did you ever have**
10  **any -- see hide nor tail of this guy Bill**
11  **ever again?**
12     A.   Yes.
13     **Q.   When was the next time you**
14  **had a chance to see him?**
15     A.   He came to the restaurant a
16  couple of weeks later, and he entered
17  into the kitchen, but he wasn't on
18  vendor's business, which means should he
19  get hurt or something, we were solely
20  responsible because he wasn't there on
21  company business.  I asked him to please
22  not enter the kitchen unless he was on
23  company business because other employees

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 213

1 were telling me that -- he's an older
2 gentleman, and he was physically touching
3 them in flirtation ways. So in order to
4 make sure they were protected, I asked
5 him to stay on the other side of the wall
6 unless he was physically there on company
7 business.
8    Q.   Did you write that up?
9    A.   No. I contacted Rich -- no.
10 I'm sorry. I contacted home office again
11 about him physically coming into the
12 restaurant. But Rich Alexander showed up
13 minutes after the incident, so I
14 addressed it with Rich.
15    Q.   Just on his regular --
16    A.   Yes.
17    Q.   They drop -- as I understand
18 it, district managers drop in
19 purposefully when you don't know they are
20 coming so they can check things?
21    A.   Scheduled and unscheduled.
22    Q.   Correct. They do some
23 scheduled that you know they are coming

Page 214

1 and some unscheduled?
2    A.   Correct.
3    Q.   Okay. So this is scheduled
4 or unscheduled?
5    A.   Unscheduled. He lived in
6 Gardendale, so we may see him at any time
7 because he lives right around the corner
8 of the restaurant. That's where he
9 stopped to get his coffee before he hit
10 the road and for different reasons.
11    Q.   So when you were in
12 Gardendale, you saw him specifically more
13 than you would have seen him in
14 Montgomery, for example, because he lives
15 there?
16    A.   Correct.
17    Q.   So he comes in. And you tell
18 him -- is the man still there?
19    A.   Yes.
20    Q.   What happens after that?
21    A.   I asked Rich if I can speak
22 with him towards the back of the dining
23 room. We sat down to hold the

Page 215

1 discussion. I explained to him what had
2 happened and that I did contact home
3 office and they said for me to inform him
4 of the incident. He just so happened to
5 walk in, but I was also to express to the
6 gentleman, any other behaviors, he was
7 not going to be allowed back into the
8 facility. At that point the gentleman
9 got up and came to the back of the dining
10 room where Rich and I were standing and
11 commented that he'll be here when I'm far
12 gone, which means at the restaurant, when
13 I'm far gone, and no black man will ever
14 tell him what to do.
15         At which point it shocked me
16 because Rich didn't intervene. And as a
17 district manager, that was the perfect
18 time, in my opinion, for him to
19 intervene, especially when I told him
20 about the incidents earlier. And he did
21 nothing. His comments were, That's just
22 Bill. Carl, who was the general manager
23 prior to myself, let him do things and

Page 216

1 let him do what he wants, and it's just
2 always been that way.
3         Well, I then explained to
4 Rich that I'm not Carl, and if that
5 gentleman was to fall and hurt himself
6 and how he feel about me racially, he
7 would definitely come after me, was my
8 feeling, as far as negligence on Cracker
9 Barrel's portion. So I was actually
10 trying to protect not only myself but
11 Cracker Barrel from any litigation due to
12 the fact that he could fall and hurt
13 himself when he's not there on vendor
14 business. He continued to talk. And I
15 explained to Rich --
16    Q.   When you say he?
17    A.   Rich.
18    Q.   The other man has gone on out
19 the door?
20    A.   No. He didn't leave. He
21 made his comment, and he went to go sit
22 back down at the dining room table.
23    Q.   He's gone away from y'all?

54 (Pages 213 to 216)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 217

1    A.   Yes.  Rich continued to
2  explain how it's just Bill and he's been
3  allowed to do this for so long and how
4  they tolerated it because if there was a
5  really bad thunderstorm, Cracker Barrel
6  was on his list of being the first to get
7  power back up.  So they allowed him to do
8  the things that he did because if we had
9  a storm, instead of having to go rent
10  refrigerated trucks because the cooler
11  may get too hot or something like that,
12  he would come to Cracker Barrel and see
13  what he could do about getting power up
14  first.
15    Q.   What about the generator?
16    A.   There was no generator.  We
17  would have to go with trucks,
18  refrigerated trucks, if that was an
19  issue.
20    Q.   All right.  The coolers stay
21  cold, what is it, thirty-six hours or
22  something?
23    A.   It maintains a temperature

Page 218

1  for so long.  If there's a power failure,
2  we just have to maintain the temperature
3  and get them up before it reaches
4  thirty-seven degrees, and if it does
5  reach thirty-seven degrees, we have to
6  get refrigerated trucks out immediately.
7
8    Q.   Okay.  Anything else?  You've
9  told me two things that related to Bill.
10  Anything else?
11    A.   There was also several older
12  Caucasian men who were guests, such as
13  Bill, but it was a circle of them.  They
14  knew each other, but Bill usually sat by
15  himself, and then these guys sat in a
16  circle by themselves, who also made
17  racial remarks.  And Linda, who is the
18  cashier there, before I commented to the
19  gentlemen, her father who is also an old
20  Caucasian male commented to the gentlemen
21  which did not lead me to have to comment
22  to him, because I was going to ask him to
23  leave.  But he had already addressed them

Page 219

1  before I did.
2    Q.   Okay.  So basically what
3  you're telling me -- and I want to know
4  this, but when you were talking about
5  there had been other incidents that were
6  racial in nature, these involved third
7  parties?  You had not had anybody who
8  worked for you say anything racial?
9    A.   The comment that Tommy made
10  about blacks and funerals and partying on
11  the weekends.
12    Q.   Right.  I understand that
13  one, but I'm saying --
14    A.   And there was one other
15  comment that Tommy made, and it was
16  brought to my attention.  Again, her
17  first name is Linda.  I just don't
18  remember her last name.  And that comment
19  was no black man is going to tell him
20  what to do.  He was there first.
21    Q.   I thought you said Bill said
22  that?
23    A.   No, no.  Bill said no black

Page 220

1  should be in charge of all these whites.
2    Q.   Well, you also said that Bill
3  said that second sentence?
4    A.   No.  That was a comment that
5  Linda made -- that Linda told me that
6  Tommy made.
7    Q.   Nothing that you heard but
8  that Linda said that Tommy had said
9  sometime previously?
10    A.   Yes.
11    Q.   And when was that previously?
12    A.   I don't know when the comment
13  was made because Linda also told me that
14  she mentioned that to Rich Alexander as
15  well.
16    Q.   Now, Linda is the cashier
17  Linda or a different Linda?
18    A.   Cashier Linda.
19    Q.   Okay.  I just wanted to make
20  sure we know who they are.  Anything
21  else?
22    A.   Not racially.  Just
23  behaviorally.

55  (Pages 217 to 220)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 221

1    Q.   Okay.  So this comment had
2  happened in March, early March?
3    A.   Yes.
4    Q.   The evaluation occurs.  And
5  what I'm trying to get to is after you
6  speak to -- I mean, this was not
7  discussed at your evaluation.  It was
8  just performance issues and communication
9  issues?
10    A.   No.  Everything is discussed,
11  because behaviors were an issue.  So that
12  was also an issue going towards trust and
13  behaviors and credibility, because I
14  questioned credibility when race is
15  involved.  And then you have someone who
16  requests to be a general manager of this
17  facility three times and was not allowed
18  to be, who was put on a final
19  documentation for falsifying company
20  documents and his involvement of the
21  prior general manager's dismissal, and
22  then he requested to become the general
23  manager again, and they turn him down,

Page 222

1  and then I show up.  So that was my
2  discussion with him about credibility and
3  frustrations and things of that nature,
4  because it was very difficult, not only
5  to deal with the racial issues, but also
6  the behaviors.
7    Q.   But you say racial issues,
8  and, you know, what concerns me about
9  this, we're here because you filed a EEOC
10  charge, right?
11    A.   Yes.
12    Q.   And in your EEOC charge
13  you're very specific about what you're
14  complaining about?
15    A.   Yes.
16    Q.   And it was the funeral
17  comment?
18    A.   No.  There was several things
19  in my EEOC complaint.  That was one of
20  those.
21    Q.   All right.  Well, let's look
22  at it.  I didn't want to go out of order,
23  but I think we better.  Let me show you

Page 223

1  what I'm marking as Exhibit 5.  Take a
2  look at that.
3        (Whereupon, Defendant's
4  Exhibit No. 5 was marked for
5  identification and copy of same is
6  attached hereto.)
7    A.   (Witness reviews document.)
8  Okay.
9    Q.   I mean, I just want to be
10  sure we're clear.  The racially offensive
11  comment is the funeral comment, correct?
12    A.   That was one of the comments
13  made, yes.
14    Q.   Well, that's the one you
15  filed the EEOC about, correct?
16    A.   Yes.
17    Q.   And you didn't file anything
18  with the EEOC about any other -- like
19  Bill or anything, these vendors or
20  patrons, correct?
21    A.   Correct.  They were not
22  employees of Cracker Barrel.
23    Q.   That's what I'm getting to.

Page 224

1  We're in a lawsuit because you have said
2  an employee of Cracker Barrel said
3  something that you learned about that was
4  offensive to you?
5    A.   That I heard part of and I
6  learned the conclusion of the statement,
7  yes.
8    Q.   Okay.  And then the -- and
9  then thereafter you were terminated, and
10  you draw a --
11    A.   No, it wasn't thereafter.
12    Q.   When I say thereafter, I mean
13  the comment was made in March, and you
14  were terminated in September?
15    A.   That's correct.
16    Q.   Okay.  And you, in your EEOC
17  charge, state this comment was made.  I
18  received evaluations and a disciplinary
19  action, and you were discharged, correct?
20    A.   Through that time frame, yes.
21    Q.   Okay.  And so the only thing
22  that you considered to be a racially
23  offensive charge related to your

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1  employment that you filed about was the
2  funeral comment, correct?
3      A.   No, that wasn't the only
4  offensive one, but that was the only one
5  made by a Cracker Barrel employee.
6      Q.   Yeah.  I was trying to be
7  clear.  The one that you filed, the one
8  that you're complaining about related to
9  your employment was the one by the
10  Cracker Barrel employee related to the
11  funeral?
12      A.   No.  I complained of all of
13  them, but that was the only one -- he was
14  the only one who was a Cracker Barrel
15  employee.
16      Q.   All right.  The only one you
17  filed a charge of discrimination about
18  was the funeral comment?
19      A.   No.  I complained about all
20  of them, but he was the Cracker Barrel
21  employee that made the racial comment.
22      Q.   Did you complain to -- are
23  you telling me that you complained to the

1  for.  And these comments made by Rich
2  Alexander.
3      Q.   What is it you wanted to
4  happen?
5      A.   Fairness.
6      Q.   What would that be in your
7  mind?
8      A.   That would have been the
9  investigation being conducted and the
10  processes and procedures being done
11  properly.
12      Q.   And if they were, you think
13  everything has been done fair?
14      A.   They weren't, but I would
15  think that things would have been more in
16  order than they have been.
17      Q.   What is the ultimate result
18  that you were seeking from this
19  investigation?
20      A.   Fairness.
21      Q.   What would that be?
22      A.   A proper investigation,
23  proper communication, and if it warranted

1  EEOC about all of them?
2      A.   No.  I complained to human
3  resources and to Rich Alexander.
4      Q.   I'm just trying to get to
5  what the lawsuit is about.  You filed a
6  complaint with the EEOC about the funeral
7  comment, correct?
8      A.   That was one of the
9  complaints.
10      Q.   The other complaint was that
11  you felt like because you complained
12  about that, you were terminated?  Are
13  those your two complaints?
14      A.   No.
15      Q.   What are you suing Cracker
16  Barrel for?
17      A.   My complaint was the fact
18  that no actions were taken once the
19  allegations -- the complaint was made.
20      Q.   Right.
21      A.   And then I was being told
22  things when I inquired into the
23  complaint, don't forget who you work

1  action, that action be taken.
2      Q.   All right.  And do you -- are
3  you saying those things did not happen?
4      A.   Yes.
5      Q.   Was it investigated?
6      A.   No.
7      Q.   Was Penny asked about it?
8      A.   Months later.
9      Q.   Did Penny give a statement
10  about it?
11      A.   Yes.
12      Q.   All right.  Was any
13  discipline issued?
14      A.   No.
15      Q.   Do you have any knowledge
16  whatsoever as to whether or not Tommy was
17  counseled about it, spoken to about it,
18  or anything?
19      A.   I know that procedures were
20  not followed because I was not
21  addressed.  So it could not have been
22  done properly because I was not
23  addressed.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 229

1    Q.    Well, according to you today,
2  which is the first time I've seen this in
3  anything that you've said to anybody, you
4  heard two words on a conversation?
5    A.    I heard two derogatory words,
6  but yes.
7    Q.    "Only blacks" are the
8  derogatory words?
9    A.    Yes, because it singled out
10 blacks.  What's not derogatory about
11 this?
12    Q.    All right.  Those two words
13 were derogatory to you?
14    A.    Yes, based on his behaviors
15 and earlier comments.
16    Q.    Okay.  Why didn't you call
17 immediately and make a complaint?
18    A.    I wasn't aware of the
19 completion of those words.
20    Q.    Well, why would you need them
21 according to what you've just said?
22    A.    Because I just got two
23 words.  And as Penny walked in that

Page 230

1  morning and said what was said, I called
2  in.
3    Q.    No.  You weren't at work.
4  You were on the phone two and a half days
5  earlier when you claim you heard those
6  two derogatory words?
7    A.    That's correct.
8    Q.    Why didn't you call
9  immediately and make a complaint if they
10 were derogatory to you?
11    A.    Ma'am, I was at home ill, and
12 I had just got word of a death in the
13 family.
14    Q.    You were ill the next two
15 days?
16    A.    I was taking medications,
17 yes.
18    Q.    Okay.  But you were at home?
19    A.    Yes.
20    Q.    And you didn't call?
21    A.    No, I didn't speak with
22 Tommy.  I did leave word for Tommy, but I
23 did not speak with Tommy.

Page 231

1    Q.    You didn't call the home
2  office?
3    A.    No.
4    Q.    Then you got to work, and you
5  spoke to Penny?
6    A.    Yes.
7    Q.    And then you called and made
8  an open door investigation?
9    A.    Yes.
10    Q.    Where they write down what
11 you said?
12    A.    I'm sorry?
13    Q.    Where they write down what
14 you called to say to them, correct?
15    A.    I don't know what happens
16 when you call in.
17    MS. BUSBY:  Let's take a
18 break.  I'm going to get that document.
19    (Whereupon, a brief recess
20 was taken.).
21    Q.    Okay.  Mr. Rodgers, I've
22 found it.  When you called the hot line,
23 you know, they take an account of what

Page 232

1  you told them, and this is what it says:
2  That you called regarding a potential
3  employment incident seeking advice as to
4  how it proceed.  That's what you told me;
5  is that right?
6    A.    Yes.
7    Q.    Okay.  And that Penny
8  Schmidt, shift leader, is what this says,
9  is that -- was she a shift leader?
10    A.    Yes.
11    Q.    Had come to you to let you
12 know about a comment that Tommy
13 Patterson, SAM --
14    A.    Senior associate manager.
15    Q.    -- took a call -- this says
16 from an hourly stating the employee would
17 not be in work due to a funeral.  When
18 hanging up, Patterson made an
19 inappropriate comment stating that he
20 thought that black people were only
21 buried during the week, not on a
22 weekend.  This comment offended Schmidt
23 as she is married to an African-American

58 (Pages 229 to 232)

# FREEDOM COURT REPORTING

Page 233

1  man.
2      Is that what you reported to
3  them when you called?
4      A.   No.  I don't know what their
5  -- that's a part of it, but I don't know
6  what they typed up.
7      Q.   Is Penny Schmidt married to
8  an African-American man?
9      A.   No.
10     Q.   Did you say that to them?
11     A.   That she's married to an
12  African-American male?
13     Q.   Yes, sir.
14     A.   No.
15     Q.   All right.  So what you say
16  about this is that you called, told them
17  that you needed some advice because Penny
18  Schmidt had come to you about a comment
19  that she heard Tommy Patterson say.  That
20  is all correct?
21     A.   No.
22     Q.   That's incorrect?
23     A.   That's incorrect.

Page 234

1      Q.   All right.  So all we can
2  gather from this is is that you called,
3  that's true?
4      A.   Yes.
5      Q.   That you were seeking advice
6  about what to do, that's true?
7      A.   Yes.
8      Q.   That Penny Schmidt had come
9  to you that morning, that's true?
10     A.   Yes.
11     Q.   Talking about the comment
12  Tommy Patterson made about the funeral,
13  that's true?
14     A.   Part of it, yes.
15     Q.   Okay.  So all of that is
16  consistent with what you're testifying
17  to, and what you're saying is that
18  there's additional things that are not in
19  what I've just read to you?
20     A.   That's correct.
21     Q.   And the additional things are
22  that you heard the first two words as he
23  was hanging up the phone?

Page 235

1      A.   I did inform her of that,
2  yes.
3      Q.   And that once Penny completed
4  the sentence for you, you understood what
5  it was he was -- the first two words were
6  tied to, you also took offense to that?
7      A.   No, I was offended when I
8  heard the comments, and I tried calling
9  back.
10     Q.   All right.  So you told her
11  you were offended when you heard the
12  first two comments?
13     A.   She did not go into detail
14  and ask me whether it did or did not
15  offend me.
16     Q.   All right.  And did she --
17  did you speak to a person named Kay
18  Barnes?
19     A.   No.
20     Q.   You never spoke to Kay
21  Barnes?
22     A.   No.
23     Q.   All right.  Did Kay Barnes

Page 236

1  leave you a voicemail asking you to
2  obtain statements?
3      A.   No.  I was told by Vonn Barr
4  that she will get with -- Kay Barnes is
5  actually Vonn Barr's boss, and Rich
6  Alexander and -- for me to do nothing,
7  not to even initiate the open door
8  policy.
9      Q.   So did she initially -- let
10  me just ask you if you remember this.  I
11  understand they may have changed what
12  they wanted you to do according to you
13  based on you being involved.  But did you
14  ever receive a voicemail asking you to
15  obtain statements?
16     A.   No.
17     Q.   All right.  So I guess the
18  next question is:  Did you get any
19  statements?
20     A.   No.
21     Q.   So you never got any
22  statements from anybody and sent them to
23  Barnes or Barr?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 237

1    A.   No.
2    Q.   Well, the next thing I have
3  is that you call and say could you have
4  Kelly call you back so she could tell you
5  how to proceed, and this is in April?
6    A.   No.  I never asked her to
7  tell me how to proceed, because I was
8  told to remove myself.
9    Q.   So basically, if I understand
10 this scenario correctly, based on you
11 calling -- you called on March the 4th?
12   A.   Yes.
13   Q.   According to you, Ms. Barr
14 told you you're involved so you can't
15 proceed with any investigation?
16   A.   That's correct.
17   Q.   All right.  Your expectation
18 was that there would be an investigation
19 and that you would be reported the
20 result?
21   A.   No.  Ms. Barr stated that she
22 would do the open ticket and she would
23 forward it on to --

Page 238

1    Q.   Ms. Barnes?
2    A.   Ms. Barnes, and that she
3  would have to get in contact with Rich
4  personally.
5    Q.   That Ms. Barnes would?
6    A.   Yes, to do the open door.
7    Q.   Okay.  But I'm just trying to
8  get down to the bottom of this as far as
9  making sure I understand your EEOC
10 charge.  You feel that what you were
11 complaining about is that they should
12 have done the investigation fairly and
13 reported the result to you?
14   A.   Yes.
15   Q.   Okay.  Now, to do the
16 investigation you would have to ask Penny
17 what happened and Tommy what happened,
18 and your complaint is they should have
19 also asked you?
20   A.   No.  They would have to ask
21 me because of the fact that when I called
22 to do -- to seek their advice, I informed
23 them that it involved me, and I was told

Page 239

1  to remove myself because of the fact that
2  I would be questioned.
3    Q.   Okay.  Well, did you ever
4  speak to Rich about this?
5    A.   Yes.
6    Q.   Okay.  When did you speak to
7  Rich about this?
8    A.   About two weeks afterwards.
9    Q.   Okay.  And what did y'all
10 discuss?
11   A.   I just asked the status, and
12 he responded, Don't forget who you work
13 for.
14   Q.   Well, when you asked the
15 status, what was your question?
16   A.   I just asked the status of
17 the investigation, because I knew that he
18 had to talk to me.  We have ten days to
19 either do fact finding or requesting an
20 extension, and he hadn't come to speak
21 with me.  So I just asked him what was
22 the status.
23   Q.   Well, and his response was

Page 240

1  don't forget who you work for?
2    A.   Yes.
3    Q.   I mean, so you say what's the
4  status of the investigation of Tommy?
5    A.   Yes.
6    Q.   And his statement is don't
7  forget who you work for?
8    A.   Yes.
9    Q.   How is that responsive to
10 your question?  I mean, what kind of --
11 where were y'all?
12   A.   We were at Cracker Barrel,
13 and that was his response.
14   Q.   And what did you say after
15 that?
16   A.   When he said don't forget who
17 you work for, I backed off.
18   Q.   You didn't say anything?
19   A.   To Rich, no.
20   Q.   All right.  What did you do
21 after that?
22   A.   I waited to -- wait for him
23 to come to me and ask me about it, and I

60 (Pages 237 to 240)

## FREEDOM COURT REPORTING

Page 241

1 just waited at that point because I felt
2 that my asking about it was going to
3 cause trouble for me.
4     Q.   All right.  Well, sometime
5 during the midst of this you're gone to
6 the funeral?
7     A.   Yes.
8     Q.   Can you recollect when the
9 funeral was?
10     A.   I don't know what day, maybe
11 a Thursday.  It's been a while.
12     Q.   It was on a Thursday?
13     A.   I don't know exactly which
14 day.
15     Q.   I looked this up so we would
16 know what dates we were talking about.
17 March the 3rd is a Thursday.
18     A.   Again, I don't know which
19 day.
20     Q.   Well, I mean, I'm just trying
21 to get us in the general ballpark here
22 about when you came back to work and made
23 the call.  All right.  You made the call,

Page 242

1 according to you -- look on that EEOC.
2 What exhibit is that?
3     A.   5.
4     Q.   When did you tell them you
5 called, March the 3rd or the 4th?
6     A.   This just says the comment
7 was made on the 3rd.
8     Q.   All right.  So if the comment
9 was made on March the 3rd, that was on
10 Thursday, of 2005.  I'm just trying to
11 give you the dates.  And according to
12 you, you were scheduled off the two days
13 after that day anyway, which would have
14 been you were scheduled off Friday and
15 Saturday.  So you would have returned to
16 work on Sunday according to what you told
17 me earlier; is that correct?
18     A.   Again, I'm not exactly sure.
19     Q.   I think the comment,
20 according to your previous testimony --
21 and I don't know; I'm just going by what
22 you've told me -- is that the comment was
23 not made on the day you complained, and

Page 243

1 the day you complained and called for
2 advice to the home office was according
3 to you in your EEOC charge what day?
4     A.   On the EEOC charge it has
5 March the 3rd.
6     Q.   So all you have on that day
7 is what day you say the call was made?  I
8 gave y'all my copy.  That's why I'm
9 asking these questions.  I don't have it
10 in front of me.
11     A.   Ask the question again.
12     Q.   Could I see that?  Okay.  In
13 your Exhibit 5, your EEOC charge, you
14 state that on March the 3rd a derogatory
15 statement was made.  And what I'm asking
16 you is:  Was that the day the statement
17 was made or is that the day you called to
18 make the complaint or do you remember?
19     A.   No, ma'am, I don't remember
20 exactly.
21     Q.   Okay.  So the best way to
22 figure this out is I guess if we knew
23 when the woman died, we would know

Page 244

1 that -- you found out the day of or the
2 day after, I'm presuming.  Would that be
3 right, the day of her death or the day
4 after?
5     A.   Yes.
6     Q.   Okay.  So she's in Aikens?
7     A.   And the news came
8 secondhand.  I was living in Alabama.
9     Q.   Right.  But, I mean, she may
10 have passed the day before or do you
11 think you found out the day she passed?
12     A.   I'm not sure.  I was just
13 told that she had passed away, and that's
14 when they got in contact with me.
15     Q.   And that's when they told you
16 they are making arrangements for the
17 funeral?
18     A.   Yes.
19     Q.   Okay.  So if, in fact, you
20 were off the two days after, how long did
21 you work before you went to the funeral?
22     A.   I don't recall.
23     Q.   I mean, a week?

61  (Pages 241 to 244)

# FREEDOM COURT REPORTING

Page 245

1    A.   I don't recall.
2    Q.   All right.  How many days
3  were you off for the funeral?
4    A.   I don't recall if it was in
5  conjunction with my days off or if it was
6  an adjustment in the schedule for that.
7    Q.   All right.  But to the best
8  of your recollection as you sit here
9  today, you call in.  You've been off
10  sick.  You tell them that there's been a
11  death, and you stay off two days or two
12  and a half days, and you come back, and
13  then you work for a period, and then you
14  leave for the funeral?
15    A.   Yes.
16    Q.   Okay.  All right.  So that
17  comment is made.  You call the help
18  line.  You say Penny Schmidt has come to
19  you and you need some advice about how to
20  handle it, and it's also offensive to you
21  is what your recollection is?
22    A.   Yes.
23    Q.   Okay.  They tell you that

Page 246

1  since you're involved, we're going to
2  have to get somebody to do the
3  investigation, and we'll tell Rich
4  Alexander?
5    A.   No.  They tell me that Rich
6  Alexander has to do the investigation and
7  that I'm to remove myself completely and
8  that she was notifying Rich.  She was
9  doing an open ticket and she would notify
10  Rich at that time.
11    Q.   All right.  So she notifies
12  Rich.  Two weeks later you ask him about
13  it.  He tells you to remember who you
14  work for.  You don't say anything else.
15  And then what's the next thing that
16  happened?
17    A.   That's too general.  I can't
18  answer that.  That's too general.
19    Q.   Well, I mean, did you know
20  anything else about the investigation
21  from that point forward?
22    A.   During that time frame, no.
23    Q.   Did Penny tell you when they

Page 247

1  came to get the statement from her?
2    A.   No.
3    Q.   Did you ever talk to Penny
4  about any statement that she gave?
5    A.   No.
6    Q.   All right.  Did Tommy
7  Patterson ever say anything to you about
8  them taking a statement from him?
9    A.   No.
10    Q.   Did Tommy --
11    A.   I didn't talk to Tommy at
12  all.
13    Q.   You worked with him for
14  several months after this?
15    A.   About the investigation.
16    Q.   Okay.  So you never heard
17  from Tommy if they asked him about it?
18    A.   Correct.
19    Q.   You never talked to Penny
20  about whether they asked her about it?
21    A.   Correct.
22    Q.   You don't know what happened
23  between Penny and Tommy?

Page 248

1    A.   Correct.
2    Q.   And the next thing is is that
3  you -- do you ever ask Rich about it
4  again?
5    A.   Yes.
6    Q.   Okay.  When did that occur?
7    A.   I asked him again in April,
8  towards the end of the month.  And he
9  told me it was his responsibility and he
10  left it at that.
11    Q.   Meaning it's his
12  responsibility to investigate and make a
13  recommendation or a decision?
14    A.   I just took his answer as
15  it's his responsibility.
16    Q.   Okay.  Well, and you don't
17  disapprove of that statement, correct?
18    A.   Well, they told me it was his
19  responsibility.
20    Q.   Right.  Okay.  So what's the
21  next thing that happened?
22    A.   Again, that's very general.
23    Q.   Well, as it relates -- I'm

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 249

1 not trying to be general. I'm trying to
2 relate to this incident unless you have
3 something different or more you want to
4 add about it.
5      A.   When you say what's the next
6 thing that happened --
7      Q.   You go on about your business
8 and, you know, y'all work or have
9 whatever issues work related that you
10 have, I take it?
11      A.   When the comment was made, I
12 just went back to work before.
13      Q.   You have your evaluation.
14 You submit an action plan.  You proceed
15 to work with this management team and the
16 four or five of y'all agree or disagree,
17 or agree to disagree, but you proceed
18 about your work as you take it?
19      A.   I proceeded about my duties,
20 yes.
21      Q.   And as far as you know
22 everybody else proceeds about theirs?
23      A.   Yes.

Page 250

1      Q.   And you don't have any idea
2 what kind of investigation is going on
3 because you've been told it's my
4 responsibility by Rich?
5      A.   And because Vonn Barr said I
6 was to back out of it.
7      Q.   And because of that --
8      A.   Yes.
9      Q.   So in May of 2005 or
10 thereabouts, there is an opening at the
11 Montgomery store, I take it?
12      A.   June.
13      Q.   June?
14      A.   Yes.
15      Q.   There's an opening at the
16 Montgomery store?
17      A.   Yes.
18      Q.   You request to be transferred
19 to that store; is that correct?
20      A.   No.
21      Q.   All right.  What happened
22 then?
23      A.   I was asked to meet with Rich

Page 251

1 and Ron, and they informed me at that
2 time that there was an opening in
3 Montgomery, and they just felt that in
4 best for my career that I take the
5 Montgomery store.
6      Q.   Well, tell me about that
7 conversation.
8      A.   That was the conversation.
9 The conversation lasted no more than ten,
10 twelve minutes.
11      Q.   Well, best for your career in
12 what regard?
13      A.   I don't know.
14      Q.   Did you ask any questions?
15      A.   At that point, no.
16      Q.   Did you ever ask any
17 questions about it?
18      A.   After I was told don't forget
19 who you work for, it was my
20 responsibility, I didn't ask any more
21 questions after that.
22      Q.   Well, you agreed to the
23 transfer?

Page 252

1      A.   Yes.
2      Q.   Okay.  When did you start in
3 Montgomery?
4      A.   June, the first week of June.
5      Q.   All right.  How did that go?
6      A.   It was not a smooth
7 transaction.
8      Q.   Okay.  In what manner?
9      A.   Well, when there's a new unit
10 -- it was a brand new unit, and the
11 general manager prior was termed, which
12 means the current general manager has no
13 hands-on with the management or the
14 personnel being hired and the
15 coordination of training.
16      Q.   Were there assistant managers
17 there when you started?
18      A.   Yes.
19      Q.   All right.  Who were they?
20      A.   Ralph White (sic).  Tony, I
21 don't know his last name.  Carlos
22 Browning.  Ashley Moore.  And Brian.  I
23 don't know his last name.

63 (Pages 249 to 252)

## FREEDOM COURT REPORTING

Page 253

1    Q.    Okay. How did you get along
2  with these managers?
3         A.    Personally they were okay.
4  Professionally, that was not the setting
5  for them.
6         Q.    What do you mean by that?
7         A.    It was a new restaurant,
8  brand new unit, and everyone in it had no
9  experience of Cracker Barrel culture
10  whatsoever, and all except for Tony were
11  on final written warning for behavior
12  issues. So it's almost like taking the
13  bad apple and putting it in the bunch of
14  good apples.
15       Q.    Well, that would mean you
16  were the bad apple and they were the
17  bunch of good apples?
18       A.    No.
19       Q.    So you meant it the reverse,
20  I think?
21       A.    No, ma'am.
22       Q.    Okay. Then I don't
23  understand what you mean.

Page 254

1         A.    By there being two hundred --
2  a hundred and fifty to two hundred
3  employees there who do not understand the
4  culture, who do not understand how
5  Cracker Barrel works, who has to be led
6  by this management team, the managers
7  that were transferred in were managers
8  that were transferred in on final written
9  warnings for behavior issues. I was not
10  on the final written warning for
11  anything. They were on warnings for
12  behavior issues. That demonstrates that
13  they are not going to take this person
14  who they are supposed to be mold into
15  this culture and teach them culture and
16  develop and train them the right way,
17  because they are too new.
18       Q.    Well, I am completely
19  confused here.
20       A.    Okay.
21       Q.    The two hundred and fifty
22  people you are talking about, who are
23  those people?

Page 255

1         A.    Brand new employees. It was
2  a brand new store.
3         Q.    All right. So you're saying
4  all of the hourly employees?
5         A.    Yes.
6         Q.    Had no idea what to do?
7         A.    That's correct. It was a
8  brand new restaurant.
9         Q.    How long had it been open?
10       A.    It hadn't.
11       Q.    It hadn't even opened?
12       A.    No.
13       Q.    When did it open?
14       A.    The first week of June. I
15  went down like a Thursday. I opened that
16  Friday.
17       Q.    All right. Well, so nobody
18  had been there when it was opening to
19  screw anything up?
20       A.    No. That was the training
21  portion of it. We started training then.
22       Q.    All right. You've got hourly
23  employees?

Page 256

1         A.    Yes.
2         Q.    Who have been trained by
3  somebody whether you think it's good or
4  not?
5         A.    They weren't -- the training
6  was not complete.
7         Q.    All right. So they are in
8  the process of being trained?
9         A.    Hired and trained, yes.
10       Q.    So when you open a new store,
11  I take it that you bring experienced
12  managers from other locations?
13       A.    That's the concept, yes.
14       Q.    Okay. You come in as the
15  general manager?
16       A.    Yes.
17       Q.    But you say the previous
18  general manager has been terminated?
19       A.    That's correct.
20       Q.    Well, how had there been a
21  previous general manager if the store had
22  not opened?
23       A.    Because he would be the

64  (Pages 253 to 256)

# FREEDOM COURT REPORTING

Page 257

1  organization of getting it open.
2      Q.    And how long are you in that
3  position?
4      A.    I was there from June to
5  September.
6      Q.    Not you.  I mean the person
7  who is opening a store?
8      A.    Well, they start off with
9  several weeks just gathering the bases to
10 get open and go over the number of hires
11 and thing.  So it just depends on how
12 long.  Sometimes four weeks.  Sometimes
13 six weeks.  And then they coordinate
14 training and things of that nature before
15 the store itself is physically scheduled
16 to go live.
17     Q.    So apparently they had
18 according to your recollection appointed
19 somebody as a general manager who had
20 been there six to eight weeks and he is
21 let go?
22     A.    Yes.
23     Q.    Who is that person?  Do you

Page 258

1  recollect?
2      A.    His name is Steve.  I don't
3  know his last name.
4      Q.    Did you ever meet him?
5      A.    No.
6      Q.    Okay.  So you come in, and
7  there are associate managers and a senior
8  associate manager there?
9      A.    Yes.
10     Q.    And they've been in other
11 Cracker Barrel locations for varying
12 periods of time?
13     A.    Three of the people had six
14 months experience from management
15 training to the brand new store.  One had
16 eight months, and I think the other one
17 was right at two years if I'm not
18 mistaken.
19     Q.    Okay.  So on the one hand
20 you've got an opportunity to train and
21 mold these people to behave the way that
22 you want them to behave?
23     A.    No.

Page 259

1      Q.    No?
2      A.    No.  They were selected prior
3  to me being there, and with their history
4  of disciplinary actions and being on the
5  final written warning, they never would
6  have been accepted to do a new store
7  opening.
8      Q.    Tell me who was on final
9  written warning.
10     A.    Brian.
11     Q.    What was --
12     A.    Ashley.
13     Q.    What was he on final --
14     A.    I was just told by Rich that
15 they were on final written warning.
16     Q.    I mean, do you know this of
17 your own accord?  Did you review their
18 personnel files?
19     A.    Well, I was a general manager
20 in Montgomery when risk management -- and
21 I'm not sure of his name -- came to
22 complete the investigation.
23     Q.    For who?

Page 260

1      A.    Brian and Carlos.  Rich
2  informed me that Ashley was on final
3  written warning maybe two or three days
4  prior to me getting there because she was
5  involved in the incident with the GM that
6  was termed before I got there.
7      Q.    Are these the people's
8  counseling things that you had?
9      A.    You would have to -- I don't
10 know.  You would have to show it to me.
11     Q.    Well, you know, the ones that
12 you had that you claimed were in the
13 briefcase that you were holding for Rich
14 for those people?
15         MS. YORK:  I'm going to
16 object.  That's not what his testimony
17 was.
18         MS. BUSBY:  The record will
19 show what his testimony was.
20         MS. YORK:  That's true.  But
21 that's not what it was.
22     Q.    Well, maybe we better clear
23 that up then.  Did you not tell me that

65 (Pages 257 to 260)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 261

1  you had employee disciplines for people
2  in the locked briefcase that you were
3  holding for Rich to pick up?
4      A.   I did have counsels, but I
5  did not tell you I had those specific
6  counsels you're speaking of.
7      Q.   I didn't tell you anything
8  specific.  We're about to tell you who
9  they are.  Final written counseling.  Oh,
10  that's for you, Dwight Rodgers.  Ralph
11  Whiting.  So Rich had told you that Ralph
12  Whiting was on a written warning; is that
13  right?
14      A.   No.
15      Q.   No?
16      A.   I said Brian Thompson,
17  Ashley, and Carlos.
18      Q.   Who is Ralph Whiting?
19      A.   He was an associate that was
20  transferred in.
21      Q.   Did you give him a written
22  warning?
23      A.   Yes.

Page 262

1      Q.   All right.  Why did you have
2  his employee counseling report in your
3  briefcase?
4      A.   Again, anything that was in
5  my briefcase was anything that Rich
6  requested copies of.
7      Q.   And this would have been --
8  anything you had you would have had to
9  have in that briefcase before September
10  the 3rd because that's when you were
11  terminated, right?
12      A.   On September 3rd, yes.
13      Q.   And you took the briefcase or
14  the briefcase with you when you left?
15      A.   As I testified, it was given
16  to me and told my services were no longer
17  needed.
18      Q.   Who gave you the briefcase?
19      A.   Rich Alexander.
20      Q.   Was anybody with you other
21  than Rich Alexander when you were
22  terminated?
23      A.   Yes.

Page 263

1      Q.   Who was it?
2      A.   Her name is Monique.  I don't
3  know her last name.
4      Q.   Did she give you the
5  briefcase or did Rich give you the
6  briefcase?
7      A.   I've testified that Rich had
8  given me the briefcase.
9      Q.   Would she have seen it?
10      A.   I can't say whether she would
11  or would not.
12      Q.   So anything that you had you
13  would have had to have had in that
14  briefcase before September the 3rd?
15      A.   Yes.
16      Q.   All right.  Brian Thompson,
17  that would be one of the ones that Rich
18  told you about?
19      A.   Yes.
20      Q.   What were you doing with his
21  employee counseling reports in that
22  briefcase?
23      A.   Again, I don't know exactly

Page 264

1  what was in there at the time.  I just,
2  again, turned over everything that I had
3  that pertained to Cracker Barrel.
4      Q.   Did you put it in there or
5  did somebody else put it in your
6  briefcase?
7      A.   Rich also had the combination
8  to it.  It was where he secured
9  management documentation until he took it
10  back with him.
11      Q.   Well, how about Ralph
12  Whiting, is he one of the ones Rich told
13  you about?
14      A.   Again, he was a transferee
15  in, and I was not told he was on final
16  written warning, no.
17      Q.   All right.  Did you know --
18  I'm not saying he was.  Do you know
19  whether he was or not?
20      A.   Was or not what?
21      Q.   On final written warning.
22      A.   No, I don't.
23      Q.   What about James Heater?  Who

66 (Pages 261 to 264)

# FREEDOM COURT REPORTING

Page 265

1  is that?
2       A.    That's Tony's real name.  I
3  just couldn't remember his real name.
4       Q.    What kind of warning did he
5  have?
6       A.    Again, I would have to read
7  it.  It's been too long ago.
8       Q.    How about Ashley Moore?
9       A.    Yes, I was informed that she
10 was on final written.
11      Q.    Anybody else you were
12 informed was on a warning?
13      A.    No.
14      Q.    It's kind of coincidental
15 that those are the ones that were in that
16 locked briefcase, isn't it?
17      A.    Again, the briefcase, Rich
18 had access to it as I did.
19      Q.    Who did you call and ask to
20 get these documents for you after you
21 were fired?
22      A.    Ma'am, I testified that --
23      Q.    I know what you testified.

Page 266

1  I'm asking you.
2       MS. YORK:  You're being
3  argumentative.
4       MS. BUSBY:  No, I'm asking
5  him and I'm giving him a chance to --
6       Q.    You know you're under oath?
7       A.    Yes.
8       Q.    All right.  And you know that
9  in order to have had anything like this
10 in your possession -- you weren't
11 supposed to have anybody's personnel
12 information, correct?
13      A.    Again, when I was terminated,
14 I had a briefcase.  I went home.  I
15 tossed the briefcase to the side and
16 started my resume, and I started seeking
17 employment.
18      Q.    Did you ask anybody to get
19 these documents for you after you were
20 terminated?
21      A.    No.
22      MS. YORK:  It was asked and
23 answered.

Page 267

1       Q.    Did anybody give you any
2  documents after you were terminated?
3       MS. YORK:  Asked and
4  answered.
5       MS. BUSBY:  No, it wasn't.
6       MS. YORK:  Yes, it was.
7       MS. BUSBY:  No, it wasn't.
8       MS. YORK:  Yes, it was.
9       Q.    Did anybody give you any
10 documents after you were terminated?
11      MS. YORK:  Asked and
12 answered.
13      MS. BUSBY:  Well, he can
14 answer it again.  If you're wrong, you're
15 wrong.
16      MS. YORK:  You're being
17 argumentative.
18      MS. BUSBY:  Well, I just want
19 him to tell the truth.
20      MS. YORK:  He told the truth.
21 He did answer it.  It's asked and
22 answered.
23      MS. BUSBY:  Well, let him

Page 268

1  tell me again.
2       Q.    (By Ms. Busby)  Did anybody
3  give you any documents after you were
4  terminated?
5       A.    Ma'am, I've already answered
6  that question.
7       Q.    Well, answer it again.
8       A.    Again, ma'am, I've already
9  answered that question.
10      Q.    Well, you better answer it
11 again.  Yes or no?
12      MS. YORK:  He had better not
13 answer it again.
14      MS. BUSBY:  Are you
15 instructing him not to answer?
16      MS. YORK:  I'm instructing
17 him -- for you not to be argumentative
18 with him.
19      MS. BUSBY:  Are you
20 instructing him not to answer?
21      MS. YORK:  I'm instructing
22 you not to be argumentative with him.
23      MS. BUSBY:  Well, then

67  (Pages 265 to 268)

# FREEDOM COURT REPORTING

Page 269

1  instruct him to answer yes or no.
2      MS. YORK:  He's answered the
3  question.  Asked and answered.
4      MS. BUSBY:  What's the
5  answer?  I don't remember it.
6      MS. YORK:  He said no.
7      Q.   (By Ms. Busby)  Is it your
8  testimony that no nobody gave you
9  documents from Cracker Barrel after you
10 left?
11     A.   Yes.
12     Q.   Your lawyer said your answer
13 is no.  Is your answer no?
14     A.   That's correct.
15     Q.   All right.  Good.  Then let's
16 take a look at some of the stuff that
17 you've produced.
18         You produced a document that
19 is Bates stamped 134 to 139.  And it is a
20 document that was printed on September
21 the 8th, 2005 at 10:52 a.m.  Now, you
22 didn't work for Cracker Barrel on
23 September the 8th, 2005 at 10:52 a.m.,

Page 270

1  did you?
2      A.   No, I did not.
3      Q.   All right.  And it's an
4  employee listing that has all the
5  employees with their payroll ID, phone
6  numbers, birth date, date hired, and
7  their status.  That's a confidential
8  business record of Cracker Barrel, is it
9  not?
10     A.   Yes, it is.
11     Q.   And when you print stuff, it
12 tells you the page numbers that you're
13 printing, correct?
14     A.   I have to see the document.
15     Q.   All right.  I'll be happy for
16 you to.  I'm not going to mark that as an
17 exhibit because it violates personnel
18 information.  But I would like for you to
19 explain to me how you had that in your
20 possession after you were terminated to
21 produce it to your lawyers to produce to
22 us since according to your sworn
23 testimony nobody gave you any

Page 271

1  documentation after you left.
2      A.   And as I testified, I don't
3  know where that came from with the dates
4  and things on it, but I gave them
5  everything I got from the time that I
6  terminated.
7      Q.   All right.  Well, let's start
8  over.  Who gave you documents after you
9  were terminated from Cracker Barrel?
10     A.   No one.
11     MS. YORK:  Asked and
12 answered.
13     MS. BUSBY:  In the face of
14 this evidence that you've produced, do
15 you want him to not answer that question
16 again?
17     MS. YORK:  He's already
18 answered it.
19     MS. BUSBY:  So then I need to
20 be asking you who you have improperly
21 gotten confidential business information
22 from.
23     MS. YORK:  We could have

Page 272

1  gotten the file from EEOC.  We could have
2  gotten it from anywhere.  It was asked
3  and answered.
4      MS. BUSBY:  So you're making
5  yourself a witness?  Is that what you're
6  telling me?
7      MR. BREEDLOVE:  Listen.  It's
8  Cracker Barrel's.  If Cracker Barrel
9  cannot keep control of their documents
10 and they get out, it is not our problem.
11 It's Cracker Barrel's problem.
12     MS. YORK:  But you're not
13 going to testify that he got documents
14 from someone else that he asked because
15 he's told you he did not do that.
16     MR. BREEDLOVE:  We have
17 documents that we provided you, and
18 you've got to live with that.
19     MS. BUSBY:  Well, we'll see
20 if the judge thinks I have to live with
21 it or not.
22     MR. BREEDLOVE:  You can do
23 whatever you want to do.  I don't think

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 273

1  the judge is going to have a problem with
2  you all having -- if employees or whoever
3  are providing other folks with Cracker
4  Barrel documents, that's not our problem.
5  That's your problem.  And you can make it
6  as big an issue at this deposition as you
7  want.  But the facts are clear.  He's
8  testified that he hasn't given you -- no
9  one in Cracker Barrel has given him
10  documents.
11      MS. YORK:  After he left.  He
12  testified to it at least ten times.
13      MR. BREEDLOVE:  And that's
14  his testimony.
15      MS. BUSBY:  I want to make
16  sure the record is clear then.  What you
17  are representing as an officer of the
18  court then is that what you have produced
19  to me may not be documents that Mr.
20  Rodgers gave you?
21      MS. YORK:  I'm not testifying
22  to anything.
23      MS. BUSBY:  I'm not asking

Page 274

1  you to testify.  I'm asking you to
2  represent.
3      MS. YORK:  I'm not putting
4  anything on the record because I'm not
5  the witness.  But he's been asked the
6  question and answered it.
7      MS. BUSBY:  Well, these
8  documents were produced as documents in
9  Mr. Rodgers' possession.  Is that correct
10  or incorrect?
11      MR. BREEDLOVE:  There was an
12  EEOC investigation, and if those
13  documents were provided by -- we don't
14  know.  If he doesn't know, we don't know,
15  but they are there, and you have them.
16  He gave you at your request everything he
17  had that was -- that we had being honest
18  and straightforward.  If we were trying
19  to hide something --
20      MS. YORK:  We wouldn't have
21  provided it.
22      MR. BREEDLOVE:  -- you
23  wouldn't have them.

Page 275

1      MS. BUSBY:  I guess that's
2  what I'm trying to get to.  If these are
3  not documents in Mr. Rodgers' possession,
4  then I just need somebody to tell me.  Do
5  y'all not have records?  Because the next
6  document that I'm going to ask him about
7  is plaintiff document 140, which is
8  Cracker Barrel 574, Employee Turnover
9  Tracking Fiscal Year 2005, Fourth
10  Quarter.
11      Q.  Is this a document that you
12  had in your possession?
13      A.  Again, ma'am, I turned in so
14  many documents, I don't know exactly what
15  every document was that was submitted.
16      Q.  Did you have a copy of
17  Cracker Barrel Old Country Store Income
18  Statement?
19      A.  Again, ma'am, I had a lot of
20  documents, and I don't know what EEOC did
21  or didn't do.
22      Q.  Well, you agree that the EEOC
23  could not have requested you to print

Page 276

1  something on September the 13th, 2005
2  when you weren't there?
3      A.  I wasn't there then.
4      Q.  So somebody printed this on
5  9/13/2005?
6      A.  Again, ma'am, I don't know
7  about the document.
8      Q.  Which employees did you talk
9  to after you were terminated?
10      A.  I live in the town.  All
11  employees, they see me, they speak to
12  me.  So I have general conversations with
13  --
14      Q.  Which managers did you talk
15  to?
16      A.  Again, they all live in the
17  market.
18      Q.  Well, do you still live in
19  Montgomery?
20      A.  No.
21      Q.  Well, what market are you
22  referring to?
23      A.  Montgomery.

69 (Pages 273 to 276)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 277

1    Q.    Okay.
2    A.    I lived there until I
3    relocated to Atlanta.
4    Q.    And when was that?
5    A.    January of this year.
6    Q.    January of '06 or '07?
7    A.    '07.
8    Q.    All right.  Which employees
9    have you kept regular contact with?
10    A.    I haven't kept regular
11    contact with any of the employees.
12    Q.    Have you spoken to any of the
13    managers since you were terminated?
14    A.    Yes.
15    Q.    Which ones?
16    A.    All of them.  I've seen them
17    all since my stay in Montgomery before I
18    moved back here.
19    Q.    Did you see any of them on a
20    social basis?
21    A.    No.
22    Q.    Have you been to dinner with
23    any of them?

Page 278

1    A.    No.
2    Q.    Have you been to lunch with
3    any of them?
4    A.    No.
5    Q.    Have you been out with any of
6    them period --
7    A.    No.
8    Q.    -- in any manner?  Have you
9    talked to them on the telephone?
10    A.    Again, they've all called to
11    say hello, the employees.  They all have
12    my number.  I never made my number
13    secret.
14    Q.    Did you call any of them?
15    A.    Again, I can't tell you.
16    I've spoken to them, but I can't tell you
17    if I called them or they called me.
18    Q.    Did you call Carlos Browning?
19    A.    I spoke with Carlos, but I
20    can't tell you the last time I talked to
21    him and if he called me or I called him.
22    Q.    Did you call Tony?
23    A.    Again, ma'am, we saw each

Page 279

1    other.  I live in the same community, and
2    I saw them all.
3    Q.    So if I understand your
4    testimony, did you talk to any of the --
5    any of the other managers in the
6    Montgomery location about your
7    termination?
8    A.    Again, ma'am, I can't --
9    we've had general conversation since the
10    day I was terminated.
11    Q.    Who have you had general
12    conversation with?
13    A.    With all the employees.  No
14    single.
15    Q.    All two hundred and fifty of
16    them?
17    A.    With all those who have
18    contacted me or seen me on the streets or
19    I've seen somewhere.  I mean, I --
20    Q.    Can you name one specific
21    person that you've discussed your
22    termination with?
23    A.    No, I can't, because I don't

Page 280

1    recall the conversations.  I just said
2    I've spoken with them.
3    Q.    Okay.  You were written up
4    when you were in Montgomery, correct?
5    A.    Yes.
6    Q.    What were you written up for?
7    A.    I don't recall.
8    Q.    You don't recall?
9    A.    No.
10    Q.    It wasn't important to you?
11    A.    Yes, ma'am.  It was almost
12    two years ago.  I can't remember every
13    incident and every date.
14    Q.    Well, what were you
15    terminated for?
16    A.    Again, he told me that my
17    services were no longer needed, and that
18    documentation I surrendered over to the
19    EEOC -- I don't remember the words of
20    that documentation.
21    MS. BUSBY:  All right.  Let
22    me show you what I'm going to mark as
23    Exhibit 6.

70  (Pages 277 to 280)

# FREEDOM COURT REPORTING

Page 281

1       (Whereupon, Defendant's
2   Exhibit No. 6 was marked for
3   identification and copy of same is
4   attached hereto.)
5       Q.   Take a minute to look at
6   that.
7       A.   Okay.
8       Q.   All right.  This is an
9   employee counseling report dated 8/12/05,
10  final written, correct?
11      A.   Yes.
12      Q.   Signed by you and Mr.
13  Alexander on August the 20th, 2005; is
14  that right?
15      A.   Yes.
16      Q.   This Employee Counseling
17  Report is related to operational
18  failures; is that correct?
19      A.   It's related to a food
20  incident on that date.
21      Q.   Well, the problem situation
22  at the top part is related to a specific
23  food incident, correct?

Page 282

1       A.   Yes.
2       Q.   Then the corrective action
3   plan summary discusses your sales, your
4   guest complaints, and your food cost
5   issues, correct?
6       A.   Yes.
7       Q.   And it refers to the
8   conversations that you and Mr. Alexander
9   have had related to these issues as well
10  as others, correct?
11      A.   Yes.
12      Q.   Did you discuss this review
13  with him?
14      A.   Yes.
15      Q.   All right.  So what happens
16  is on the review I guess he came to the
17  store and y'all sat down together and
18  went over it before you executed it?
19      A.   Yes.
20      Q.   And that would have been on
21  August the 20th?
22      A.   Yes.
23      Q.   And he explained to you that

Page 283

1   if you didn't have improvement in these
2   operational issues, that further
3   disciplinary action up to and including
4   termination could occur?
5       A.   That's a part of this
6   counseling, yes.
7       Q.   Do you recollect discussing
8   this with him?
9       A.   Yes.
10      Q.   All right.  Tell me about
11  that conversation.
12      A.   What this doesn't state is
13  the fact that it's a brand new restaurant
14  and it has almost two hundred plus
15  employees, that the store sat unopened
16  for two months where they couldn't get
17  enough employees and trainers to come
18  down to have them, that the store opened
19  with another Cracker Barrel right there
20  in the market.  So projected sales for
21  that restaurant were not met due to their
22  projections.
23          And the guest complaints --

Page 284

1   what it doesn't state is twenty-nine for
2   new store opening, and again, you're
3   looking at two hundred employees who is
4   not aware of Cracker Barrel culture and
5   is not unusual for a brand new store,
6   because we received all new store
7   openings numbers at the same time.  So
8   the numbers that's there are average
9   numbers based on the staffing issues that
10  they had prior to me getting there, the
11  training issues that they had, the
12  turnover that they had, the level of
13  commitment from the management team with
14  these new employees, and the fact that
15  there was labor issues as far as sales,
16  the issues are -- because you have to
17  have the sales in order to generate the
18  labor.
19      Q.   There had been a number of
20  complaints by guests over the course of
21  the summer; is that correct?
22      A.   Yes.
23      Q.   And this is something that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 285

1  you had discussed with -- I guess you
2  discussed this with both the district
3  manager, Mr. Alexander, and with Ron
4  Phillips as I see it; is that right?
5       A.   We always discussed
6  operations, yes.
7       Q.   Who is Monique Frank?
8       A.   Retail district manager.
9       Q.   And Laura Murchison?
10      A.   Retail regional
11 vice-president.
12      Q.   Okay.  I'm going to give you
13 -- apparently Mr. Phillips e-mailed you
14 on July 24th along with the other people
15 that I mentioned seeking you to respond
16 to nine complaints that had been received
17 in the last eight days related to the
18 operation.  Do you recollect that e-mail?
19      A.   Yes.
20           (Whereupon, a discussion off
21 the record was held.)
22           (Whereupon, Defendant's
23 Exhibit No. 7 was marked for

Page 286

1  identification and copy of same is
2  attached hereto.)
3       Q.   I'm going to show you what
4  I've marked as Exhibit 7.  If you look on
5  the second page of Exhibit 7, I think if
6  I was looking -- I was trying to get it
7  in the correct order for you.  I
8  unstapled it and clipped it back.
9           It appears to me that Mr.
10 Phillips sent you an e-mail and copied
11 the people we discussed attaching a
12 complaint is what it looks like is below
13 it.
14      A.   At the very bottom?
15      Q.   Yes, sir, and the next few
16 pages.  You unstapled it and rearranged
17 it because I think that's the order.  Is
18 that what that is?  And then you respond
19 on the top page.  Let me look at it.  I
20 was trying to get it in order.  Maybe we
21 should just mark it separate.  Why don't
22 we do that?  Well, we can't because
23 that's the way it -- I apologize.

Page 287

1            Okay.  I did.  I put it in
2  the right order for you as I understand
3  it.  Let me just give it to you.  You can
4  put the clip back on it after you look at
5  it and we can make sure.  It looks like
6  page two is an e-mail that Mr. Phillips
7  sends to you attaching, I guess, a guest
8  complaint, a customer complaint that
9  starts at the bottom of page two and goes
10 to page four.
11      A.   Yes.
12      Q.   Okay.  And he's asking you a
13 bunch of questions in his e-mail to
14 respond.  And I don't have it so you'll
15 have to tell us.
16      A.   Yes.
17      Q.   What's the date of the
18 e-mail?
19      A.   7/24.
20      Q.   All right.  So on 7/24 he
21 sends you this complaint and says, you
22 know, we can't have this.  We've got to
23 have consistency.  What's going on?  Is

Page 288

1  that correct?
2       A.   Yes.
3       Q.   All right.  And then on the
4  first page, I've tried to put it in
5  order, of Exhibit 7, that is your
6  response?
7       A.   Yes.
8       Q.   Is that correct?  Okay.  So
9  basically he's putting you on notice
10 that, look, we're getting too many
11 complaints about inconsistency and
12 service issues and those kind of things,
13 and you're going to have to give me the
14 response to this.  And the first page is
15 your response to him?
16      A.   Yes.
17      Q.   Okay.  After you sent that
18 e-mail, did you talk to him about his
19 concerns with these problems?
20      A.   Yes.
21      Q.   All right.  Tell me when was
22 that and tell me about the conversation.
23      A.   Again, the conversation was

72 (Pages 285 to 288)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 289

1  with Ron, myself, and Rich Alexander at
2  the Montgomery location.
3      Q.  Okay. And when did that
4  occur to the best of your recollection?
5      A.  I think about two weeks --
6  approximately about two weeks after this.
7      Q.  Okay. So y'all met together,
8  and you talked to him about these issues,
9  correct?
10     A.  Yes.
11     Q.  All right. And then what
12  occurs thereafter is what we've gone
13  over, issues continue operationally to
14  need to be addressed, and that is the
15  counseling that we reviewed which was
16  August 12th of '05; is that correct?
17     A.  Well, after calling this
18  meeting with Ron Phillips, this meeting
19  -- this e-mail was sent to -- requesting
20  a meeting with Ron. Ron then got in
21  contact with Rich and they showed up at
22  the store. Shortly after we had the
23  meeting with this, I received this

Page 290

1  (indicating).
2      Q.  Which is Exhibit 6 that we've
3  already gone over?
4      A.  Yes.
5      Q.  Okay. So the counseling
6  report puts into a formal documentation,
7  I guess, the meeting that you've had and
8  the issues that you've discussed with Mr.
9  Phillips and Mr. Alexander?
10     A.  No.
11     Q.  Okay. I misunderstood you
12  then. Let's just go --
13     A.  This just came -- this came
14  after this meeting.
15     Q.  Okay. Let me see this. Give
16  me that. We have it in the order then.
17  What happens is apparently these customer
18  complaints must be called in to the home
19  office?
20     A.  Yes.
21     Q.  Or the people get on the
22  website or something and make complaints?
23     A.  Yes.

Page 291

1      Q.  So because there's so many of
2  them they get apparently brought to the
3  attention by home office to Ron Phillips?
4      A.  Well, they always -- any
5  complaint goes to the regional
6  vice-president of any store in his
7  region.
8      Q.  All right. So he gets the
9  complaints, and he writes you on July the
10 24th and basically says this is nine
11 complaints in eight days, our operation
12 -- you know, he tells you all the stuff
13 in our operation has got to be
14 consistent. Please respond to me via
15 e-mail no later than 7/27.
16     All right. Then -- oh, I
17 see. There's an e-mail in between.
18 Okay. Then I guess you didn't respond,
19 and Ron says, Dwight, I sent you the
20 below on 7/24, please update me
21 immediately on what's going on. I want
22 some feedback by Thursday the 27th. And
23 then through a couple of -- he sends it

Page 292

1  to you again, and then finally on the
2  31st you say you apologize for the delay
3  in the response, and here is my response
4  to what the issues are?
5      A.  I don't recall him sending it
6  several times.
7      Q.  I'm just going by what's on
8  the document of Exhibit 7. I'm just
9  following the trail to go up. 24th,
10 31st, and then your response is on the
11 31st?
12     A.  On the 24th, he said he
13 needed it by the 27th.
14     Q.  Right.
15     A.  But I had to research
16 everything and spoke with Rich that I was
17 going to send the response, but I have to
18 research the information because I wanted
19 to give him detail versus a general
20 e-mail. And then the e-mail was sent to
21 him on the 31st.
22     Q.  All right. So you respond on
23 the 31st?

73 (Pages 289 to 292)

# FREEDOM COURT REPORTING

Page 293

1   A.   Yes.
2   Q.   And you say I apologize for
3 the delay in the response, and you
4 respond?
5   A.   Yes.
6   Q.   And what you're telling me is
7 in addition to this response, y'all spoke
8 about it thereafter?
9   A.   Yes.
10   Q.   All right.  And then after
11 you spoke about it, did you talk about
12 any of these other issues in here?  You
13 say that Rich is trying to coach you and
14 is committed to talking to you about your
15 performance on a weekly agenda review,
16 and you're hoping that this will have an
17 immediate impact on guest service and
18 consistency.  And I guess that's what --
19 and then y'all have a meeting thereafter
20 to your recollection?
21   A.   Yes.  The reviews didn't
22 happen, and I requested the meeting, yes.
23   Q.   Okay.  So you didn't have a

Page 294

1 meeting?
2   A.   We did have a meeting.
3   Q.   You did have a meeting?
4   A.   Yes.
5   Q.   And we don't know when that
6 meeting was, but it was sometime in your
7 recollection between July the 31st and
8 August the 12th?
9   A.   Yes.
10   Q.   All right.  And then on
11 August the 12th, you're given the final
12 written warning?
13   A.   Yes.
14   Q.   Which is an employee
15 counseling report, Exhibit 6?
16   A.   Yes.
17   Q.   Okay.  All right.  And that's
18 August the 12th?
19   A.   Yes.
20   Q.   Now, between August the 12th
21 and your termination of September the
22 3rd, do you have any meetings or
23 conversations with anybody to your

Page 295

1 recollection?
2   A.   I don't recall.
3      MS. BUSBY:  All right.  Let
4 me show you what I'm marking as Exhibit
5 No. 8.
6      (Whereupon, Defendant's
7 Exhibit No. 8 was marked for
8 identification and copy of same is
9 attached hereto.)
10   Q.   It appears to me that what
11 y'all were supposed to do was have weekly
12 telephone calls, if not meetings, where
13 you were to give reports on certain
14 issues and including food costs and other
15 things.  Do you recollect that?
16   A.   I don't recall.  I'll have to
17 read it.
18   Q.   Well, let me show you what
19 I've marked as Exhibit 8.  This is the
20 Employee Counseling Report which is your
21 termination which was given on, according
22 to this, September the 3rd, 2005; is that
23 right?

Page 296

1   A.   Yes.
2   Q.   Okay.  And attached to that
3 is, I guess, the performance issues that
4 y'all reviewed and dates of certain
5 occurrences?
6   A.   No.  This wasn't -- yes, this
7 was handed to me at termination, yes.
8   Q.   Okay.  And you refused to
9 sign it, according to the note?
10   A.   No, I did not.  I wasn't
11 asked to sign it.
12   Q.   Okay.  Fair enough.  Well,
13 let's just go over -- let's start on page
14 two and just see if any of these notes
15 give you any recollection of these
16 occurrences.  You had sales building day
17 on July 13th.  What is that?
18   A.   That's a day where the retail
19 manager, the general manager, and the
20 training coordinator meet with the
21 district manager to discuss the
22 operations.
23   Q.   All right.  And this says on

74 (Pages 293 to 296)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 297

1  that date you were not prepared.  Any
2  recollection of anything like that?  It
3  says you weren't prepared and they asked
4  you for some sort of outline via e-mail
5  to lay out when you and your retail
6  partner would meet to plan business prior
7  to each Wednesday call?
8      A.   I do recall this, but what it
9  does not state is that Monique, the
10 retail district manager, gave Teresa, the
11 retail manager, off.
12     Q.   What do you mean by that?
13     A.   That was her supervisor, the
14 retail district manager, the retail
15 manager's supervisor.
16     Q.   So what you're saying is you
17 weren't prepared and the reason you
18 weren't is because the retail manager was
19 off?
20     A.   No.  I was missing her
21 portion of the report.  The restaurant
22 and retail goes hand in hand, and I was
23 missing her portion of the report.

Page 298

1      Q.   All right.  And what you've
2  said is you don't have it because she's
3  off, I take it?  I mean, is that what
4  you're telling me?
5      A.   Yes.
6      Q.   You told me you didn't have
7  it because the woman was off?
8      A.   I told him I did not have the
9  retail portion.
10     Q.   All right.  Well, I
11 appreciate you telling me that.  But what
12 I was really getting to is:  Did you ever
13 do the outline via e-mail?
14     A.   I don't understand what
15 you're asking.
16     Q.   Well, it says in here that
17 you were supposed to -- an outline via
18 e-mail was requested to lay out when you
19 and your retail partner would meet, I
20 guess, so that you could discuss what was
21 going to happen before each call so that
22 you wouldn't be in a position of not
23 being able to give the report because one

Page 299

1  or the other of you was not there?
2      A.   Yes.
3      Q.   Well, did you do that?
4      A.   Yes.
5      Q.   Did you do an e-mail about
6  it?
7      A.   I don't remember if it was an
8  e-mail, because we spoke every day
9  because he wasn't in the market.
10     Q.   Okay.  This document says you
11 didn't do the e-mail.  That's why I'm
12 asking if you have a different
13 recollection.
14     A.   Again, I don't remember an
15 e-mail.
16     Q.   Okay.  Then it says for nine
17 weeks straight you did not meet the
18 district deadline for sales building day
19 information, meaning you're supposed to
20 give it to your district manager by
21 Tuesday at 5:00 and that you either
22 provided no information or only partial
23 information usually on Wednesday.  Why

Page 300

1  did you not meet the 5:00 p.m. Tuesday
2  deadline?
3      A.   Again, ma'am, this document
4  was given to me on September the 3rd at
5  termination.  Nine weeks, per this
6  document, had lapsed before this was even
7  addressed.  This document was simply
8  handed to me.  To say that it did or
9  didn't happen, I just got this and said,
10 you're no longer needed.  So I wasn't --
11     Q.   They handed it to you and you
12 just gave it back?
13     A.   I wasn't to dispute or do
14 anything to this document because I
15 wasn't afforded the opportunity.  It was
16 just you're no longer needed
17 (indicating).
18     Q.   Okay.  But I'm trying to get
19 to -- I understand that at the time on
20 the day.  I'm just trying to get to, I
21 mean, if you're ever going to have
22 anything to say about these categories,
23 today is your day.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 301

1    A.   What I'm saying is over a
2  nine-week period of time, from the
3  previous documentation and things of that
4  nature, nine weeks period of time of not
5  doing something, then it wouldn't have --
6  I wouldn't have just received a
7  documentation or communication nine weeks
8  later at termination.
9    Q.   Well, I think what this is
10  saying is he's been telling you this, but
11  you still didn't give it to him.  And I
12  think what you're saying is you never
13  investigated it because it was handed to
14  you that day.  So you don't -- I guess
15  you -- are you saying you don't agree or
16  disagree?
17    A.   No, ma'am.  The part that we
18  were discussing earlier was the one
19  single date.  The over the nine-week
20  period we're talking about June, July,
21  and August from this date.
22    Q.   Let me try to just make this
23  easy.  Do you dispute this?  Are you

Page 302

1  saying that you gave the district manager
2  the information by 5:00 on Tuesday every
3  week like you were supposed to?
4    A.   My scheduled date wasn't
5  Tuesdays.  My schedule date was
6  Wednesday.  So the answer is no, because
7  I was new store opening.
8    Q.   All right.  So you're saying
9  that you don't believe your date was
10  Tuesday?
11    A.   No.  We all had different
12  days.  Mine was different because new
13  store reports were totally different than
14  the standard report.
15    Q.   I understand from reading
16  this that you're supposed to have the
17  call apparently on Wednesday, but my
18  question is:  According to this document,
19  you were supposed to give the report or
20  information, whatever that means, by
21  Tuesday at 5:00?
22    A.   That's incorrect.
23    Q.   You're saying you weren't

Page 303

1  supposed to give it at Tuesday at 5:00?
2    A.   Correct.
3    Q.   That's what I'm trying to get
4  to, what your position is on this.  So
5  then it would be your position that you
6  were not late in providing the
7  information to him?
8    A.   Yes.
9    Q.   Okay.  That's all I wanted to
10  know.  I was trying to get to what your
11  position is.  On Friday, August the 12th,
12  we know this is true, we've already been
13  over it, they came to the unit, and you
14  had two hundred and thirty-three dollars
15  worth of food items that were either not
16  labeled or discarded, and you were
17  informed you were going to get a
18  counseling because of it?
19    A.   What this does not state is
20  that on this date as the counseling
21  states, there were two other managers in
22  the building.  I was not even in the
23  building.  I entered the building twenty

Page 304

1  minutes, thirty minutes after Rich and
2  immediately had to go to work because
3  they were very busy.  At that point he
4  broke off and did his walk-through.  I
5  received the counseling as being the
6  general manager there, but the two
7  associate managers on duty were actually
8  documented by Rich for not physically
9  walking the building.  I wasn't.  I
10  didn't open up the building.
11    Q.   I understand that.  But
12  basically, as you and I have already
13  discussed, it's your ultimate
14  responsibility that these things are
15  supposed to be done, and what you're
16  telling me is he wrote all of you up?
17    A.   Yes.
18    Q.   Okay.  That's all I'm getting
19  to.  We agree that this happened, the
20  12th.  We don't dispute that this
21  happened.
22    A.   Yes, this happened.
23    Q.   And you're ultimately

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 305

1  responsible as the general manager, and
2  you all got written up?
3      A.   Yes.
4      Q.   This next one says, August
5  the 6th, The four general managers in the
6  district that are struggling with their
7  abilities to plan their business, drive
8  sales on a shiftly basis, meaning y'all
9  have shifts, and/or be proactive or
10  reactive to control labor costs were
11  notified to personally call the district
12  manager every day to explain what
13  happened on the previous day if they did
14  not make their daily R goals.  So I guess
15  y'all have daily goals?
16      A.   They are R.  Our new unit is
17  E, but there are daily goals.
18      Q.   Okay.  So you are --
19      A.   New unit E.
20      Q.   You're E.  And so I guess
21  that's what you told him, I didn't call
22  you because I'm E and not R?
23      A.   No.  My goals -- we spoke

Page 306

1  every day because the labor was not in
2  order because the labor was not in order
3  because we had to transport people from
4  Florence, Alabama, other restaurants
5  where we pay for their travel and we pay
6  them -- we paid the 213 server eight
7  dollars an hour.  So he was already aware
8  of our E because he coordinated their
9  arrival.  He coordinated their salaries.
10  He coordinated that on a daily basis.  So
11  he was informed.  He knew about that
12  every day.  That was his coordination.
13      Q.   Well, are you saying that
14  because he knew, you didn't have to call
15  in like he told you to?
16      A.   No.  I'm saying we spoke
17  every single day because of the cost of
18  bringing others in.
19      Q.   All right.  So you spoke to
20  him about labor costs every day, and he
21  says you did not call him even though
22  your unit continues to miss your goal.
23  And you say that's not true.  You talked

Page 307

1  to him every day?
2      A.   That's correct.
3      Q.   Okay.  Lack of preparedness,
4  not meeting requirement deadlines, lack
5  of follow through.
6          August the 18th, one of your
7  associate managers left a voicemail
8  explaining why labor was over on the
9  17th.  Did that happen?
10      A.   I don't know.
11      Q.   Okay.  August the 6th y'all
12  had a district -- the district manager
13  was informed by another associate manager
14  that somebody used the F word.  The
15  district manager spoke with you and told
16  you to start an open door investigation.
17  Did you do that?
18      A.   I don't know if it was the
19  6th.  There was an incident where Rich
20  said that someone had used the F -- that
21  someone approached him about using the F
22  word, and he did want me to look into
23  it.  Yes, I did do that.

Page 308

1      Q.   Did you take any written
2  statements from anybody?
3      A.   Yes.
4      Q.   All right.  Who did you take
5  written statements from?
6      A.   The initial -- it was
7  initiated to Rich, so there was three
8  bodies involved in the office.  He had
9  already spoke to one, so I only spoke
10  with Ashley Moore and Carlos.
11      Q.   Did you take statements from
12  them, written statements?
13      A.   Yes.
14      Q.   When did you send them to the
15  district manager?
16      A.   I don't recollect exactly
17  when they were sent out.
18      Q.   All right.  So according to
19  this, it could be that you hadn't sent
20  them as of the 25th, but you may have
21  sent them subsequent to that?  You just
22  don't know one way or the other?
23      A.   The 25th of?

77  (Pages 305 to 308)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 309

1    Q.   August.  All this says is
2  that as of the morning of 25th you hadn't
3  sent the statement.  But you're saying
4  you believe you did do the statements but
5  you don't know when?
6    A.   Those statements were not
7  supposed to go to Rich.  Those statements
8  were supposed to go to Kelly Barnes.
9    Q.   Okay.  Did you ever send them
10  to Kelly Barnes?
11    A.   Yes.
12    Q.   Do you know the date upon
13  which you sent them?
14    A.   No.
15    Q.   So it could be that you sent
16  them but you sent them sometime after
17  August 25th?  We just don't know?
18    A.   They were sent, because he
19  asked me about them prior to this, and I
20  told him that they were already gone.  We
21  had a conversation prior to this paper.
22    Q.   But you don't know the date
23  you sent them?

Page 310

1    A.   Correct.
2    Q.   Okay.  Then you had another
3  one of those sales building day meetings
4  on August 17th and there was a issue
5  about not getting your required
6  information and the staffing worksheet
7  and schedules were messed up.  And it
8  says there were too many instances of too
9  many employees or too few employees
10  scheduled during parts of the day.  And
11  you said this is the scheduling manager's
12  problem?
13    A.   No.
14    Q.   Who was the scheduling
15  manager?
16    A.   James Heiter.
17    Q.   Is that the same person as
18  Tony?
19    A.   Yes.
20    Q.   All right.  Did you or did
21  you not discuss this with Mr. Rodgers on
22  August 17th?
23    A.   Mr. Alexander?

Page 311

1    Q.   Mr. Alexander.  Excuse me.
2    A.   On the 17th?
3    Q.   Yeah, that's what it says.
4  August 17th or a day or two thereafter?
5    A.   I'm sorry.
6    Q.   Do you recollect this event?
7    A.   Yes.
8    Q.   All right.  So you recollect
9  discussing it with Mr. Alexander about
10  the schedule?
11    A.   That sales building day, yes.
12    Q.   And do you recollect that
13  there was a problem with the schedule?
14    A.   I didn't have sales
15  building.  I was not physically on the
16  conference with him and James Heiter who
17  was the scheduling manager.  We're
18  required to have one or the other on that
19  meeting, and I was actually relocating
20  from Birmingham to Montgomery that day.
21    Q.   On August the 17th?
22    A.   Yes.  I stayed in a hotel
23  because it was very -- I moved rather

Page 312

1  quickly, and they had me to go into a
2  hotel and then relocate my possessions
3  later.
4    Q.   Is that why you got -- is
5  that why you've turned in the U-haul
6  receipt?
7    A.   I believe that is because it
8  was to show that I was in the middle of a
9  move and no general manager is required
10  to be on a sales building call or
11  anything when they are in the middle of a
12  relocation or on vacation or something.
13  That's why we have an associate manager
14  responsible for each area.
15    Q.   All right.  Do you agree that
16  the manager's schedule is due at the end
17  of the month?
18    A.   It was due prior to the end
19  of the month.
20    Q.   Prior to the end of the
21  month?
22    A.   Yes.
23    Q.   And do you agree that as of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 313

1  **August the 25th, you had not submitted**
2  **the schedule to Mr. Alexander?**
3      A.   What this doesn't state is
4  that one manager quit and they
5  transferred another manager in and then
6  that manager left.  So the schedule was
7  actually rewritten during this time frame
8  about three or four times.  The original
9  schedule was done, but the schedules were
10  rewritten about three or four times
11  during this time frame.
12      **Q.   All right.  So if I**
13  **understand what you're telling me, you**
14  **agree that this statement is true, but**
15  **you say that there is a legitimate reason**
16  **why it was not done on a timely basis?**
17      A.   The original schedule was
18  written timely.  The schedule had to be
19  rewritten three or four times even after
20  this day.
21      **Q.   Well, this says as of August**
22  **the 25th no manager schedule was**
23  **submitted?**

Page 314

1      A.   No.  The original schedule
2  was submitted.
3      **Q.   All right.  So you dispute**
4  **that?**
5      A.   Yes.
6      **Q.   Well, then why did you tell**
7  **me all those excuses about it then if you**
8  **dispute it to begin with?  What does that**
9  **have to do with, which day on here?**
10      A.   It has to do with them saying
11  that the original -- as I said, when I
12  made that comment that the original
13  schedule was submitted, there was -- and
14  during that time frame there was a time
15  when several schedules were written, but
16  the original schedule was submitted on
17  time.
18      **Q.   Okay.  All I'm trying to get**
19  **to is that this simply says that as of**
20  **August the 25th, no manager's schedule**
21  **has been submitted.  Regardless of the**
22  **excuses, my question is:  Did you submit**
23  **the original schedule by August the 25th?**

Page 315

1      A.   Yes.
2      **Q.   All right.  How do you submit**
3  **those schedules?**
4      A.   They are e-mailed or faxed.
5      **Q.   Okay.  On sales building day**
6  **on the 20th you did not call into the**
7  **conference.  Tony participated in the**
8  **call.  At 8:30 Dwight contacted Mr.**
9  **Alexander to report you were on the road**
10  **and could not pick up a signal on the**
11  **cell phone.  Do you remember that event?**
12      A.   Okay.  I'm looking at the
13  dates.  On the date mentioned with the
14  cell phone is the day that I was
15  traveling.
16      **Q.   Say that again?**
17      A.   Hold on.  You read the dates.
18      **Q.   You've told me that August**
19  **17th you didn't call in because you were**
20  **moving, and the cell phone day is July**
21  **the 20th.**
22      A.   No, ma'am.  The 17th is not
23  mentioning calling in.  The 20th -- and

Page 316

1  when you said didn't call in, the 20th is
2  mentioned the call-in.  That's why I say
3  I was moving.
4      **Q.   You told me you were moving**
5  **when we were talking about on the 17th**
6  **when you failed to get the required**
7  **information of district manager and there**
8  **was that schedule problem, and this said**
9  **you placed blame on the scheduling**
10  **manager, and you said, no, you didn't**
11  **participate in that because you were**
12  **moving?**
13      A.   You said I failed to call in.
14      **Q.   You can correct your**
15  **testimony any way you want to just so I**
16  **can understand it.  So tell me what**
17  **you're trying to tell me.  You told me**
18  **you were moving as the reason for you not**
19  **getting that thing on the August 17th.**
20  **But if you're now saying, no, that's**
21  **wrong, I mean, that's fine.  I just need**
22  **you to tell me what we're talking about.**
23      A.   No, ma'am.  You said the 17th

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 317

1  that I missed the call. I knew the day
2  that I missed the call is the day that I
3  was moving, but it's not the 17th.
4      Q.    You've only ever missed one
5  call?
6      A.    Yes, the day that I didn't
7  call in was the 20th when I was moving.
8      Q.    Are you saying that's the
9  only day that you never called in when
10 you were supposed to?
11     A.    Yes, because my cell phone
12 call -- James Heiter was on the labor
13 call.
14     Q.    Okay. So the only day that
15 you have not called in like you were
16 supposed to now you're telling me is on
17 July the 20th?
18     A.    That's where this is stating
19 about the phone call, yes.
20     Q.    And you're further saying as
21 your excuse for not doing that is because
22 you were moving?
23     A.    Yes.

Page 318

1      Q.    Well, then why on here did
2  you tell him it was because you were on
3  the road and you could not pick up a
4  signal on your cell phone?
5      A.    I was in the truck. My cell
6  phone was with me.
7      Q.    Right. Well, didn't you say
8  you were moving from Birmingham to
9  Montgomery?
10     A.    Yes.
11     Q.    Your cell phone would not
12 work anywhere between Birmingham and
13 Montgomery?
14     A.    There was a dead spot, yes.
15     Q.    I understand that, but why
16 did you wait until 8:30 to call?
17     A.    Because, one, I wasn't
18 required to be on it from when I was
19 moving, and he said he called me and I
20 had no phone -- no missed calls or
21 anything from where he tried to contact
22 me. And, again, I could not -- I even
23 went as far as to explain to him that if

Page 319

1  I'm in the middle of moving and I know
2  James Heiter is on the call, that I
3  didn't expect a call or I didn't make a
4  call because I was in the middle of
5  moving.
6      Q.    Let's do this: What is your
7  cell phone number during that -- do you
8  have the same cell phone number?
9      A.    I'm not sure. I have two,
10 and I don't know if it's the same one.
11     Q.    Well, tell me what the two
12 numbers are.
13     A.    I can only recall one.
14     Q.    Well, tell me that one.
15     A.    It's my home, the same
16 number, 678-▒▒▒▒▒.
17     Q.    But you think on July the
18 20th of 2005 you had a different cell
19 phone number?
20     A.    I don't know when I had the
21 different. It's unlimited. That's
22 always been my primary number.
23     Q.    Okay. Well, who is your

Page 320

1  service with?
2      A.    Sprint.
3      Q.    Sprint. Have you always been
4  with Sprint?
5      A.    For a number of years, yes.
6      Q.    Were you with Sprint in 2005?
7      A.    Yes.
8      Q.    Okay. All right. So
9  basically on July the 20th we've got two
10 explanations. One is you weren't
11 supposed to have to call anyway because
12 you were moving and, two, your cell phone
13 didn't have a signal, correct?
14     A.    No. That wasn't -- again,
15 that's what he said. But as I explained
16 to him, when I had a conversation with
17 him prior to this was the fact that I was
18 moving and that I had a dead spot,
19 because he said that it was -- and like I
20 said, there is a dead spot between
21 Birmingham and Montgomery. And so that I
22 didn't show a missed call or anything
23 like that that he had tried calling me.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 321

So we had a conversation prior to this
day, but we didn't dispute or converse on
this.
    Q.   When you're saying this day,
you're saying prior to the termination?
    A.   9/3, yes.
    Q.   Right. I understand that.
After you didn't call in on the 20th, you
and he discussed why you weren't involved
in the call, and according to you he
says, well, I tried to call you, and you
said, well, you were in a dead spot and
you didn't have a missed call. That's
why that's written up on here. That's
what y'all previously had discussed?
    A.   Yes.
    Q.   And sure enough, on the next
page it says that y'all have spoken about
these matters. Then on July the 28th you
were supposed to e-mail a structured
day-by-day outline of your workday so he
could help you with planning. Did you
ever do that?

Page 322

    A.   It wasn't an e-mail. It was,
in fact, a calendar that we received
prior.
    Q.   When you say we received?
    A.   It was a manager's meeting
and they gave us planning calendars and
we were to fill out this calendar and fax
it in.
    Q.   Did you do that?
    A.   Yes.
    Q.   Were you late to work on
August the 6th? Do you know one way or
the other?
    A.   No.
    Q.   Okay. Now, what about this
last thing? Why did you tell your
associate manager that the district
manager had frozen all vacation requests
due to the district being short of
managers?
    A.   I informed -- it was actually
Ashley that wanted to go on vacation.
There was a voicemail from Ron Phillips,

Page 323

the regional vice-president, that
vacations had been frozen. I, in turn,
passed that information on to Ashley that
she had to wait before she can go on
vacation because of the voicemail that
came out from Ron Phillips. Weeks later
Ashley asked when would be a good time
for her to go on vacation. At that time
we found out that because of the fact
that we had five managers, that Ashley
could have went on vacation, but that
wasn't Ron Phillips' instructions. His
instructions from the regional was that
no vacations were to be taken during that
time frame. So she was actually told
that she could take the vacation once we
found out it did not include the new
store, but her mother and father chose to
do something differently, and she didn't
take it.
    Q.   So to the best of your
recollection, she never went on the
vacation?

Page 324

    A.   She did. She didn't go for
that particular day she asked.
    Q.   Okay. After you are given
your termination and you leave, did you
call anybody at the home office, Ron
Phillips, or anybody after that?
    A.   I don't recall.
    Q.   Okay. And then we've already
briefly talked about this, but you,
thereafter -- you can't remember when,
but you found a lawyer, correct?
    A.   Yes.
    Q.   Now, this EEOC charge is
dated September the 8th, 2005, correct?
    A.   I have to see the -- yes.
    Q.   And that's your signature on
here?
    A.   Yes.
    Q.   Did you have a lawyer when
you went to see the EEOC?
    A.   No.
    Q.   All right. Who typed this up
for you, the EEOC?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 325

1   A.  Yes.
2   Q.  So this is based on what you
3 told them that day?
4   A.  This is a very brief
5 description of about two hours worth of
6 conversation.
7   Q.  Do you remember who you met
8 with?
9   A.  Serena Curry.
10   Q.  Was she the first person that
11 you met with?
12   A.  No.  I think she was the --
13 no.  There was actually two people.
14 Serena was the second person.
15   Q.  Byrdsong?
16   A.  I don't know the name of the
17 first person.
18   Q.  I have here a document,
19 handwritten notes that are called intake
20 notes that y'all produced to us from L.J.
21 Byrdsong, B-y-r-d-s-o-n-g, which purports
22 to be notes that were taken, I believe,
23 when you went to the EEOC?

Page 326

1   A.  I don't know.  I wasn't able
2 to see those notes.
3   Q.  Well, here, let me show you
4 what I'm marking as Exhibit 9.
5   (Whereupon, Defendant's
6 Exhibit No. 9 was marked for
7 identification and copy of same is
8 attached hereto.)
9   Q.  Okay.  Tommy Patterson,
10 associate manager, stated to PCP.
11   MS. BUSBY:  Potential
12 charging party?  Is that what that stands
13 for?  Does anybody know?  I think that's
14 what that stands for.  Is that what y'all
15 think?
16   MS. YORK:  I think so.
17   Q.  That on the preceding
18 Wednesday -- okay.  So this helps us a
19 little bit.
20   Where did that calendar go?
21 I'm just trying to help us get the date
22 straight if we can ever work this thing
23 out.

Page 327

1   (Whereupon, a discussion off
2 the record was held.).
3   Q.  Anyway, this is the notes
4 that you gave the investigator, I guess,
5 so let's look at them and see if you
6 agree that this is what you told her,
7 what she wrote down.  That don't all
8 blacks bury their people on the weekends,
9 and that you supervised Tommy.  So that's
10 what she said you told her, correct?  And
11 that you called HR and spoke to Vonn
12 Barr, who is a black female, employee
13 relations specialist.
14   A.  I don't know all that part,
15 whether she's a black female or not.  But
16 I did speak with Vonn Barr, yes.
17   Q.  Well, just read this.  I see
18 that you're reading it.  This is what she
19 wrote down that you told her when you
20 came to the EEOC.
21   A.  This is notes from that day,
22 yes.
23   Q.  Okay.  All right.  So based

Page 328

1 on these notes, the two of you put
2 together the EEOC charge that we marked
3 as Exhibit 8 -- or what is the exhibit on
4 the charge?  You have it in front of you.
5   A.  5.
6   Q.  Exhibit 5; is that correct?
7 You go in, you met with her to your
8 recollection a couple of hours?  She
9 writes down all these notes that you tell
10 her, which we've marked as Exhibit 9,
11 correct?
12   A.  Yes.
13   Q.  And then thereafter, I guess,
14 she types up for you to sign the charge
15 that you're making which is reflected in
16 Exhibit 5?
17   A.  Yes.
18   Q.  Okay.  Anything else happen
19 on that day?  Did you talk to anybody
20 else or do anything else?
21   A.  No.
22   Q.  The only thing else I have,
23 before you say no, there is one other

82  (Pages 325 to 328)

# FREEDOM COURT REPORTING

Page 329

1  thing.  I guess you filled out this
2  questionnaire that I'm going to mark as
3  Exhibit 10.  Let me give you a copy of
4  that.
5        (Whereupon, Defendant's
6  Exhibit No. 10 was marked for
7  identification and copy of same is
8  attached hereto.)
9      A.  This was at EEOC.
10      Q.  So all of that was at the
11  EEOC, right?
12      A.  Yes.
13      Q.  Exhibit 9 and Exhibit 10.  So
14  you go in there, and I guess you fill out
15  Exhibit 10, the questionnaire first,
16  correct?
17      A.  Yes.
18      Q.  And then who is Samuel
19  Dunbar?
20      A.  Just a friend.
21      Q.  Okay.  And you handwrite out
22  your synopsis of what you're there about?
23      A.  Yes.

Page 330

1      Q.  And then after you write out
2  your synopsis, I guess you then go in and
3  meet with Ms. Byrdsong, and she asked you
4  questions about it?
5      A.  Yes.
6      Q.  And those are the intake
7  notes that you and I have reviewed, which
8  is Exhibit 9, correct?
9      A.  Yes.
10      Q.  And then thereafter she types
11  up the EEOC charge which is Exhibit 5?
12      A.  Yes.
13      Q.  And then it's assigned to
14  Serena Curry to investigate?
15      A.  Yes.
16      Q.  And that's the name you gave
17  me?
18      A.  Yes.
19      Q.  Tell me what you did as part
20  of the investigation with Serena Curry.
21  Did she ask you to get any witnesses or
22  provide any witness statements or provide
23  any documentation or any of those kind of

Page 331

1  things?
2      A.  Yes.
3      Q.  All right.  Well, what did
4  she ask you to do?
5      A.  She asked for witnesses,
6  names and telephone numbers, and she
7  asked for if I could get addresses of
8  those people, and then she said she would
9  contact me again.
10      Q.  Okay.  Whose names did you
11  give her?
12      A.  I gave her several.  I don't
13  recall.  I gave her several names.  I
14  don't recall every name that I gave her.
15      Q.  Okay.  Well, on your intake
16  sheet, you say Penny Schmidt heard the
17  thing and that Linda — I can't really
18  read your writing.  I'm sorry.  Osborne
19  or Ogborne?
20      A.  Ogborne, yes.
21      Q.  Charlotte Johnson and Shauna
22  Ray were the people that you have listed
23  as witnesses; is that correct?

Page 332

1      A.  Yes.
2      Q.  Did you give her any other
3  names other than those four?
4      A.  I don't recall from phone
5  conversation or -- because she called me
6  numerous times to ask for information
7  and stuff like that.  So I don't recall.
8      Q.  Okay.  Also you listed who
9  are some people that you think were
10  treated more favorably than you.  And you
11  listed a person named Greg Waters.  Who
12  is that person?
13      A.  He was a general manager
14  under Rich's district.
15      Q.  For which store?
16      A.  I don't remember exactly
17  which store.
18      Q.  Why did you think he was
19  treated more favorably than you?  I mean,
20  do you know anything specific about him?
21      A.  I didn't know a specific
22  date, but I do know that he missed the
23  meeting and we were just told, you know,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 333

1 make sure you're on time and, you know,
2 these things have got to be taken care
3 of. But that it was very nonchalant and
4 nothing where I had conversation with
5 Greg. And the reason why I say I thought
6 I was treated differently is I asked him
7 if he was documented for missing the
8 meeting and Greg told me no.
9     Q.    When was this conversation,
10 before or after you were terminated?
11     A.    Before.
12     Q.    Okay. So you don't know of
13 anything specific -- you don't know
14 whether he's been documented for anything
15 or not one way or the other?
16     A.    Just that he said no.
17     Q.    On that one incident that
18 you're referring to?
19     A.    Yes.
20     Q.    What about this Kevin
21 person?
22     A.    He's also general manager in
23 Rich's district.

Page 334

1     Q.    Do you know anything about
2 him?
3     A.    No.
4     Q.    Well, basically you're just
5 writing down the why?
6     A.    No, these were -- what do you
7 mean when you ask do you know anything
8 about him?
9     Q.    Well, you say that you think
10 they are treated more favorably than you,
11 and I'm asking you do you know anything
12 -- is there any specific incident that
13 you're referring to? Greg, you said you
14 think he was late for a meeting and
15 didn't get written up. Kevin, who you
16 don't know his last name, is there any
17 specific incident you're referring to?
18     A.    Yes.
19     Q.    All right. What is his
20 incident?
21     A.    Actually under -- all of
22 these it's under Rich's district. There
23 were issues of, one, they were senior to

Page 335

1 myself who have been general managers a
2 lot longer, and they've had or were going
3 through food cost and labor issues and
4 they are still employed.
5     Q.    Let me ask a better question.
6     A.    Yes.
7     Q.    Do you know anything
8 specifically about food cost or labor
9 issues that any of these people you've
10 listed were going through or just your --
11     A.    That they were missing food
12 cost.
13     Q.    And how do you know that or
14 why do you believe that?
15     A.    We received a report every
16 month, and it divides it into districts
17 and it shows the ones that are making
18 food and the ones that are missing food,
19 and you can also go back and pull up the
20 prior years' numbers. And --
21     Q.    Well, do you know one way or
22 the other if any of them were counseled,
23 coached, or written up about it?

Page 336

1     A.    No.
2     Q.    You don't know?
3     A.    Right.
4     Q.    So you just wrote it down
5 because you thought, well, I know that
6 they've missed food cost, so they may
7 have been treated differently?
8     A.    That, and, again, with
9 general managers did not -- it wasn't --
10 anything can happen between the time you
11 schedule yourself to come in. A general
12 manager may come in an hour or two by
13 going past the chambers, by picking up
14 something for the store or something, and
15 they normally are not documented for
16 twenty-minute tardiness or thirty-minute
17 tardiness. And that was one of the
18 reasons that I wrote their names. Kathy
19 was --
20     Q.    Well, no. Wait a minute.
21 Are you saying you know for sure none of
22 them have ever been documented for
23 tardiness?

84  (Pages 333 to 336)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 337

1    A.    I don't know if all of them
2  was.  But there was an incident, and I
3  asked questions is the reason why I wrote
4  their names.  Just like with Greg, I knew
5  that Greg was not documented for missing
6  a meeting.
7        **Q.    Well, who was not documented
8  for being tardy?**
9    A.    That would be Kevin.
10       **Q.    Okay.  When was he tardy?**
11   A.    I can't give you a specific
12  date.  It was just a conversation between
13  he and I.
14       **Q.    How about Kathy?**
15   A.    Kathy's name is there.  She
16  had the same incident where Rich went
17  into her store, found product, tossed it
18  out.  The way he had it set up is if he
19  come in and that happens, you have to
20  send out a voicemail to the other -- the
21  manager on duty must send out a voicemail
22  saying Rich came in today; this is what
23  happened; and this is what we're going to

Page 338

1  do to make sure it doesn't happen again.
2  But for my restaurant, the voicemail did
3  not have to take place.  Kathy was
4  actually the manager on duty when this
5  happened, because she left the voicemail,
6  and she's a general manager for Rich.
7  And I asked her if she was documented for
8  that, and she said, no, she just had to
9  leave a voicemail.  So that's why I put
10  her name on here.
11       **Q.    Do you know her last name?**
12   A.    No.  I know she was out of
13  Pelham.
14       **Q.    Okay.  How about Don?**
15   A.    I don't remember why.
16       **Q.    Okay.  So these three things,
17  your questionnaire, the notes, and the
18  charge, that's what you gave to the EEOC?**
19   A.    Well, I gave them --
20       **Q.    Or were the documents on the
21  first day you went?  Those three
22  documents contain what you told the EEOC
23  when you made your charge?**

Page 339

1    A.    Yes.
2        **Q.    Okay.  Now, the EEOC did an
3  investigation, correct?**
4    A.    Yes.
5        **Q.    And what was their finding?**
6    A.    Do I have the paper?  I don't
7  have the paper.  They gave me a letter.
8  I don't recall their exact words on it.
9        **Q.    Well, what I have is -- I'll
10  show you what I have as Exhibit 11.  Did
11  you receive that document?**
12       **(Whereupon, Defendant's
13  Exhibit No. 11 was marked for
14  identification and copy of same is
15  attached hereto.)**
16   A.    Yes.
17       **Q.    Was there a separate letter
18  that came with it or just this document?**
19   A.    There were more papers that
20  came with this.
21       **Q.    Okay.  Do you remember what
22  they were?**
23   A.    I think it was just an

Page 340

1  explanation of this document.
2        **Q.    Do you remember what it said?**
3    A.    No, I don't.
4        **Q.    Do you still have a copy of
5  it?**
6    A.    I don't think I do.
7        **Q.    Will you check?**
8    A.    Yes.
9        **Q.    Okay.  This document says
10  that they've made the following
11  determination, that they were unable to
12  conclude that the information established
13  a violation of the statute.  Is that what
14  you understood, that they had
15  investigated it and they were unable to
16  conclude that Cracker Barrel had violated
17  any of the statutes?**
18   A.    No.  That's not how Ms. Curry
19  explained it to me.
20       **Q.    All right.  Well, what did
21  she tell you?**
22   A.    And, again, this is a single
23  page, but there's more pages, because

85  (Pages 337 to 340)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 341

1  there are different -- this says Page 3,
2  but there are more pages that go along
3  with this that was explaining to me more
4  about this form.
5      Q.  Well, let me see if y'all
6  produced it.
7          MS. BUSBY:  I don't have a
8  letter.  Do y'all have a letter?
9          MS. YORK:  I don't remember
10  if we actually got it or if he got it and
11  sent it to us.  I don't know if we got
12  the full --
13          MS. BUSBY:  Thing or not?
14          MS. YORK:  Yeah, I don't
15  recall.
16          MS. BUSBY:  Somewhere in the
17  middle of all this I know y'all became
18  involved and they contacted y'all, but I
19  can't tell who -- I think they mailed it
20  to him.  It has his address on it.  The
21  only thing I have is just the instruction
22  sheet, you know, which --
23          THE WITNESS:  May I see it?

Page 342

1          MS. BUSBY:  Sure.  And the
2  Dismissal and Notice of Rights.  Y'all
3  did not produce a letter to us.  So if
4  you received a letter --
5          THE WITNESS:  No.  This is
6  the forms that came along with that
7  (indicating).
8      Q.  (By Ms. Busby)  Okay.  So
9  let's look at this.  Along with your
10  dismissal and notice of rights which we
11  marked as Exhibit --
12      A.  11.
13      Q.  -- 11, you got the
14  information sheet, correct?
15      A.  Yes.
16      Q.  Not a written letter from Ms.
17  Curry?
18      A.  Correct.
19      Q.  Okay.  But did you talk to
20  Ms. Curry after you received your
21  dismissal?
22      A.  I talked to her before I
23  received the dismissal.

Page 343

1      Q.  All right.  So she called you
2  and told you what her determination was
3  going to be?
4      A.  No.  She just called me and
5  told me that she was calling to confirm
6  my telephone number and my address and
7  that I would be receiving documentation
8  in the mail.
9      Q.  That's all she said to you?
10      A.  Yes.
11      Q.  Well, I go back to my
12  original question.  I mean, you agree
13  that her notice tells you that the EEOC
14  issues the following determination.  It's
15  where the check mark is.
16      A.  Okay.
17      Q.  That they were unable to
18  conclude that the information obtained
19  establishes a violation of the statute.
20      A.  Okay.
21      Q.  I mean, you understood that
22  meant that they couldn't find a
23  violation, and they weren't going to

Page 344

1  proceed, but you could file a lawsuit,
2  correct?
3      A.  No.
4      Q.  You did not understand that?
5      A.  No.  It also continues on
6  that this does not certify that the
7  respondent is in compliance with the
8  statutes.
9      Q.  I know.  I see what was being
10  pointed out to you, but that's not my
11  question.  My question is that the
12  finding of the EEOC is that they were
13  unable to conclude that the information
14  obtained established a violation of the
15  statute.
16          MS. YORK:  He asked and
17  answered that.  And he just wanted to
18  clarify what he sees in front of him.
19          MS. BUSBY:  You can come back
20  and ask him any question or point out
21  anything you want to.  I don't care.  I
22  just want to make sure that he
23  understands what the EEOC's finding was.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 345

1    MS. YORK: And he was stating
2  what he saw.
3    Q.  (By Ms. Busby)  Do you agree
4  that the EEOC did not find a violation of
5  the statute?
6    A.  I don't agree with that.  I
7  read that, yes.
8    Q.  Okay.  Now, let me show you
9  what I'm going to mark as Exhibit 12.
10  These are your initial disclosures.  Did
11  you participate in drafting those initial
12  disclosures?
13    (Whereupon, Defendant's
14  Exhibit No. 12 was marked for
15  identification and copy of same is
16  attached hereto.)
17    A.  Yes.
18    Q.  Okay.  Do you recollect from
19  looking at it which part you did?
20    A.  I don't understand what you
21  mean what part I did.
22    Q.  Which part you drafted or
23  participated in?

Page 346

1    MS. YORK: I'm going to
2  object. Mr. Rodgers did not draft a
3  pleading.
4    MS. BUSBY:  Well, I asked him
5  if he participated and put it together,
6  and he said yes.
7    MS. YORK: But he didn't
8  draft.  You said did he draft it.  He did
9  not draft the pleading.
10    Q.  Which part did you
11  participate in?  All right.  Three and --
12    A.  This is -- this is one of my
13  attorney documents.
14    Q.  Well, the only reason I'm
15  asking you any questions is because you
16  said, yes, you participated in it.  I
17  don't know if you did or not.
18    A.  No, ma'am, I didn't
19  participate in this document.
20    Q.  Okay.  Fair enough.  All
21  right.  Where are you employed now?
22    A.  Ruby Tuesday.
23    Q.  What's your job at Ruby

Page 347

1  Tuesday?
2    A.  Manager.
3    Q.  Which store?  Is it just for
4  one location?
5    A.  Yes.
6    Q.  Which store?
7    A.  Panola Road.
8    Q.  Have you been at that one
9  since you were employed by them?
10    A.  No.
11    Q.  When were you first employed
12  by Ruby Tuesday?
13    A.  October of last year.
14    Q.  Okay.  What's your rate of
15  pay?
16    A.  It changed.  I think it's
17  fifty-four five.
18    Q.  Was that for 2006?
19    A.  Yes.
20    Q.  Do you know what it will be
21  for 2007?
22    A.  I'm not eligible for an
23  increase.

Page 348

1    Q.  Okay.  Are you eligible for
2  any bonuses?
3    A.  No.
4    Q.  Why are you not eligible for
5  an increase?
6    A.  For the position that I'm in,
7  I would have to be promoted in order to
8  get an increase.
9    Q.  Have you had any evaluations
10  since you've been employed?
11    A.  Yes.
12    Q.  What did they say?
13    A.  What do you mean?
14    Q.  Well, have they been good,
15  medium, bad?
16    A.  They've been good
17  evaluations.
18    Q.  Have you had any disciplines?
19    A.  No.
20    Q.  Have you had any
21  communication problems with any managers?
22    A.  No.
23    Q.  Do you have a district

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 349

1 manager?
2     A.   Yes.
3     Q.   Who is your district manager?
4     A.   Brian -- for Montgomery or
5 the new one since I moved here?
6     Q.   Your current manager.
7     A.   Christine and I think her
8 last name is Lawton.  She's brand new.
9     Q.   Did you start as a district
10 manager in Montgomery at a Ruby Tuesday?
11     A.   As a manager, not a district
12 manager.
13     Q.   At which location?
14     A.   Wetumpka, Alabama.
15     Q.   And how long were you at that
16 location?
17     A.   That was just for training.
18 And nine weeks.
19     Q.   And then where did you go?
20     A.   Montgomery, the Atlanta
21 Highway store.
22     Q.   How long were you there?
23     A.   Six months.

Page 350

1     Q.   And then where did you go?
2     A.   Still at Montgomery but the
3 Eastern Boulevard store.
4     Q.   Why did you change stores?
5     A.   The Eastern Boulevard store
6 needed a general manager.  I went to take
7 over the Eastern Boulevard store.
8     Q.   And how long were you at the
9 Eastern Boulevard store?
10     A.   Until December of last year.
11     Q.   All right.  And why did you
12 leave?
13     A.   I relocated to Atlanta.
14     Q.   But why?
15     A.   It was by my choice.
16     Q.   You asked for a relocation?
17     A.   Yes.
18     Q.   Why did you want to move back
19 to Atlanta?
20     A.   Friends.  I didn't really
21 know that many people back there.
22     Q.   All right.  And so was there
23 an opening in Atlanta?

Page 351

1     A.   Yes.
2     Q.   At which location?
3     A.   Panola Road.
4     Q.   So how long have you been
5 there?
6     A.   Since January of this year.
7     Q.   When you applied at Ruby
8 Tuesday, did you tell them you had been
9 terminated from Cracker Barrel?
10     A.   Yes.
11     Q.   Who did you tell?
12     A.   James Aubey who was the
13 district manager for Ruby Tuesday.
14     Q.   Okay.  Did you put it on your
15 application?
16     A.   Yes.
17     Q.   What was the reason that you
18 gave them for your termination?
19     A.   I don't know if I wrote it on
20 the application or if I told them.
21     Q.   Just however you gave it to
22 them.  How did you tell them?  What
23 reason did you give them?

Page 352

1     A.   I don't recall the exact
2 reason that I gave them.
3     Q.   Did you tell them you filed
4 an EEOC charge?
5     A.   He was aware of it, yes.
6     Q.   Was he aware of it because
7 you told him or --
8     A.   No.  I told him because I may
9 need to take time off to do something,
10 and I didn't want it to interfere with my
11 current position.
12     Q.   Okay.  As part of your
13 production, you have given me a lot of
14 written statements which I am not sure
15 what the relevance is.  You gave me a
16 statement about Carlos Browning
17 witnessing somebody in the stockroom, in
18 the retail stockroom, who was upset.  Is
19 that relevant to your case?
20     A.   I need to read the statement
21 to tell you.
22     Q.   I mean, it may be just in
23 keeping with you giving everything that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 353

1  you had from your Cracker Barrel days.
2  I'm just trying to see if it's relevant
3  to anything.
4      A.   Yes.
5      Q.   Yes to which question?  It's
6  relevant to your case or it's just part
7  of the documents you had related to
8  Cracker Barrel?
9      A.   I think it is relevant to the
10 case.
11     Q.   Okay.  Tell me in what
12 manner.
13     A.   The fact that Rich -- as the
14 retail manager, Rich was made aware by
15 another manager that Teresa was using
16 profane language.  She's the retail
17 manager, Teresa is.  And that her
18 behavior was inappropriate.  He reported
19 it to Rich Alexander that that incident
20 happened, and when that happened, we were
21 told not to document her.  With Ashley,
22 they said that she said the F word, and
23 we were told to be documented.

Page 354

1      Q.   Okay.  Hang on a minute.  I'm
2  not sure I understand you.  Carlos
3  reports to you that he hears the retail
4  manager screaming?
5      A.   He reported to Rich.
6      Q.   Well, then why do you have a
7  copy of it?  I mean, this doesn't say
8  anything about reporting anything to
9  Rich.  This looks like a statement that
10 is taken as part of an investigation.
11     A.   I don't know.  I can just
12 tell you what happened in that incident.
13 I don't know when, where, why, how.
14     Q.   Well, how did you get a copy
15 of this document?
16     A.   I don't know if it's a part
17 of me just giving them information to the
18 EEOC or how the packet came.  I just --
19 don't remember how I even got the -- it
20 was just too many documents for me to say
21 where that particular one came from.  I
22 remember the incident itself.
23     Q.   Did you witness it?

Page 355

1      A.   No.
2      Q.   So did you investigate it?
3      A.   No.
4      Q.   So you don't have any
5  personal knowledge about it?
6      A.   No.  I was told to don't
7  worry.
8      Q.   Who were you told by?
9      A.   Rich.
10     Q.   All right.  And he told you
11 don't investigate this incident?
12     A.   Yes.
13     Q.   All right.  Did Carlos
14 Browning report this to you?
15     A.   To me, no.
16     Q.   Okay.  So the way you found
17 out about it was how?
18     A.   Through another employee who
19 told me about it.
20     Q.   Who is that?
21     A.   It was one of the retail
22 clerks.  I don't know which one.
23     Q.   Did they come to you

Page 356

1  complaining or what happened?
2      A.   No.  It was in a general
3  conversation that they were talking about
4  in the retail stockroom, and Carlos was
5  actually talking to the retail clerk when
6  I came into the stockroom itself.
7      Q.   So you overheard him talking
8  about it and said what are y'all talking
9  about?
10     A.   I overheard them talking
11 about it, yes, just bits and pieces of
12 it.
13     Q.   You overheard them talking
14 about what?
15     A.   The comment was made Ashley
16 got wrote up but Teresa didn't.
17     Q.   Well, I mean, how is it that
18 -- you don't have anything to do with
19 retail; is that right?
20     A.   No, I do.  But we also have a
21 retail district manager who was opposite
22 of Rich Alexander who was responsible for
23 the retail manager.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 357

1    Q.   So whatever investigation
2  goes on in retail, the retail district
3  manager handles?
4    A.   They would do the direction,
5  yes.
6    Q.   Okay.  What about Allison
7  Wakely?  Who is that person?
8    A.   Shift leader from the
9  Gardendale, Alabama store.
10    Q.   All right.  Inside your
11  documents there is a statement about --
12  it looks to me to be a guest had a
13  complaint because you ran out of a dinner
14  feature.  Does this have any relevance to
15  what we're here about?
16    A.   I think it does as to the
17  responses from the guest and how
18  complaints were handled, that they
19  weren't just negligently unattended to
20  and that it wasn't -- that it was someone
21  just walked through the door and
22  something can go wrong and no one does
23  anything to try and fix it.

Page 358

1    Q.   All right.  So May 11th,
2  2005, this is something that occurred at
3  the Gardendale store, a guest complained
4  at Gardendale?
5    A.   Yes.
6    Q.   Okay.  I mean, did you keep a
7  copy of this purposefully?
8    A.   I don't know why we -- again,
9  I left from Gardendale, went to Atlanta,
10  and went straight to Alabama.  So I don't
11  have the documents that you have.
12  There's just been so many, I don't know.
13    Q.   Well, that's what I'm trying
14  to -- you said you submitted so many.
15  You submitted them to your attorneys.  I
16  mean, did you not review any of your
17  documents before coming to your
18  deposition today?
19    A.   Well, I also gave documents
20  to the EEOC.  I don't know what was given
21  to the attorney or what was given to the
22  EEOC.
23    Q.   Well, everything I've showed

Page 359

1  you says plaintiff's documents.  So what
2  that means is that your lawyer gave it to
3  us, you know, so I assume you gave it to
4  them?
5    A.   Okay.
6        MR. BREEDLOVE:  Or the EEOC.
7  We have the EEOC file.
8    Q.   Well, what I'm utilizing that
9  says plaintiff's documents is what y'all
10  have produced to me.  I don't know where
11  you got them.  So I guess that would be
12  the best way to put it.
13    A.   Okay.
14    Q.   So the next thing we've
15  already talked about was what you said
16  was a condolence card thinking of you.
17  They sent flowers?
18    A.   It's the reason why -- I had
19  in practice that if there was an employee
20  of our restaurant to be ill, have a baby,
21  or have someone deceased, we would send
22  something to either the hospital or to
23  the funeral.  And it would come from

Page 360

1  Cracker Barrel.  There was a fund for
2  that.  Those young ladies found out that
3  they did not -- the management team did
4  not do anything for me, and they
5  physically sent those -- those three
6  ladies physically sent that themselves.
7    Q.   Did they send it to your
8  house?
9    A.   No.  They gave it to me when
10  I came back when I was there.
11    Q.   Oh, they just gave you --
12  what was it, flowers?
13    A.   It was a flower, yes.
14    Q.   So they gave it to you?
15    A.   Yes.
16    Q.   Okay.  All right.  You don't
17  know for which funeral it was, right?
18    A.   No.
19    Q.   Okay.  You received and
20  signed for the employee handbook, right?
21    A.   When I was MIT, yes.
22    Q.   Pardon me?
23    A.   When I was MIT, when I first

90  (Pages 357 to 360)

# FREEDOM COURT REPORTING

Page 361

1 came to the company, yes.
2      Q.   I have this one here dated
3 7/9/02.  I guess that's when you were in
4 training?
5      A.   Yes.
6      Q.   Where you received and went
7 over all the training, the awareness --
8      A.   Yes.
9      Q.   -- the policies and all
10 that?
11         MS. BUSBY:  If y'all want to
12 take a quick break, I may be almost
13 finished.  I just want to go through
14 these documents and make sure.
15         (Whereupon, a brief recess
16 was taken.)
17         (Whereupon, Defendant's
18 Exhibit No. 13 was marked for
19 identification and copy of same is
20 attached hereto.)
21      Q.   I'm going to show you what
22 I've marked as Exhibit 13.  That is a
23 counseling, coaching memorandum to you

Page 362

1 from Rich Alexander in June about certain
2 issues; is that right?  It's just one
3 page.
4      A.   Oh, this is the same page.
5         (Whereupon, a discussion off
6 the record was held.).
7      Q.   Dated June 17th, 2005, Dwight
8 from Rich Alexander typing up, you know,
9 I don't know if you call it counseling,
10 coaching, concerns that he has.  He
11 wanted to discuss and document concerns
12 with your actions and behaviors in your
13 current position as general manager of
14 Unit 574, Montgomery, right?
15      A.   Yes.
16      Q.   Do you recollect receiving
17 this?
18      A.   Yes.
19      Q.   All right.  Did you respond?
20      A.   I responded to a number of
21 them.  I just don't remember if this is
22 one that I responded to telephonically or
23 in writing.

Page 363

1         (Whereupon, Defendant's
2 Exhibit No. 14 was marked for
3 identification and copy of same is
4 attached hereto.)
5      Q.   Okay.  I have what I've
6 marked as Exhibit 14, which is you write
7 Ron Phillips on -- somewhere in response
8 to this.  I don't see that you date it.
9 Let me just give it to you and let you
10 take a look at it.
11         Okay.  Exhibit 13 is, Dwight,
12 you receive a coaching, I guess, to put
13 the best spin on it or a counseling from
14 Rich about certain issues that he is not
15 happy about have gone on in June.
16 And y'all meet and discuss it as best I
17 can figure out; is that correct?
18      A.   The -- on this one, I'm not
19 sure if we met about it or we -- we
20 discussed it because I remember it, but I
21 don't know if we met in person or we had
22 a conversation about it and then the
23 document itself was produced.

Page 364

1      Q.   All right.  Well, let's look
2 then at Exhibit 14, which is your letter
3 to Ron.  Maybe this will refresh your
4 recollection.  What you say is on June
5 18th, you and Rich met for a discussion
6 about concerns he had about your
7 performance and decisions you made at
8 Unit 574, Montgomery.  And before
9 continuing the conversation, y'all had a
10 discussion about your ability.  And then
11 he read to you a list of credibility and
12 operational issues that you feel were
13 unwarranted.  I take it you're referring
14 to Exhibit 13 that he gave you that --
15      A.   Yes.
16      Q.   -- he went over those
17 concerns, and he gave you the document at
18 your meeting and y'all went over them?
19      A.   Yes.
20      Q.   You then write Ron Phillips
21 to talk about concerns, I guess, that you
22 have about the list and to give your
23 explanation of those concerns?

91 (Pages 361 to 364)

# FREEDOM COURT REPORTING

Page 365

1  A.  Yes.
2  Q.  Is that right?
3  A.  Yes.
4  Q.  And that's what this document
5  is?
6  A.  Yes.
7  Q.  Okay.  And this is stuff
8  that, I guess, all happened in June of
9  2005?
10  A.  Yes.
11  Q.  Okay.  All right.  Then in
12  July you received the e-mail that we've
13  already gone over from Ron Phillips about
14  the escalating number of guest
15  complaints.  You remember it's already an
16  exhibit.  We went over it.
17  A.  Yes.
18  Q.  And you sent an e-mail back
19  in response?
20  A.  Yes.
21  Q.  And then you received a memo
22  from Rich giving you a coaching and
23  counseling about the number of guest

Page 366

1  complaints that y'all have received that
2  y'all went over on August the 6th related
3  to things that you were going to do to
4  immediately readdress the issues.  And
5  that's what's contained in Exhibit 15.
6      (Whereupon, Defendant's
7  Exhibit No. 15 was marked for
8  identification and copy of same is
9  attached hereto.)
10  A.  Yes.
11  Q.  And that's your signature
12  down there that y'all talked and went
13  over this?
14  A.  Yes.
15  Q.  Okay.  So as best I know, and
16  if you know of any others, just, you
17  know, we can talk about them.  I know
18  that there are the written warning that
19  you received in August, on August the
20  12th that we've already gone over.  But
21  prior to that we have several written
22  coachings and counselings that you go
23  over with either Mr. Alexander or Mr.

Page 367

1  Phillips from June, July, and August that
2  we've talked about here today; is that
3  right?
4  A.  Well, the several that you
5  speak of as far as coaching and
6  counseling is -- and that's why I
7  requested to meet with Ron, because this
8  is two weeks of some sort of opportunity
9  that he feels needs to be addressed, and
10  in coaching and teaching and developing,
11  you don't keep notes for two weeks to
12  address it.  You try to address it at
13  hand.
14  Q.  I mean, what you're
15  criticizing is his management style.
16  You're saying that if you were in charge,
17  you would have coached as it occurred --
18      MS. YORK:  I'm going to
19  object.  That's not his testimony.  He's
20  explaining.  You asked him a question.
21      MS. BUSBY:  Don't interrupt
22  me in the middle of the question again.
23      MS. YORK:  I can interrupt if

Page 368

1  I feel that you are testifying or
2  changing his testimony.  That is not what
3  he testified to.
4      MS. BUSBY:  Actually, all you
5  can do is object to the form.
6      MS. YORK:  Well, I'm
7  objecting to the form and for you to stop
8  testifying for him or changing his
9  testimony.
10  Q.  (By Ms. Busby)  Did you or
11  did you not just say that in management
12  you don't wait two weeks for coaching?
13  A.  Yes.
14  Q.  That is your opinion?
15  A.  Yes.
16  Q.  That is apparently different
17  than what Mr. Alexander believes should
18  be done?
19  A.  I can't answer that.  I don't
20  know if anyone else received
21  documentation for weeks at a time as I
22  have.  I don't know if that's his
23  management style or not.

92  (Pages 365 to 368)

# FREEDOM COURT REPORTING

Page 369

1    Q.   All right.  Let's ask these
2  very simple questions then.
3    A.   Yes.
4    Q.   If there are concerns as
5  listed in Exhibit 13, he could have
6  coached you on each individual one as
7  they came up under your management style,
8  correct?
9    A.   No, under coaching.
10    Q.   Under coaching?
11    A.   Yes.  That's our policy.
12  That's Cracker Barrel's.
13    Q.   Or he could have written you
14  up as verbal warnings for all of these
15  things, should he have chosen as the
16  general manager to do so?
17    A.   That's correct.
18    Q.   And by the time we get to the
19  incident of customer complaints in July,
20  he could have given you a final written
21  warning, if he had chosen to do so?
22    A.   And I would have had a chance
23  to respond earlier before receiving this

Page 370

1  for weeks at a time.
2    Q.   So is that yes?  So the
3  answer to my question is yes then?
4    A.   Could you repeat the question
5  then?
6    Q.   He could have written you up
7  in July for the continued customer
8  complaints that you were experiencing?
9    A.   Yes.  It was his right to
10  document, yes.
11    Q.   And he could have written you
12  up on August the 6th, 2005 when he sent
13  you -- when Mr. Alexander sent you the
14  memorandum related to the things he
15  expected you to immediately address that
16  you signed on August the 6th, 2005, had
17  he chosen to do so?  That could have been
18  your final written warning, correct?
19    A.   He could have, yes.
20    Q.   Okay.  Now, your final
21  written warning was August the 12th,
22  which you signed, correct?
23    A.   Yes.

Page 371

1    Q.   And you understood as of
2  August the 12th specifically what the
3  expectations were for you operationally,
4  food cost wise, and food service wise,
5  participating in management telephone
6  calls, and scheduling and coming to work?
7    A.   No.  I disputed this because
8  it did not -- again, does not say that he
9  put a freeze on hiring.  So sales can't
10  be met.  Labor can't be met.  Shifts
11  can't be covered.
12    Q.   Where is your dispute?
13    A.   I disputed that with Rich.
14    Q.   Did you put together a
15  written response as you did as is shown
16  in Exhibit 14?
17    A.   I did dispute this.
18    Q.   My question was:  Did you put
19  together a written response?
20    A.   I did several responses.  I
21  don't know if this is one I've done a
22  written response to.  You've shown me one
23  written response, but I did several.

Page 372

1    Q.   Do you have a home computer?
2    A.   Yes.
3    Q.   All right.  The Exhibit 14 as
4  an example, you typed that written
5  response up?
6    A.   Yes.
7    Q.   Did you do it on your home
8  computer?
9    A.   No.
10    Q.   Where did you do that?
11    A.   Cracker Barrel.
12    Q.   Have you ever typed any type
13  of written response up on your home
14  computer?
15    A.   No.
16    Q.   Have you sent an e-mail from
17  your home computer to anybody at Cracker
18  Barrel or about Cracker Barrel?
19    A.   About a complaint that I had
20  through their website.
21    Q.   What complaint was that?
22    A.   It was about treatment last
23  year when I visited one of the

93  (Pages 369 to 372)

# FREEDOM COURT REPORTING

Page 373

1  restaurants. I wasn't treated fairly,
2  and I just -- instead of going through
3  any changes with the management team, I
4  chose to e-mail it properly to the home
5  office.
6      Q.   You made a guest complaint?
7      A.   Yes.
8      Q.   Okay. Was this while you
9  were employed with Cracker Barrel?
10     A.   No, I was not employed at the
11 time.
12     Q.   So you made a guest
13 complaint, and I presume through those
14 channels you received some sort of
15 notification one way or the other about
16 the investigation of the guest complaint?
17     A.   Yes.
18     Q.   Okay. So that's separate and
19 apart from what we're here about today?
20     A.   Yes. That's the only time
21 I've used e-mail from my house to contact
22 Cracker Barrel.
23     Q.   All right. I mean, as far as

Page 374

1  you're concerned, that thing is resolved,
2  whatever it was, or do I need to question
3  you about that at length today?
4      A.   They sent me a letter stating
5  that they conducted an investigation and
6  they didn't find anything. But I'm not
7  comfortable with the response, if that's
8  what you're asking.
9      Q.   Well, are you asserting any
10 claim about it?
11     A.   I did contact EEOC at the
12 time that it happened, and they said that
13 I wasn't employed and that I had to go
14 through other channels. And I contacted
15 Nancy Langworthy at Department of
16 Justice, the Civil Rights Division, per
17 the plaque that they have on their front
18 door to contact them.
19     Q.   All right. Well, did you
20 make a complaint with them?
21     A.   I was told that they were
22 going to get with Cracker Barrel and that
23 there was also a third party who didn't

Page 375

1  belong to DOJ or Cracker Barrel that
2  looks into these types of things and that
3  they would get back in contact with me.
4      Q.   Well, have you heard from
5  them?
6      A.   No. Actually, I relocated.
7  I left her two voicemails because my
8  address had changed, and when I initially
9  moved, my mail didn't follow me right
10 away. And so a lot of my mail was lost,
11 and I don't know if she responded by mail
12 or not. But I haven't spoken to her
13 since.
14     Q.   Have you followed up?
15     A.   I haven't spoken with her
16 since.
17     Q.   As far as you're concerned
18 then, have you done what you're going to
19 do about it? Are you making it an issue
20 in this lawsuit? Do I need to question
21 you about it in that regard? I mean,
22 that's what I'm trying to get to.
23     A.   I think the behavior is

Page 376

1  extending from this, yes.
2      Q.   All right. Then we'll go
3  through all that in a minute then.
4          All right. As it relates to
5  the lawsuit that you have filed, you are
6  suing Cracker Barrel because you believe
7  you have -- for a Title 7 violation that
8  you think you've been discriminated
9  against because of your race; is that
10 right?
11     A.   That was one of the charges
12 in the claim, yes.
13     Q.   What else is there?
14     A.   I don't understand the
15 wording. And that I was treated
16 differently than other general managers
17 with the company, with Rich's district.
18     Q.   Is that the whole claim as
19 far as you know?
20     A.   And the retaliation.
21     Q.   All right. So that you think
22 that you were discriminated against
23 because of the comment that we've talked

94  (Pages 373 to 376)

# FREEDOM COURT REPORTING

Page 377

1  about that we're referring to as the
2  funeral comment, correct?
3      A.   Yes.
4      Q.   And that subsequent to that
5  you were retaliated against?
6      A.   As well as the other comments
7  that I made mention of earlier, yes.
8      Q.   The comments by third parties
9  or the gentleman named Bill --
10     A.   Yes.
11     Q.   -- and the group of older men
12  that you did not involve yourself in?
13     A.   Yes.
14     Q.   That's the sum and substance
15  of the comments and the racial issue, and
16  then we have the retaliation issue?
17     A.   Yes.
18     Q.   Okay.  Is there anything
19  else?
20     A.   I don't recall anything else
21  documented.
22     Q.   I'm looking at your
23  Complaint.  That seems to be it.

Page 378

1          MS. BUSBY:  Do you agree
2  that's the Complaint?
3          MS. YORK:  I would have to go
4  through the Complaint again, but I think
5  that's it, yeah.
6      Q.   Okay.  So the reason I asked
7  that question is to get to this next line
8  of questioning so that -- Monica, feel
9  free to speak up if I don't need to go
10  into this in any great detail.  But you
11  made a guest complaint, which is not part
12  of this, other than you think you were
13  not treated correctly in the service of
14  your food as a guest?
15     A.   No.  I --
16     Q.   And you believe that's
17  because you used to work there and the
18  people who still work there treated you
19  differently than other guests?
20     A.   No.  I believe that, based on
21  the actions that were taken that day and
22  based on their treatment that day of me
23  individually versus other guests in the

Page 379

1  restaurant --
2      Q.   Well, you believe what?  I
3  mean, complete the sentence.
4      A.   That I was singled out that
5  day.
6      Q.   As a guest?
7      A.   Yes.
8      Q.   I understand that you feel
9  that way about that day, your service
10  that day.  But does that have any part or
11  are you utilizing that as any part of
12  your evidence for your claim when you
13  were an employee?  I mean, you understand
14  you were no longer an employee when that
15  happened?
16     A.   Correct.
17     Q.   Is that relevant in any
18  manner to your claim when you were an
19  employee?
20     A.   I think the retaliation was
21  done from when I was employed there.
22     Q.   What do you think the
23  retaliation was?

Page 380

1      A.   Well, myself and a gentleman
2  -- I'm sorry, two other gentlemen went in
3  to have breakfast, and we were greeted
4  right away, and our server took our drink
5  order and our food order.  She brought
6  our first round of drinks.
7      Q.   Wait a minute.  Before you
8  get into the whole story of what
9  happened, my question was in response to
10  your statement, you said that -- are you
11  saying that you -- you think that the
12  retaliation that you're claiming is in
13  relation to this guest experience?
14     A.   Yes.
15     Q.   Okay.  Go ahead.
16     A.   Okay.  Apparently something
17  happened with our server with her pants
18  or something, and she physically left the
19  restaurant.  Ralph Whiting, one of the
20  managers who was there before when I was
21  employed there was the manager on duty as
22  well as the replacement general manager.
23  When we placed our order, it took a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1   significant amount of time before anyone
2   came back to help us because we learned
3   later that the young lady -- they said
4   she split her pants and left the building
5   and went shopping and things of that
6   nature.
7       Q.   She went to take care of her
8   obvious issue?
9       A.   Yes.
10      Q.   Okay.
11      A.   From the time that she served
12  us, we had no service for almost
13  forty-five minutes.  It was to the point
14  where --
15      Q.   You mean she delivered your
16  food but she didn't come back?
17      A.   She never delivered the
18  food.  She only brought the first drink
19  of coffee.  She did put the food order
20  in, but apparently it must have happened
21  after she put the food order in.  The
22  food came out almost forty minutes later,
23  and it was totally incorrect.  Everything

1   was actually raw.
2       Q.   Meaning you got somebody
3   else's order?
4       A.   No.  We got what we ordered,
5   but it was cooked raw.
6       Q.   Raw?
7       A.   Raw.
8       Q.   I thought you said wrong?
9       A.   No, raw.  I requested one of
10  the young ladies walking by if she would
11  ask Ralph to come out to the table,
12  because between the forty-five minutes
13  I've watched Ralph and the other two
14  servers that was in that section take
15  care of every table except for the table
16  where myself and my two guests were.
17      Q.   All right.  Now, let me stop
18  you right there.  Is this the first time
19  you had been back to eat since your
20  termination?
21      A.   No.
22      Q.   Okay.  So you've been back to
23  the restaurant without incident?

1       A.   Yes.
2       Q.   Okay.  And on this occasion
3   this all takes place?
4       A.   Yes.
5       Q.   Okay.  Go ahead.
6       A.   So Ralph refused to come to
7   the table, so I actually had to flag down
8   another server because my server was
9   gone.
10      Q.   Well, how do you know he
11  refused to come to the table?
12      A.   The server told me that he
13  wasn't coming out.
14      Q.   Do you know who the server
15  was?
16      A.   Yes.  I know her first name
17  is Elaine.
18      Q.   Okay.  So she came back to
19  you and said what?
20      A.   That she asked him to come to
21  the table, and he just would not come.  I
22  did not want to just get up and leave
23  because of the litigation that was

1   already in process.  So I wanted to -- I
2   asked for my server, and no one could
3   seem to find my server.  When the food
4   came out raw, another server, and I can't
5   think of her name, came to the table, and
6   she just started apologizing because she
7   overheard Ralph and the grill cook and
8   the other manager in the kitchen talking
9   about my table.  But the grill cook, his
10  name is Shawn -- Shawn approached me the
11  following day.  I was at the supermarket,
12  and he again apologized.
13      Q.   Which supermarket?
14      A.   It's a store on the main
15  highway there, a supermarket.  I don't
16  know the name of the supermarket, but
17  that's where I saw him.  And he -- Shawn
18  informed me at that time that he -- when
19  they mentioned that the food was
20  incorrect and that was for my table,
21  because he had worked there before, he --
22  you know, he always was a breakfast cook.
23  Whenever I ate breakfast, he usually

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 385

1  would fix it and he knew how I liked my
2  food, so he would take care of it.
3        He informed me then that
4  Ralph and the other manager on duty told
5  him to move from the grill, that they'll
6  take care of it, and the reason the food
7  came out that way is because he had just
8  put the food down and they took it and
9  scraped it up on the spatula and put it
10  on the plate with all the grind and the
11  grill scrapings and everything.  And
12  Ralph physically delivered that to the
13  table and walked off.
14        Q.   Who was with you at your
15  table?
16        A.   My best friend, Webster
17  Cross, and another friend that came in
18  from Atlanta, Frank Tasala.  They, too,
19  sent an e-mail in about -- no.  They
20  filled out the forms to complain and sent
21  them in.  The problem --
22        Q.   Now, how was their food?
23  Their food came out fine?

Page 386

1        A.   It was incorrect.  The whole
2  table came out raw and bad.  Web asked me
3  to -- I said, well, you stay there.
4  Maybe the manager will come out and talk
5  to you, and I'll leave out because I
6  don't want them to think that this is
7  something between with what's happening,
8  and I left my money for him to pay
9  because I didn't want them to say I did
10  not pay for it regardless of it, and I
11  was just going to go ahead and send in
12  the complaint.
13        At which time the young lady
14  walked past the table that had three
15  servers assigned to the one section.  She
16  gave coffee to this table.  Mine was
17  empty.  I asked for my coffee.  She
18  simply walked right past me.  Another
19  young lady that was also serving that
20  portion of the dining room, I asked her
21  if she would go check on our server
22  because our server was gone for so long.
23  She walked right past me.  I actually had

Page 387

1  to flag down servers from other dining
2  rooms to go get a manager, go get
3  somebody to come out to help us or see if
4  they could find out what is going on.
5        And again, they were all
6  coming back, you know, they won't come
7  out.  We're sorry, this and that, to the
8  point where I said, I'm sorry, I'm going
9  to leave.  And I asked Webster to deal
10  with it because I didn't want them to
11  think that he was talking to them about
12  this again from me being there.
13        Q.   So what happened?  I mean, I
14  know you weren't there, but did Webster
15  talk to somebody?
16        A.   Yes.  Actually, I left out of
17  the restaurant, and I walked towards the
18  back of the restaurant, and Ralph was
19  actually smoking a cigarette out back.
20  So I came back in to let Webster know,
21  you know, pay for the food, get the
22  receipt, and we'll go through the
23  channels.  As I was coming in, Ralph was

Page 388

1  coming around the building and he went
2  inside right before me.
3        The young lady named
4  Brittany, she was a hostess, came back up
5  at that time and said that -- and I don't
6  know her GM's name at the time.  Said
7  that Rich Alexander told them that they
8  did not have to serve me, and if I had a
9  problem, simply call home office.  I had
10  a problem with the fact that not only did
11  I sit there for almost an hour and twenty
12  minutes, but they served every table
13  around my table.  And when one young lady
14  came over to ask if she could help me,
15  she was -- and these are her words, that
16  she was called to the back while we was
17  in there, Ralph physically walked to the
18  breezeway and called her to the back and
19  she came back and walked over real
20  quickly and she said he said I can't help
21  you, I can't serve you, and she went to
22  the first dining room, because I was in
23  the second dining room.  And at that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 389

1  point is when I left. So that's the fact
2  that they told the grill cook, move over,
3  we've got this. They delivered the raw
4  food. It was delivered.
5      Q.   All right. Now, you, I
6  think, as part of the things that you
7  have produced, produced some sort of
8  statements. Is that what these
9  statements are related to?
10     A.   Yes.
11     Q.   All right. Did you take
12  those statements? I mean, how did you
13  get those statements?
14     A.   No. They were given to me.
15  They knew that -- they knew where I was
16  working, and the statements were actually
17  brought to me.
18     Q.   Who brought them to you?
19     A.   The individual people.
20     Q.   Well, I mean, they brought
21  them one at a time?
22     A.   I received one while I was at
23  work. I received two other statements

Page 390

1  from one person, but --
2      Q.   Well, who is the one person?
3      A.   Veronica gave me a statement
4  from herself, and I don't know who the
5  other person was.
6      Q.   I mean, are you friends with
7  Veronica?
8      A.   No, no more than our working
9  relationship that she had prior.
10     Q.   Did she bring them to your
11  house?
12     A.   No.
13     Q.   Where did she bring them to?
14     A.   Out front of Ruby Tuesday.
15     Q.   So she called you and said,
16  meet me outside, I'm bringing you
17  something?
18     A.   Yes.
19     Q.   All right. Well, who did you
20  talk to about doing the statements?
21     A.   I didn't speak to anyone.
22  That was their claim, that I was at the
23  restaurant soliciting statements, which I

Page 391

1  did not do.
2      Q.   That was whose claim?
3      A.   Cracker Barrel. That's what
4  they said to me.
5      Q.   Who is they?
6      A.   Allison something from the
7  people who respond to your e-mail when
8  you e-mail in. She called me back and
9  asked questions. And her second phone
10  call was -- she asked me if I had
11  statements and I said yes. She asked me
12  how I obtained the statements, and I told
13  her, and she said that, well, from her
14  understanding that the managers up there
15  told her that I was at Cracker Barrel
16  soliciting statements which were not
17  true. But I informed her at that time
18  that that wasn't true as well.
19     Q.   Did she ask you to send in
20  any statements?
21     A.   She never asked for the
22  statements, no. And I did make her aware
23  that I had them.

Page 392

1      Q.   Okay. Anything else about
2  that?
3      A.   No.
4      Q.   Does that cover everything?
5      A.   Pretty much, yes.
6      Q.   All right. And so to your
7  knowledge were your friends ever
8  contacted?
9      A.   Frank, yes. Webster, no.
10     Q.   Okay. And Frank was
11  contacted by whom?
12     A.   I don't know by whom. I know
13  he got a letter, though. I don't know
14  what person sent him the letter.
15     Q.   Are you still friends with
16  those two people?
17     A.   Yes.
18     Q.   What about Cornelius
19  Browning, are you friends with him?
20     A.   Carlos Browning? No, we're
21  not friends.
22     Q.   I mean, do you talk to him?
23     A.   I haven't in quite some time.

98  (Pages 389 to 392)

# FREEDOM COURT REPORTING

Page 393

1    Q.   What about Veronica McCall?
2    A.   Again, I haven't spoken to
3  them in quite some time.
4    Q.   All right.  You have made a
5  claim for -- for some pay that you missed
6  in between the time that you were
7  employed by Cracker Barrel and Ruby
8  Tuesday as I understand it; is that
9  correct?
10    A.   Yes.
11    Q.   And that's the difference
12  between what you claim you made and what
13  you make now?
14    A.   No.  The original claim --
15  but this was asked of Ruby Tuesday, was
16  initially I was scheduled to go on
17  vacation, and I also was supposed to
18  receive a bonus check from Gardendale,
19  Alabama as well as Montgomery.  And I was
20  told that I had the bonus check, but
21  because I was not physically at the
22  company, which the check was cut two days
23  later, I was not entitled.

Page 394

1    Q.   In other words, it's one of
2  those policies that you have to be there
3  to earn the bonus?
4    A.   That's what I was told.
5    Q.   Okay.  Now, the bonus checks
6  are calculated on a combination of things
7  including the sales of the restaurant,
8  food cost and labor cost, and all those
9  kind of things, correct?
10    A.   That's correct.
11    Q.   Do you have any -- I mean, do
12  you have a -- you're making a specific
13  claim for a bonus.  Are you saying you
14  know what your bonus would have been?
15    A.   No.
16    Q.   But you had received
17  statements -- I mean bonuses in the past
18  by virtue of being a manager?
19    A.   Yes.
20    Q.   Based on that combination of
21  things that bonuses are paid on?
22    A.   Yes.
23    Q.   Okay.  Have you ever been

Page 395

1  involved in any other lawsuit?
2    A.   A car accident.
3    Q.   When was that?
4    A.   Years ago.  It was settled.
5  It was nothing.  She just took care of
6  the physical therapy bill and there was
7  nothing going after her for anything
8  extra.
9    Q.   Have you ever filed
10  bankruptcy?
11    A.   Yes.
12    Q.   When did you file bankruptcy?
13    A.   I don't recall.  2001 maybe.
14  2000, 2001, somewhere around there.
15    Q.   Who handled it?  Do you
16  remember?
17    A.   I'm sorry?
18    Q.   Do you remember who handled
19  it?
20    A.   No, I don't.  But I do know
21  he -- I can't remember his name, but I
22  know he's deceased.
23    Q.   Well, where did you file it,

Page 396

1  Georgia?
2    A.   Atlanta.
3    Q.   Georgia?
4    A.   Georgia, yes.
5    Q.   But so only one bankruptcy?
6    A.   Yes.
7    Q.   Were you discharged from
8  bankruptcy?  Do you know?
9    A.   Yes.
10    Q.   Have you talked to anybody
11  else about your lawsuit, any other
12  Cracker Barrel employees or anybody else
13  who has filed a lawsuit or thinking about
14  filing a lawsuit?
15    A.   Not about my suit, no.
16    Q.   Have you talked to anybody
17  else about anybody else's suit or
18  potential suit?
19    A.   No.  Anyone who I talked to
20  were in just general conversation, but
21  nothing about anything that they are
22  doing.
23    Q.   Well, have you told anybody

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 397

1   you filed the lawsuit?
2       A.    My best friend.
3       Q.    Well, anybody employed with
4   Cracker Barrel?
5       A.    No.
6       Q.    Is your best friend employed
7   by Cracker Barrel?
8       A.    No.
9       Q.    So you've not spoken to
10  another Cracker Barrel employee about the
11  lawsuit?
12      A.    No.
13      Q.    What about Linda Ogborne?
14  Have you talked to her?
15      A.    I haven't talked to her in
16  almost two years maybe.
17      Q.    What about Charlotte?
18      A.    The same.  Shortly after I
19  left from Birmingham to move to
20  Montgomery, quite naturally, just like
21  the other restaurants, they would call
22  and say, hello, are you okay, how is
23  things going, but --

Page 398

1       Q.    When you were talking with
2   Ms. Curry, did you talk to anybody or try
3   to give her any information or contact
4   information about anybody who you claimed
5   would be your witnesses?
6       A.    I don't understand.  My
7   witnesses?
8       Q.    People that you say would
9   substantiate what your claim is.
10      A.    I don't recall.  Again, in
11  our conversation, because we were there
12  for a hour, she might have said this
13  happened, she might have said was there
14  anyone around.  And if somebody else was
15  around, I don't know if they did or did
16  not have firsthand information or
17  anything.  I just don't recall.
18      Q.    When you opened that store in
19  Montgomery, you said you were there as
20  the general manager when it opened?
21      A.    Yes.
22      Q.    Who was the store operating
23  supervisor or store opening supervisor

Page 399

1   that they sent down there to help you?
2       A.    Paula Pate was the retail
3   store opening supervisor, and the store
4   opening supervisor, I don't recall her
5   name.
6       Q.    That's okay.  I mean, but
7   basically when you open a new store, you
8   have the general manager and the
9   associate managers that are there, but
10  they also send opening supervisors and
11  others to help get the store open?
12      A.    They are responsible for
13  their team, yes.
14      Q.    And they bring a team of
15  people, however many it is?
16      A.    Yes.
17      Q.    How long do they stay?
18      A.    Two weeks after opening, but
19  then they are all given assignments to go
20  to the next store opening, yes.
21      Q.    Okay.  Did you have any of --
22  talking about those managers that were
23  there when you started, did you have any

Page 400

1   of them quit during the time you were the
2   general manager?
3       A.    One transferred.  He had
4   allegations against him, and that was
5   Brian.  I can't think of his last name.
6       Q.    When you say allegations
7   against him, what do you mean?
8       A.    One of the young ladies --
9   there was a rumor, I should say, not
10  allegations, that one of the hourly
11  employees were involved.  He denied it,
12  and shortly thereafter he transferred,
13  but then I understand he left the company
14  shortly after that.
15      Q.    Did you do any investigations
16  while you were a general manager?
17      A.    Yes.
18      Q.    All right.  What would you
19  do, like take statements or let people
20  write out their own statements and gather
21  the information?
22      A.    Yes.
23      Q.    And then after you did that,

100  (Pages 397 to 400)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 401

1  kind of like those statements we've
2  looked at, you would just get them to
3  write them out and you would just send
4  them in, or how would you do that?
5      A.   They were done by fax and
6  then Rich would come and get copies
7  whenever he came to get them.
8      Q.   And did you make
9  recommendations and decisions about
10 discipline and disciplining the people?
11     A.   After speaking with human
12 resources about the case itself, they
13 gave us the feedback on their
14 recommendations, but they do give us a
15 chance to do some feedback.
16     Q.   Did you ever fire anybody
17 while you were with Cracker Barrel?
18     A.   Yes.
19     Q.   Okay.  And these are just
20 kind of follow-up things from things I've
21 already asked you.  I realized this when
22 we were on the break.  On your
23 questionnaire you wrote down Sam Dunbar

Page 402

1  as your contact person?
2      A.   Yes.
3      Q.   That's the same last name as
4  the aunt?
5      A.   Yes.
6      Q.   Are they related?
7      A.   No.
8      Q.   That's weird.
9      A.   Yeah.  Sam is my friend in
10 Alabama.  He's the only person I knew in
11 Alabama.  Viola Dunbar, her last name --
12 she has another -- that's her maiden, but
13 that's not her married.  She was back to
14 her -- she has two names, but they are
15 not related.
16     Q.   All right.  Well, you're
17 going to have to help me with this.  You
18 can find out the records of these
19 funerals so I can try to get this date so
20 we can all be on the same page.
21     A.   Okay.
22     Q.   All right.  Viola Dunbar, she
23 was the one in South Carolina?

Page 403

1      A.   Yes.
2      Q.   All right.  When she died,
3  did she have the name Dunbar or did she
4  have another name?
5      A.   No.  She had Dunbar.
6      Q.   What was her other name?
7      A.   I don't know.
8      Q.   Do you have any kind of like,
9  you know, sometime at funerals they give
10 out little pamphlets about the people or
11 anything like that?  Did you keep any of
12 those kind of things?
13     A.   No, I don't collect those
14 since my mother's death.
15     Q.   Okay.  How is Viola Dunbar
16 related to you?
17     A.   My mother and her father were
18 together, but he's not my father.
19     Q.   Wait.
20     A.   I'm sorry.  My mother and her
21 brother were together in a relationship,
22 but he is not -- her husband -- her
23 brother is not my father.

Page 404

1      Q.   Viola's brother?
2      A.   And my mother.
3      Q.   Viola's brother.  And what's
4  his name?
5      A.   Thomas.
6      Q.   Thomas Dunbar?
7      A.   Yes.
8      Q.   Was your mother's significant
9  other?
10     A.   For a period of time, yes.
11     Q.   Okay.  And did Viola have any
12 children?
13     A.   Yes.
14     Q.   What are their names?
15     A.   Michael and Tracy.
16     Q.   What are their last names?
17     A.   I don't know.  They were --
18 my father has been deceased since I was
19 two, so that was -- we kept in contact
20 very rarely.
21     Q.   You called him your father
22 then, but he really wasn't your father.
23 Are you talking about your real father?

101 (Pages 401 to 404)

# FREEDOM COURT REPORTING

Page 405

1    A.   Right.  Him and my mother
2  were friends.
3    Q.   Look, that's fine with me.
4  I'm just trying to figure out.  I mean,
5  I'm not trying to get anything like
6  that.  Was he your father?
7    A.   No.  My father was deceased.
8    Q.   Okay.  That's what I'm
9  getting to.  So your real father is not
10  related to Viola?
11    A.   Correct.
12    Q.   Okay.  Fine.  So Viola's
13  children, what are their last names?
14    A.   My understanding Dunbar as
15  well.
16    Q.   Okay.  Fine.  Good.  It's her
17  brother, he's a Dunbar as well?
18    A.   Yes.
19    Q.   And when she died, her name
20  was Viola Dunbar?
21    A.   Yes.
22    Q.   In Aikens, South Carolina?
23    A.   Yes.

Page 406

1    Q.   And she was buried in Aikens,
2  South Carolina?
3    A.   Yes.
4    Q.   Fine.  So we ought to be able
5  to find her by that, wouldn't you think?
6    A.   Yes.
7    Q.   I mean, is there anything
8  else that I need to know about her?
9    A.   No.
10    Q.   And if it wasn't her, it was
11  the other aunt?
12    A.   Sherry Thompson.
13    Q.   Sherry Thompson who was in
14  Athens?
15    A.   Correct.
16    Q.   And he was buried in Athens?
17    A.   Yes.
18    Q.   Funeral was in Athens?
19    A.   Yes.
20    Q.   Which means the March funeral
21  that you attended had to be Ms. Dunbar,
22  because she is the only one buried in
23  South Carolina, and you went to South

Page 407

1  Carolina?
2    A.   I've already testified yes to
3  that.
4    Q.   I know you testified.  I just
5  want to make sure I'm clear on it when I
6  look her up.
7    A.   Yes.
8    Q.   Okay.  Perfect.  Do you know
9  her middle name by chance?
10    A.   No.
11    Q.   All right.  Was she married
12  at the time?
13    A.   No.
14    Q.   And Aikens, South Carolina is
15  where the funeral was?
16    A.   Yes.
17    Q.   Okay.  So that ought to tell
18  us the date of the funeral.
19    A.   Okay.
20    Q.   Okay.  Now, we got off on
21  that topic because we were talking about
22  your friend Sam Dunbar who was not even
23  related to this woman, correct?

Page 408

1    A.   Right.
2    Q.   Who is Ms. Ray?  That's
3  somebody else you listed.
4    A.   Shauna Ray is manager with
5  Cracker Barrel.  She was with me in
6  Georgia when I was with Cracker Barrel,
7  and when I went to Montgomery, she came
8  to Montgomery from time to time to help
9  the Montgomery market.
10    Q.   Okay.  So she would work
11  inside the store occasionally?
12    A.   Yes, like I did before to
13  help, she did the same thing.
14    Q.   Do you keep in touch with
15  her?
16    A.   Yes.
17    Q.   Do you still talk with her?
18    A.   Yes.  I haven't in a couple
19  of months, but yes.
20    Q.   Did you hire any of the
21  former Cracker Barrel employees to work
22  at Ruby Tuesday?
23    A.   Yes.

102  (Pages 405 to 408)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 409

1    Q.   All right.  Who did you hire?
2    A.   Her first name is Sonya.
3  Well, no, I didn't hire her.  She worked
4  at Ruby Tuesday's, but I didn't hire her.
5    Q.   Okay.
6    A.   The answer is no.  They
7  worked there, too, part-time jobs, but I
8  didn't physically hire them.
9    Q.   Okay.  Who was it?  Sonya and
10 who is the other one?
11   A.   I know Sonya was still doing
12 double duty.  I don't recall the other --
13 there was two servers, but I know they
14 worked at Cracker Barrel.  But when I got
15 to Ruby's, they were already there.
16   Q.   I seem to remember you had
17 some interrogatory responses.  Do you
18 know what I mean when I say interrogatory
19 responses?
20   A.   No.
21   Q.   We send written questions,
22 and y'all had to put answers together.
23 Here, I'll just show them to you.  That's

Page 410

1  what they were.
2       MS. BUSBY:  But then y'all
3  sent a supplement, I think, answering
4  some questions we asked.  Is that how
5  that came about?
6       MS. YORK:  (Nods head.)
7    Q.   One of them asked just to
8  tell us what your residence is, where you
9  lived, and your supplement -- well, here,
10 I better give you that, too.  That's the
11 supplement.  That's a letter from your
12 lawyer that's giving your supplemental
13 answers to the interrogatories.  And
14 that's in response to a follow-up that we
15 sent where we asked number two.  I guess
16 these are your addresses that you can
17 remember for the last ten years; is that
18 right?  Does that look correct to you?
19 Look on the letter.  That would be the
20 easiest thing.
21   A.   Yes.
22   Q.   Okay.  You're going to give
23 the verification to get all that stuff.

Page 411

1  That's fine.
2       You say that you haven't
3  filed any other EEOC charges with the
4  exception of the September 2005 EEOC
5  claim.  All right.  Then you list the
6  colleges, again, where you didn't
7  graduate, but you've already told me what
8  they were.
9       This is where I read it.  I
10 can't figure this out.  Interrogatory
11 number eleven you said you were owed a
12 bonus for seventeen thousand dollars.
13 How do you come up with that figure?
14   A.   No.  The -- I was due a bonus
15 from -- that's also including vacation.
16 I had two weeks of vacation that they
17 denied me, as well as my bonus from
18 Gardendale and from Montgomery.
19   Q.   Well, just do the math for
20 me.  I mean, just how are you -- I mean,
21 I need to know how to, you know,
22 determine what you're claiming.  So
23 seventeen thousand dollars.  You came up

Page 412

1  with that figure based on what you
2  believe you were owed for two weeks of
3  vacation and this says a bonus, but now
4  you're saying two bonuses?
5    A.   Well, when I was in one
6  location, so the bonus came from two
7  different locations, but it's in the same
8  period time frame.
9    Q.   What part of this seventeen
10 thousand is the bonus you're claiming?
11   A.   I'm not sure.  Based on my
12 previous bonuses if -- my average bonuses
13 from the past, I know that from
14 Montgomery I should have received a bonus
15 from June, July, and August, which is
16 calculated differently than from
17 Gardendale.
18   Q.   All right.  Let me ask it
19 this way:  Are you guessing that that
20 would be the amount based on other
21 bonuses you've received if you were
22 eligible for a bonus?
23   A.   This amount is from numbers

103  (Pages 409 to 412)

# FREEDOM COURT REPORTING

Page 413

1 that I received while at Cracker Barrel.
2 Yes, for July and August and from the
3 numbers that I received from Gardendale
4 in June and also --
5     Q.   I don't know what you're
6 referring to.  When you say numbers, do
7 you have notes of some numbers that you
8 received?
9     A.   No, I was at the company, so
10 our P&Ls are done monthly.  So at the end
11 of every month you pretty much can figure
12 your bonus out.
13     Q.   Just do the math for me.
14 Okay.  Basically you came up with this
15 number based on information you had seen
16 in June and July and August, right?
17     A.   Yes.
18     Q.   All right.  What then did you
19 calculate for June, for July, and for
20 August?
21     A.   I can't recall the exact
22 amounts for each bonus.
23     Q.   Well, how did you come up

Page 414

1 with putting this number of seventeen
2 thousand here per your lawyers on May the
3 7th, 2007?
4     A.   Again, it was -- this was
5 done prior to my termination.  With the
6 profit and loss statements being done
7 monthly, I can't break this down, though,
8 because I just don't remember what was
9 due from Gardendale, what was due for
10 July and August and including my
11 vacation.
12     Q.   So you cannot tell me how you
13 calculated the seventeen thousand
14 dollars?
15     A.   I can tell you where the
16 information came from, but I just can't
17 break it down to how I got what amount
18 from what month from what store.
19     Q.   All right.  You're removing
20 Jerome Kelly and Kevin Harris as
21 witnesses?  Is that what this means?
22 There's a statement on number twelve in
23 the letter that says we're removing the

Page 415

1 last two people as witnesses.  I just
2 want to make sure it's Jerome Kelly and
3 Kevin Harris; is that correct?
4     A.   Yes.
5     Q.   All right.  Who are these
6 people, general managers of what?
7     A.   Cracker Barrel.
8     Q.   So they are not going to be
9 witnesses for you?
10     A.   No.
11     Q.   Have you talked to them?
12     A.   No.  They were other general
13 managers, but they were not with me at my
14 time that I was, so they didn't have any
15 firsthand information.
16     Q.   All right.  Do you have any
17 other witnesses that you're going to rely
18 on that are not listed here?  Now, that
19 would be Tommy Patterson, Rich Alexander,
20 Penny Schmidt, and yourself, obviously.
21 Anybody else that you're going to rely on
22 for your case?
23     A.   I did submit Charlotte and

Page 416

1 Linda's name to the EEOC as well.
2     Q.   Okay.  Anybody other than
3 those people?
4     A.   And Shauna Ray.
5     Q.   Shauna Ray.  Okay.  Do you
6 have any other statements?  Have you
7 taken any written statements or gotten
8 any written statements or read any
9 written statements that any of these
10 people have given about the matter?
11     A.   No.
12     Q.   When did you apply for your
13 job at Ruby Tuesday's?
14     A.   I don't know the exact date.
15     Q.   Did you apply at Ruby
16 Tuesday's prior to your termination at
17 Cracker Barrel?
18     A.   No.
19     Q.   Did you go physically and
20 fill out a handwritten application at
21 Ruby Tuesday's?
22     A.   I don't remember the process
23 because I did so many online and I faxed

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 417

1 so many, e-mailed so many. I don't
2 remember how I made the contact with
3 Ruby.
4         MS. BUSBY: Okay. I'm going
5 pass the witness to y'all while I look at
6 these notes so we don't have to stop, if
7 that's okay, because, I think, unless
8 Ashley writes me a note, that I might
9 have covered my follow-up questions. And
10 I know you said that you have a few.
11        (Whereupon, a brief recess
12 was taken.)
13    Q.   (By Ms. Busby) Mr. Rodgers,
14 I wrote down in my notes that you said
15 you got some documents from the EEOC. Do
16 you know which ones those were?
17    A.   No. I just turned everything
18 over to Breedlove and Lassiter.
19    Q.   Who gave them to you at the
20 EEOC? That might help me.
21    A.   They weren't physically given
22 to me. They were mailed. It was through
23 a request by having to write in to say to

Page 418

1 send the documentation.
2    Q.   Okay. So you wrote to the
3 EEOC and asked them to send you stuff,
4 and that's how you got whatever you got?
5    A.   Yes.
6    Q.   Okay. And then on one of the
7 things I also read -- and I must be
8 crazy, but did you tell me you worked for
9 the EEOC?
10    A.   No. I took a course when I
11 was in the military -- well, after I got
12 out of the military with EEOC. It was an
13 additional duty that I did was -- I was
14 with the Department of Defense.
15    Q.   Okay. Just some sort of
16 training course or something?
17    A.   Right.
18    Q.   Okay. I thought that I must
19 have misunderstood what you said.
20        MS. BUSBY: Those are my
21 questions from my notes. Thank you.
22        MS. YORK: Okay. My brain
23 is working a little better now.

Page 419

1         EXAMINATION
2 BY MS. YORK:
3    Q.   Let's go back to Exhibit 5,
4 your Charge of Discrimination with the
5 EEOC, and you state that it was based on
6 race and retaliation; is that correct?
7    A.   Yes.
8    Q.   Okay. Can you -- you went
9 into -- you testified earlier that the
10 dinner -- I'm trying to word this -- that
11 prior to you leaving or being terminated
12 from Cracker Barrel you had dinner there
13 and you had a bad experience and that was
14 retaliatory. Was there any other
15 experiences or any other things that you
16 considered retaliatory or retaliation in
17 relation to this claim?
18        MS. BUSBY: Object to the
19 form.
20    A.   Yes.
21    Q.   You can answer.
22    A.   Yes.
23    Q.   Can you elaborate on what

Page 420

1 those are?
2    A.   The documentation, the
3 adverse documentation that I started
4 receiving after inquiring into the
5 investigation itself by Rich Alexander.
6    Q.   Had you be written up prior
7 to this at Cracker Barrel?
8    A.   No.
9    Q.   So let me be clear. You're
10 stating that the documents or the
11 write-ups from Rich Alexander you
12 considered retaliatory?
13    A.   Yes.
14    Q.   And this is off that. Did
15 you discuss with -- what you said
16 earlier, that Tommy made a comment that
17 no black man was going to tell him what
18 to do because he was here first?
19    A.   Yes.
20    Q.   Was that comment made to you?
21    A.   No.
22    Q.   I'm not sure -- I'm sure that
23 you asked him. Who was the comment made

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 421

1  to?
2      A.   Linda Ogborne.
3      Q.   And how were you made aware
4  that this statement was made?
5      A.   She told me that the comment
6  was made but that she had already
7  discussed it with Rich Alexander.
8      Q.   And did you later discuss the
9  comment with Rich?
10     A.   Yes.
11     Q.   Okay.  And what was his
12  response to this comment?
13     A.   That he would handle it.
14     Q.   And do you know, in fact,
15  whether, in fact, he did handle it?
16     A.   No.
17     Q.   No, you do not know?
18     A.   No, I don't know.
19         MS. YORK:  Okay.  And I'm
20  going to go back to Exhibit 9.  This was
21  you said Linda Byrdsong or L. Byrdsong.
22  You don't know what her name is?
23         MS. BUSBY:  Are you asking

Page 422

1  me?  I don't know her name.
2         MS. YORK:  I thought you said
3  Linda Byrdsong, but it's just L.
4  Byrdsong.
5         MS. BUSBY:  No, he said Linda
6  and I said are you talking about Ms.
7  Byrdsong?
8      Q.   (By Ms. York)  Okay.  Was it
9  Linda Byrdsong?
10     A.   I don't know her.  She just
11  spelled the last name.  I didn't say a
12  first name.  I don't know her.
13     Q.   You said you had a two-hour
14  meeting with the EEOC.  Was the two-hour
15  meeting with Ms. Byrdsong?
16     A.   Yes.
17     Q.   And during the two-hour
18  meeting, you discussed a lot of things
19  regarding your employment with Cracker
20  Barrel?
21     A.   Yes.
22         MS. BUSBY:  Object to the
23  form.

Page 423

1      Q.   Did you discuss all the
2  racial slurs that you witnessed while you
3  were at Cracker Barrel?
4         MS. BUSBY:  Object to the
5  form.
6      A.   Yes.
7      Q.   Including the statements made
8  by Bill, the vendor, and other third
9  parties?
10         MS. BUSBY:  Object to the
11  form.
12     A.   Yes.
13     Q.   Do you know why she didn't
14  include those statements in her intake
15  notes?
16     A.   No.
17         MS. BUSBY:  Object to the
18  form.
19         MS. YORK:  Okay.  I think
20  that's it unless -- I think that's it.
21         MS. BUSBY:  I have one
22  question, and it may not even be a
23  question.  Would you read me her first

Page 424

1  question?
2         (Record read.)
3
4         RE-EXAMINATION
5  BY MS. BUSBY:
6      Q.   I've got one question.  The
7  dinner that your lawyer asked you about
8  and that you testified about, that
9  happened after you were terminated from
10  Cracker Barrel, correct?
11     A.   Yes.
12         MS. BUSBY:  Thank you.
13         MS. YORK:  And that's fine to
14  clarify.  I did mean after.  I didn't
15  mean prior to termination.
16         MS. BUSBY:  Yeah.
17
18         FURTHER DEPONENT SAITH NOT
19
20
21
22
23

106 (Pages 421 to 424)

# FREEDOM COURT REPORTING

Page 425

```
1        C E R T I F I C A T E
2
3    STATE OF ALABAMA)
4    JEFFERSON COUNTY)
5
6          I hereby certify that the above
7    and foregoing deposition was taken down
8    by me in stenotype, and the questions and
9    answers thereto were transcribed by means
10   of computer-aided transcription, and that
11   the foregoing represents a true and
12   correct transcript of the testimony given
13   by said witness upon said deposition.
14          I further certify that I am
15   neither of counsel nor of kin to the
16   parties to the action, nor am I in
17   anywise interested in the result of said
18   cause.
19
20
21
22   _____
22   TANYA D. CORNELIUS
23
23
```

107 (Page 425)

PLTF DWIGHT RODGERS

DEPOSITION EX. 1

DEFENDANT'S
EXHIBIT
67307
Rodgers

**Moore Ted 402**

From:
Sent:
To:
Subject:

Medoff Burt 402
Monday, June 24, 2002 5:21 PM
Moore Ted 402
FW: Monster Resume #15097421 Associate Restaurant Manager FLCTRES061002BM
Monster Job #15063351

-----Original Message-----
From: DNRODG@YAHOO.COM [mailto:DNRODG@YAHOO.COM]
Sent: Friday, June 21, 2002 6:39 PM
To: Medoff Burt 402
Subject: Monster Resume #15097421 Associate Restaurant Manager
FLCTRES061002BM Monster Job #15063351

Monster resume #15097421
"Professionalism First"
Job_ref_code FLCTRES061002BM
Monster job #15063351

Name:        DWIGHT RODGERS
Street:
City/Town:    STONE MOUNTAIN
State:        GA
Postal Code:  30083
Country:      US
Phone Number:  770-
Fax Number:   770-4
Email:        DNRODG@          .COM
Relocate:     Will Relocate
Salary Requirements:   44000 USD/year
Work Requirements:   Full-Time, Employee
Education:    Bachelor's Degree
Work Status:   US I am authorized to work in this country for any employer.

DWIGHT RODGERS

STONE MOUNTAIN, GA  30083
US
DNRODG@YAHOO.COM
Primary Phone: 770
Secondary Phone: 770
Mobile: 678 695 6174
Fax: 770-469-4062
"Professionalism First"
Resume #15097421

OBJECTIVE
    To obtain a position in management with your company that would give me the opportunity of advancement to use the skills and knowledge I have obtained while working in the restaurant management field.
TARGET JOB
    Target Job Title:   GENERAL MANAGER
    Alternate Target Job Title:   MULTI-UNIT MANAGER

1

Desired Job Type: Employee
Desired Status: Full-Time
Desired Salary: 44,000.00 USD Per Year
Site Location:   No Preference
Description of my perfect job:
One that would allow to advance to a senior management position by implementing and developing my managerial traits and knowledge
Career Level:   Management (Manager/Director of Staff)
Date of Availability:     Immediately
TARGET COMPANY
Company Size: No Preference
Category:   Restaurant and Food Service
Description of my ideal company:
One that promotes a continued education and allows it's employee's the chance to advance and demonstrate their abilities.
TARGET LOCATIONS
Relocate:   Yes
US
WORK STATUS
US: I am authorized to work in this country for any employer.
EXPERIENCE
8/2001 – Present    RTM Southeast Incorporated    Atlanta, Georgia
General Manager
*Manage 2 assistant managers and 20 team members.
*Control food cost and inventory accountability.
*Interview, select and develop restaurant personnel.
*Maintain In-Unit P&L, General Ledger reconciliation and budgeted sales.
*Designed and implemented the local store marketing program.
*Completed performance reviews on subordinate managers and team members.

5/1999 – 8/2001    Bojangles Restaurant Inc.    Martinez, Georgia
Training Unit Director
*Implemented company training program with new management candidates and restaurant staff *Responsible for earning and maintaining phase I and II training and certification of restaurants
*Train area management staff in restaurant operating procedures and certification
*Interview, select and develop management trainee candidates
*Maintained P&L's and implemented yearly budget.
*Implement and managed the local store marketing program.

8/1998 - 5/1999    Bojangles Restaurant Inc.    Greenwood, South Carolina
Unit Director
* Operated shifts without supervision.
* Interviewed, selected and developed restaurant level personnel.
* Implemented training course for new restaurant personnel.
* Established restaurant goals and budget.
* Completed performance reviews.
* Controlled food cost and inventory.

2/1997 - 5/1998    Athens Daily News  Athens, Georgia
District Manager
* Supervised the delivery and sales of newspapers on district 18.
* Promoted sales of company paper through cold calling and route maintenance.
* Maintained customer log of stops and starts for a timely delivery of paper stops and starts.

10/1995 - 12/1997  Prestige Staffing/Merchandising Services    Athens, Georgia
Operating Partner/Owner
* Recruited and trained personnel to assist clients with personnel shortages for various positions.
* Managed the work performance of company temporary personnel.
* Negotiated contracts for the hiring of services personnel and their salaries.
* Coordinated the marketing and advertising for recruitment of company services

10/1992 - 3/1995    PIA Merchandising Company Inc.    Clear Water, Florida

2

Rodgers v. Cracker Barrel
Def. Initial Disc. 0025

Area Manager
* Managed 9 supervisors and 65 merchandisers in the implementing of company plan-o-grams.
* Implement the training program for new projects.
* Completed performance reviews on supervisors.
* Conducted Quality Assurance inspections on completed assignments.
* Managed the administrative office hiring of temporary staff personnel.
EDUCATION
    Cochise College    US-Arizona-Sierra Vista,
Bachelor's Degree
Completed 1 of my 3.5 years. Relocated due to military spouse.

    University of Maryland   US-Maryland-College Park
Bachelor's Degree
Completed 1.5 years of my 3.5 years of college, relocated with military spouse.

    Commonwealth College     US-Virginia-Norfolk
Bachelor's Degree
Completed 1 year of my 3.5 years of college
SKILLS
    Skill Name  Skill Level  Last Used  Experience
    Serve Safe certified and Instructor qualified  Expert  Currently used  6 years
REFERENCES
    Mr. Michael Schuller    Bojangles Restaurant Inc.   Area Manager
    Phone Number:   803-██████████
    Reference Type:    Professional

    Deborah Dykes Athens Daily News  Circulation Director
    Phone Number:   800-██████████
    Reference Type:    Professional

    Mr. Floyd Baker    PIA Merchandising Company Inc.   President of Operations
    Phone Number:   800-██████████
    Reference Type:    Professional

    James Rundell  RTM Incorporated   Area Supervisor
    Phone Number:   770-██████████
    Reference Type:    Professional

    James Rundell  RTM Incorporated   Area Supervisor
    Phone Number:   770-██████████
    Reference Type:    Professional
ADDITIONAL INFORMATION
    Completed the Equal Employment Opportunity Officers course. Worked as a Equal Employment Opportunity
Specialist for 3 years

3

Rodgers v. Cracker Barrel
Def. Initial Disc. 0026

PLTF DWIGHT RODGERS

DEPOSITION EX. 2

## Associate Performance Evaluation

Employee Name:              RODGERS DWIGHT N

Employee ID:                364639

Employee Position:          GM0237

Evaluator:                  ALEXANDER, RICH A

Evaluator ID:               96880

Evaluator Position:         RDM015

Evaluation:                 Eval 1 of 2005

Review dates

Evaluation End Dates for Fiscal: 2005

Eval 1 - 01/28/2005

1) All employees who are evaluated will receive a signed paper copy of their own evaluation.

2) Evaluators will send evaluations to the home office HRIS department.



**DEFENDANT'S EXHIBIT**

2    Rodgers

**Objective 1: Achieve and maintain fully staffed stores with high quality management and hourly employees.** Process Date 4-5-2005 12:49:15

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| Eval_1> | 4: Exceeds Standards: (0.14% to 0.2%) | 1) Meet overtime % related to total labor cost<br>5: Role Model: (0.13% or less)<br>4: Exceeds Standards: (0.14% to 0.2%)<br>3: Meets Standards: (0.21% to 0.26%)<br>2: Needs Improvement: (0.27% to 0.3%)<br>1: Unacceptable: (0.31% or greater) | Strength |
| Eval_1> | 5: Role Model: (98. or less) | 2) Achieve hourly employee turnover goal (Goal = 115% annualized)<br>5: Role Model: (98. or less)<br>4: Exceeds Standards: (99 to 109.)<br>3: Meets Standards: (110 to 120.)<br>2: Needs Improvement: (121 to 145.)<br>1: Unacceptable: (146 or greater) | Strength |
| Eval_1> | 2: Needs Improvement | 3) Staffing and Retention | |
| | | 3.1 Develops and implements appropriate staffing and succession plans. | Developmental |
| | | 3.2 Hires appropriately qualified candidates through effective interviewing and selection processes. | N/A |
| | | 3.3 Follows procedures outlined in the Staffing and Retention guide. Follows Best Practices guidelines for staffing and retention. | Strength |
| | | 3.4 Creates a work atmosphere where employees feel appreciated and motivated to perform and remain with Cracker Barrel. | Developmental |
| | | 3.5 Confronts and resolves employee conflicts and morale issues. | Developmental |
| | | 3.6 Supports and promotes quality of life initiatives. | N/A |
| | | 3.7 Evaluations are performed on a timely basis per the review cycle. | Strength |
| | | 3.8 Interviews all applicants and has a good application system in place. | N/A |
| | | 3.9 Uses designated skill trainers for all positions and meets regularly to improve training. | N/A |
| Eval_1> | 2: Needs Improvement | 4) Leading, Developing, and Communicating with Others | |
| | | 4.1 Communicates Cracker Barrel mission, vision, values, and goals to employees. Motivates and gains commitment from others. Schedules and holds weekly operational management meetings. | Developmental |
| | | 4.2 Holds managers and staff accountable to Cracker Barrel Standards. | Strength |

Rodgers v. Cracker Barrel<br>Def. Initial Disc. 0142

4/5/2005

Evaluation View

| | | |
|---|---|---|
| | 4.3 Trains managers and employees effectively, using a hands-on approach when necessary. | N/A |
| | 4.4 Provides specific, constructive and well-balanced feedback to retail counterpart, subordinates, peers, and supervisors on an ongoing basis. | N/A |
| | 4.5 Effectively manages PAR program to develop employees. | N/A |
| | 4.6 Listens actively, promotes and practices open door policy and manager is approachable. | Developmental |
| | 4.7 Communicates clearly, candidly, and honestly; avoids ambiguity and mixed messages. | Developmental |
| | 4.8 Effectively uses situational leadership skills to communicate with others. | N/A |
| | 4.9 Participates in MIT and Associate Manager development as outlined in the Associate Manager Development Guide. | N/A |
| Eval_1> | 3: Meets Standards    5) Administering Policies and Procedures | |
| | 5.1 Executes Cracker Barrel's orientation and skills training programs for new employees. | Strength |
| | 5.2 Documents and manages discipline and/or performance problems in accordance with Cracker Barrel's policies and procedures. | N/A |
| | 5.3 Demonstrates a working knowledge of fair employment policies and guidelines (EEO guidelines, hiring minors, OSHA, etc.). | Developmental |
| | 5.4 Supports and executes responsibilities associated with the performance management process. | N/A |
| | 5.5 Leads and supports all Best Practices initiatives. | Strength |
| Eval_1> | Objective 1 Comment | Dwight, as we have discussed on many occasions, your communication and approachability with your subordinates needs improvement. There is an obvious disconnect between you and your team when it comes to your perception of communication and theirs. Continue to work with me and others in our company to come up with strategies to improve communication and mixed messages wether perceived or real. |
| **Objective 1: Point Subtotal** | | |
| Eval_1 | Performance Measurements: | 18.00 |
| | Performance Behaviors: | 22.40 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0143

Evaluation View

**Objective 2: Improve guest perceptions.** Process Date 4-5-2005 12:49:16

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| Eval_1> | 2: Needs Improvement. (10 to 12, guest complaints) | 6) Number of guest complaints<br><br>5: Role Model: (0 to 3, guest complaints)<br>4: Exceeds Standards: (4 to 6, guest complaints)<br>3: Meets Standards: (7 to 9, guest complaints)<br>2: Needs Improvement: (10 to 12, guest complaints)<br>1: Unacceptable: (13 or more guest complaints) | Developmental |
| Eval_1> | 3: Meets Standards: (85 to 88.) | 7) Store Visit Report (average of two scores)<br><br>1: Unacceptable: (74, or below)<br>2: Needs Improvement: (75 to 84.)<br>3: Meets Standards: (85 to 88.)<br>4: Exceeds Standards: (89 to 93.)<br>5: Role Model: (94 or above) | Strength |
| Eval_1> | 2: Needs Improvement | 8) Building and Maintaining Guest Relations | |
| | | 8.1 Educates and empowers employees to please guests. | N/A |
| | | 8.2 Interacts frequently with guests in dining room (e.g. table visits) and retail store in a friendly, courteous manner. | Developmental |
| | | 8.3 Follows through on commitments made to internal and external guests (e.g. follow through with complaints). | Strength |
| | | 8.4 Resolves guest problems or needs using S.T.A.R.S. Sets an example for employees. | N/A |
| | | 8.5 Provides service to guests that exceeds their needs and expectations. | Developmental |
| | | 8.6 Staff is friendly, smiles, and demonstrates pleasing people practices. | N/A |
| Eval_1> | 2: Needs Improvement | 9) Planning and Supervising Operations | |
| | | 9.1 Does accurate sales and labor forecasts. Anticipates and responds to volume fluctuations / bottlenecks and takes appropriate action. | Strength |
| | | 9.2 Manages multiple tasks and responsibilities simultaneously. Organized and uses day planner effectively. Meets all company and district deadlines. | N/A |
| | | 9.3 Considers employee training, breaks, and special requests when preparing schedules. | Developmental |
| | | 9.4 Uses organizational skills. Prioritizes, delegates, and follows-up to | N/A |

Rodgers v. Cracker Barrel<br>Def. Initial Disc. 0144

4/5/2005

| | | | |
|---|---|---|---|
| | maintain a smooth operation. | | |
| | 9.5 Plans shifts using appropriate tools (e.g. PEP Talk, shift cards, production charts, Ally Rally, Red Book) to ensure store readiness. | | N/A |
| | 9.6 Determines Behaviors that need improvement; develops and implements goals and plans which successfully address these Behaviors. | | Developmental |

| | | | |
|---|---|---|---|
| Eval_1> | 3: Meets Standards | 10) Safety, Security, and Sanitation | |
| | 10.1 Follows all HACCP guidelines. | | Developmental |
| | 10.2 Meets all Cracker Barrel asset protection policy, cash management, safety, security, and sanitation standards. | | Strength |
| | 10.3 Maintains property, building, and equipment function at all times. | | N/A |
| | 10.4 Performs regular walk-thrus and holds all employees accountable for safety, security, and sanitation. | | N/A |
| | 10.5 Performs all required safety and sanitation inspections and makes adjustments as necessary. | | N/A |
| | 10.6 Ensures regular inspection of restrooms. | | N/A |
| | 10.7 Monitors dating and rotating shelf-life on boxes and food packages. | | Developmental |
| | 10.8 Makes regular supervised trash runs throughout shift. | | N/A |
| | 10.9 Educates and trains hourly staff and other managers on proper safety and security procedures. | | N/A |
| | 10.10 Promotes the "clean as you go" policy. | | Strength |
| Eval_1> | Objective 2 Comment | Dwight, I am very concerned about your unit's negative sales numbers and negative traffic vs. prior year.I realize you have had competition move in on you.However, we need to out execute the competition and not use this as an excuse.Way too many guest complaints for your unit.You cannot grow your business with this many complaints from the guest that take the time to complain.I need to see manager presence in the dining room.Are you role modeling the behavior? | |
| Objective 2: Point Subtotal | | | |
| Eval_1 | Performance Measurements: | 8.40 | |
| | Performance Behaviors: | 20.80 | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0145

Objective 3: Improve store margins.  Process Date 4-5-2005 12:49:17

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| Eval_1> | 4: Exceeds Standards: (-0.29 to -0.11) | 11) Achieve restaurant labor goal<br><br>5: Role Model: (less than or equal to -0.3)<br>4: Exceeds Standards: (-0.29 to -0.11)<br>3: Meets Standards: (-0.10 to 0.20)<br>2: Needs Improvement: (+0.21 to +0.49)<br>1: Unacceptable: (greater than or equal to +0.5) | Strength |
| Eval_1> | 1: Unacceptable: (greater than or equal to +0.4) | 12) Achieve food cost goal<br><br>5: Role Model: (less than or equal to -0.3)<br>4: Exceeds Standards: (-0.29 to -0.1)<br>3: Meets Standards: (-0.09 to +0.09)<br>2: Needs Improvement: (+0.1 to +0.39)<br>1: Unacceptable: (greater than or equal to +0.4) | Developmental |
| Eval_1> | 2: Needs Improvement | 13) Maintaining Sales and Quality of Operation | |
| | | 13.1 Manages production, labor, and other costs using Cracker Barrel tools to achieve planned targets. | Developmental |
| | | 13.2 Follows company mandatory food cost requirements. | Developmental |
| | | 13.3 Increases sales and profitability through shift execution and appropriate sales-building strategies (using a seating index and appropriate staffing). | N/A |
| | | 13.4 Maximizes productivity of self and others. | N/A |
| | | 13.5 Takes initiative to solve operational problems that arise. | Developmental |
| | | 13.6 Labor - schedules properly for the volume to hit the targeted goals. | Strength |
| | | 13.7 Demonstrates an understanding of the impact of all decisions on Cracker Barrel profits. | Developmental |
| | | 13.8 Uses data to make appropriate decisions to maximize sales. | N/A |
| | | 13.9 Adheres to Cracker Barrel product and guest service standards. | N/A |
| | | 13.10 Adheres to Cracker Barrel food quality and recipe standards. | N/A |
| | | 13.11 Trains and maintains proper procedures on guest check, exception reporting, service comps, manager unknowns, voids, and meal policies. | N/A |
| | | 13.12 Has proper (minimum standards) levels of small wares in service to assure a smooth operation. | N/A |
| | | 13.13 Partners with management team to reduce shrinkage. | N/A |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0146

| | | | |
|---|---|---|---|
| | 13.14 Reduces shrinkage through the use of the "Effective Shrinkage Management" tool. | | N/A |
| | 13.15 Ensures compliance to Retail Audit Procedures. | | N/A |
| | 13.16 Follows Asset Protection Policy. | | N/A |
| Eval_1 | Objective 3 Comment | Dwight, good job on managing labor costs for the first half of fiscal '05.Food management is a different issue.Very inconsistent on your ability to manage this cost control.Are you talking and walking food cost focus and expectations?The tools are there for your use.Are you holding your managers and staff accountable for hitting the target?? | |
| **Objective 3: Point Subtotal** | | | |
| Eval_1 | Performance Measurements: | 8.00 | |
| | Performance Behaviors: | 9.60 | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0147

4/5/2005

**Objective 4: Exceed the Financial Plan   Process Date 4-5-2005 12:49:18**

| Eval | Rating | Category Scales Results from Qtrly PM | Focus Area |
|---|---|---|---|
| Eval_1> | 1: Unacceptable: NOI v/s LY: (0%) | 14) Net Operating Income (NOI) v/s Last Year NOI<br><br>1: Unacceptable: NOI v/s LY: (0%)<br>2: Needs Improvement: NOI v/s LY: (+0.01% to +7.5%)<br>3: Meets Standards: NOI v/s LY: (+7.51% to +15.0%)<br>4: Exceeds Standards: NOI v/s LY: (+15.1% to +20%)<br>5: Role Model: NOI v/s LY: (+20.0% or greater) | Developmental |
| Eval_1> | 2: Needs Improvement Rsales: (-3.59% to +3.39%) | 15) Real Net Restaurant Sales Growth<br><br>1: Unacceptable Rsales: (-3.6% or below)<br>2: Needs Improvement Rsales: (-3.59% to +3.39%)<br>3: Meets Standards Rsales: (+3.4% to +5.49%)<br>4: Exceeds Standards Rsales: (+5.5% to +6.09%)<br>5: Role Model Rsales: (+6.1% or greater) | Developmental |
| Eval_1> | 1: Unacceptable: (-3.6% or below) | 16) Achieve Retail Sales v/s Last Year<br><br>1: Unacceptable: (-3.6% or below)<br>2: Needs Improvement (-3.59% to -0.1%)<br>3: Meets Standards (+0.09% to +3.9%)<br>4: Exceeds Standards: (+3.91% to +5.99%)<br>5: Role Model: (+6% or greater) | Developmental |
| Eval_1> | Objective 4 Comment | Dwight, a very disappointing first half of fiscal '05 in the areas of sales growth both restaurant, retail and net operating income vs. prior year. You need to have a great finish to the last half of fiscal '05 in order to bring the year in to the expectations of myself and our company. Focus on the 3 region 2 priorites for the remainder of this year and let's make it happen. | |
| **Objective 4: Point Subtotal** | | | |
| Eval_1 | Performance Measurements: | 7.20 | |
| | Performance Behaviors: | Subtotal N/A | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0148

## 2005 Performance Summary

| Objective No | Performance Areas | Eval 1 |
|---|---|---|
| Process Date 4-5-2005 12:49:19 | | |
| Objective 1 | Performance Measurements: | 18 |
| | Performance Behaviors: | 22.4 |
| Objective 2 | Performance Measurements: | 8.4 |
| | Performance Behaviors: | 20.8 |
| Objective 3 | Performance Measurements: | 8 |
| | Performance Behaviors: | 9.6 |
| Objective 4 | Performance Measurements: | 7.2 |
| | Performance Behaviors: | — |
| | Current Evaluation Performance Measurements Score: | 41.6 |
| | Current Evaluation Performance Behaviors Score: | 52.8 |
| | Current Evaluation Overall Performance Rating: | |
| | | |
| | Overall Annual Performance Measurements Score: | 41.6 |
| | Overall Annual Performance Behaviors Score: | 52.8 |
| | | |
| | 2005 Overall Annual Rating: | 2 |
| | | 1 = 19.0000 - 29.4999 |
| | | 2 = 29.5000 - 49.4999 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0149

4/5/2005

| 2005 Rating Scale: | 3 = 49.5000 - 69.4999 |
|---|---|
| | 4 = 69.5000 - 89.4999 |
| | 5 = 89.5000 - 100.0000 |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0150

4/5/2005

Evaluation View                                                        Page 11 of 13

### Individual Development Program

Process Date 4-5-2005 12:49:19

| Developmental Plan | Resources needed | Method to Measure | Follow-up Date |
|---|---|---|---|
| **Eval 1** | | | |
| see attached IDP | | | |
| | | | |
| | | | |

| | Current Recommendations (Check) | | Comments |
|---|---|---|---|
| | Remain in current position for continued development | -X- | |
| Career Development: | Developmental Projects | -X- | Improve communication and vision with your staff. |
| | Promote | -x- | |
| | Willing to relocate | -x- | |
| | Special interests | -x- | |

Rodgers v. Cracker Barrel
Def. Initial Disc. 0151

4/5/2005

Evaluation View

**Eval - 2005 Performance Comments and Signatures**

**Supervisor's Comments:**

Dwight, a very difficult and disappointing first half of fiscal '05. Sales and traffic are down on both sides of our business. This greatly affect the middle of the P & L along with mismanagement of some of our basic cost controls. Food cost is out 0.59% after the first six months. Net operating income is down -0.41% compared to prior year. You did bring labor in at -0.12%. Good Job!!

Dwight, even though the above mentioned numbers are very concerning, I am more concerned with the lack of a cohesive committed management team at your unit. We have had many conversations about your subordinate managers frustrations with your leadership in the following areas: >Mutual respect >Credibility >Work Ethic >Passion for the position you are in >Your vision statement and other key leadership traits. Dwight we cannot fix the top line and the middle of the P & L until you get your team behind you and set clear direction for your unit.

You have given me a plan of action that includes reaching out to others in our organization for suggestions that will improve your leadership skills. This is good step but first you must realize their is a serious problem and be very self analytical in how you are going to change some behaviors to regain the trust, respect and credibility with your managers. You must become more approachable, listen to understand, give clear direction and planning skills need improving.

Dwight, you are very intelligent, articulate and you know Cracker Barrel. If you follow your plan, listen and quit being so defensive/argumentative when confronted you can succeed as the GM of unit #237 Gardendale. You have my 100% support in your endeavors to make some very important behavior changes.

I feel you can make it happen.

**Employee's Comments:**

_____

_____

_____

_____

_____

_____

Rodgers v. Cracker Barrel
Def. Initial Disc. 0152

4/5/2005

Evaluation View

Employee's
Signature:

Supervisor's
Signature:

Second Level Review
Signature:

**Definition for Second Level Review and Signature**

1. Associate Manager and Senior Associate Manager evaluations performed by General Manager, the Second Level Review is the District Manager.

-OR-

2. General Manager and Retail Manager evaluations performed by District Manager, the Second Level Review is the Regional Vice President.

"I accept and understand Cracker Barrel's Equal Employment Opportunity policy, Anti-harassment policy, and Open Door policy, and that employees may utilize the company's toll free number (1-888-648-DOOR) to report complaints or violations of these policies. I understand that the company may be held responsible for acts of harassment that I commit, condone, tolerate, or fail to investigate. I further understand that if I violate any aspect of these policies that I will be subject to immediate discipline, up to and including termination, and that I can be sued and may be held personally liable for my acts or omissions. Therefore, I acknowledge and confirm that I am not aware of any observed, alleged, experienced, or reported harassment, including discrimination or sexual harassment. I commit that I will report any such knowledge or awareness of possible violations of these policies to my immediate supervisor or the Employee Relations Department."

Employee signature:

Process Date 4-5-2005 12:49:19

Rodgers v. Cracker Barrel
Def. Initial Disc. 0153

4/5/2005

PLTF DWIGHT RODGERS

DEPOSITION EX. 3

# Based on our conversation, I have prepared an action plan to address gaining respect quickly; building trust and credibility.

How To:
Establish and communicate personal standards/expectations to guide you through all situations. Learn as much as possible about the person you are about to meet, and use those facts in your first meeting. Be prepared with what you will be discussing so you do not waste the other's time. Use language appropriate to the listener. Ask for the other person's opinions or ideas. Follow up your meetings with a memo or thank-you note. Dress for success. Speak only when you have something of value to offer; project confidence and competence. Be sure of your facts and figures. If you do not know the answer to a question, do not bluff; offer to get the answer quickly and precisely. Do not repeat gossip. Listen and respond with empathy; maintain the other person's self-esteem. Be yourself.

## Ways To Learn Additional "How Tos":

### On-Job
When you have made a poor impression, find out exactly why. Analyze the qualities in others that impress you. Study videotapes of yourself as if through another person's eyes. Be aware of the behavior and appearance of people you meet to determine what adds to or detracts from a favorable impression

### Readings
*What Every supervisor Should Know* by Bitel and Newstrom.
*Management of Organizational Behavior: Utilizing Human Resources* by Hersey and Blanchard.
*Becoming a Manager: Mastey of a New Identity* by Hill.
*Leadership: The Inner Side of Greatness* by Koestenbaum.
*The Essence of Leadership: The 4 Keys to Leading Effectively* by Locke and Latham.
*Super Leadership* by Manz.

### Programs
"Building Credibility, Rapport and Trust" - Achievement Center, Inc.
"Client Centered Selling" - MOHR Financial Services
"Internal Counsulting" - Personnel Decisions, Inc.
"The Credibility Factor" - TPG/Learning Systems
"Producing Results With Others" - The TACOM Corporation

## Ways To Practice:
Notice how quickly you establish rapport with others during social gatherings; work to make the connection faster. Choose important people whom you want to meet, plan what you will do at the first meeting, and have a friend introduce you; after the meeting, get feedback from the friend on how you came across. Write down the reasons why you trust someone you know; strengthen these qualities in yourself. Make a committed and enthusiastic effort to satisfy internal and external customers' requests.

## How To Measure:
Get feedback from your manager and others on what your reputation is in these areas. Have someone you trust solicit feedback from a person you met recently. Ask a friend how he/she would rate your performance in a recent situation. Ask your toughest critic how he/she would rate your performance in



DEFENDANT'S EXHIBIT

3    Rodgers

Rodgers v. Cracker Barrel
Def. Resp. to RFP 00001

a recent situation.  Co-workers will confide in you, ask your opinion, and refer others to you as a source of information more often.

**How To Use This Talent More:**
Volunteer for any project that includes representing your organization to the public.  Identify a project in trouble that could be rescued with the help of this strength.  Be the spokesperson for your group.  Offer your help to two parties who are at a standstill.

PLTF DWIGHT RODGERS

DEPOSITION EX. 4

-----Original Message-----
**From:** Alexander Rich 8015
**Sent:** Monday, April 04, 2005 9:12 PM
**To:** Phillips Ron 9802
**Subject:** 04-04-05 Dwight Rogers' Action Plan

Ron, here is Dwight's action plan.  Rich A.
-----Original Message-----
**From:** 237 General Manager
**Sent:** Saturday, April 02, 2005 12:19 AM
**To:** Alexander Rich 8015
**Subject:** Document1

Rich,

I am forwarding this response per our conversation.  I have voice mails out to others who were giving me some feed back on measures I could take to resolve the perception matter here and I may be forwarding other information to you as well

If this is not to your satisfaction, please let me know.


Dwight



DEFENDANT'S
EXHIBIT

4    Rodgers

Rodgers v. Cracker Barrel
Def. Resp. to RFP 00003

March 30, 2005

To: Rich Alexander,
DM, District # 15

From: Dwight Rodgers
GM, Unit 237
Gardendale, AL

Per your request, I am responding to the letter of concern that you and I discussed on March 26, 2005 ref: the manager's meeting held on March 21, 2005.

In order to begin the process of self-evaluation, I have enlisted several outside personnel's assistance in the overall methods of how one would be able to start a measure of this nature.

In conversation with all parties enlisted, I have decided to try several methods to work not only on the traits that make one a great leader, but also the traits that makes one assessable, receptive and a valued team player.

On March 31, 2005 I will be conducting a survey of all hourly employees asking for their honest feedback on their perception of my leadership abilities. This survey will only contain 5 questions and will not ask the employee for their names.

On April 5, 2005 instead of our standard manager's meeting, We will be holding the manager's meeting off site to allow us the time and surroundings were the managers will be able to give me feedback without being disturbed with my undivided attention. Your presence is requested.

I have also solicited the assistance of Mr. Kevin Dilley and Dan McChurch from Home Office Management Development Department on different exercises that I may be able to use to break the communication barer between myself and the management team of this unit.

I will also be meeting with the entire Shift Leading team on 04/13/05 from 3-5p once a month were we will be going over the Shift Leader Training Workbook as a group in order to ensure all members of the supervisory team are on the same page.

As it has been my motivation since the day I inquired / pursued employment with this company, that at no time would I not give 110% and I will not start now. I do understand that at some point in our career we have to make choices and changes in order to ensure that the overall mission of the team is met and I'm willing to do/continue to do that. I hope this plan of action will be that which this unit will need in order to operate as one and not be divided as we are operating currently.

Any suggestions, concerns or feedback that you may have in reference to any of the ideas placed within, will definately be appreciated.

Dwight N. Rodgers
GM, Unit 237

PLTF DWIGHT RODGERS

DEPOSITION EX. 5

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 130-2005-06620 |
| | | and EEOC |

_State or local Agency, if any_

| Name _(Indicate Mr , Ms., Mrs )_ | Home Phone No. _(Incl Area Code)_ | Date of Birth |
|---|---|---|
| **Mr. Dwight N. Rodgers, Sr.** | (334) ▓▓▓▓ | ▓▓▓-1966 |

| Street Address | City, State and ZIP Code |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓, **Montgomery, AL 36117** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. _(If more than two, list under PARTICULARS below.)_

| Name | No. Employees, Members | Phone No. _(Include Area Code)_ |
|---|---|---|
| **CRACKER BARREL RESTAURANT INC** | **500 or More** | **(334) 244-1085** |

| Street Address | City, State and ZIP Code |
|---|---|
| **9191 Boyd Cooper Pkwy,  Montgomery, AL 36117** | |

| Name | No. Employees, Members | Phone No. _(Include Area Code)_ |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON _(Check appropriate box(es) )_

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER _(Specify below.)_

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **03-03-2005**   Latest **09-03-2005**

☐ CONTINUING ACTION

THE PARTICULARS ARE _(If additional paper is needed, attach extra sheet(s)):_

I began my employment with the employer named above as a Manager on July 22, 2002.  I was promoted to the position of General Manager during September of 2004. On March 3, 2005, a White Associate made a derogatory statement about Blacks which I found to be offensive.  An investigation was to be scheduled into the matter.  However, I was informed by the District Manager, Richard Alexander that I could not take any corrective action regarding this employee.  The finding of the investigation was never revealed to me, although I questioned the finding on several occasions.  Thereafter, I was not allowed to discipline any manager according to established policy.  I am not aware of any White General Manager being denied this privilege.  Upon my complaining of the offensive comment and the status of the investigation, I began to be given several disciplinary actions regarding my job performance.  On September, 3, 2005, I was given a final warning regarding my job performance and discharged.   I was informed that I was discharged for performance below standards of the employer's General Managers. I am not aware of any other General Manager who has complained of matters he found to be racially offensive.  I was the only Black General Manager assigned to Mr. Alexander's district.

I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended because of my race, Black and in retaliation for my constant inquiry into the status of the investigation of the racially offensive comment.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – _When necessary for State and Local Agency Requirements_ |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Sep 08, 2005**<br>Date          _Charging Party Signature_ | SUBSCRIBED AND SWORN TO B▓ _(month, day, year)_ |

DEFENDANT'S EXHIBIT
5    Rodgers

PLTF DWIGHT RODGERS

DEPOSITION EX. 6



# Employee Counseling Report

**Employee Name:** Dwight Rodgers      **Employee #:** 364639

**Store #:** 574     **Job Status:** General Manager     **PAR Level:** N/A

**Supervisor's Name:** Rich A. Alexander     **Supervisor's Employee #:** 96880

**Written or Verbal:** Final Written     **Date:** 08-12-05     **Time:** 3:30pm

## Problem/Situation:

Dwight, a very disappointing visit to your unit on Friday, August 12th. I arrived at approximately 9:15am to find yourself and two other managers on duty. When I did my walk through I pointed out and had you discard $233.00 of food items that were either not labled or had passed their hold times. Dwight food availability, quality and food safety has always and will always be a top priority in our company. It is unacceptable that both your opening managers and yourself did not do a walk through and did not catch these issues with food quality and/or food safety. Some of these food items were out of date the day before and were being served to our guests. When I sat down and expressed my concerns, you immediately started to blame your associates. Dwight, your associates are performing up to the standards you have both role modeled and accepted.

Dwight, we have spoken many times about you finding your operator"s hat and setting clear expectations, coaching and training to the Cracker Barrel's operational standards, and then following up and holding your managers and employees accountable to deliver these standards.

And most importantly, you must role model the behaviors in order to set the example to others in your unit.

## Summary/Corrective Action Plan:

Dwight, your unit is failing in the following operational areas: 1. Sales are well below expectatioon and continue to decline weekly. 2. 29 guest complaints in 11 weeks of operation. 3. Food cost over goal by greater than 5% for the last two months. 4. In the 11 weeks since opening, you have yet to meet the "New Store" weekly labor efficiency goal. 5. I have had many conversations with you in regards to you or your managers failing to perform required call ins and/or required e-mails/faxes.

Dwight, immediate improvement regarding the current operational issues mentioned above is expected. Failure to make and sustain these improvements will result in further disciplinary action up to and including termination..

DEFENDANT'S EXHIBIT

Rodgers

6

**Policy Statement:**    Yes ☐    No ☐

**Information concerning Employee Assistance Program?**    Yes ☐    No ☐

**Employee Statement:**

_____

_____

_____

_____

_____

| I have read and understand the above statement. | |
| --- | --- |
| Signed (Manager): _~~Rich G. Tibble~~_ | Date: 8/20/'05 |
| Signed (Employee): _____ | Date: 8/20/05 |

*Original – Supervisor;  Copy – Employee*

PAR 4/22/99

Plaintiff Doc's  000167
Rodgers  v. CB

Dwight Rodgers Docs
Prod. to EEOC 000006

PLTF DWIGHT RODGERS

DEPOSITION EX. 7

**From:**     574 General Manager
**Sent:**     Sunday, July 31, 2005 6:56 PM
**To:**       Phillips Ron 9802
**Cc:**       Alexander Rich 8015; Murchison Laura 9702; Adkins Mike 394
**Subject:**  RE: 07-31-05 FW: 07-24-05 Guest Relations Issue - Store # 574



 Rodgers

Ron,
I apologize for the delay in response.

In response to your email dated 07/24/05, With the initial opportunities
that this unit has faced since day one.."hiring, staffing, management
selection and management dismissal" I have taken the following steps to
generate consistency within the unit. In reviewing the guest complaints and
noticing the levels of inconsistency with the staff, I decided to have a
mass meeting with the staff to get out as much information in the least
amount of time. On 07/26/05 and 07/27/05 Teresa Cameron  (Retail Manager)
and myself held meetings with the staff to discuss standards, expectations,
guest complaints, guest service, DOJ, attendance, productivity and the
overall performance of the unit. In narrowing down the information gap I
have also held one on ones with the management staff in reference to the
same. Some of the things that I've done with the management team is role
played S.T.A.R.S. with the guest complaints.." how could we have handled
this differently"?, Will start taking Manager breaks "when only two managers
are on shift only one will break at a time to give floor coverage at all
times". I have assigned three managers on the weekend both shifts, one BOH,
one FOH and one wait line/host assistance to ensure guest are getting the
best service.  During this weekend in utilizing this coverage guest comps
and discounts has reduced from 7/2 $150.00, 7/9 $188.00, 7/16 $148.00, 7/23
$72.00 and 7/30 $18.00. In noticing this change in service and reaction
times, my weekend schedule will be from opening shifts with 7am being the
latest time in for me until further notice.  I recognize that a unit is only
as strong as it's leader and until their development/awareness is to par,
these measures are necessary.  OPERATIONS AND TRAINING HOURLY PERSONNEL:  I
have requested assistance from the district in getting experienced personnel
to spend a weekend with us to help in the continued training of the staff as
I continue to develop and increase the awareness of the management team.
This started this weekend with Renee (Lisa) Holmes from Decatur joining us
for two days (Please thank her for her assistance as I have) working with
the grill crew as well as having a set of developed eyes to give feedback on
how we can improve in our guest service. She is also scheduled to return in
two weeks to assist in coaching, and developing FOH staff. Rich Alexander
(DM)has committed to continue to coach and develop me on my performance as
the General Manager with constant feedback and Weekly agenda review, "show
time spent with developing managers as well as myself". In applying that
which I have described above, Operations of the unit will have an immediate
impact on guest service and consistency.  Overall, I'm constantly pushing
the managers to focus on running great shifts one day at a time.  Making an
impact one shifts day at a time.

Dwight Rodgers
GM, Unit 574


> -----Original Message-----
> From: Phillips Ron 9802 [mailto:Ron.Phillips@crackerbarrel.com]
> Sent: Sunday, July 31, 2005 7:23 AM
> To: 574 General Manager
> Cc: Frank Monique 7054; Alexander Rich 8015; Adkins Mike 394; Murchison
> Laura 9702
> Subject: 07-31-05 FW: 07-24-05 Guest Relations Issue - Store # 574
>
>

Rodgers v. Cracker Barrel
Def. Resp. to RFP 00005

> Dwight - on   7/24 I sent this request regarding multiple complaints
> received the week ending 7/22/05 - Please update me immediately on what
> we are doing. I expected feedback by Thursday, 7/27/05.
>
> Ron Phillips
>
>
>
>
>
>
>     -----Original Message-----
> From: Phillips Ron 9802
> Sent: Sunday, July 24, 2005 5:58 PM
> To: 574 General Manager; Frank Monique 7054; Alexander Rich 8015;
> Murchison Laura 9702
> Cc: Adkins Mike 394
> Subject: 07-24-05 Guest Relations Issue - Store # 574
>
>
> Dwight... this is one of nine complaints in the last eight days....
> We also had three compliments and apparently a "bogus" complaint from a
> non-existent state senator....
>
> Two complaints mentioned loud music and managers being "unprofessional,"
> - see following
> Our server was nice enough to call the manager how was nothing but RUDE.
> Also, we were sitting close to the kitchen entrance and there was too
> much noise coming out. They had a radio in the kitchen playing a very
> loud RAP music, and some people were coursing. Not what we want to hear
> in a restaurant!!!
>
> My concerns are that our operation MUST be more consistent! Many of the
> seven valid complaints reflect slow service and food issues (quality and
> outages). What are we doing to regain our momentum? What are doing to
> become more consistent - shift by shift - and guest by guest? Nine
> complaints in eight days is unacceptable. We've invested too much money
> in this unit to lose our business through inability to operate.
>
> Please respond to me via email no later than Thursday, 7/27/05 and
> detail what we're doing to get OPERATOR consistent...
>
> Ron
>
>
>
>
> -----Original Message-----
> From: Guest Relations
> Sent: Friday, July 22, 2005 12:37 PM
> To: 574 General Manager; 574 Retail Manager; Restaurant Region 2 VP;
> Rest DM-District 15; Retail Region 2 VP; Retail DM-District 54
> Cc: Turner Bridget 472
> Subject: Guest Relations Issue - Store # 574
>
>
>
>
> Store #: 574    Guest Relations Ticket # 455906   Store #: 574
>
>    _____
>
>
> Mr George Toumbacaris
>
> 2500 Halcyon Downs Loop

2

Rodgers v. Cracker Barrel
Def. Resp. to RFP 00006

> 
> 
> 
> Montgomery, AL 36117 us
> (334) 279-6121
> 
> 
> 
> 
> 
> _____
> 
> 
> Status:
> Closed
> Assigned to:
> Danita Lock
> 
> Category:
> Complaints - Service (Bad, Slow, Etc.)
> 
> 
> 
> Store #:
> 574 - Montgomery, Al (Montgomery, Al 36117)
> 
> 
> Incident Date:
> 07/21/2005 06:00 PM
> 
> Manager Reported Date:
> Origin:
> Phone
> 
> Disposition:
> Party Size:
> 0
> 
> Action Taken:
> Refund Amt:
> 
> Employee Name:
> 
> Total Sale Amt:
> 
> 
> 
> _____
> 
> Guest Comments
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> Questions and Answers
> 
> 1.    Which Cracker Barrel did you visit? Please include City, State,
> Interstate, & Exit number if known.

3

Rodgers v. Cracker Barrel
Def. Resp. to RFP 00007

> 2.   When did you visit us? Date, Time?
>
> 3.   Would you happen to have a copy of your receipt from that day?
> Yes
> 4.   Receipt #
> 001109
> 5.   How many people were in your party?
> 2
> 6.   Please describe the general nature of your complaint.
> The Chalkboard as they entered said turkey and dressing 1 veg
> and a price. They decided they wanted it. Guest said he did not see
> anything showing it as a lunch special and waiter checked and said they
> did have a dinner turkey and dressing dinner but not the smaller
> portions. So they decided to find something else, ruben sandwich and a
> ham, gb carrot dinner plt. Biscuits were hard as a rock. He asked server
> for fresher biscuits. 5-6 min later he came back with more but these
> were hard also. Ast mgr came over and said let me see if we can find you
> some fresh biscuits. 5 □10 min later mgr came back with plate of fresh
> hot biscuits. And guest said I only wanted one and mgr offered him to
> take them home and guest declined. Said he was not happy getting the
> fresh biscuits after he was through with his meal. The fries were stone
> cold also. They took one dinner off the bill. Cashier seemed
> indifferent; she was on the phone. Then the gm came out and said you
> should not have been told the smaller portion was not available it is
> the same except one veg. After the first time the batch should have been
> checked and thrown out. He was most gracious and his name was Ralph. At
> least he was concerned and listened.
> 7.   Food/Food Service - What did the people in your party order to
> eat?
> reuben and ham dinner
> 8.   Food/Food Service - Do you remember the name of your server?
> Yes
> 9.   Please enter his/her name or if not, do you possibly have a
> description? (approximate age, race, height, weight/build,gender...)
> 753926 Brian S
> 10.  Food/Food Service - How long were you seated before the server
> approached your table?
> 4 minutes
> 11.  Food/Food Service - After placing your order, how long did it
> take for your food to be delivered?
> 15-20 minutes
> 12.  Food/Food Service - Do you have a complaint about the way your
> server treated you?
> No
> 13.  If yes, please explain.
> na
> 14.  Were you able to speak with a manager about this experience?
> Yes
> 15.  If so, do you remember their name or could you describe them?
> Carlos; them Ralph
> 16.  How did the manager respond?
> Carlos went thru the motions but Ralph seemed genuinely
> concerned
> 17.  Were you satisfied with their actions and response?
> Yes
> 18.  We would like to ask some demographic information. Providing
> this information is voluntary, and will be used to assist in compliance
> with federal law. Regardless of whether or not you provide this
> information, be assured that we will investigate this matter fully.
> Which of the following best describes your Race?
> Caucasian
> 19.  Which of the following best describes your age range?
> 55 and older
> 20.  Why do you think this happened to you?
> somone was not doing their job, a number of people were not.
>

PLTF DWIGHT RODGERS

DEPOSITION EX. 8

DEFENDANT'S EXHIBIT



# Employee Counseling Report

8.  Rodgers

**Employee Name:**     Dwight Rodgers

**Employee #:**     364639

**Store #:**   574          **Job Status:**   General Manager          **PAR Level:**

**Supervisor's Name:**     Ron Phillips, Rich Alexander          **Supervisor's Employee #:**

**Written or Verbal:**   Termination          **Date:**          **Time:**

## Problem/Situation:

Dwight's performance continues to fall below the standards and expectations of the General Manager position. Issues previously discussed with Dwight include:

Dwight's failure to meet required deadlines,

Unacceptable guest complaints, and Dwight's limited responsiveness to address these matters.

A lack of taking personal responsibility to respond to issues needing his attention.

Dwight continuously misses deadlines or does not submit information within required deadlines or in a timely manner.  Examples:  failure to submit reports for Sales Building calls, failure to submit monthly manager schedule as required, failure to conduct timely employee relations investigations, failure to obtain and/or submit required statements even though repeated requests have been made.

## Summary/Corrective Action Plan:

For on-going poor performance, Dwight's employment is terminated effective immediately.

**Policy Statement:**     Yes _____     No _____

**Information concerning Employee Assistance Program?**     Yes _____     No _____

## Employee Statement:

_____

_____

_____

_____

Plaintiff Doc's  000163
Rodgers  v. CB

I have read and understand the above statement.

| Signed (Manager): | *Rich C. Al...* | Date: | 9/3/05 |
|---|---|---|---|
| Signed (Employee): | | Date: | |

Original – Supervisor;  Copy – Employee                    PAR 4/22/99

*Manager Refused to sign*
*Monique Frank*

Dwight Rodgers Docs
Prod. to EEOC 000001

# Documentation of Performance

Dwight Rodgers consistently demonstrates a lack of preparedness, insufficient responsiveness to requests and deadlines, and leadership that does not meet Cracker Barrel's standards for a General Manager.

<u>Lack of Preparedness, Not Meeting Required Deadlines, Lack of Follow Through</u>

- On Sales Building Day on July 13th, Dwight had done little if any preparation for this call. When questioned by his District Manager about his business for the prior week and his plan for the next week, Dwight had very little information to provide. Dwight became defensive, argumentative and placed blame on others. An outline via email was requested by District Manager, Rich Alexander, to clearly lay out when he and his retail partner would meet to plan their business prior to the call each Wednesday. As of August 5th, Dwight had not provided the requested document.

- Over a period of nine weeks, Dwight did not meet the district deadline for Sales Building Day information to be provided to his District Manager.   This information is due to his DM by: Tuesday at 5:00 p.m. Dwight has either provided no information or only partial information (usually on Wednesday mid morning not Tuesday by 5pm. deadline)

- On Friday, August 12th, the District Manager visited Dwight's unit. Dwight and two of his associate managers were on duty.   $233 of food items had to be discarded as they either were not labeled, up to Cracker Barrel standards or out of hold time. Dwight was informed that he would be receiving a counseling.

- On August 6th, four General Managers in the District that are struggling with their ability to plan their business, drive sales on a shiftly basis and/or be proactive or reactive to control labor costs were notified to personally call the District Manager every day to explain what happened on the previous day if they did not make their daily "R" goal. Dwight returned a call to the District Manager on Monday, August 14th, since he had not called on the first day of this new requirement. Said he was confused because he thought his performance was based on "E" not "R". The District Manager explained the process once again and Dwight said he understood the requirements. However, Dwight has yet to call the District Manager even though his unit continues to miss daily "R" goal.

Plaintiff Doc's  000164
Rodgers  v. CB

Dwight Rodgers Docs
Prod. to EEOC 000002

Continued:

<u>Lack of Preparedness, Not Meeting Required Deadlines, Lack of Follow
Through</u>

- On August 18th, Dwight had one of his associate managers leave a voice mail for
  the District Manager explaining why labor was over on Wednesday, August 17th.
  The focus of this program was not a voice mail and definitely not an associate
  leaving a message. Dwight has not followed through on this expectation, nor
  taken action to demonstrate personal responsibility for this expectation.

- On Saturday, August 6th, an associate manager on Dwight's team informed the
  District Manager that another associate manager, on the previous Thursday, had
  used the "F" word in the office. The District Manager spoke with Dwight on
  Sunday, August 7th, and told him to start an open door investigation in regards to
  this matter. As of August 19th, after many conversations, the DM still had not
  received any statements from Dwight. The DM spoke with Dwight again that
  day. Then on Tuesday, August 16 this matter was discussed with Dwight. He
  stated that he was waiting to hear back from Employee Relations. Employee
  Relations also has not received any statements. As of August 24, Dwight had yet
  to provide these statements so that the investigation may proceed and the issue
  may be addressed. Dwight again assured his District Manager that he would
  obtain the statement on August 24. As of the morning of August 25, no
  statements have been received from Dwight.

- On Sales Building Day on Wednesday, August 17th, Dwight once again failed to
  get required information to his District Manager on a timely basis. Once the
  staffing worksheet was received, it became apparent that Dwight had not spent
  much time reviewing the schedules. There were many instances of too many
  employees or too few employees scheduled during different day parts. Instead
  of accepting personal responsibility, Dwight placed blame on his scheduling
  manger. A General Manager is responsible for reviewing the schedule prior to
  sending the staffing worksheet to his district manager.

- The manager's schedule is due from Dwight by end of month. As of August 25th,
  no manager's schedule has been submitted to the District Manager. The new
  schedule starts in two days. On August 24, Dwight assured his District Manager
  that he would submit the schedule later that day. He has again failed to follow
  through on expectations and commitments.

Plaintiff Doc's  000165
Rodgers v. CB

- On Sales Building Day on July 20th, Dwight failed to call in to the confe......
  call; Tony Heiter the scheduling manager participated in the call. At 8:30 pm that
  evening, Dwight contacted his District Manager to report that he was on the road
  and could not pick up a signal on his cell phone. As a General Manager, Dwight

Dwight Rodgers Docs
Prod. to EEOC 000003

is responsible for participating in the calls, and for communicating with his District Manager. He could have used a pay phone, as the call is a toll free number. Dwight responded to his District Manager in a non-chalant manner demonstrating that he does not understand the importance of these calls and his responsibility.

Dwight's District Manager has spoken with Dwight about these matters. Dwight has received coaching to help him understand the necessity of provided information crucial to our business in a timely manner.

## Attendance and Communication:

- On Thursday, July 28th, Dwight notified his District Manager that he was going to be e-mailing a structured day by day outline of his workdays so that his District Manager could look at it and help Dwight in his planning. After 9 days the District Manager had still not received this document from Dwight.

- On Saturday, August 6th, Dwight was 35 minutes late to work.

- Dwight informed his Associate Manager that his District Manager had frozen all vacation requests due to the district being short managers. This is simply not the case. The vacation was approved (as this store had an extra manager on staff) and when approached, Dwight then stated that the Regional Vice President had placed a freeze on vacations, which also was not the case. His credibility as a leader was negatively impacted. His integrity was also, therefore, questioned.

*[signature]*

9/3/ 05

8:30 A.m.

*[signature]*

9-3-05

9:05 a.m.

Plaintiff Doc's  000166
Rodgers  v. CB


Dwight Rodgers Docs
Prod. to EEOC 000004

PLTF DWIGHT RODGERS

DEPOSITION EX. 9

**DEFENDANT'S EXHIBIT**

Plaintiff Doc's  000131
Rodgers  v. CB

Dwight Rodgers        090805            Intake Notes

9  Rodgers

~~The~~ Tommie Patterson, Associate Mgr W/M stated
to PCP on 3-3-05 that on the preceding
Wednesday that don't all Black bury their
people on the week-ends. Patterson is supervised
by PCP.

PCP called HR on 3-4-05 speaking with
Vonn B/F Barr, Employee Relationship Specialist
& Played no role in the investigation

District Mgr Richard Alexander W/M stated PCP
could take no actions toward Patterson because
CP was the one offended.

Alexander promised to conduct an investigation.
CP did not hear anything, therefore in
April '05, PCP questioned the matter.

PCP was told to not forget who he worked for
and Alexander once again promised he was
going to take care of the matter.

PCP was discharged by Alexander on 9-3-05 for ~~conduct~~
performance unbecoming of a general mgr

Prior to complaining PCP had no performance related
problems.

PCP had been promoted in Sept '04 and relocated

2

to Montgomery.

Plaintiff Doc's 000132
Rodgers v. CB

All complaints are to be handled the same way regardless as to whether it is mgmt or below.

PCP was not allowed to place ~~any~~ a White Associate Mgr on final written warning although he had such authority.

PCP asked ~~Patterson~~ Alexander on three occasions the status of the investigation on his complaint

PCP first warning in 3/05 after he complained bout Patterson

nother warning in June 05 after he inquired bout the status of his complaint

Investigations should be completed in ten days nless unusual circumstances exist.

n 6-17-05, PCP received another performance warning. On 6-18-05, PCP sent a letter of dispute to the Regional V.P., Ron Phillips.

Alexander called PCP following a phone call in which Alexander called PCP a liar.

(3)

Shortly thereafter a meeting was held with PCP, Alexander and Phillips

Phillips told Alexander PCP had to be allowed to do his own thing.

Other GM's have been late, no action taken.

Last warning was 9-3-05, the same day of his discharge.

090805
LJByrdsong

Plaintiff Doc's  000133
Rodgers v. CB

PLTF DWIGHT RODGERS
DEPOSITION EX. 10

DEFENDANT'S
EXHIBIT

O6620

10    Rodgers

# YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## BIRMINGHAM DISTRICT OFFICE

## CHARGE QUESTIONNAIRE

This Form Is Affected By The Privacy Act Of 1974; Read The Last Page Before Completing This Form.

### PLEASE READ THE FOLLOWING INFORMATION BEFORE PROCEEDING:

* <u>A charge must be filed with the EEOC within 180 days</u> after the alleged unlawful practice has occurred (300 days, if the employer is within the jurisdiction of a Fair Employment Practice Agency - If you are a state employee or you worked in Richmond County).

* <u>The employer must have</u> 15 or more employees if the alleged unlawful practice falls under Title VII of the Civil Rights Act and the Americans With Disabilities Act; 20 employees if the alleged unlawful practice falls under the Age Discrimination In Employment Act and 2 employees if the alleged unlawful practice falls under the Equal Pay Act.

* <u>Federal employees</u> should file with their Agency EEO Counselor, unless the unlawful practice falls under the Equal Pay Act.

Please complete this questionnaire and return it to the Receptionist. You will be interviewed by an Investigator to determine if your employment situation falls within the jurisdiction of the EEOC. Be prepared to spend up to approximately three hours here today. Interviews are conducted on a first-come, first-served basis. Thank you for your patience and cooperation.

## PLEASE PRINT

NAME Dwight N. Rodgers Sr.                    DATE OF BIRTH ____ / ____ / 66

ADDRESS _____

CITY Montgomery    STATE AL    ZIP 36117    COUNTY _____

TELEPHONE 334- _____    (CELL) PAGER 678- _____

YOUR RACE Black    YOUR SEX : FEMALE _____    MALE    X

SS# _____

Plaintiff Doc's  000258
Rodgers  v. CB

PAGE 2

WHAT DAY(S) AND TIME(S) ARE YOU AVAILABLE BY TELEPHONE BETWEEN THE HOURS OF 8:30 AM AND 5:00 PM? _Anytime_

CONTACT PERSON: (SOMEONE AT A DIFFERENT ADDRESS AND TELEPHONE NUMBER WHO KNOWS WHERE YOU CAN BE REACHED)

NAME _Samuel Dunbar_    TELEPHONE _205_ ███████

ADDRESS _____

CITY _Birmingham_    STATE _AL_ ZIP _____

ARE YOU REPRESENTED BY AN ATTORNEY? IF SO, PROVIDE HIS/HER NAME AND TELEPHONE NUMBER:

NAME _N/A_    TELEPHONE _____

## PLEASE ANSWER THE FOLLOWING QUESTIONS

DATE OF YOUR EMPLOYMENT _7/22/02_    JOB AT TIME OF HIRE _Manager_
_____ JOB AT TIME OF DISCRIMINATORY ACTION _General Manager_

I BELIEVE I WAS DISCRIMINATED AGAINST BY: (CHECK THOSE THAT APPLY)

COMPANY _✓_ UNION (Give Local Number)_____ EMPLOYMENT AGENCY _____

NAME _Cracker Barrel Restaurant Inc._
ADDRESS _9191 Boyd-Cooper Pkwy_
CITY, STATE, ZIP _Montgomery, AL 36116_
TELEPHONE _334-244-1085_ APPROXIMATE NO. OF EMPLOYEES _60,000+_

NAME _____
ADDRESS _____
CITY, STATE, ZIP _____
TELEPHONE _____ APPROXIMATE NO. OF EMPLOYEES _____

WHAT IS THE BUSINESS OF YOUR EMPLOYER _Food Service_

Page 3

**PROVIDE THE NAME OF THE COMPANY OFFICIAL (OWNER, PRESIDENT OR PERSONNEL DIRECTOR)**

NAME _Cy Taylor_ _____ TITLE _President_ _____

**YOUR BEST RECOLLECTION OF THE MOST RECENT DATE OF THE DISCRIMINATORY ACTIONS TAKEN**

**BY THE EMPLOYER** _____

**DO YOU BELIEVE THE ACTION WAS TAKEN AGAINST YOU BECAUSE OF ANY ONE (OR MORE) OF THE**

**CATEGORIES LISTED BELOW?** _X_ YES ____ NO ( IF YES, CIRCLE THE ONE(S) THAT APPLY)

(RACE,) COLOR, SEX, RELIGION, NATIONAL ORIGIN, AGE, (RETALIATION) OR DISABILITY (SPECIFY)
_Based on actions taken after complaining about a_
_discriminative remark._

**SPECIFIC DISCRIMINATORY ACTION: (CIRCLE THE ONE(S) THAT APPLY)**

(DISCHARGE;) HIRING; LAYOFF; RECALL; SUSPENSION; PROMOTION; RETIREMENT (INVOLUNTARY);

WAGES; HARASSMENT; SEXUAL HARASSMENT; OTHER (SPECIFY) _after several inquiries_
_about the case mentioned above._

**PROVIDE A BRIEF EXPLANATION OF THE DISCRIMINATORY ACTION TAKEN AGAINST YOU:**
_A junior Manager made a remark about blacks which_
_offended myself and another employee. The investigation_
_of this was taken away from me and conducted by my_
_superior. I was never interviewed nor informed of any_
_said investigation. When I inquired I started receiving_
_negative documentation._

**WHAT REASON(S) WERE YOU GIVEN FOR THE ACTION TAKEN** _performance unbecoming_
_a Cracker Barrel General Manager._

_____

**WHY DO YOU THINK THE ACTION BY THE EMPLOYER WAS DISCRIMINATORY?** _Is the only_
_African American General Manager in Dist 15. After being_
_Inquiring & filing the discrimination allegation with_
_Human Resources I started being treated differently_
_by my supervisor (District Manager). Documented_
_differently than any other counterpart of the same_
_position._

Plaintiff Doc's  000260
Rodgers  v. CB

**Page 4**

**IF YOUR ISSUE OF DISCRIMINATION IS HIRING OR PROMOTION, LIST THE POSITION YOU WERE**

SEEKING_____N/A_____

**PROVIDE THE NAME & JOB TITLE OF THE PERSON IN THE SAME OR SIMILAR SITUATION WHO WAS**

**TREATED MORE FAVORABLE THAN YOU (Identify this person by race, sex, religion, national origin or age)**

NAME _Greg Walters_____ JOB TITLE _General Mgr. Cauc. Male,_
_Kevin ? General Manager Cauc. Male, Kathy ? General_
_Manager, Cauc. Fem., Don ? General Mgr. Cauc. Male._

**PROVIDE THE NAME(S) AND TELEPHONE NUMBERS OF THE WITNESS(ES) WHO YOU THINK CAN**
**PROVIDE EVIDENCE IN SUPPORT OF YOUR ALLEGATIONS OF DISCRIMINATION.**

NAME _Penny Schmidt_____ TELEPHONE NUMBER_____
_Linda Osborne,_
_Charlotte Johnson_
_Shauna Ray_

**PROVIDE A DESCRIPTION OF THE INFORMATION THAT EACH PERSON LISTED ABOVE CAN SUBMIT IN**
**SUPPORT OF YOUR ALLEGATIONS.**

_Penny Schmidt: Overheard the discrimination remark_
_Linda Osborne: witness mistreatment and verbalized it._
_Charlotte Johnson:_
_Shauna Ray:_

**WHAT RELIEF ARE YOU SEEKING THROUGH THE EEOC?** _Compensation for termination;_
_Clean employment record; job reinstatement._

## <u>YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION</u>

**I SWEAR OR AFFIRM THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT TO THE BEST OF MY**
**KNOWLEDGE.**

SIGNATURE_____ DATE _9/8/05_____

PLTF DWIGHT RODGERS

DEPOSITION EX. 11

FROM :                                                     FAX NO. :                          Jun. 01 2004 07:26AM  P3

EEOC Form 161 (10/96)          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Dwight Rodgers                          From: Birmingham District Office
    919 Eastern Oats Drive                        Ridge Park Place
    Montgomery, AL 36117                          1130 22nd Street South
                                                  Suite 2000
                                                  Birmingham, AL 35205

[  ]  *On behalf of person(s) aggrieved whose identity is*
      *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 130-2005-06620 | Serena Curry, Investigator | (205) 212-2072 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[  ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ]  Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[  ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[  ]  We cannot investigate your charge because it was not filed within the time limit required by law.

[  ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[  ]  While reasonable efforts were made to locate you, we were not able to do so.

[  ]  You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[  ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed **WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Beverly S. Hinton for*                                          8/31/06

Enclosure(s)                    Bernice Williams-Kimbrough,  District Director          *(Date Mailed)*

cc:  Cracker Barrel Old Country Store, Inc.
     c/o Ashley Hattaway
     Burr & Forman, LLP
     420 North 20th Street
     Birmingham, AL 35203

DEFENDANT'S EXHIBIT

11 Rodgers

Plaintiff Doc's  000034
Rodgers  v. CB

PLTF DWIGHT RODGERS

DEPOSITION EX. 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

DWIGHT N. RODGERS,                )
                                  )
          Plaintiff,        )    **Civil Action File**
                                  )    **No.**
   vs.                          )
                                  )
CRACKER BARREL  OLD  )
COUNTRY STORE, INC.,              )
                                  )
          Defendant.        )

**DEFENDANT'S EXHIBIT**

*12* Rodgers

## PLAINTIFF'S INITIAL DISCLOSURES

(1)   State precisely the classification of the cause of action being filed, a brief factual outline of the case including plaintiff's contentions as to what defendant did or failed to do, and a succinct statement of the legal issues in the case.

**This is a civil rights lawsuit arising under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e 3(A) et seq,.   Plaintiff under the supervision of Richard Alexander was subjected to disparate treatment based on a pattern and practice of racial discrimination in evaluation and discipline of minorities of Defendant Cracker Barrel Old Country Store, Inc., and retaliatory treatment through termination.  Plaintiff had been employed by Defendant as a General Manager from July, 2000 through to September, 2005.  Plaintiff filed an internal compliant and was retaliated against with adverse performance evaluations, unwarranted reprimands and unfound charges. He was then terminated without cause.  Plaintiff had filed a Charge of Discrimination charging his employer with discrimination based on what plaintiff reasonably believed to be Defendant's discriminatory comments, conduct and actions directed at Plaintiff.**

     **Issues:**

Did Defendant Cracker Barrel violate Mr. Rodgers' rights secured under the Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e 3(A) et seq., through disparate treatment, discrimination and retaliation against Plaintiff?

Did Defendant's actions constitute a wilful violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e 3(A) et seq., entitling Plaintiff to liquidated damages.

Was Mr. Rodgers' poor performance evaluation and termination in violation of the retaliation provisions of the Fair Labor Standards as incorporated under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e 3(A) et seq.?

Was Plaintiff retaliated against, on account of having filed a Charge of Discrimination, by the Defendant?

Was Plaintiff retaliated against on account of his objecting to what Plaintiff reasonably believed to be discriminatory comments and conduct on the part of the Defendant?

Whether Plaintiff has been harmed as a result of employer's acts and if employer's actions are found to be in violation of law, what should be the proper remedy?

(2) Describe in detail all statutes, codes, regulation, legal principles, standards and customs or usages, and illustrative case law which plaintiff contends are applicable to this action.

Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e 3(A) et seq.

(3) Provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that you may use to support your claims or defenses, unless solely for impeachment, , identifying the subjects of the information. (Attach witness list to Responses to Mandatory Disclosures as Attachment A.)
See Attachment A.

**Plaintiff's investigation is ongoing, and he will comply with his duty to supplement these responses as necessary.**

(4)    Provide the name of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. For all experts described in F.R. Civ.P. 26(a) (2) (B), Provide a separate written report satisfying the provisions of that rule. (Attach expert witness list and written reports to Responses to Mandatory Disclosures as Attachment B.)

**Plaintiff has not identified any expert witness at this time but will comply with his duty to supplement these disclosures.**

(5)    Provide a copy of, or description by category and location of, all documents, data compilations, and tangible things in your possession, custody, or control that you may use to support your claims or defenses unless solely for impeachment, identifying the subjects of the information. (Attach document list and descriptions to Responses to Mandatory Disclosures as Attachment C.)

**Much of the documents relevant to this case are in the possession, custody or control of Defendant. Any other responsive documents Mr. Rodgers discovers will be made available pursuant to F.R.Civ.P. 34 at a time and place mutually agreeable to the parties.**

(6)    In the space provided below, provide a computation of any category of damages claimed by you. In addition, include a copy of or describe by category and location of, the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered, making such documents or evidentiary material available for inspection and copying as under F.R.Civ. P. 34. (Attach any copies and descriptions to Responses to Mandatory Disclosures as Attachment D.)

**Plaintiff seeks back pay which may be calculated at the rate of his annual salary less any mitigation. Also, Plaintiff seeks the value of benefits lost and front pay and compensatory damages. Mr. Rodgers will need to obtain documents from Defendant during the discovery period in this case in order to accurately determine the amounts of frontpay and backpay to which he is entitled.**

**Plaintiff seeks reinstatement or front pay in lieu thereof.**

**Plaintiff seeks compensatory damages. However, those amounts can only be set by the finder of fact in the instant action.**

**Mr. Rodgers seeks an award of punitive damages against Defendant, based upon its willful, intentional, and deliberate violations of his statutory rights and its conscious disregard of the probable consequences of its actions, in an amount to be determined by the enlightened conscience of the jury.**

**Plaintiff seeks attorney's fees and costs, which are not static, and which continue to accrue. Therefore, no monetary value can be set.**

**Mr. Rodgers seeks an award of pre-judgement interest, on all damages awarded, as allowed by Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e 3(A) et seq.**

**Most of the documents relevant to Mr. Rodgers' damages are in the possession, custody or control of Defendant. Any other responsive documents Mr. Rodgers discovers will be made available pursuant to F.R. Civ.P. 34 at a time and place mutually agreeable to the parties.**

**Such other relief as the court deems appropriate.**

(7)    Attach for inspection and copying as under F.R.Civ.P. 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment. (Attach copy of insurance agreement to Responses to Mandatory Disclosures as Attachment E.)

**Any such insurance agreements which may exist are in the possession of the Defendant.**

(8)    Disclose the full name, address and telephone number of all persons or legal entities who have a subrogation interest in the cause of action set forth in plaintiff's

cause of action and state the basis and extent of such interest.

**None known to plaintiff at this time.**

Respectfully submitted,

Byron R. Perkins
Attorney for Plaintiff

**OF COUNSEL:**
**THE COCHRAN FIRM**
505 North 20th Street
Suite 825
Birmingham, AL 35203
(205) 244-1115 Office
(205) 244-1171 Fax
BPERKINS@cochranfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel of record by U.S. MAIL, on this the _16_ day of _April_, 200_7_.

Lee Breedlove, Esq.
Monica A. York, Esq.
Breedlove and Lassiter, LLP
250 E. Ponce de Leon Ave. Ste. 425
Decatur, Georgia 30030
(404) 377-5512

Jennifer Busby, Esq.
Ashley Hattaway, Esq.
Burr & Foreman, LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203

Done this _16_ day of _April_, 2007.

OF COUNSEL

Attachment A

Tommy Patterson, Sr. Associate Manager at the facility contributed to the situation by making a racially derogatory and offensive comments and is aware of the Plaintiff's claims.

Richard Alexander, District Manager is aware of the situation that is a result of this claim.

PLTF DWIGHT RODGERS

DEPOSITION EX. 13

June 17, 2005

Dwight, once again I find it necessary to discuss and document concerns which I have with your actions and/or behaviors in your current position as General Manager of unit #574 Montgomery, Alabama.

When you requested a lateral transfer to #574 from #237, a meeting was set for you, I and Ron Phillips(RVP) to discuss this possibility. This meeting lasted over three hours and covered many topics which included your strengths, talents, motivation and also many concerns on what you had not accomplished as General Manager at #237 Gardendale, Al.

At the end of the meeting, Ron and I agreed to grant you the lateral transfer. However, we made it very clear that you had to be successful in two important leadership traits that you had not exhibited in the past. These traits that were defined and discussed in much detail were:

　　　Credibility: Do what you say you're going to do.
　　　Operations: Find your "Operator's Hat" and role model the GM position in your unit.

Here are some of the actions and/or behaviors that cause me to question whether you can or are willing to be credible and be a profit center operator:

**6/03/05:** Second day in new unit and was to be here at 7am. You arrived at 7:20am and when I questioned you as to why you were late, you told me that you had told a member of the training team that you would be in between 7am/7:30am. Dwight, when you, the store opening supervisors and both DMs met at 8pm the night before we all agreed to be in at 7am as at 8am the Special Guest Preview would be starting. Once again, you failed to call me or leave a voice mail as to a schedule change. *(credibility)*

**6/11, 6/12:** The first weekend that #574 is opened. Dwight, there were many times that I had to question you as to what you were doing in the office. Dwight, many of the tasks you were doing could have been completed by any of your newer inexperienced associates or Melanie your ETC. Chris Bailey, Store Opening Supervisor also made comments as to how often you are in the office. *(operator)*

**6/13/05:** You were scheduled 7a – 5p. You left at 3:30pm take care of a vehicle in a repair shop. Dwight, this is also on a day that we had one of your associates fail to show up for a scheduled shift. You did call Ashley in on her day off but you left before she arrived leaving only one new associate on duty. Couldn't you have picked up this vehicle on Wednesday, which was your day off? *(operator)*

**6/16/05:** You were scheduled 11a – 9p. You called me at 11:00am and said you were leaving the hotel across the street to be at work. I later find out that you entered the building at 12:10pm. When questioned, you state that you were talking to a landscaper about upgrades or repairs to the landscape. Then I question your judgement and ability to prioritize your actions. You should have told the landscaper to come back at 3pm and you should have got into the building to check on whether we were ready for lunch business and been part of the 11a – 2p hour. *(operator)*

**6/17/05:** You were scheduled 9a – 9p. I left home at 6:40am to get here in time to talk to you at 9am before peak period set up for Friday lunch. I get here at 8:30am only to find that you had once again changed your schedule without informing me. Dwight, had I known that you needed to change your schedule, I could have visited the Gardendale unit for a couple of hours before driving to Montgomery. This has to be at least 10 to 12 times that you have failed to report schedule changes to myself. *(credibility)*

Dwight, I cannot and will not continue to spend two to three days each week in your unit and deny other units and managers my time with them. Ron and I stressed the importance of credibility in a leadership role and the importance of role modeling a passion for shift execution by finding your operator's hat and being involved in our goal of serving the highest quality food and best guest service in Montgomery, Al.

Any future issues with you not doing what you say you are going to do (credibility) and/or your lack of being greatly involved in shift execution/associate development (operator) could possibly lead to me making a decision on whether you are the right leader for this unit.

*(signature)* 6/18/05

DEFENDANT'S EXHIBIT

13  Rodgers

PLTF DWIGHT RODGERS

DEPOSITION EX. 14

00001/005

Lett
Dwight Rodgers
# 3646039
5pg

To: Ron Phillps
(678) ███ - ███

From: Dwight Rodgers
#3646074

Thanx

DEFENDANT'S
EXHIBIT
14 Rodgers

IMAGED

To: Ron Phillips, RVP, and Region 2

From: Dwight N. Rodgers Sr., GM, and Unit 574

Ron, I am writing this letter with great concern about my career and future with Cracker Barrel.

On June 18th I was asked by Rich Alexander, DM, Dist 15 to meet for a discussion about concerns that he had about my performance and decisions I made as GM of unit 574. Before continuing the conversation he paused to comment that before today June 18th he wasn't sure about my operators' ability, but was impressed by my performance on that said day. He also stated that he had written the documentation in question before my performance that day and saw it fit to continue with its presentation.

Rich began to read a list of credibility and operational issues that I feel were unwarranted and above all other things a motivational kick in the head.

Over the first six months in my position of General Manager I've had my personal/professional characteristics questioned and give and take rightfully so. My concerns are that after two weeks in position as GM of unit 574, I'm receiving documentation, which is not factual nor justly given. In making every effort to recognize and adjust the behaviors, which Rich expressed including communicating, it seems the communication is only done through documentation.

My dispute:

6/3 No schedule change was made and not communicated because no meeting was held the evening Rich commented on that day. Paula Pate was the ROS in charge and we both worked stayed late and discussed our arrival time with each other and we both agreed to 0730 hrs because the next day was going to be a long day. I arrived at 0720hrs and was not late nor did I change my schedule. Paula Pate is willing to verify this statement.

6/11-12 Rich walked into the office only after I had been in the office less than 2 minutes and made the comment "don't give the perception of being an office manager" and walked back out. As he was leaving I asked him what was he talking about. I had only been in the office a few minutes before he came in and that I was almost finish what I was doing. I also explained that the Associate Manager "Brian" who asked about the document did not know how to find the document in the computer and that I was simply retrieving it for him. Rich commented that task I was completing should have been done by less experienced managers than myself, yet I arrived 1 day before preview day the office was in rambles. I was staying two and three hours over my own scheduled to try and get some organization to the office because no one knew how to set the office up. What concerns me here the most is that Rich mentioned Chris Bailey SOS commented about me being an office manager and she denies ever making that comment to Rich. Chris stated that Rich made the comment about me being an office manager and she said did not respond because she did not see me in the office as he was commenting. Ms. Bailey stated that if need be she would speak with you about any and all conversations about my performance that she shared with Rich.

IMAGED

Dwight Rodgers Docs
Prod. to EEOC 000048

6/13 Every since 6/3/05 I informed Rich as well as the SOS/ROS of my transportation situation. My vehicle was being repaired and I was in a loaner as of 6/1/05. I informed Rich, that when the Repair Company called and informed me when my car was ready I would have to return the loaner or I will be charged from repair completion date forward. On 6/13 I received a call from the repair company around 1:00pm and was told the vehicle had to be picked up NLT 5pm. I called Rich and informed him of the phone call and got his permission to go and get the vehicle. We were not busy and the ROS, SOS and 1 Associate was on duty. Rich said to get with the ROS or SOS and see if they felt it was ok to leave and retrieve my vehicle. I also had a second associate coming in at 4:00pm. I did as requested and stayed as late as 3:30pm to ensure that the 3rd associate was not too far off. The ROS (Paula Pate) said to go on before I hit traffic and that all was well and I did. This was communicated with Rich from beginning to end.

6/16 As I strive to improve the behaviors which were in questioned I made every effort to do just that. As Rich stated in his documentation. I called him when I was simply running 1 minute late to inform him of that. Upon arriving to the unit the landscaper was outside waiting on me because Rich asked him to complete a project. I arrived at the unit just minutes after talking to Rich, placed down my paperwork verified with the manager on duty that all was well. I then walked the grounds with the landscaper before receiving/signing anything and went inside to start my shift. As Rich stated Vicki (Store Opening Specialist) stated she did not see me until she was leaving the building at 12:00 so I must not have arrived until then. Rich then stated that he questioned my judgement and ability to prioritize my actions, That I should have asked the landscaper to return at a later time. If were not ready for said business then I. Why would the specialist be leaving the building 2? Why ask the landscaper to return when there was absolutely none thing going on. Asking the vendor to return would have been pointless.

6/17 Since transferring to Unit 574 I have made every effort to communicate/over communicate with you every change in schedule, every minute out of the unit, every concern of the unit, relentlessly. On 6/16 a schedule change had to be made because of a concerns that the opening team had about the closing managers. I could not relate the change to Rich because I had to voicemail the associate that I had to make the change with and had no confirmation that the change would take place. After my shift and leaving that night the associate called while I was walking out of the door and confirmed that he would be in at 0900 instead of 1100hrs which would allow me to come in one and half hour later. After walking out at 10:00pm I was ready to get some sleep and return the next day. Though by his own words, Rich stated that I have been calling him even when 1 minute late, the one time and under last minute circumstances I'm documented and damned if I do and try and double damned if I don't.

The closing statement of not is willing to continue to spend two and three days each week in my unit and deny other managers were his time was unbelievable. Not only was the comment inappropriate, but not one unit has 5 managers with 6.75 avg. months between them all. In holding discussions with the SOS and ROS they found it unbelievable that he even documented me nonetheless had issues with my performance.

All parties mentioned will be willing to discuss any conversations or situations with you.

Chris Bailey, Store Opening Supervisor

Dwight Rodgers Docs
Prod. to EEOC 000049

Paula Pate, Retail Opening Supervisor

Dwight N. Rodgers Sr.
GM, Unit 574

Dwight Rodgers Docs
Prod. to EEOC 000050

PLTF DWIGHT RODGERS

DEPOSITION EX. 15

## Memorandum

**To:**       Dwight Rodgers, 574 General Manager
**From:**     Rich Alexander
**CC:**       Phillips Ron 9802
**Subject:**  Performance Concern RE: Guest Complaints

Dwight, the level of guest complaints coming from your unit is alarming.  After only 10 weeks your unit has received 27 guest complaints. Your unit is averaging a guest complaint for every $16,074.  If this trend continues, you will realize approximately 142 complaints in a fiscal year based on your current average sales volume.  Dissatisfied customers result in decreased Sales. Sales at your unit have continued to decrease on a week after week basis.    This memorandum serves as a Written Warning.

Continuing to provide the level of service to our guests that results in this high number of complaints is unacceptable.  I'm sure you realize that this reflects only the guests that take the time to complain.  Most guests don't take the time; they just don't come back.  Also, in our industry, they say the guest having a complaint will tell at least 7 other people about their disappointing experience.

As General Manager you are expected to manage, investigate and respond to Guest Relations issues in a timely manner.  I have previously discussed the need for immediate responsiveness on Guest Relations issues with you.  Additionally, I communicated on three separate occasions via voice mails that a greater sense of urgency on this matter is expected.  The lack of importance that you have placed on the Guest Relations issues in your unit demonstrates a low sense of concern for our guests, for their satisfaction and for your unit's success.   Delayed responses to our Guest Relations issues do not reflect the commitment and leadership that is expected of a Cracker Barrel General Manager.

I expect you to immediately address the issues that are causing your unit not to be able to provide the Cracker Barrel experience at #574 Montgomery.  You need to get more involved ensuring the following:

- Staffing levels are appropriate for each and every shift to ensure we have staff to serve our guests.
- Peak period set up is done to prepare every shift by managers and staff.
- Managers are on the floor visiting with **every** guest that comes in, making them feel welcome, valued and ensuring that guest expectations are being met.
- Excellent service delivered through Cracker Barrel's Best Practices.
- Managers are circling in the BOH to ensure that food quality and availability is up to Cracker Barrel standards.
- All employees and managers understand "STARS" and how to apply in a guest recovery situation, which can prevent Guest Relations issue

The level of service to our guests must immediately improve and be maintained under your leadership, Dwight.

Rich Alexander
August 6, 2005

Signature

8/6/05
Date

DEFENDANT'S EXHIBIT

Rodgers

15

Plaintiff Doc's  000169
Rodgers  v. CB

Dwight Rodgers Docs
Prod. to EEOC 000007

# DFT CRACKER BARREL'S

# EX. C

# TO EVIDENTIARY SUBMISSION

AFFIDAVIT

STATE OF _Georgia_ )

            )

COUNTY OF _Fulton_ )


I, _Clete McGinty_, being first duly sworn, on oath, depose and say that:

I am a duly authorized custodian of the records of (insert name of provider) _RTM Restaurant Group, Inc_ including records pertaining to Dwight Rodgers, and have the authority to certify those records.

The copy of the records attached to this affidavit is a true copy of the records described in the subpoena duces tecum served on or about _5/2/07_ .

The records were prepared by the personnel or staff of (insert name of provider)_____ _RTM_ or persons acting under their control, in the regular course of the business at or about the time of the act, condition or event recorded.

I declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct and based upon my personal knowledge and knowledge obtained by me in the performance of my duties.


_____

Signature


_7/2/07_____

Date



```
      DATE     EMPLOYEES  FUNCTION    LIST REPORT         FLAGS  EMPLOYEE #
    6/19/07    198315     HISTORY                                227927302
```

┌────────────────────────────────────────┐
│ POSITION HISTORY FOR DWIGHT RODGERS     │
└────────────────────────────────────────┘

```
..ITEM..           ..DATE..                  ....NEW VALUE ....
DEPARTMENT         10/31/01                  1744
EMPLOYEE TYPE      10/31/01                  2 Mgr Trainee
EMPLOYEE TYPE      10/31/01                  3 Asst Mgr
JOB CODE           10/31/01                  0
DEPARTMENT         11/28/01                  5931
DEPARTMENT         10/17/01                  1821
DEPARTMENT         12/07/01                  5307
TERMINATION DATE   06/18/02                  06/15/02
TERMINATION REAS   06/18/02                  59
```

                                  press return when ready

Arby's Doc's  000002
Rodgers v. CB

```
      DATE     EMPLOYEES   FUNCTION    LIST REPORT        FLAGS   EMPLOYEE #
      6/19/07  198315      HISTORY                                227927302

06/18/02 PSF AUTO   GIVING HOUR TO SOMEONE THAT WA
             FROM..............            TO................
TERMINATION DATE                           06/15/02
TERMINATION REAS 00                        59
```

*Violation of Company Policy*

```
                              press return when ready
```

# DFT CRACKER BARREL'S

# EX. D

# TO EVIDENTIARY SUBMISSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DWIGHT N. RODGERS,** | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action File** |
| | ) | **No.: 2:06 CV 1067-WKW** |
| vs. | ) | |
| | ) | |
| **CRACKER BARREL OLD** | ) | |
| **COUNTRY STORE, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

### VERIFICATION

I, personally appeared before the undersigned officer authorized to administer oaths, Dwight N. Rodgers, who does state under oath that he is the Plaintiff in the named **Discovery Responses**. The facts alleged in the Discovery Responses are true and correct.

_____
Dwight N. Rodgers

Sworn to and subscribed before
me this 15th day of May , 2007.

_____
Notary Public

HELENA WILLIAMS
Notary Public
Dekalb County
State of Georgia
My Commission Expires December 27. 2008

My commission expires:

Dec. 27, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DWIGHT N. RODGERS, | ) | |
| | ) | |
| PLAINTIFF, | ) | **Civil Action File** |
| | ) | **No. 2:06-CV-1067 WKW -SRW** |
| vs. | ) | |
| | ) | |
| CRACKER BARREL OLD | ) | |
| COUNTRY STORE, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST INTERROGATORIES TO PLAINTIFF

Pursuant to Rules 26 and 33 of the Local Court Rules for the United States District Court for the Northern District of Georgia, Plaintiff Dwight Rodgers (hereinafter referred to as "Plaintiff") responds to Defendant Cracker Barrel Old Country Store, Inc., ("Defendant") First Interrogatories to Plaintiff (the "Interrogatories") with the following objections and answers:

## GENERAL OBJECTIONS

Dwight Rodgers objects to these Interrogatories to the extent that:

(1)    The interrogatories are vague and ambiguous;

(2)    A full and complete response to the Interrogatories would subject

can confirm dates and places.

103 Whitney Chase, Stone Mountain, GA30088

919 Eastern Oats Drive, Montgomery, AL 36117

3.

List each job you have had during the last ten (10) years, whether part-time or full-time, including the employers' addresses, your dates of employment, your wages or earnings, your immediate supervisor(s), positions held by you, and the reason for the ending of the employment relationship.

**Response:**

Plaintiff specifically incorporates objections 3 and 5. Subject to and without waiving the foregoing objection, Plaintiff states as follows:

Ruby Tuesday, full time, General Manager, 3010 Panola Road, Lithonia, GA 30038, 2005 - present

Cracker Barrel, full time, Montgomery Al, 7/2001 -9/2005, Associate Manager, Sr. Associate Manager, General Manager, Richard Alexander (District Manager).

RTM Southeast Inc., full time, Atlanta Ga, 8/2000-7/2001, Multi Units General Manager, sought another position

Bojangles Restaurant, Inc., full time, Martinez Ga, 6/1997-8/2000, Multi Units

4

Training Director, sought another position

Athens Daily News, full time, Athens Ga, 2/1996 - 6/1997, District Manager, sought
another position

4.

If you have been examined, evaluated, counseled, treated, prescribed
medication by or consulted with any healthcare provider, including, but not limited
to, any doctor, physician, counselor, psychologist, psychiatrist, surgeon,  hospital,
clinic or any other healthcare facility with respect to any facts or alleged damages
referenced in your Complaint and/or otherwise related to your allegations in this
action, state identity of each, the dates of  treatment, any medication or treatment
prescribed, and any diagnosis rendered as to any illness or injury.

**Response:**

Plaintiff specifically incorporates objections 2, 4 and 5.  Subject to and without
waiving the foregoing objection, Plaintiff states as follows: Plaintiff can not recall
every physician that has examined,  evaluated, counseled or treated him regardless
of the illness or injury and will have to supplement this response at a later date.

5.

If you have ever been treated, counseled or observed by any person or entity,

5

Respectfully submitted this _19th___ day of April, 2007.

s/Byron R. Perkins w/expression
Byron R. Perkins
State Bar No. ASB-0183-N75B

**THE COCHRAN FIRM**
505 North 20th Street - Suite 825
Birmingham, Alabama 35203
205-244-1115
205-244-1171 fax
email: bperkins@cochranfirm.com

Monica A. York
Georgia State Bar No. 781153
*Pro Hac Vice*

**ATTORNEYS**
**BREEDLOVE & LASSITER, LLP**
250 E. Ponce de Leon Avenue, Suite 425
Decatur, Georgia 30030
404-37705512
404-377-5515 fax
email: myork@breedloveandlassiter.com

13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

DWIGHT N. RODGERS,                 )
                                   )
                    Plaintiff,     )        **Civil Action File**
                                   )        **No.: 2:06 CV 1067-WKW**
        vs.                        )
                                   )
**CRACKER BARREL  OLD**            )
**COUNTRY STORE, INC.,**           )
                                   )
                    Defendant.     )

## VERIFICATION

I, personally appeared before the undersigned officer authorized to administer oaths, Dwight N. Rodgers, who does state under oath that he is the Plaintiff in the named **Amended Discovery Responses**. The facts alleged in the Amended Discovery Responses are true and correct.

_____
Dwight N. Rodgers

Sworn to and subscribed before
me this _15th_ day of _May_____, 2007.

_____
Notary Public

HELENA WILLIAMS
Notary Public
Dekalb County
State of Georgia
My Commission Expires December 27. 2008

My commission expires

_December 27, 2008_

ATTORNEYS

# BREEDLOVE & LASSITER, LLP

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Lee Breedlove                                                    404.377.5512
Jule C. Lassiter, III                                           404.377.5515 Fax
Monica A. York*
*Also admitted in Massachusetts

May 7, 2007

Ashley Hattaway, Esq.
Burr & Forman LLP
3100 Wachovia Tower, 420 North 20th Street
Birmingham, Alabama 35203

Re:    ***Dwight N. Rodgers v. Cracker Barrel Old Country Store, Inc.***
       United States District Court for the Middle District of Alabama
       Northern Division: Civil Action No.: CV-06-1067-WKW-SRW

Dear Ms. Hattaway:

       We are in receipt of your letter dated May 1, 2007 regarding Plaintiff's responses to discovery requests. I supplement our responses with the following information.

Interrogatory No. 2:    6/05 - 01/07 919 Eastern Oak Drive, Montgomery. AL 36117
                        9/04 - 06/05 Birmingham Al, (can not recall the exact location)
                        8/00 - 09/04 404 Summit Lake Drive, St Mountain, GA 30083
                                     Parkway Vista, Atlanta, GA
                        6/97 - 08/00 North Augusta, SC

       Also, see Plaintiff's submission of the Defendant's Background Verifications which included some of his prior addresses.

Interrogatory No. 3:    Plaintiff provides his background verification which covers wages, his immediate supervisors , and addresses for the companies. he also provides his online resume submitted to Defendant.

Interrogatory No. 4:    Plaintiff did not see any health care providers in reference to the allegations in his complaint or this action.

Interrogatory No. 5:    Plaintiff still objects to this request on the grounds that it is not relevant to the issues raised in this action and is not reasonably calculated to lead to the discovery of admissible evidence, however

250 East Ponce de Leon Avenue • Suite 425 • Decatur • Georgia • 30030

he amends his response by sating that he has not been treated for any psychological, emotional or mental condition, substance abuse or disorder.

Interrogatory No. 6:    Plaintiff has not been a party to any other lawsuit.

Interrogatory No. 7:    Plaintiff has not filed any other administrative or judicial claim with the exception of a September 2005 EEOC claim and Department of Labor claim against the Defendant.

Interrogatory No. 10:   Plaintiff provides the following dates 1984-1985 - did not graduate from Commonwealth College
1990-1992 - did not graduate from University of Maryland
1998- 2000 - did not graduate from Cochise College

Interrogatory No. 11:   Plaintiff submits pay stubs from Ruby Tuesday detailing his salary. He does not recall the amount he received for unemployment benefits. He is still owed a bonus from Defendant in the amount of $17,000.00.

Interrogatory No. 12:   The last two witnesses are being removed by Plaintiff as witness and can be disregarded.

Interrogatory No. 13:   If Plaintiff determines that he is going to rely on any individual that he has not already listed, he will provide this information but at this time his response remains the same.

In regards to the RTP plaintiff is requesting his tax documents and should be receiving them in three to four weeks upon receipt he will forward them. Plaintiff is willing to sign an authorization for the release of tax information. Plaintiff will provide all that he has in his possession to date. As is our duty we will supplement this responses and requests if more information or documents become available.

If you have any questions, please contact our office. Thank you for your cooperation in this matter.

Sincerely,

**ATTORNEYS**
**BREEDLOVE & LASSITER, LLP**

Monica A. York

cc:    Byron Perkins

# DFT CRACKER BARREL'S

# EX. E

# TO EVIDENTIARY SUBMISSION

# AFFIDAVIT

STATE OF _North Carolina_ )

COUNTY OF _Mecklenburg_ )

I, _Jeannine Eubanks_ being first duly sworn, on oath, depose and say that:

I am a duly authorized custodian of the records of (insert name of provider) _Bojangles' Restaurants Inc._ including records pertaining to Dwight Rodgers, and have the authority to certify those records.

The copy of the records attached to this affidavit is a true copy of the records described in the subpoena duces tecum served on or about _May 4, 2007_

The records were prepared by the personnel or staff of (insert name of provider) _Bojangles' Restaurants Inc_ or persons acting under their control, in the regular course of the business at or about the time of the act, condition or event recorded.

I declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct and based upon my personal knowledge and knowledge obtained by me in the performance of my duties.

_Jeannine Eubanks_
Signature

_May 9, 2007_
Date

LINDSEY JAYNE NUNNERY
NOTARY
My Comm. Exp.
June 16, 2010
PUBLIC
MECKLENBURG COUNTY, N.C.

_Lindsey Jayne Nunnery_
_May 9, 2007_

1565359

# BOJANGLES'
## WORK INCIDENT REPORT

Employee's Name _Rodgers Dwight_    Date _5/3/01_

         Last             First        Middle

Position _U.D._    Department / Location _081_

Date of Violation _5/3/01_

Has employee previously received a written warning ?    ( ) Yes ( ✓ ) No

**Description of Incident ( Check One )**

( ) Absent    ( ) Excused    ( ) Unexused

( ) Tardy

( ✓ ) Violation of Company Policy

( ) Notice of Unsatisfactory Performance

( ) Misconduct

**Disciplinary Action Taken**

( ) Verbal Warning    ( ) Written Warning - Second

( ✓ ) Written Warning - First    ( ) Suspension for _____ Days

( ) Other  ( Specify )

**Consequence of Repeat Violations**

( ) Written Warning - First    ( ) Suspension for _____ Days

( ) Written Warning - Second    ( ✓ ) Termination

( ) Other  ( Specify )

**Supervisor Comments** _Dwight failed to follow procedures set forth in the Security / Loss prevention manual in that a 12 hour gap occurred in reporting a missing deposit._

**Employee Comments**

**HAS THE EMPLOYEE BEEN INFORMED OF THE CONSEQUENCES OF REPEAT VIOLATIONS ?**

( ✓ ) Yes ( ) No

Supervisor's Signature _____    Date _5/4/01_    Employee Signature _____    Date _5/4/01_

Initiated By _____    Date _____    Witness Signature _____    Date _____

\* Signing this form does not indicate agreement , but only signifies you have been informed of the above action .

Bojangles  000033
Rodgers  v. CB

# WORK INCIDENT REPORT

| Employee Name: *Dwight Rodgers* | | Date: 12/26/0 |
|---|---|---|
| Position: *Asst Builder* | Department/Location: 489 | |
| Date of Violation or Superior Performance: | | |
| If violation, has employee previously received written warning? ☑Yes  ☐No | | |

**DESCRIPTION OF INCIDENT (CHECK ONE):**

☐ Absent          ☐ Excused          ☐ Unexcused

☐ Tardy                              ☐ Violation of Company Policy

☑ Unsatisfactory Performance          ☐ Misconduct

☐ SUPERIOR PERFORMANCE

**ACTION TAKEN:**

☐ Verbal Warning                ☑ Written Warning - Second

☐ Written Warning - First       ☐ Suspension for _____ Days

☐ Positive Reinforcement        ☐ Other (Specify)

**CONSEQUENCE OF REPEAT VIOLATION:**

☐ Written Warning - First       ☑ Suspension for 5 Days

☐ Written Warning - Second      ☐ Termination

☐ Other (Specify)_____

SUPERVISOR COMMENTS: *Hourly Employees not being clocked in and paid correctly. Reader Board message not changed as directed. Info not ready on Monday A.M.*

EMPLOYEE COMMENTS: _____

Bojangles  000040
Rodgers v. CB

HAS THE EMPLOYEE BEEN INFORMED OF THE CONSEQUENCES OF REPEATED VIOLATIONS? ☐ YES ☐ NO

| Supervisors Signature: | Date: 12/26/0 | Employee Signature: | Date: 12/26/0 |
|---|---|---|---|
| Initiated By: | Date: 12/26/07 | Witness Signature: | Date: 12/26/10 |

# BOJANGLES'

## WORK INCIDENT REPORT

Employee's Name _Rodgers    Dwight_    Date _7/17/w_
                    Last          First          Middle

Position _U.D._    Department / Location _489_
Date of Violation _____

Has employee previously received a written warning ?    ( ) Yes (✓) No

**Description of Incident ( Check One )**

( ) Absent          ( ) Excused          ( ) Unexused
( ) Tardy
( ) Violation of Company Policy
(✓) Notice of Unsatisfactory Performance
( ) Misconduct

**Disciplinary Action Taken**

( ) Verbal Warning          ( ) Written Warning - Second
(✓) Written Warning - First    ( ) Suspension for _____ Days
( ) Other  ( Specify )

**Consequence of Repeat Violations**

( ) Written Warning - First    ( ) Suspension for _____ Days
(✓) Written Warning - Second   ( ) Termination
( ) Other  ( Specify )

**Supervisor Comments**  _Failure To Report Labor Hrs. Used Correctly on Monday A.M._

**Employee Comments**

HAS THE EMPLOYEE BEEN INFORMED OF THE CONSEQUENCES OF REPEAT VIOLATIONS ?
(✓) Yes ( ) No

_M. Glenn_
Supervisor's Signature          Date _7/17/w_    Employee Signature    Date _7/17/w_

_Linda Wells_
Initiated By          Date          Witness Signature          Date

* Signing this form does not indicate agreement , but only signifies you have been informed of the above action .

Bojangles  000023
Rodgers  v. CB

# BOJANGLES'
## WORK INCIDENT REPORT

Employee's Name _Rodger Dwight_    Date _12/26/01_

       Last        First        Middle

Position _U. D._    Department / Location _485_

Date of Violation _12/24/01_

Has employee previously received a written warning ?  ( ✓ ) Yes ( ) No

**Description of Incident  ( Check One )**

( ) Absent      ( ) Excused      ( ) Unexused

( ) Tardy

( ) Violation of Company Policy

( ✓ ) Notice of Unsatisfactory Performance

( ) Misconduct

**Disciplinary Action Taken**

( ) Verbal Warning      ( ✓ ) Written Warning - Second

( ) Written Warning - First      ( ) Suspension for _____ Days

( ) Other  ( Specify )

**Consequence of Repeat Violations**

( ) Written Warning - First      ( ✓ ) Suspension for _____ Days

( ) Written Warning - Second      ( ) Termination

( ) Other  ( Specify )

**Supervisor Comments** _Employee new hire Packet not completed missing 3 days of deposit slips._

**Employee Comments**

**HAS THE EMPLOYEE BEEN INFORMED OF THE CONSEQUENCES OF REPEAT VIOLATIONS ?**

✓ Yes ( ) No

_M. Blmer_      _12/24/01_      _12/26/01_

Supervisor's Signature    Date    Employee Signature    Date

Initiated By    Date    _Andr Wells_    _12/26/01_

           Witness Signature    Date

* Signing this form does not indicate agreement , but only signifies you have been informed of the above action .

17

# BOJANGLES'

## WORK INCIDENT REPORT

Employee's Name  *Rodgers*  *Dwight*                Date  10/9/00

Position  U.P.              Department/Location        489

Date of Violation

Discipline

☑

Disciplinary Action Taken

☑ Verbal Warning

*followed per Banking Procedures not being*
*followed per company policy.*

M. Salesman        10/9/00            [signature]        10/9/00

*Linda Wells*

DFT CRACKER BARREL'S

EX. F

TO EVIDENTIARY SUBMISSION

## AFFIDAVIT

I, Melanie Wallace, of Ruby Tuesday, Inc., the undersigned, being duly sworn, according to law, hereby certify that the records attached hereto are true and correct copies of the records in my custody, pertaining to Dwight Rodgers.

_____
CUSTODIAN OF RECORDS

SWORN TO AND SUBSCRIBED BEFORE ME this _14th_ day of _May_, 2007.

_____
NOTARY PUBLIC

My Commission Expires: 10-2-07

NATALIE E. MOORE
STATE OF TENNESSEE
NOTARY PUBLIC
KNOX COUNTY

# DWIGHT N. RODGERS SR.
### 919 EASTERN OATS DRIVE
### MONTGOMERY, ALABAMA 36117
E: dnrodg@yahoo.com
P: 334-277-7126  C: 678-595-5174

*Monster*

**Objective:**

To obtain a position in Management Leadership with your company that would give me the opportunity of advancement. I am a results-oriented leader offering a strong and experience base. Record of success in management leadership, and controlling multi units. Excellent organizational and communication's skills. Committed to providing the highest levels of team leadership and growth through coaching, teaching and developing subordinates.

**Work Experience:**

| Dates | Company | Employed Job Title |
|---|---|---|
| 7/2001-Present | Cracker Barrel Restaurant Inc. Montgomery, Alabama | General Manager |

- Lead a 4.1 million dollar restaurant and 1.1 million dollar retail unit.
- Lead a staff of 5 associate managers, 1 retail manager and 142 hourly personnel
- Managed 4 successful new unit openings.
- Analyze and interpret data. Identify critical elements and apply solutions.
- Develop, implement and manage routines and systems for subordinate managers.
- Monitor management performances against goals and predetermine measures for success.
- Review sales compared to budget, food, supplies and labor cost, and all other controllable cost.
- Manage and reconcile the unit's Profit and Loss Statement.
- Direct hiring, training, motivating, evaluating and termination of personnel.
- Develop local store marketing strategy and implement advertisement, which promote company image.
- Lead and delegate the daily operations of the unit.
- Perform as Multi Unit General Manager in the absence of the District Manager

| 8/2000-7/2001 | Multi Units General Manager Atlanta, Georgia | RTM Southeast Inc |
|---|---|---|

- Manage 2 assistant managers and 20 team members per unit.
- Manage food cost and inventory accountability
- Interview, select and develop restaurant personnel
- Maintain In-Unit P&L, General Ledger reconciliation and budgeted sales.
- Designed and implemented the local store marketing program.
- Completed performance reviews on subordinate managers and team members.

Ruby Tuesday  000034
Rodgers v. CB

# DWIGHT N. RODGERS SR.

| 6/1997-8/2000 | Multi Units Training Director | Bojangles Restaurant Inc |
| | Martinez, Georgia | |

- Implemented company training program with new management candidates and restaurant staff for 9 units.
- Responsible for earning and maintaining phase I and II training certification of all personnel.
- Train area management staff in restaurant operating procedures and certification.
- Interview, select and develop management trainee candidates.
- Monitored P&L's and implemented yearly budget for 9 units.
- Implement and managed the local store marketing program.

| 2/1996-6/1997 | District Manager | Athens Daily News |
| | Athens, Georgia | |

- Lead a team of 7 Managers and 21 circulation personnel in the daily operations of the circulation department.
- Interviewed, trained and developed route managers in their areas of responsibilities in customer data organization
- Developed and implemented current system of route analysis and alignment.
- Reconciled journals to ensure all personnel were receiving correct payroll wages and commissions.

| 8/1991-10/1996 | Area Director | PIA Merchandising Company Inc |
| | Clear Water/ Florida | |

- Lead a team of 8 managers and 240+ merchandisers in the implementing of company plan-o-grams throughout the United States "CVS/ECKERD" Program.
- Developed the training program for new hires without plan-o-gram experience to ensure a timely completion of contracts.
- Completed Quality Assurance Inspections on completed contracts.
- Completed performance reviews on management staff.
- Managed the administrative office hiring of temporary staffing personnel to assist in contract completion.
- Negotiated contract compensation for assignment completions on a per market basis.

## Education:

| Commonwealth College | Bachelor's Degree Program | Norfolk, Virginia |
| | Completed 2 years joined military | |
| University of Maryland | Bachelor's Degree Program | College Park, Maryland |
| | Completed 1 year while overseas (Military) | |
| Cochise College | Bachelor's Degree Program | Sierra Vista, Arizona |
| | Completed 1 year relocated (Military) | |

Sanitation Certification: Am Serv Safe certified and Serv Safe Instructor Qualified. I am also a Certified First Aid/CPR Instructor

*Tom Speziale*
*706.224.3504*
*GM - Cracker Barrel*

*George Katsudof*
*404.583.1937*
*District Manager at Cracker Barrel*

*Shauna Ray*
*GM RTM 678-656-8697*

# Ruby Tuesday, Inc.

## APPLICATION FOR SALARIED POSITIONS

**Print or Type Answers to All Questions**                    Date of Application 10/6/05

NAME Dwight N. Rodgers Sr.
STREET ADDRESS 919 Eastern Oaks Dr.
CITY Montgomery  STATE Alabama  ZIP 36117
PREVIOUS ADDRESS (if at present address less than one year)
102 Hugh Circle
CITY Birmingham  STATE AL  ZIP 35205

POSITION DESIRED Manager/Multi Unit
SALARY DESIRED 52K +
PHONE - HOME 334-877-7126  WORK
Are there any days of the week or holidays that you will not be able to work? NO

If you have applied for and/or worked for Ruby Tuesday, Inc. before, state where, final position, and reason left:

If necessary, would you be willing to relocate? ☒ Yes ☐ No        Willing to travel? ☒ Yes ☐ No

**WORK EXPERIENCE:** List your previous experience beginning with your most recent position.
**CIRCLE THE NAME OF ANY EMPLOYER THAT YOU DO NOT WANT CONTACTED AT THIS TIME**

EMPLOYER Cracker Barrel Restaurant Inc
ADDRESS 9411 Boyd Cooper Pkwy, Montgomery Al  PHONE NUMBER REQUIRED 334-244-1035
STARTING POSITION General Manager  SALARY LAST POSITION 66,300  SALARY
DATES EMPLOYED FROM (month/year) 7/22/02  TO 9/3/05  IMMEDIATE SUPERVISOR Rich Alexander
DUTIES Lead in daily operations of all with out Quality of Life

EMPLOYER KIM
ADDRESS Atlanta, Georgia  PHONE NUMBER REQUIRED
STARTING POSITION General Manager/Multi Unit  SALARY LAST POSITION 53,800  SALARY
DATES EMPLOYED FROM (month/year)  TO 7/02  IMMEDIATE SUPERVISOR Jim Rundell
DUTIES Lead operations of 2 dual & 2 Stand alone Company Stability

EMPLOYER Bojangles
ADDRESS Martinez, Georgia  PHONE NUMBER REQUIRED
STARTING POSITION Training Director/Multi Unit  SALARY LAST POSITION 56,600  SALARY
DATES EMPLOYED FROM (month/year)  TO  IMMEDIATE SUPERVISOR Linda Wells
DUTIES Developed & trained all Management social to franchise Candidates

Your application will be considered active for six months. After that time, if you continue to have interest in employment, please submit another application.
**RUBY TUESDAY, INC. IS AN EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER**

Ruby Tuesday  000050
Rodgers  v. CB

## EDUCATION:

| Type of School | Name of School | Address of School | Field of Study | Level Completed | Graduate |
|---|---|---|---|---|---|
| High School | Booker T Wash. | Norfolk, Va. | General | Grad | ☒ Yes ☐ No |
| College | University of md. | College Park md | Business management | 3yrs | ☐ Yes ☒ No |
| Business, Trade Correspondence | | | | | ☐ Yes ☐ No |

Who referred you to the Company? If a specific Employment Agency, Employee, or Organization, please give full name.

Geiko Hospitality

List names and positions of any relatives employed with the Company

None

What are your Career Objectives?

Director of Operations

List Computer Software and/or Programming Languages in which you have experience: Cobol, Excel, Word, execute

☒ Yes ☐ No     ARE YOU LEGALLY ELIGIBLE FOR EMPLOYMENT IN THE U.S.?

☐ Yes ☒ No     Have you ever been convicted of a felony or any crime involving prostitution; procuring any person; soliciting of a child under 18 for immoral acts involving sex; possession or sales of narcotics, marijuana, or other drugs; rape; incest, gambling; illegal cohabitation; adultery; bigamy; or a crime against nature?

If yes, state details and dates:

**CONVICTION WILL NOT NECESSARILY DISQUALIFY AN APPLICANT FOR EMPLOYMENT.**

DRIVER'S LICENSE # OR STATE ID: Ga 053228807

In case of emergency, please contact: Sharon R. McClain     Phone: 757 627 4434

## OTHER PROFESSIONAL REFERENCES:     Please list 3 professional references.

| NAME | POSITION & COMPANY | ADDRESS | PHONE NUMBER |
|---|---|---|---|
| Tom Spezzale | General Mgr Cracker Barrel | LaGrange, Ga | 706 308 0304 |
| Shayna Ray | General Mgr. | McDonough, Ga | 678-379-2340 |
| Jim Kundell | Director of Ops RTM | Atlanta, Ga. | 678-541-2303 |

**AGREEMENT: PLEASE READ THE FOLLOWING AND SIGN YOUR NAME BELOW.**

In compliance with Federal and State Equal Employment Opportunity Laws, qualified applicants are considered for all positions applied for without regard to race, color, religion, sex, national origin, age, veteran's status, disability, or any other legally protected status.

In the event of my employment, I understand that false or misleading information given in my application or interview(s) may result in discharge and that my first three months of employment will be probationary. In consideration of my employment, I agree to conform to the rules and regulations of the Company. I acknowledge and understand that (1) no policy, rule, regulation, guideline, manual, position guide, newsletter, poster, procedure or similar writing constitutes a guaranty of employment or a contract of employment with the Company, (2) my employment and compensation can be terminated at any time, for any reason or for no reason, by the Company or me, and (3) no manager or official of the Company (other than the CEO or President in writing) has the authority to enter into any contract or agreement with me for employment for any specified period of time, or to make any contract or agreement contrary to the foregoing.

I understand that unless otherwise prohibited by applicable law, I may be required at any time to submit to a physical, urinalysis, or other examination as a condition of my employment with the Company, including a pre-employment urinalysis drug test. By accepting employment, I agree to submit to such examinations or tests as required by the Company, all at Company expense.

I authorize you to make such investigations and inquiries of my personal, employment or financial history and other related matters as may be necessary in arriving at an employment decision. I hereby release employers, schools or persons from all liability in responding to inquiries in connection with my application

**INCOMPLETE APPLICATIONS WILL NOT BE CONSIDERED**

If your application is considered favorably, on what date will you be available for work?     10/6/05
I certify that answers given herein are true and complete to the best of my knowledge.

READ CAREFULLY BEFORE SIGNING

I agree that any claim or lawsuit relating to my service with Ruby Tuesday must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit. I waive any statute of limitations to the contrary.

Signature of Applicant _____     Date 10/6/05

Ruby Tuesday   000051
Rodgers  v. CB

DFT CRACKER BARREL'S

EX. G

TO EVIDENTIARY SUBMISSION

## AFFIDAVIT OF TOMMIE PATTERSON

STATE OF ALABAMA                )
                                                    )
COUNTY OF JEFFERSON        )

The undersigned, Tommie Patterson, deposes and states as follows:

1.      My name is Tommie Patterson.  I am over the age of nineteen and I have personal knowledge of the facts set forth in this affidavit.  I give this affidavit voluntarily and without coercion.

2.      I am currently employed by Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") as a Senior Associate Manager in the Columbus, Georgia store. I have been employed by Cracker Barrel since January, 2000.

3.      I worked in Cracker Barrel's Gardendale, Alabama store from January, 2000 until October, 2005.  My first position there was Manager in Training, then Associate Manager and then Senior Associate Manager.

4.      I am aware of and understand Cracker Barrel's Equal Opportunity, Harassment and Discrimination policies.  As a manager, I have been well trained in these policies.  I have attended classes on these policies and in diversity.  Cracker Barrel frequently distributes materials reminding us of its policies and emphasizing that it does not tolerate any harassment or discrimination.  I am also aware that

1478758

Cracker Barrel provides a hotline that employees can use to make complaints to the home office.

5.    I also understand that Cracker Barrel takes complaints of discrimination and harassment very seriously.    I understand that anyone who engages in discrimination or harassment will be disciplined, which may include immediate termination.    My experience with Cracker Barrel's Home Office is that it is responsive to all employee complaints, including those involving discrimination and harassment, and that it requires that all employee complaints be investigated and resolved as is appropriate in each circumstance.

6.    Rich Alexander was my District Manager during my employment in the Gardendale store.    My experience with Mr. Alexander was that he took employee complaints very seriously and would not tolerate any harassment and discrimination.    Based on my observation and experience, Mr. Alexander responded to all employee complaints of which he was aware and would not hesitate to discipline employees if warranted.

7.    I was the Senior Associate Manager at the Gardendale, Alabama store when Dwight Rodgers became the General Manager of that store in approximately September, 2004.  I did not interview for the General Manager position at that time and had no expectation of obtaining that position.

8.    The other managers during Mr. Rodgers' tenure as General Manager in Gardendale were Lisa Clayborne, Carolyn Freeman and Brian Harbin.  Mr. Rodgers told me that he could have replaced us with other managers if he wanted to do that, but that he had a good management team, and he chose to keep us.

9.    When Mr. Rodgers became the General Manager and throughout his employment there, I fully supported him in his role.  As Senior Associate Manager, it was my job to implement the General Manager's decisions, and I always tried to do that.  However, I sometimes found it difficult to implement Mr. Rodgers' decisions because he was not a very good leader.  He did not seem to have a clear direction for the store, and I was often unsure how Mr. Rodgers wanted me to proceed on matters.  This was an unusual situation for me.  Under previous General Managers, I felt that the Gardendale store had a clear direction and plan.

10.    When Mr. Rodgers first became General Manager at the Gardendale store, he spent a lot of time in the office rather than in the restaurant or kitchen with the employees.  At first, this did not seem unusual to me because I expected that it would take some time for him to learn the store, get organized and develop his plans for the store.  However, after a couple of months, Mr. Rodgers had still not communicated any direction or plans to me or to my knowledge to the rest of the management team, and he continued to spend a lot of time in the office.

11.    Mr. Rodgers also spent a lot of time away from the store, when it was not his off day.  Again, at first I thought he probably had things to do to get settled in a new town so his absences did not bother me, but even after a few weeks, his attendance did not improve, and in fact, it became worse.  Mr. Rodgers often arrived at work late and left early.  Sometimes he left the store and said he would come back, but he did not return that day.  He also called off from his scheduled shift several times at the last minute.  Because of his frequent absences from the store, I often had to work extra.  For example, if he called off, I had to cover his shift, often with very little notice.  If he was late or left early, I sometimes had to work over into the next shift.  Mr. Rodgers' poor attendance became increasingly frustrating to me.  Although the other managers sometimes covered the time he missed, I usually bore the brunt of his absence.

12.    Another concern that I had about Mr. Rodgers was that he did not communicate well with his management team.    For example, he would tell employees certain things or allow changes in procedures without telling me or the others on the management team.  When an employee would bring the matter to my attention or to another manager's attention who would ask me, we would not know what the employee was talking about.  This failure to communicate made it difficult to address employee misconduct and to enforce Cracker Barrel procedure.

4

13.    Mr. Rodgers was also not very good at following through with plans or paperwork.  He also was not very good at holding employees accountable for their actions and enforcing consequences if they did not follow the rules.

14.    Under Mr. Rodgers, the management team became very divisive and dysfunctional.  We were not working well together as a team.  There was no animosity towards Mr. Rodgers.  In fact, I enjoyed being around him when he was there, and thought he was a fun person, but without leadership or a clear direction there was a lot of tension within the team.

15.    I tried to talk to Mr. Rodgers about my concerns, including the lack of direction, his poor attendance and his failure to communicate, but he always acted like he did not care about my concerns and told me it was his decision how to run the store.

16.    When asked, I also shared my concerns with Rich Alexander.  My purpose in talking with Mr. Alexander was not to get Mr. Rodgers in trouble.  I shared my concerns with Mr. Alexander because I hoped he could help Mr. Rodgers give us leadership and direction and thus help us be a better team.  Mr. Alexander met with the management team and Mr. Rodgers in the Spring of 2005, talked with us about our issues and made suggestions to help us work together better.  My observation was that Mr. Alexander wanted all of us, including Mr.

Rodgers, to succeed in our individual jobs and as a team. Despite Mr. Alexander's assistance, I never saw any significant changes in Mr. Rodgers as the leader of our store.

17.    In approximately March, 2005, Mr. Rodgers called me at the Gardendale store (I believe on a Monday) and told me that he had a death in the family and to cover his shifts. I was upset by this phone call for a couple of reasons. One, since I had received such short notice that Mr. Rodgers would not be in that day, I would have to work a double shift unexpectedly. I would also have to work more that week. Two, this was not the first time that Mr. Rodgers had called off unexpectedly, and I was frustrated about his poor attendance in general and the fact that I was working twice as much as him.

18.    An employee named Penny Schmid was standing near me during this phone call and when I got off the call she asked me what was the matter and I told her that Mr. Rodgers had a death in the family. She asked when he would be returning to work, and I said "I do not know. He was scheduled to work Thursday but I don't know if he will be back on Thursday. Don't they normally have their funerals on the weekend." By "they" I meant African-Americans. I did not mean for this comment to be derogatory in any way. I made this comment because many of the African-Americans that I have known had funerals on the weekends. I now

realize that this comment, even if true, was insensitive, and I should not have said it. At the time, I was so frustrated with Mr. Rodgers' absence that I did not consider the insensitivity of the comment.

19.    Ms. Schmid did not respond when I made this comment. A few days later, Rich Alexander informed me that Ms. Schmid was offended by a comment by me. Mr. Alexander asked me if I made the above-referenced comment about African-Americans having funerals on the weekends, and I admitted that I did. I told Mr. Alexander that I did not mean it to be derogatory or offensive and that my experience with African-American friends led me to believe it was a true statement. Mr. Alexander told me that it was an insensitive comment and that I should not have said it. He told me to apologize to Ms. Schmid. He warned me that any similar comments in the future would cost me, which I understood to mean I could lose my job. In his conversation with me, Mr. Alexander appeared to take the matter seriously and to mean what he said.

20.    Soon after I met with Mr. Alexander, I gave him a signed statement which summarized the above-referenced incident. The document attached hereto is a true and correct copy of the statement which I prepared and gave Mr. Alexander, except the copy that I gave Mr. Alexander was signed and dated by me. To date, I have not been able to locate a signed and dated copy of the statement.

21.    After meeting with Mr. Alexander, and within a week, I apologized to Penny Schmid for the comment. I told Ms. Schmid that I was sorry I made the comment and that I did not mean for it to be offensive.

22.    I also told Mr. Rodgers about the comment I had made, and I explained why I made the comment and that I did not mean it to be derogatory. I do not recall Mr. Rodgers saying anything in response.

23.    Mr. Rodgers transferred to the Montgomery, Alabama store in approximately June, 2005. He told me that he requested that transfer.

24.    I did not hear anything more about this comment after these conversations with Mr. Rodgers and Ms. Schmid. Mr. Rodgers never mentioned it again. I thought the matter was resolved until I learned that Mr. Rodgers mentioned it in a charge of discrimination with the EEOC.

25.    I never intended to offend Mr. Rodgers or Ms. Schmid, and I am sorry if I did so. I do not discriminate on the basis of race. The fact that Mr. Rodgers was African-American did not matter to me. I liked Mr. Rodgers on a personal level. My concerns about him were based solely on the lack of leadership that he showed as General Manager of the Gardendale store and had nothing to do with his race.

26.    The foregoing is true and complete to the best of my knowledge and sworn to under penalty of perjury.

DATED: _____8/10/06_____

_Tommie O. Patterson_
Tommie Patterson

## VERIFICATION

STATE OF ALABAMA            )
                            )
COUNTY OF JEFFERSON         )

Before me, _Rabbi Stewart_, a notary public in and for said county in said State, personally appeared, Tommie Patterson, who is known to me and who being first duly sworn, deposes and says that he has personal knowledge of the facts set forth in the foregoing affidavit and that all such matters are true and correct to the best of his knowledge.

Subscribed and sworn before me this 10th day of August, 2006.

_Rabbi Stewart_
NOTARY PUBLIC

My Commission Expires:

I, Tommie Patterson, took a call from the GM, D. Rodgers, at the front register (I believe it was on a Monday). D. Rodgers, was calling to request that I cover his shift for him due to a death in his family. Penny Schmid, Server/Shift Leader, was also at the register. When I ended the call, she noticed the concerned look on my face and asked me what was the matter. I told her D. Rodgers had a death in the family. She asked when he would be returning to work. I said, "I do not know. He was scheduled to work Thursday but I don't know if he will be back on Thursday. Don't they normally have their funerals on the weekend." Working with other African Americans in the past, it has been my experience that many African American funerals are held on the weekend.

I am sorry that Ms. Schmid took offense to my statement. My statement intended nothing derogatory. As soon as I see Penny Schmid, I will apologize for my statement. At hindsight, I can see where my statement may have seemed insensitive.

_____                    _____

Tommie Patterson, Senior Associate Manager          Date

Ex. 1
to
Patterson
Affidavit

DFT CRACKER BARREL'S

EX. H

TO EVIDENTIARY SUBMISSION



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place, South
1130 - 22nd Street, South, Suite 2000
Birmingham, AL 35205
(205) 212-2069
TTY (205) 212-2112
FAX (205) 212-2105

July 03, 2007

Ms. Michelle Montgomery, ParaLegal,
BURR & FORMAN, LLP,
Attorneys and Counselors,
3100 Wachovia Tower,
420 North Twentieth Street,
Birmingham, AL    35203-5206,

| | |
|---|---|
| Regarding Charge: | *Dwight N. Rodgers, Sr. vs. Cracker Barrel Old Country Store, Inc.* |
| EEOC Charge Number | 130-2005-06620 |
| FOIA Number | A7-08-FOIA-205-BI |

Dear Ms. Montgomery:

We are in receipt of your Freedom of Information Act (FOIA) request addressed to the Regional Attorney, Birmingham District Office dated May 10, 2007 regarding the Charge Number shown above. Your request was received by the Regional Attorney on June 27, 2007. Pursuant to law, we are required to provide an initial response to your request within twenty (20) business days of receiving your request. This letter is that initial response.

Your request has now been processed. Your request for a copy of this file is Granted in Part and Denied in Part. The charge in question was filed under Title VII of the Civil Rights Act of 1964. Those portions of the file not released are being withheld pursuant to disclosure exceptions described in that Act and in the Freedom of Information Act (FOIA), 5 U.S.C. §552, as amended. The first attachment to this letter (Attachment A) lists the subsections of the FOIA which apply to the documents withheld. The second attachment to this letter (Attachment B) explains the use of these FOIA exemptions in more detail.

The remaining documents, which will be produced, total 0341 pages (copies enclosed). You now have the option of (1) inspecting the documents to be disclosed or (2) obtaining copies of the disclosed documents. If you elect to receive copies of the disclosed documents, we will promptly forward the documents to Pete's Print and Copy Service, Inc. a local provider of copy services. Under the terms of a contract entered into between the EEOC Birmingham District Office and Pete's Print and Copy Service, Inc. a copy of all disclosed documents could be promptly provided for a fee of $34.10. The contracted fee for photocopying is within the fee schedule set forth in 29 C.F.R. §1610.15(a)(3). If you choose to obtain copies, a check in the aforementioned total amount should be made payable to Pete's Print and Copy Service, Inc.

Upon receipt of the above amount, the documents will be delivered for copying and will then be forwarded to you.[1]

You may appeal the denial or partial denial of your request by writing within thirty days of receipt of this letter to Assistant Legal Counsel/FOIA Programs, Office of Legal Counsel, U.S. Equal Employment Opportunity Commission, 1801 L Street, N.W., Washington, D.C. 20507. You must include a copy of the Regional Attorney's determination with your appeal. Your appeal will be governed by 29 C.F.R. §1610.11.

Very truly yours,

C. Emanuel Smith
Regional Attorney

Enclosures

CES/bls

---

[1] Under Commission regulations, 29 C.F.R. §1610.15, there will be no charge for copying the first 100 pages.

Witness Statement
April 27, 2006

S. Curry, Investigator

Charge No. 130-2005-2006

Dwight Rodgers vs. Cracker Barrel Restaurant

**Witness:  Penny Schmidt, Education & Training Coordinator (Schmidt was a shift leader and has recently been promoted to ET Coordinator).**

Schmidt was asked if she heard Tommy Patterson make any racist comments about Dwight Rodgers (hereinafter, Charging Party).

Schmidt stated that Tommy Patterson was on the telephone with the Charging Party and when he got off the telephone he stated that the Charging Party had a death in his family.  Schmidt stated that Patterson told her that he thought "blacks buried their people on the weekend."

Schmidt stated that she later told the Charging Party about Patterson's comments.

Schmidt was asked if she ever told Rich Alexander (District Manager) about Patterson's comments.

Schmidt stated no, Rich Alexander came to her around the end of May or first part of June (2005) and asked her how she felt about it.

Schmidt stated that she told Rich Alexander that the comments offended her because her grandchildren are Black.

Schmidt stated that Rich Alexander told her that he didn't think that Tommy Patterson was being discriminatory.  Schmidt also stated that she wrote a statement and gave it to Rich Alexander telling him that she thought that the comments were offensive.

Schmidt stated that the Charging Party "didn't stand a chance" at the Gardendale store because Tommy Patterson wanted to be the general manager.

Schmidt was asked if there were a lot of customer complaints at the Gardendale store (CP was the general manager at the time that Schmidt worked at the Gardendale store).

Schmidt stated there were a few complaints, especially from Bill (White, male), who worked for Alabama Power.  Schmidt stated that the Charging Party wouldn't allow Bill to come into the kitchen when he wasn't on official Alabama Power business.  Schmidt also stated that Gardendale (the customers) didn't want a Black man to be the manager.

EEOC Doc's 000321
Rodgers v. CB

Schmidt stated that the managers constantly talked about not wanting to work with the Charging Party.  Schmidt also stated that the Charging Party was a good manager.