IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DWIGHT N. RODGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:06-cv-1067-WKW [WO] |
| | ) | |
| CRACKER BARREL OLD | ) | |
| COUNTRY STORE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is before the court on a Motion for Summary Judgment (Doc. # 16) filed by Defendant Cracker Barrel Old Country Store, Inc. ("Cracker Barrel"). For the reasons set forth below, the defendant's summary judgment motion is due to be GRANTED.

## I. PROCEDURAL HISTORY

The plaintiff in this case, Dwight N. Rodgers ("Rodgers"), filed this employment discrimination suit on November 29, 2006, alleging three claims[1] against Cracker Barrel: disparate treatment, hostile work environment, and retaliation. (Compl.) The complaint alleges Cracker Barrel's actions were in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983.[2] The defendant filed its motion for summary judgment

---

[1] Although the complaint only specifies two counts (intentional discrimination and disparate treatment), because it was filed *pro se* and because the defendant has addressed the claims in its briefs, the court will construe the complaint liberally to include all three claims.

[2] The plaintiff now admits 42 U.S.C. § 1983 is inapplicable to his claims, and for the first time asserts he amended his complaint to add claims pursuant to 42 U.S.C. § 1981 instead of § 1983. (Pl.'s Resp. Br. 22.) However, the plaintiff never filed a motion to amend his complaint – even after his attorneys made their appearance. Therefore, the first and only complaint (Doc. # 1) filed by the plaintiff contains his only legal claims for the purposes of this suit. He has no claims pursuant to 42 U.S.C. § 1981, and his claims pursuant to 42 U.S.C. § 1983 are due to be dismissed for the reasons admitted by the plaintiff.

(Doc. # 16) on August 2, 2007.  The plaintiff responded (Doc. # 23) and the defendant replied (Doc. # 32).

## II.  FACTS

Rodgers is a black male who was hired by Cracker Barrel in July 2002 into their Management-in-Training Program.  Upon completion of his training, Rodgers became an Associate Manager in the Athens, Georgia store.  In July 2004, Rodgers was promoted to the position of Senior Associate Manager.  Shortly thereafter, he applied for a General Manager position at another store in Georgia, but he did not get the job.  He was, however, invited to apply for the same position at a Cracker Barrel store in Gardendale, Alabama, by the area's District Manager, Rich Alexander ("Alexander").  After interviewing for the position, he was awarded the job of General Manager[3] of the Gardendale store, over other candidates who were white, by Alexander, with the approval of Alexander's supervisor, Ron Phillips ("Phillips").  (Alexander Aff. ¶ 11.)

During his tenure as General Manager of the Gardendale store, the store performed poorly in many objective financial areas, as reflected in his employee evaluation dated January 28, 2005.[4]  (*See, e.g.*, Doc. # 17-7, at 17.)  In the evaluation, Rodgers scored an overall performance rating of two out of five, and Alexander noted that "[s]ales and traffic are down on both sides of [the] business."  (*Id.*)  He also earned poor scores in

---

[3]  In Cracker Barrel's organizational structure, a store's General Manager is responsible for all areas of operation, the performance of the store, and the associates.  The General Manager then assigns specific tasks to the Associate Managers, such as managing food costs or scheduling employees.

[4]  Rodgers's evaluation notes "a very difficult and disappointing first half of fiscal '05."  (Doc. # 17-7, at 17.)

objective categories, such as guest complaints, food costs, net operating income, restaurant sales growth, and retail sales.  (*Id.* at 6-18.)  Furthermore, Alexander noted that "even though the above mentioned numbers are very concerning, I am more concerned with the lack of a cohesive committed management team at your unit."  (*Id.* at 17.) Alexander also stated, "If you follow your plan, listen and quit being so defensive/argumentative when confronted[,] you can succeed as the GM of [the Gardendale store].  You have my 100% support in your endeavors to make some very important behavior changes."  (*Id.*)

In early March 2005, Rodgers claims that Tommie Patterson ("Patterson"), one of his assistant managers, made a comment to which he and another employee took offense. Rodgers had a death in the family and called the store to plan for his absence to attend the funeral in South Carolina.  (Rodgers Dep. 200.)   While Rodgers was speaking to Patterson on the phone, another employee, Penny Schmidt, noticed the phone conversation and asked Patterson if Rodgers was okay.  (*Id.* at 201-02.)  She asked when the funeral would take place and whether any schedule adjustments were needed.  (*Id.*) Rodgers believes that Patterson replied by saying, "[D]on't blacks bury their kind on the weekends[?]"[5]  (*Id.* at 206.)   Rodgers admits that he only heard the first two words ("don't blacks"), however.  (*Id.* at 202.)  He only learned the entirety of Patterson's

---

[5]  In her witness statement to the EEOC, Schmidt stated that Patterson told her he thought "blacks buried their people on the weekend."  (Doc. # 17-13, at 4.)  Patterson claims he said, "Don't they normally have their funerals on the weekend."  (Patterson Aff. ¶ 18.)

comment upon his return to work after the funeral, at which time he reported the incident to Cracker Barrel's home office on behalf of Schmidt and himself. (*Id.* at 245-46.)

Because the comment related directly to Rodgers, Alexander was chosen to investigate the incident. (*Id.* at 237:13-16.) After talking to Rodgers the following day (Rodgers Dep. 208:6-12), Alexander proceeded to interview Schmidt and Patterson, who admitted to making the comment. (Patterson Aff. ¶ 19.) Patterson explained that he thought the comment to be true and did not mean for it to be offensive. (*Id.*) Alexander told him it was insensitive, that he should not have said it, had him apologize to Schmidt, and warned him that similar comments in the future would cost him his job. (*Id.*) Because Patterson admitted to making the comment and Rodgers was not present when it was made, Alexander did not interview Rodgers in detail during the investigation but did let him know that he had handled it. (Alexander Aff. ¶ 42.) Still, Rodgers was frustrated with the investigation because he was not informed of the outcome and Patterson had not apologized to him. (Pl.'s Resp. Br. 19.) Rodgers alleges that he inquired into the investigation twice, and that Alexander told him, "don't forget who you work for," and "it's my responsibility," on those respective occasions. (Rodgers Dep. 226:21-227:2; 239:3-240:8; 248:7-10.)

Meanwhile, the Gardendale store continued to experience staff problems. Because many of the associate managers complained to Alexander about Rodgers, Alexander held a meeting with them out of the presence of Rodgers on March 21, 2005. (Alexander Aff. ¶ 17.) At the meeting, the associate managers complained that Rodgers did not

4

communicate well, spent too much time in his office, did not follow through with paperwork, did not come in to work enough, and sometimes called in to take off work at the last minute. (*Id.*; Doc. # 17-4, at 2-3.) Rodgers claims he was not informed of the meeting in advance. (Pl.'s Resp. Br. 9.) However, after the meeting, Alexander and Rodgers met to discuss the concerns. (Alexander Aff. ¶ 17; Pl.'s Resp. Br. 9-10.)

In the first week of June 2005, a position opened at a new store in Montgomery, Alabama, after Alexander fired the previous General Manager. Rodgers requested a lateral transfer to the new store, which was granted by Cracker Barrel. According to Alexander, he was reluctant to allow the transfer because of Rodgers's past performance problems, but ultimately "decided to allow the transfer because we hoped that [Rodgers's] performance might improve if he had a new store and a new management team." (Alexander Aff. ¶ 24.) According to Cracker Barrel, during June through August 2005, the Montgomery store experienced sales that were below expectations, high numbers of guest complaints, and excessive labor and food costs. (Alexander Aff. ¶ 25.) Rodgers admits responsibility for the store during this time (Rodgers Dep. 157:15-21) and that "[t]he store did not perform well." (Pl.'s Resp. Br. 12.) However, he blames the poor performance on high employee turnover, inherent problems with a new store, and claims that he "was set up to finally fail." (*Id.* at 12-13.)

During his three months in Montgomery, Rodgers's performance was continuously evaluated and criticized by Alexander, first in a lengthy memo on June 17, 2005, then through a string of emails and written warnings, including a final written warning on

August 12, 2005, for the discovery of $233.00 worth of food items that had to be discarded because they were either not labeled or expired.  (Def.'s Mot. Summ. J. Br. 10-12.)  The final written warning also indicated Rodgers's store was "failing" in five operational areas, including sales, guest complaints, food costs, and labor costs. (Doc. # 17-7, at 28.)  Finally, on September 3, 2005, "[f]or on-going poor performance," Rodgers was terminated by Cracker Barrel.  (Doc. # 17-7, at 36.)

### III.  JURISDICTION

Because this case arises under Title VII of the Civil Rights Act of 1964, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and the court finds a sufficient basis for each.

### IV.  STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.  The movant can meet this

burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## V. DISCUSSION

### A.    *Disparate Treatment Claim*

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

7

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Disparate treatment claims may be established through either direct or circumstantial evidence.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).  Direct evidence of discrimination is defined as "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  *Id.* at 1086 (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks omitted)).  Direct evidence is such that it makes it abundantly clear the employer discriminated against the employees on the impermissible basis of race, and it consists of "'only the most blatant remarks, whose intent could mean nothing [else].'"  *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).  "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence."  *Id.*

Rodgers claims that his supervisor's response to his inquiry into the funeral comment is direct evidence of racial discrimination.  According to Rodgers, after he asked Alexander for the status of the investigation, Alexander responded by saying, "Don't forget who you work for."  (Pl.'s Resp. Br. 21.)  This statement fails to suffice as direct evidence of racial discrimination, however.  It is race-neutral and far from a blatant remark whose intent could be mean nothing other than unlawful discrimination.  *See Roberts v. Design & Mfg. Servs., Inc.*, 167 Fed. Appx. 82, 85 (11th Cir. 2006) (noting in the similar context of age discrimination, "the quintessential example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old'" (quoting

*Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997))). Alexander's statement is subject to many interpretations having nothing to do with race. For example, it could be that of any senior employee putting a subordinate in his place for acting out of line or bucking his authority. Therefore, there is no direct evidence of racial discrimination and the only evidence Rodgers can put forth is circumstantial.

The sufficiency of a disparate treatment claim based on circumstantial evidence is tested by applying the *McDonnell Douglas* burden-shifting framework, under which:

> a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. The plaintiff's successful assertion of a *prima facie* case creates a rebuttable presumption that the employer unlawfully discriminated against her. Second, if the plaintiff successfully demonstrates a *prima facie* case, the burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason. We proceed to the third step of the analysis once the employer meets its burden of production by proffering a legitimate, non-discriminatory reason, thereby rebutting the presumption of discrimination, and [our] inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination. Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff.

*Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (citations and internal quotation marks omitted). In order to establish a *prima facie* case of race discrimination under Title VII, the a plaintiff must show that: "(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

"Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Id.* Cracker Barrel does not dispute Rodgers is a member of a protected class or that his termination was an adverse employment action. (Def.'s Mot. Summ. J. Br. 18.)

While both parties argue extensively over whether Rodgers was qualified for the position (*see, e.g.*, *id.* at 2-4; Pl.'s Resp. Br. 3-5), it is a moot point because Rodgers fails to show that similarly situated employees outside of his protected class were treated more favorably. The employees outside of a plaintiff's protected class who are identified as comparators "must be similarly situated 'in all relevant respects.'" *Wilson*, 376 F.3d at 1091 (quoting *Holifield*, 115 F.3d at 1562). Courts "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 n.2 (11th Cir. 2006).

Rodgers claims "there were four Caucasian General Managers under the supervision of Rich Alexander that were performing in the same level and were treated different from him." (Pl.'s Resp. Br. 29.) In his deposition, Rodgers proffers the following General Managers as comparators who were treated more favorably by not having their alleged violations documented by Cracker Barrel: (1) Greg Waters, who missed a meeting (Rodgers Dep. 332:8 - 333:19); (2) Kevin, who was tardy on an unspecified occasion (*id.* at 337:7-13); (3) Kathy, whose store had food product that was

10

discarded (*id.* at 337:14 - 338:10).[6]

These three comparators are wholly inadequate to support a *prima facie* claim of disparate treatment because neither the quantity nor the quality of their alleged misconduct is similar to that of Rodgers. While Rodgers did receive negative evaluations in some of the same areas as the proffered comparators, the quantity of the misconduct is substantially different. Each comparator is alleged to have only a single instance of misconduct; Rodgers accumulated numerous poor evaluations in a wide range of areas, many of them objective, over the course of twelve months and two different stores. Furthermore, the driving force behind Rodgers's termination, as documented in the various evaluations, memos, and emails, had more to do with his overall poor leadership and communication skills than any isolated incident of tardiness, missed meeting, or spoiled food. Because Rodgers has failed to show his employer treated similarly situated employees outside his classification more favorably, he has failed to establish a *prima facie* case of racial discrimination.[7] Cracker Barrel's motion for summary judgment on this claim is due to be granted.

**B.     Retaliation Claim**

"To establish a prima facie showing of retaliation under Title VII, 'the plaintiff must show (1) that [he] engaged in statutorily protected expression; (2) that [he] suffered

---

[6] The fourth General Manager identified is Don, but Rodgers cannot remember how he was treated differently and, therefore, cannot use him as a comparator. (Rodgers Dep. 338:14-15.)

[7] Rodgers further negates his case by arguing he "was the only African American General Manager that worked under Rich Alexander who received repeated disciplinary actions." (Pl.'s Resp. Br. 27.) If true, this only tends to show that Alexander was not motivated by racial animus toward black General Managers in general, but rather performance problems specific to Rodgers.

an adverse employment action; and (3) that there is some causal relation between the two events.'" *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).  Rodgers asserts that his action of reporting Patterson's funeral comment to Cracker Barrel's home office is statutorily protected conduct, and that his subsequent disciplinary actions and eventual termination are adverse employment actions.  He argues causal connection is established because "before the complaint he had been promoted an[d] his record was unblemished, afterward he was constantly written up and disciplined."[8]  (Pl.'s Resp. Br. 34.)

Cracker Barrel argues that Rodgers's reporting of a complaint on behalf of one of his subordinates was not a statutorily protected activity.  Title VII recognizes two forms of conduct statutorily protected from retaliation.  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999).  First, under the opposition clause, an employee is protected from discrimination when "he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  Second, under the participation clause, an employee is also protected when "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.*  Because there was no ongoing EEOC investigation at the time

---

[8]  His entire argument to establish causal connection merely states the following: "Plaintiff can show that before the complaint he had been promoted an [sic] his record was unblemished, afterward he was constantly written up and disciplined.  He was subsequently transferred and terminated shortly thereafter."  (Pl.'s Resp. Br. 34.)

Rodgers reported the funeral comment, the participation clause is inapplicable.  *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 n.3 (11th Cir. 2000).

In order to establish that the activity was statutorily protected under the opposition clause, the plaintiff must show that he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  *Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997); *see also Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311-12 (11th Cir. 2002).  Furthermore, the "plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented."  *Little*, 103 F.3d at 960.  "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law."  *Clover*, 176 F.3d at 1351.  The employer's practice does not have to actually be unlawfully discriminatory; it only "must be close enough to support an objectively reasonable belief that it is."  *Id.*

Rodgers's belief that one partial comment overheard from a subordinate was an unlawful employment practice attributable to Cracker Barrel is not objectively reasonable when measured against Eleventh Circuit case law.  In *Little*, the court held that the expression of opposition to a single comment by one co-worker to another does not constitute opposition to an unlawful employment practice as a matter of law.  *See Little*, 103 F.3d at 959-60 (finding a co-worker's lone racially offensive comment that "Nobody runs this team but a bunch of niggers and I'm going to get rid of them" was not

attributable to the employer, and therefore opposition to the remark did not constitute opposition to an unlawful employment practice).

Even if Rodgers were engaged in statutorily protected conduct, he still fails to establish a causal connection between his report of the funeral comment and his termination six months later. To establish a causal connection, a plaintiff "need only show 'that the protected activity and the adverse action are not completely unrelated.'" *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (quoting *Meeks*, 15 F.3d at 1021). A plaintiff satisfies this element if he shows his employer knew of the protected activity and there was a close temporal proximity between this awareness and the adverse action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Wideman*, 141 F.3d at 1457.

The funeral comment was made in early March 2005. Because Rodgers only heard two words of the comment, he only learned of its entirety upon his return from the funeral. After Schmidt told him the entire comment and complained to him about it, Rodgers phoned in his report of the incident to Cracker Barrel's home office on March 4, 2005. (Doc. # 25-10, at 5.) Rodgers termination was almost exactly six months later, on September 3, 2005, and after he had been given a second chance at a new store. Six months, by itself, is simply too long to establish temporal proximity. *See, e.g.*, *Keith v. MGA, Inc.*, 211 Fed. Appx. 824, 827 (11th Cir. 2006) (finding a four month gap too long); *Higdon*, 393 F.3d at 1220-21 (finding a three month gap too long).

14

Rodgers's argument that "his record was unblemished" before he phoned in the complaint is simply contrary to the evidence.  As already discussed, Rodgers received an extensive negative evaluation on January 28, 2005, where he earned poor scores in objective categories, such as guest complaints, food costs, net operating income, restaurant sales growth and retail sales, along with criticism of his management practices. (*See* Doc. # 17-7, at 17.)  To paint a picture that his problems began only with the filing of the funeral comment complaint is inaccurate and distorts his employment history. Rodgers cannot establish temporal proximity nor any other evidence of a causal connection.  For these reasons, and the lack of an objective belief he was engaged in statutorily protected conduct, Rodgers cannot establish a *prima facie* case of retaliation. Therefore, Cracker Barrel's motion for summary judgment is due to be granted as to the retaliation claim.

**C.    *Hostile Work Environment Claim***

In order to establish a hostile work environment claim, a plaintiff must show the following elements:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  It is the fourth element – sufficiently severe or pervasive harassment – that "tests the mettle of most . . .

harassment claims," *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), and, without belaboring the unnecessary analysis of the remaining elements, Rodgers's claim is no exception.  Rodgers argues the harassment to which he was subjected was a level of scrutiny higher than that given to other general managers.  (Pl.'s Resp. Br. 35.)

Four factors are considered when evaluating the severity of alleged harassment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Miller*, 277 F.3d at 1276.  Upon examination of the factors, the court finds the severity of any alleged harassment to be wholly inadequate to support a *prima facie* case of hostile work environment.

Before engaging in the process of weighing the factors, it is worth examining the conduct to which Rodgers labels "harassment."  Heightened scrutiny of an employee by a supervisor has not been found to constitute harassment in similar hostile work environment claims in at least one other circuit, *see, e.g.*, *Combs-Burge v. Rumsfeld*, 170 Fed. Appx. 856, 862 (4th Cir. 2006) (stating that "counseling [an employee] about performance deficiencies and assigning her remedial tasks to correct those deficiencies . . . is not the type of conduct that is objectively abusive because it was the direct result of the documented shortcomings in [the employee's] job performance"), and has frequently been unsuccessful in the Eleventh Circuit as well.  *See, e.g., Harrington v. Disney Reg'l Entm't, Inc.*, No. 06-12226, 2007 WL 3036873, at *12 (11th Cir. Oct. 19, 2007) (finding

16

no hostile environment where employer's alleged conduct included subjecting the employee to unfair discipline); *Harbuck v. Teets*, 152 Fed. Appx. 846, 848 (11th Cir. 2005) (finding no hostile work environment where employer's alleged conduct included subjecting the employee to heightened scrutiny).

Moreover, in a strikingly similar case where the employee's alleged harassment included being treated less favorably than white comparators, having his hiring decisions vetoed and authority reduced, receiving "tainted" performance evaluations, and being accused of not being a "team player" and labeled a "disgruntled employee," the employee failed to establish a *prima facie* case of hostile work environment because he did not provide any evidence that his allegations were based on his protected status. *Apodaca v. Sec'y of Dep't of Homeland Sec.*, 161 Fed. Appx. 897, 901-02 (11th Cir. 2006). Rodgers also fails to provide evidence the alleged heightened scrutiny was based on his race. The poor evaluations began before he ever complained to Cracker Barrel about the funeral comment. Furthermore, despite being negative overall, the memos, emails, and evaluations conducted by Alexander are often encouraging and supportive, more in the nature of one who is coaching a troubled employee with potential.[9]

---

[9] For example, in his first evaluation as General Manager of the Gardendale store, despite problems in many other areas, Alexander praised Rodgers where he could for his labor costs ("Good Job!"). (Doc. # 17-7, at 17.) He went on to write, "If you follow your plan, listen and quit being so defensive/argumentative when confronted[,] you can succeed as the GM of [the Gardendale store]. You have my 100% support in your endeavors to make some very important behavior changes." (*Id.*) In an internal email to his supervisor on February 22, 2005, Alexander wrote, "I feel Dwight is very talented and capable of being the leader we need him to be, but I feel his is loosing (sic) credibility among the managers and staff due to his off-beam behaviors." (Doc. # 17-4, at 6.) These words do not reflect a discriminatorily abusive working environment.

In conclusion, Rodgers presents no evidence he was subject to a different level of scrutiny than any other general manager of a store suffering from the same type of problems as his. He fails to present any evidence indicating the heightened scrutiny, if it did exist, was because of his race and not his individual performance. The evaluations, while critical (as evaluations are by their very nature), do not rise to a level of severity such that they could objectively and reasonably alter the terms and conditions of Rodgers's employment. On the contrary, they are an appropriate form of employee development and management. "Title VII is not designed to make federal courts 'sit as a super-personnel department that reexamines an entity's business decisions.'" *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Rodgers cannot establish a *prima facie* claim of hostile work environment, and Cracker Barrel's motion for summary judgment with respect to this claim is due to be granted.

## VI. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the defendant's Motion for Summary Judgment (Doc. # 16) is GRANTED as to each and every claim brought by the plaintiff.

An appropriate judgment will be entered.

DONE this 28th day of January, 2008.

      /s/  W. Keith Watkins
UNITED STATES DISTRICT JUDGE

18